## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| **DARON JEROME WILLIS AND** | § | |
| **SUBRINNA LYNN COLEMAN,** | § | |
| **Individually and as Next Friend of** | § | |
| **SDW, a Minor,** | § | |
| **Plaintiffs** | § | **CIVIL ACTION NO. 1:14-cv-00314** |
| | § | |
| **VS.** | § | |
| | § | |
| **BEAUMONT INDEPENDENT** | § | |
| **SCHOOL DISTRICT, ET AL,** | § | |
| **Defendants** | § | |

### PLAINTIFFS' EXPERT DISCLOSURE

TO:    Defendant Beaumont Independent School District, by and through its counsel of
record, Ms. Frances R. Broussard and Mr. Christopher G. Gilbert, THOMPSON
& HORTON LLP, Phoenix Tower, Suite 2000, 3200 Southwest Freeway,
Houston, TX  77027-7554, **VIA CERTIFIED MAIL NO. 7011 2970 0004 1653
4020**.

Defendant Stephen Rivers, by and through his counsel of record, Mr. James E.
Byrom and Ms. Kelley L. Kalchthaler, WALSH, ANDERSON GALLEGOS,
GLENN & TREVINO, PC, 10375 Richmond Avenue, Suite 750, Houston, TX
77042-4196, **VIA CERTIFIED MAIL NO. 7011 2970 0004 1653 4013**.

Plaintiffs, Daron Jerome Willis and Subrinna Lynn Coleman, Individually and As

Next Friend of SDW, a Minor, make these expert disclosures as required by Federal

Rule of Civil Procedure 26(a)(2).

### IDENTITY OF NON-RETAINED EXPERTS

1.    The following persons may be used at trial to present evidence under Federal Rule
of Evidence 702, 703, or 705:

   a.    Plaintiffs designate all those experts identified by Defendant.

   b.    Plaintiffs designate the following medical providers who treated Minor
Plaintiff and may testify as to his medical and mental condition following the
incident made the basis of this suit.  These medical providers have not been
retained or employed by Plaintiffs.

   1.    Medical Providers for
City of Beaumont EMS
P. O. Box 3827
Cash Management - EMS

**EXHIBIT 1**

Beaumont, TX  77704-3827
(409) 880-3148

Including but not limited to:
Phillip Kimbrow
Kyle LaRose

2.    Medical Providers for
Christus St. Elizabeth Hospital
2830 Calder
Beaumont, TX  77702-1809
(409) 892-7171

Including but not limited to:
Morgan Nelson, RN
Gerard R. Tiffault, MD

3.    Medical Providers for
Jefferson Emergency Medicine
3303 S. Meridian Ave.
Oklahoma City, OK  73119
(800) 225-0953

4.    Medical Providers for
Radiology Associates
P. O. Box 12480
Beaumont, TX  77726-2480
(409) 899-3682

5.    Medical Providers for
Beaumont Pediatrics
3127 College Street
Beaumont, TX 77701
(409) 899-1433

Including but not limited to:
Elias Ezike, M.D.

6.    Medical Providers for
Texas Children's Hospital
Orthopaedic Surgery
6701 Fannin
Houston, TX  77030-2399
(832) 824-1000

Including but not limited to:
Susannah M. Ferguson, PA-C

c.    Plaintiffs designate the following custodians of records for the medical
providers  designated  above.    The  custodians  may  testify  as  to  the

authenticity of the medical records and bills as well as the charges being reasonable and necessary.  These custodians have not been retained or employed by Plaintiffs.

1.    Custodians of Medical and Billing Records for
City of Beaumont EMS
P. O. Box 3827
Cash Management - EMS
Beaumont, TX  77704-3827
(409) 880-3148

2.    Custodians of Medical and Billing Records for
Christus St. Elizabeth Hospital
2830 Calder
Beaumont, TX  77702-1809
(409) 892-7171

3.    Custodians of Medical and Billing Records for
Jefferson Emergency Medicine
3303 S. Meridian Ave.
Oklahoma City, OK  73119
(800) 225-0953

4.    Custodians of Medical and Billing Records for
Radiology Associates
P. O. Box 12480
Beaumont, TX  77726-2480
(409) 899-3682

5.    Custodians of Medical and Billing Records for
Beaumont Pediatrics
3127 College Street
Beaumont, TX 77701
(409) 899-1433

6.    Custodians of Medical and Billing Records for
Texas Children's Hospital
Orthopaedic Surgery
6701 Fannin
Houston, TX  77030-2399
(832) 824-1000

7.    Custodian of Medical and Billing Records of
CVS Pharmacy
One CVS Drive
Woonsocket, RI
(800) 287-2414

8.    Custodian of Medical and Billing Records of
Walgreens

1901 E Voorhees Street, Suite 735
Danville, IL 61834

d.   Law enforcement and/or Investigators who responded to and/or investigated the incident made the basis of this suit. The following persons were either present during the incident and/or responded to the scene of the incident and/or was involved in the investigation of the subject incident. These individuals may have opinions, factual knowledge, and other information consistent with the previously-produced incident report and/or the previously-produced witness statements. These individuals include but are not limited to the following:

1.   Aqua Delco
     Beaumont ISD Police Department
     1025 Woodrow Street
     Beaumont, TX 77705
     (409) 617-7001
     Aqua Delco is employed as the Administrative Sergeant for the Beaumont ISD Police Department.

2.   Melisa Moore
     BISD Public Safety Officer
     West Brook High School
     8750 Phelan Blvd.
     Beaumont, TX 77706
     (409) 617-5500
     Security guard that initially intervened in the altercation; witnessed the incident made basis of this suit.

3.   Sergeant Eric Payne
     Beaumont ISD Police Dept.
     1025 Woodrow Street
     Beaumont, TX 77705
     (409) 617-7001
     Conducted an internal investigation regarding the incident; contacted Plaintiff Subrinna Coleman and requested a statement from Minor Plaintiff

4.   Sergeant David Hall
     Beaumont ISD Police Dept.
     1025 Woodrow Street
     Beaumont, TX 77705
     (409) 617-7001
     Was on duty at the school when the incident occurred; arrived at the scene of the incident and witnessed Officer Rivers and PSO Moore had Minor Plaintiff on the ground

5.   Chief Clydell Duncan
     Beaumont ISD Police Dept.
     1025 Woodrow Street

Beaumont, TX 77705
(409) 617-7001
Defendant River's supervisor at the time of the incident and the person responsible for placing defendant Rivers on administrative leave and for initiating an investigation into the incident made the basis of this suit

6.     Detective Sgt. Danny Moore
Beaumont ISD Police Dept.
1025 Woodrow Street
Beaumont, TX 77705
(409) 617-7001
Received a copy of the video taken of the incident from Defendant Rivers for review

## IDENTITY OF RETAINED OR SPECIALLY EMPLOYED EXPERTS

2.     The following persons are those whom Plaintiffs have retained or specially employed to provide expert testimony or whose duties as Plaintiffs' employee regularly involve giving expert testimony:  Ken Wheatley MA, CPP

3.     For each expert, Plaintiffs attach the following:

a. A report prepared and signed by the expert in compliance with Rule 26(a)(2)(B).
**See expert preliminary report prepared by Ken Wheatley MA, CPP dated October 10, 2014 attached.**

b. A complete statement of all opinion to be expressed and the bases and reasons for them.
**See expert preliminary report prepared by Ken Wheatley MA, CPP dated October 10, 2014 attached.**

c. The data or other information considered in forming the opinions.
**See expert preliminary report prepared by Ken Wheatley MA, CPP dated October 10, 2014 attached.**

d. A description of exhibits to be used as a summary or in support of those opinions.
**See expert preliminary report prepared by Ken Wheatley MA, CPP dated October 10, 2014 attached.  The report refers to the following documents used to support Ken Wheatley's opinion:**

1.     **BISD Police Department Offense Report, dated 03/07/14 submitted by Officer Stephen Rivers.**

2.     **BISD Police Department Supplement Case Report, dated 03/07/14 submitted by Detective Sgt. Danny Moore.**

3.  BISD Police Department Follow-up Case Report, dated 03/07/14 submitted by Sgt. Eric Payne.

4.  BISD Police Department Property Case Report, dated 03/07/14 (video recording of incident).

5.  BISD Police Department Voluntary Statement of MeLisa Moore, dated 03/18/14.

6.  Handwritten Witness Statement form of Randall Maxwell.

7.  Handwritten Witness Statement form of Rachiel Guidry.

8.  Handwritten Witness Statement form of the mother of person engaged in altercation with Minor Plaintiff (name redacted).

9.  Handwritten Witness Statement form of person engaged in altercation with Minor Plaintiff (name redacted).

10. Handwritten Witness Statement form of a person (name redacted) but signed by Karma Savory.

11. Computer printout records search for S██████ W███ dated 03/20/14.

12. Computer printout regarding S██████ W██ listing Dispatcher Janet flanagan, dated 03/20/14.

13. Computer printout from NCIC regarding S██████ W███.

14. Communication (3 pages) from Sgt. Payne to Chief Duncan regarding internal investigation dated 05/09/14.

15. Letter from Fred Patterson to unknown recipient regarding his opinion of the event and use of force.

16. Statement of Officer Rivers dated 03/26/14.

17  Statement from Sgt. David Hall.

18. Force Incident Data Report - Officer name omitted.

19. BISD Police Department Reporting Information Form on Restraint Use.

20. Black and white photo of police officer kneeling down and a person lying on the ground.

21. Plaintiff's Original Petition.

      22.     **Article in MailOnline of a purported interview with Chief Clydell Duncan.**

   e.  A curriculum vitae, resume, or other listing of each expert's qualifications.
       **See CV of Ken Wheatley MA, CPP attached.**

   f.  A list of all publications authored by the expert within the last ten years.
       **See list of publications authored by Ken Wheatley MA, CPP attached.**

   g.  A list of all other cases in which the expert has testified as an expert at trial or by deposition within the last four years.
       **Ken Wheatley MA, CPP has not testified within the last four years attached.**

4.      The listed expert will be compensated at a rate of $300.00 per hour.

                         Respectfully submitted,

                         **WELLER, GREEN, TOUPS & TERRELL, L.L.P.**

                         By: /s/ *B. Adam Terrell*
                              **B. ADAM TERRELL**
                              **STATE BAR NO. 19790900**
                              **P. O. Box 350**
                              **Beaumont, Texas 77704-0350**
                              **(409) 838-0101**
                              **(409) 832-2940 (FAX)**

                         **ATTORNEY FOR PLAINTIFFS DARON JEROME WILLIS AND SUBRINNA LYNN COLEMAN, INDIVIDUALLY AND AS NEXT FRIEND OF S███████D███████W████, A MINOR**

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that a true and correct copy of this instrument has been served upon all counsel of record in this cause and all other parties entitled to same in accordance with the Texas Rules of Civil Procedure on this 15th day of October, 2014.

                        /s/ *B. Adam Terrell*
                        **B. ADAM TERRELL**

Use of Force Expert Report

In the matter of

Daron Jerome Willis and Subrinna Lynn Coleman, et al, Plaintiffs

vs

Beaumont Independent School District, et al, Defendants

Civil Action Number: 1:14-CV-00314


Prepared for:

Attorney B. Adam Terrell

Weller, Green, Toups & Terrell, L.L.P.

Bank of America Tower

2615 Calder Street

Suite 400

Beaumont, TX 77702


Prepared by:

Ken Wheatley MA, CPP

Royal Security Group, LLC

P.O. Box 501722

San Diego, CA 92150


Report Date: October 10, 2014


1

## Introduction

This is my preliminary expert report in the matter of Daron Jerome Willis, et al, (Plaintiffs) vs Beaumont Independent School District, et al (Defendants), hereafter referred to as BISD.

I was retained in this matter by Attorney B. Adam Terrell of law firm: Weller, Green, Toups & Terrell, L.L.P. on September 22, 2014. Attorney Terrell represents Mr. Daron Jerome Willis, et al.

This matter concerns the use of force by Officer Stephen Rivers during an attempt to restrain S█████ W███, a student at West Brook High School, which resulted in Officer Rivers breaking S█████ W██' arm. This event occurred on March 7, 2014 at West Brook High School in Beaumont, Texas.

Attorney Terrell retained me to provide an opinion on the appropriateness of the actions taken by Officer Rivers to restrain S█████ W██.

## Methodology and Qualifications

The methodology for the analysis utilized in this case is consistent with good and accepted practices within the security industry, (See Exhibit A: IAPSC Forensic Methodology), and, specific to this matter, Exhibit B: IAPSC Use Of Force Best Practice, and Exhibit C: IACP (International Association of Chiefs of Police) National Law Enforcement Policy Center 2006 Use of Force Model Policy.)

This analysis was performed reviewing documents available to me as of October 10, 2014, (listed below), and by applying my education, training, and experience to the facts of this case. Specific to this matter, my training and experience in martial arts (judo and ju juitsu), military service (U.S. Air Force), law enforcement (FBI Special

Agent), and a team leader on the San Diego Citizens Review Board on Police Practices (See Exhibit D: Curriculum Vitae of Ken Wheatley).

Documents/information lacking at this point to conduct a complete review and evaluation of the matter include, but are not limited to:

1. Copies of Officer Rivers' personnel file, including disciplinary action reports, if any.
2. Copies of Public Security Officer MeLisa Moore's personnel file, including disciplinary action reports, if any.
3. Weight of Officer Rivers and Officer Moore on the date of the event.
4. A copy of the training records and any notations, for Rivers and Moore.
5. A copy of the Police Department's Defensive Tactics manual
6. A copy of the Police Department's Use Of Force policy
7. Any information available regarding the "great deal of controversy" referred to by Mr. Fred Patterson, expert witness for Defendant(s).
8. Depositions of Officers Rivers and Moore
9. Deposition of Sgt. Eric Payne
10. Deposition of Police Chief Clydell Duncan
11. Deposition of S█████ W███
12. Deposition of Defensive Tactics instructor who trained/recertified Officer Rivers
13. Any other witness statements/videos/depositions not provided to date

My opinions, while preliminary in nature, are based on a review of the following documents provided to date and may be modified or supplemented upon further discovery:

3

1. BISD Police Department Offense Report, dated 3/7/14 at 15:00 (3pm), submitted by Officer Stephen Rivers

2. BISD Police Department Supplement Case Report, dated 3/7/14 at 15:00 (3pm) submitted by Detective Sgt. Danny Moore

3. BISD Police Department Follow-up Case Report, dated 3/7/14 at 15:00 (3pm) submitted by Sgt. Eric Payne

4. BISD Police Department Property Case Report, dated 3/7/14 (Description - DVD video recording of incident)

5. BISD Police Department Voluntary Statement of MeLisa Moore, dated March 18, 2014.

6. Handwritten Witness Statement form of Randall Maxwell, taken by Sgt. Payne, on 3/21/14. No time listed.

7. Handwritten Witness Statement form of Rachiel Guidry, taken by Sgt. Payne, on 3/19/14 at 1300 (1pm)

8. Handwritten Witness Statement form of NAME REDACTED (mother of person engaged in fight with W█████), taken by Sgt. Payne on 3/20/14 at 12:05pm

9. Handwritten Witness Statement form of NAME REDACTED (person engaged in fight with W████), taken by Sgt. Payne on 3/20/14 at 11:50am

10. Handwritten Witness Statement form of NAME REDACTED (however, form signed by Karma Savoy), taken by Sgt. Payne on 3/20/2014 at 12:15pm

11. Computer printout on a records search for S████████W███, dated 3/20/2014, time 9:38am

12. Computer printout regarding S████████W████ listing Dispatcher Janet Flanagan, dated 3/20/2014, time 9:39am

4

13. Computer printout from NCIC (National Crime Information Center) regarding S███ W██ dated 3/20/2014

14. 3 page communication dated 5/9/2014 from Sgt. Payne to Chief Duncan regarding internal investigation of March 7, 2014 incident

15. 2 page letter from Fred Patterson to unnamed recipients(s) regarding his opinion of the event and use of force.

16. 3 page, typed statement from Officer Rivers, with cover document, dated March 26, 2014

17. Typed statement from Sgt. David Hall

18. Force Incident Data Report - Officer name omitted and form not signed by supervisor.

19. BISD Police Department Reporting Information Form on Restraint Use. Copy provided contained mostly illegible information. Of very limited use.

20. Black and white photo of a police officer kneeling down, leaning over a person laying on the ground. Another person, wearing what appears to be a reflective vest, is standing just to the left of the police officer who is kneeling.

21. Plaintiff's Original Petition

22. Article in MailOnline, an online publication of the United Kingdom – based, Daily Mail, of a purported interview with Chief Clydell Duncan.

## The Incident

On Friday, March 7, 2014, at approximately 3pm, Mr. S███ W██ - according to witness statements - became involved in a physical altercation with another student. Mr. W██ is a 17 year old male student at West Brook High School in Beaumont Texas.

5

According to the cellphone video provided, BISD Public Security Officer, MeLisa Moore, approached W█ from behind and attempted to separate W█ from the other person by wrapping her arms around W█' upper body and pulling him away. (It's unclear from the audio in the video as to whether Moore identified herself).

W█ struggled against Moore in what appears to be an attempt to break free from her. Just as it appears that W█ is about to break free, Officer Rivers enters the scene and quickly approaches W█ from the front and grabs W█ as W█ and Officer Moore start falling to the ground.

W█ is then laying on the ground, partially on his right side. About half of Officer Moore's body is laying on top of W█' upper body, from approximately his head to his waist. Officer Moore's left arm is wrapped under W█' upper body, just under his left armpit. It's unclear from the video where her right hand/arm are located.

Officer Rivers is partially on top of Officer Moore when she's on top of W█

When Officer Rivers lifts up off Moore you can see that Rivers is using his right hand to press W█ head to the ground. W█ left hand is next to his head and Officer Rivers uses his left hand to pull W█ left hand and arm back, and up, towards Rivers' body. Moore has W█ pinned to the ground using her weight and leverage.

Rivers grabs W█ left hand with his right hand, and closes his fingers over W█' fingers, forming a ball. Rivers grabs W█' wrist with his left hand, closing his fingers around W█' wrist, and in one fluid motion, using his weight, pushes W█ arm forward and to the left, away from W█' head. You hear a snap and W█ scream.

6

## Opinion and Conclusion

Given the chaotic scene, this incident required the application of non-deadly force to separate the subjects and restrain Mr. W█ from harming himself or others. This force includes any physical effort to control or restrain Mr. W█.

In his March 26, 2014 Statement, on page 2, Officer Rivers said: "...The unidentified male observed me approaching and aggressively tried a (sic) punch me in the head. His (Mr. S█████ W█) swing was short but it allowed me to grab him and try to get the student under control. The student continued to ignore requests to calm down and continued to be non-compliant."

In the same Statement, Officer Rivers wrote, "I immediately began an open-hand behind the back pin maneuver in an attempt to control the subject, who continued to be non-compliant. He (W█ continued to ignore requests to calm down and he continued his struggle as we fell to the ground..."

Officer Rivers didn't physically engage Mr. W█ until Mr. W█ and Officer Moore started to fall to the ground. The video does not show Office Rivers employing the behind the back pin maneuver for the brief seconds that they are standing.

Officer Rivers, or Officer Moore can't be heard on the video issuing any commands for Mr. W█ to calm down.

When restraining Mr. W█ on the ground, in my opinion, Officer Rivers should have used the level of force that was objectively reasonable to bring Mr. W█ under control.

"Objectively reasonable", as defined by the 2006 Use of Force Model Policy from the International Association of Chiefs of Police (IACP) National Law Enforcement

7

Policy Center means that Officer Rivers should have determined "the necessity for force and appropriate level of force…" after evaluating the situation to include, "…but not limited to: the seriousness of the crime, the level of threat or resistance presented by the subject, and danger to the community."

Based on the video, Mr. W█████ was restrained, on the ground, by Officer Moore laying on him, and by Officer Rivers pressing Mr. W███ head to the ground. Officer Rivers also had control of Mr. W███ left hand. At that point, Mr. W███ was not a danger to the community and his ability to resist was greatly impacted by both Officer Moore laying on him, and Officer Rivers having control of his left arm and hand.

From a crisis intervention and control perspective, Officer Rivers could have stopped there, or certainly have paused long enough to get close to Mr. W███ ear to identify himself as a police officer and issue commands to calm down and stop resisting.

The maneuver Officer Rivers attempted unsuccessfully to employ is a standard pain compliance/control technique taught at law enforcement academies. At various times it's referred to as:

- an arm pin
- empty hand arm pin
- common arm lock
- open-hand-behind-the-back-pin

To prevent injury, there are a few steps an officer should follow:

- The officer should keep the person's hand and arm very close to their back and sweep "up" along the back, starting at the top of the buttocks and

8

moving toward the shoulder-blade, until resistance is felt, and pause, while maintaining physical control of the hand and arm.

- They should monitor the person's physical and verbal reactions at that point to either stop and hold, until handcuffs can be applied, or continue, slowly, to adjust upward tension until compliance is achieved.
- To further maintain control of the hands and arms, and increase compliance, two or more fingers on the hand that's being controlled can be grabbed and maneuvered to hasten compliance.
- If accessible, the section of the arm being controlled between the elbow and shoulder should be stabilized against the inner thigh of the officer to prevent injury to the subject and control their movements. This would also allow the officer to keep the person's arm against the person's body, maintain better control, and reduce the amount of leverage required to obtain compliance.

These actions should be coupled with loud verbal commands to ensure the subject can hear the officer.

In this case, given the presence of Officer Moore on the back of Mr. W█. Officer Rivers should have evaluated the situation, based on his training, and determined that he couldn't successfully apply the arm pin without risking injury to Mr. W█

Officer Rivers already had control of Mr. W█ left arm and hand, so he could have selected a different control technique, perhaps an arm bar or wrist control. His proficiency to consider alternative techniques, and his ability to perform under stress, is a function of how well and how frequently Officer Rivers has trained, per Department regulations.

9

The training Officer Rivers received needs to be determined as there are conflicting, or missing, interpretations of whether he applied the proper technique, or the technique properly.

Officer Rivers' written accounts (March 7, 2014 and March 26, 2014) about his altercation with W███ are not consistent with the video.

In the March 7, 2014 report, Officer Rivers states that "…I was able to grab W███ left wrist with my right hand and his upper arm with my left. I then began to pull his arm behind his back in a standard empty-hand arm pin maneuver per the use of force continuum to gain control of him. As I was doing this we were falling to the ground. I continued this maneuver once on the ground."

Mr. W███ and Officer Moore were starting to fall to the ground when Officer Rivers first engages Mr. W███, so he wasn't in a position to employ the arm pin maneuver, as he described, at that point.

In the March 26, 2014 statement that he provided to Sgt. Payne, Officer Rivers said that he "…immediately began an open-hand behind the back pin maneuver in an attempt to control the subject…" prior to them falling to the ground. That is not evident in the video.

In the same Statement, Officer Rivers also stated that, "…Once on the ground the subject continued to struggle and it took me using both hands to be able to begin to pull his arm up behind his back…" That description is not consistent with the video.

Sgt. Payne, in his May 9, 2014 report to Chief Duncan, finds that Officer Rivers didn't violate the department's Use of Force policy, but he doesn't address whether Officer Rivers applied the right technique, or the technique properly.

10

Mr. Fred Patterson's March 26, 2014 statement indicates that "...the need to gain control of a struggling individual using a basic technique while being partially blocked by a 3rd party – is not a scenario that an officer anticipates or trains specifically for."

I would proffer that, while this specific scenario may not have been taught during Mr. Peterson's tenure at the Academy, my experience is that an officer is trained in a myriad of "moves" or techniques and needs to use judgment in the field when determining what technique is most appropriate for the given situation.

Lastly, Chief Duncan allegedly stated during an April 15, 2014 interview with MailOnline, that "...Rivers broke the student's arm because he used an improper technique while trying to handcuff him, placing his arm forward instead of backward..." And "...We have not determined the circumstance for improper technique...."

These alleged statements by Chief Duncan were made after the internal investigation report issued by Sgt. Payne. So it's important to determine if a supplemental report was issued by Sgt. Payne that addresses the technique used.

**Exhibit A**

**IAPSC Forensic Methodology**



## FORENSIC METHODOLOGY

### Table of Contents

POSITION STATEMENT ........................................................................................... 2
EVIDENCE REVIEW – THE PROCESS .................................................................. 2
RISK ASSESSMENT ............................................................................................... 3
THREAT ASSESSMENT .......................................................................................... 3
VULNERABILITY ASSESSMENT / SECURITY SURVEY ........................................ 4
ANALYSIS AND OPINIONS ..................................................................................... 6
BIBLIOGRAPHY / REFERENCES ........................................................................... 6
FORENSIC SECURITY COMMITTEE MEMBERS .................................................... 8
CASES CITING METHODOLOGY ............................................................................ 8
DOCUMENT REVISION HISTORY ........................................................................... 8

The International Association of Professional Security Consultants has issued this consensus-based and peer-reviewed Best Practice for the guidance of and voluntary use by businesses and individuals who deal or may deal with the issues addressed in the context of third-party premises security litigation.

## POSITION STATEMENT

The International Association of Professional Security Consultants does hereby recognize that its members will be called upon to perform as "Forensic Consultants" and serve as Expert Witnesses in a court of law or other legal proceeding. The purpose of these guidelines is to meet the need for a standardized methodology used in the evaluation of premises security cases.

It is recognized that the task of the Forensic Consultant is one of education. Forensic Consultants will provide their opinion(s) to the client, to opposing counsel during deposition, in response to written interrogatories, in reports, and to the judge and jury at trial or any other lawfully convened hearing. This is done with the goal of making others aware of the security issues and contributing to a just and proper conclusion on the litigation.

The responsibility of the Forensic Consultant lies within our system of justice and the ethics of the security profession. The opinions so offered are made as an objective expert witness/consultant, without any financial or other interest in the outcome of the litigation.

Forensic Consultants will, at all times, be forthright, honest and precise in evolving the ultimate conclusion(s) and opinion(s). The opinion(s) will be the result of a review of all available documentation and discovery material presented by all parties to the litigation. Site inspections and analytical procedures generally followed by the "Forensic Consultant" are described in these guidelines.

The following methodology is to be used in a typical premises security case. The Forensic Consultant is expected to exercise diligence in requesting and/or obtaining information that the Consultant reasonably believes is relevant to the facts and circumstances of the case. *It is reasonable to expect variations of the steps, with some steps deleted and others added as the facts and circumstances of the case being analyzed warrant.*

## EVIDENCE REVIEW – THE PROCESS

In the context of this Guideline, the Forensic Consultant will review and analyze various information, whether produced during the discovery process of the litigation or otherwise obtained through research, common knowledge, investigation, and/or other legal means which allows the Consultant to identify factors leading to an understanding of the crime risks present at the time of the criminal event.

Types of evidence generally available to the Forensic Consultant include, but are not limited, to the following:

1.     Complaint/Petition

13

2.  Police Report
3.  Site and Immediate Vicinity Crime History
4.  Interrogatories and Responses
5.  Requests for Production of Documents and Responses
6.  Requests for Admissions and Responses
7.  Affidavits, Witness Statements and Interviews
8.  Depositions
9.  Expert Witness Reports
10. Medical Records Relating to the Facts of the Case
11. Photographs, Video and Audio Recordings, etc.
12. Other Related Evidence

**RISK ASSESSMENT**

A risk assessment is the general process of identifying and prioritizing risks. It is a qualitative, quantitative, or hybrid assessment that seeks to determine the likelihood that criminals will successfully exploit a vulnerability or compromise a security countermeasure.

There are two main components to a risk assessment: a threat assessment and a vulnerability assessment. The threat assessment is an evaluation of the various sources for crime threats. The vulnerability assessment, which includes a security survey, is an analysis of the weaknesses in a security program.

The security survey, along with documented evidence, is the means by which security measures utilized and/or available at the facility at the time of the incident leading to the incident that is the subject of the litigation are identified and analyzed.

A risk assessment provides the foundation for effectively implementing countermeasures.

**THREAT ASSESSMENT**

A threat assessment is an evaluation of events that can adversely affect operations and/or specific assets. Historical information is a primary source for threat assessments, including past criminal and terrorist events. A comprehensive threat assessment considers actual, inherent, and potential threats.

1.  Actual Threats

    a.  The crime history against an asset or at a facility where the asset is located. Actual threats are a quantitative element of a threat assessment.
    b.  Relevant crimes on the premises (three to five years prior to the date of the incident)

14

    c. Relevant crimes in the immediate vicinity of the facility (three to five years prior to the date of the incident) as defined by and deemed relevant by the security expert

2.    Inherent Threats

Threats that exist by virtue of the inherent nature or characteristics of the facility or nature of the operation. For example, certain types of facilities or assets may be a crime magnet or prone to loss, damage or destruction (e.g., assaults among patrons in nightclubs, infant abductions from hospital nurseries, etc.).

3.    Potential Threats

Threats which exist by virtue of vulnerabilities around the asset or weaknesses in the security program which produce opportunities for crime to occur.

## VULNERABILITY ASSESSMENT / SECURITY SURVEY

The vulnerability assessment is an analysis of security weaknesses and opportunities for criminal activity. A security survey is the fundamental tool for collecting information used in the vulnerability assessment.

A security survey is a physical survey of the scene of the incident and areas/functions that are applicable to the incident to achieve a meaningful understanding of information that has potential application to the matter in litigation.

1.    Incident Review

    a. Police incident and investigation report

    b. Proprietary incident report

    c. Medical records (emergency room and/or autopsy as it relates to information about the occurrence of the incident)

    d. Other sources of information about how the incident occurred

2.    Site Inspection - Inspect site where the incident occurred and the surrounding relevant area. *(Note: Not all cases will require site inspections, nor is it always possible to conduct site views - e.g., if the site has been altered substantially or*

15

*no longer exists). Further, the facts of some cases and potential liability issues are not related to the site/property layout, design, or other physical attributes. As such, a site inspection may be unnecessary.*

    a.  Determine layout of the premises

    b.  Evaluate relevant factors (lighting, lines of sight, places of concealment, remoteness, accessibility, security measures, conditions, etc.)

    c.  If and when appropriate and as allowed by local rules of evidence, interview those with knowledge of the incident and/or the premises/surrounding area (this is often covered in depositions, police interviews and private investigators' investigations)

    d.  Review relevant documentation (lease, contract, diagram, map, etc.)

    e.  Assess the characteristics of the surrounding area

3.    Security Personnel

    a.  Review security officer(s) actions, staffing levels, post orders, duty hours, equipment provided, tours, evaluations, training, hiring procedures and supervision

    b.  Review law enforcement presence and actions (e.g., on-duty, police details, etc.)

    c.  Review roles and actions of non-security related persons who may have participated in the security program and/or incident

    d.  Assess the qualifications and performance of owner/management personnel overseeing the security program

4.    Security Program

    a.  Review security related policies and procedures

    b.  Review risk assessments performed prior to the date of the incident

    c.  Review daily activity reports, job descriptions, incident reports and internal correspondence

    d.  Review security services contract

    e.  Review security manuals

16

    f.  Review training manuals and materials

    g.  Interview parties and/or review depositions regarding employees' understanding of their duties, and all customs and undocumented practices

    h.  Review changes to security prior to the incident

    i.  Evaluate the qualifications and experience of security management and supervisory personnel

5.    Security Equipment

    a.  Review building design and site plans

    b.  Inspect all security devices related to the incident

    c.  Inspect all structural security features

    d.  Determine the position, function and maintenance status of the relevant security equipment and features

    e.  Determine levels of illumination, if relevant

## ANALYSIS AND OPINIONS

The security expert will determine the level of adequacy of security at the location of the incident on the date and at the time the incident occurred. This will be based on the information obtained in the previous steps, and the application of a qualitative analysis based on experience, education and training.

Based upon the analysis, the expert will reach conclusions on the issues of foreseeability, preventability and causation (i.e., terms as used in the security profession). At this point the expert has formed opinions and is prepared to provide a written report, be deposed and/or testify at trial. Those opinions will state the detailed bases for the findings, including evidence, standards, best practices and guidelines, where applicable.

## BIBLIOGRAPHY / REFERENCES

The process of evaluating the risk of crime at a specific location or geographical area is widely recognized and has been adopted nationwide by private industry, public law enforcement, municipalities, and other governmental agencies. The following published

sources reference the process used to perform a crime risk analysis. *This is not all-inclusive, but a representative sampling of available references.*

This bibliography is not to be construed in any way as an endorsement by the International Association of Professional Security Consultants of the publications or the respective authors.

ASIS International (2003). *General Security Risk Assessment Guideline.* Alexandria, VA.

Bates, Norman D. (1997). "Foreseeability of Crime and Adequacy of Security", Accident Prevention Manual for Business & Industry, Security Management, National Safety Council.

Broder, James F. (2006). *Risk Analysis and the Security Survey*, Boston, MA: Butterworth-Heinemann.

Crowe, Timothy D. (2000). *Crime Prevention Through Environmental Design*, National Crime Prevention Institute, Boston, MA: Butterworth-Heinemann.

Department of the Navy, Naval Facilities Engineering Command, (1983). *Physical Security Design Manual 13.1,* Washington, DC: Government Printing Office.

Eck, John E. and Weisburd, David (1995). Crime and Place. Monsey, NY: Criminal Justice Press (Police Executive Research Forum).

Gottlieb, Stephen, Sheldon Arenberg, and Raj Singh (1998). Crime Analysis: From First Report to Final Arrest. Montclair, CA: Alpha Publishing.

International Association of Crime Analysts (2004). Exploring Crime Analysis. Overland Park, KS: International Association of Crime Analysts.

Miethe, Terance D. and Richard McCorkle (1998). Crime Profiles: The Anatomy of Dangerous Persons, Places, and Situations. Los Angeles: Roxbury Publishing Company.

National Crime Prevention Institute (2001). *Understanding Crime Prevention*, Boston, MA: Butterworth-Heinemann.

"*Premises Security Experts and Admissibility Considerations Under Daubert and Kumho: A Revised Standard*", Norman D. Bates and Danielle A. Frank, Suffolk Journal of Trial and Appellate Advocacy, June 2010

U.S. Army Corps of Engineers (1990). *Security Engineering Manual,* Missouri River Division/Omaha District.

U.S. Department of Justice, Federal Bureau of Investigation, *"UCR: Uniform Crime Reporting Handbook"* Revised 2004, U.S. Government Printing Office, Washington, D.C.

U.S. Department of Justice (1995). *Vulnerability Assessment of Federal Facilities,* Washington, DC: Government Printing Office

Sennewald, Charles A. (2003). Effective Security Management. 4th Edition. Woburn: Butterworth-Heinemann.

Vellani, Karim H. (2006). Strategic Security Management: A Risk Assessment Guide for Decision Makers. Woburn: Butterworth-Heinemann.

## FORENSIC SECURITY COMMITTEE MEMBERS

Norman D. Bates, Esq., Committee Chairman; President, Liability Consultants, Inc.
John Case, CPP, John Case & Associates
James H. Clark, CPP, Managing Partner, Clark Security Group, LLC
Lance Foster, CPP, CSC, Security Associates, Inc.
William A. Hawthorne, CPP, CSC, William A. Hawthorne Associates, Inc.
Steve Kaufer, CPP, CSC, Inter/Action Associates, Inc.
Robert Shellow, Ph.D, CSC, Fellow, APA, President, IMAR Corporation
Ira S. Somerson, BCFE, CPP, CSC, Loss Management Consultants, Inc.
Karim Vellani, CPP, CSC, Threat Analysis Group, LLC
Ralph W. Witherspoon, CPP, CSC, Witherspoon Security Consulting
Alan W. Zajic, CPP, CSP, AWZ Consulting

## CASES CITING METHODOLOGY

Childress v. Kentucky Oaks Mall, 2007 WL 2772299 (W.D. KY) 2007

Reinaldo Robles Del Valle, et al v. Vornado Realty Trust, 06-1818 US Dist. Crt., Puerto Rico, 2009

## DOCUMENT REVISION HISTORY

Initial Release: June 2000 approved by the IAPSC membership in attendance at the annual meeting.

Revised: May 2, 2005 with approval by the IAPSC membership in attendance at the annual meeting.

Revised: November 2008 with approval of the Board of Directors

Revised: November 2011 by Forensic Security Committee – minor formatting changes and addition of "Premises Security Experts…" article to bibliography.

Revised: April 28, 2014 with approval of IAPSC Forensic Security Committee – addition of language to Actual Crime section: "Relevant crimes in the immediate vicinity of the facility (three to five years prior to the date of the incident) *as defined by and deemed relevant by the security expert*."

**Exhibit B**

**IAPSC Use Of Force Best Practice**



**BEST PRACTICE No. 3: USE OF FORCE BY SECURITY PERSONNEL**

**Table of Contents**

**Position Statement** ................................................................................................ **2**
**Purpose** ...................................................................................................................... **2**
**Definitions** ................................................................................................................ **2**
**Policies** ...................................................................................................................... **3**
**Bibliography/References** ...................................................................................... **4**
**Best Practice Committee Members** .................................................................. **5**
**Document History** .................................................................................................. **5**
**Addendums:**

**Sample Policy Statement and Use of Force Factors** ................................. **6**

**POSITION STATEMENT**

The International Association of Professional Security Consultants has issued this consensus-based and peer-reviewed Best Practice for the guidance of and voluntary use by businesses and individuals who deal, or may deal, with the issues addressed in the context of the use of force by security personnel.

I.    PURPOSE

The purpose of this best practice is to provide guidance to organizations in the development of an internal policy for the use of deadly and non-deadly force by their security personnel when such force is permitted. Organizations should take into consideration the laws of their jurisdictions and any existing model policies for guidance.

It is recognized that some organizations prefer that their security personnel limit their role to that of an "observe and report" function and not use force in the course of their work.

II.    DEFINITIONS

*Deadly Force*: Any use of force that is reasonably likely to cause death or serious bodily injury.

*Documentation:* Documentation includes written reports, written statements, video recording, audio recording, photographs, etc.

*Non-Deadly Force*: Any use of force other than that which is considered deadly force. This includes any physical effort used to control or restrain another, or to overcome the resistance of another, including that force necessary to remove an individual from a premise.

*Objectively Reasonable*: This term means that, in determining the necessity for force and the appropriate level of force, security personnel are to evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the incident, the level or threat or resistance presented by the subject, and the level or threat or resistance to the community.

*Security Personnel:* Individuals, other than public employees (federal, state or local government), employed part or full-time, in uniform or plain clothes, contract

4

or proprietary, hired to protect the employing party's assets, ranging from human lives to physical property (the premises and contents). This definition includes individuals who are not security personnel, but who regularly perform security-related tasks (e.g., individuals who perform security-related functions in a bar/nightclub, retail loss prevention, etc.).

III.    POLICIES

A.    Use of Deadly Force

Security personnel are authorized to use deadly force to protect the officer or others from what is objectively and reasonably believed to be an imminent threat of death or serious bodily harm.

B.    Use of Non-Deadly Force

1.    Where deadly force is not appropriate, security personnel may use only that level of force that is objectively reasonable to bring an individual under control.

2.    Security personnel are only authorized to use non-deadly force techniques and issued equipment to:

a.    Protect the security personnel or others from physical harm;
b.    Lawfully restrain or subdue a resistant individual; and/or
c.    Bring a situation safely under control.

C.    Training

In addition to training required for firearms qualification pursuant to local law, security personnel are to receive periodic employer training/instruction to enhance the security personnel's discretion and judgment when using force in accordance with this policy. Employers should provide appropriate training given the type of equipment and force, which may be used by their security personnel.

D.    Documentation

All incidents involving the use of force by security personnel will be documented.

5

**BIBLIOGRAPHY/REFERENCES**

This bibliography is not to be construed in any way as an endorsement by the International Association of Professional Security Consultants of the publications or the respective authors.

ASIS International, Private Security Officer Selection and Training Guideline, ASIS 2004, 2010

Bates, Norman D. (1989) "The Disarming Question of Arming Guards", Security Management, November 1989

Burns, Tommy J., "A Force to Reckon With", Security Management, July, 2011

Christman, John H., Sennewald, Charles A., Shoplifting, Managing the Problem. ASIS International, 2006. Use of force pp. 199, 208, 262.

GRAHAM vs. CONNOR, 490 U.S. 386 (1989)

IACP National Law Enforcement Policy Center, Use of Force - Concepts and Issues Paper Alexandria, VA 2006

International Association of Chiefs of Police, Use of Force Model Policy, Alexandria, VA, 2001

International Association of Chiefs of Police, Private Security Officer Selection, Training and Licensing Guidelines, Alexandria, VA April 24, 2002

Mains, Paul, CPP, (2006) Use of Force in Private Security: A Primer, Journal of Healthcare Protection Management

Mains, Paul, CPP, (2010) Security Officer Use of Physical Force, International Association for Healthcare Security and Safety

O'Malley, Michael T., MOAB®, (2010) Training International Inc., MOAB® Management of Aggressive Behavior Reference Guide

Christman, John H., Sennewald, Charles A., Retail Crime, Security, and Loss Prevention. An Encyclopedic Reference. Elsevier Books. 2008. Use of forces pages 312, 315, 404, 578-579.

6

**BEST PRACTICE COMMITTEE MEMBERS**

Alan W. Zajic, CPP, CSP, AWZ Consulting, Ad-Hoc Committee Chairman, Use of Force by Security Personnel

Norman D. Bates, Esq., Best Practice Committee Chairman; President, Liability Consultants, Inc.

John Case, CPP, John Case & Associates

Tommy J. Burns, CPP, Burns and Associates

**DOCUMENT HISTORY**

First Draft sent out for 45-day membership comments closed 10/21/2011

First Draft sent out for Non-Member review closed 10/21/2011

Review of commentary by Ad Hoc Committee 01/11/2012 and 01/26/2012

Second Draft sent out for 45-day membership comments closed 03/19/2012

Review of commentary by Ad Hoc Committee 03/30/2012

Final Draft to Board for Vote 04/15/2012

**ADDENDUM A**

**Sample Policy Statement:**

It is the policy of <u>(this organization, business/enterprise)</u> that security personnel use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives and safety of the invitees, employees, and others as is reasonably possible. Security personnel should attempt to de-escalate any situation before using any level of force upon a person. Should the use of physical force be deemed required, security personnel are to use only that amount of force necessary to overcome the opposing resistance. The use of force must be objectively reasonable. The security personnel must only use that force which a reasonably prudent person would use under similar circumstances.

**Use of Force Factors:**

The following are among the factors that should be considered when developing a use of force policy:

1. Seriousness of the act or crime

2. Size, age and weight of the subject

3. Apparent physical ability of the subject

4. Weapons possessed by or available to the subject

5. Known history of violence by the subject

6. Whether the subject appears to be under the influence of an intoxicating substance.

7. Presence of bystanders

8. Distance from the threat, ability to retreat, and the availability of back up

**Exhibit C**

**IACP National Law Enforcement Policy Center
Use Of Force
Model Policy**

---

# IACP National Law Enforcement Policy Center

## USE OF FORCE

### Model Policy

---

**February 2006**

### I.  PURPOSE

The purpose of this policy is to provide law enforcement officers of this agency with guidelines for the use of deadly and non-deadly force.

### II.  POLICY

It is the policy of this law enforcement agency that officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the use of force is not left to the unfettered discretion of the involved officer. This is not a subjective determination. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances.

### III. DEFINITIONS

*Deadly Force:* Any use of force that creates a substantial risk of causing death or serious bodily harm.

*Non-deadly Force:* Any use of force other than that which is considered deadly force. This includes any physical effort used to control or restrain another, or to overcome the resistance of another.

*Objectively Reasonable:* This term means that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community.

## IV. PROCEDURES

A. Use of Deadly Force

B. Law enforcement officers are authorized to use deadly force when one or both of the following apply:

    a. To protect the officer or others from what is reasonably believed to be a threat of death or serious bodily harm.

    b. To prevent the escape of a fleeing violent felon who the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others. Where practicable prior to discharge of the firearm, officers shall identify themselves as law enforcement officers and state their intent to shoot.

B. Deadly Force Restrictions

1. Officers may use deadly force to destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured, when the officer reasonably believes that deadly force can be used without harm to the officer or others.

2. Generally, warning shots should not be fired.

3. Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force. An officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants.

C. Use of Nondeadly Force

1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control.

2. Officers are authorized to use department-approved, nondeadly force techniques and issued equipment when one or more of the following apply:

    a. To protect the officer or others from physical harm.

    b. To restrain or subdue a resistant individual

    c. To bring an unlawful situation safely and effectively under control.

### D. Training

In addition to training required for firearms qualification, officers shall receive agency-authorized training designed to simulate actual shooting situations and conditions and, as otherwise necessary, to enhance officers' discretion and judgment in using deadly and nondeadly force in accordance with this policy.

©2006. Departments are encouraged to use this policy to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia, U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

This project was supported by Grant No. 2000-DD-VX-0020 awarded by the Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice. The Assistant Attorney General, Office of Justice Programs, coordinates the activities of the following program offices and bureaus: the Bureau of Justice Assistance, the Bureau of Justice Statistics, National Institute of Justice, Office of Juvenile Justice and Delinquency Prevention, and the Office of Victims of Crime. Points of view

or opinions in this document are those of the author and do not represent the official position or policies of the U.S. Department of Justice or the International Association of Chiefs of Police.

Every effort has been made by the IACP National Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities, among other factors.

11

**Exhibit D**

**Curriculum Vitae**

**Ken Wheatley MA CPP**



Ken Wheatley is the Founder and Principal Consultant of the Royal Security Group LLC, a security, business management, and litigation support consulting practice.

Ken retired from Sony Electronics Inc., after serving as the Senior Vice President and Chief Security Officer for their domestic and international business operations. During his almost 24 year tenure he led various operations such as: Corporate Security (including 6 Olympics, Retail, R&D, Supply Chain, Investigations, New Construction, Tenant Improvements, Joint Ventures, M&A), Dealer Sales Compliance (over 1000 stores), Brand Integrity, Business Continuity, Corporate Resilience, Competitive Intelligence, Non-Financial Risk Management, Food Service, Ground Fleet, Administrative Services, and Temporary Staffing, with a staff of 18, and a budget of $100 million.

He served as a Special Agent with the FBI for three years, working a variety of investigations and undercover operations involving kidnapping, espionage, drugs, fugitives, and violent criminal apprehensions.

Ken also served on National University's School of Engineering, Technology and Media Advisory Board, and was an adjunct instructor at UCSD Extended Studies; Grossmont College Administration of Justice; American Nursing Institute, and Florida International University School of Business.

He has addressed numerous professional associations, business groups, government entities, and conventions, internationally, in the areas of: investigations, crisis management, meeting security, global supply chain security, business risks, six sigma, corporate espionage, business continuity and resilience, emerging trends, environmental issues, & workplace violence prevention.

12

Ken has guest lectured on business management, emerging trends, and international security at the California State University San Marcos College of Business Administration; the University of California San Diego (UCSD) HR Management Program; the University of Phoenix Human Resources program; the University of Redlands School of Business, and National University.

He's been featured or quoted in the San Diego Business Journal; *CSO* (Chief Security Officer) magazine; Oracle's *Profit* E-Business magazine; *Meeting News* magazine; *The 10 Immutable Laws of Power Selling* by James DeSena; *Building Operating Management* magazine; *Re-Thinking Corporate Security in the 9-11 Era* by Dennis Dalton, and interviewed on several radio and TV stations.

In 2012, Ken was selected as the California Co-Director of the Lung Cancer Alliance, a Washington DC based non-profit, and serves as a member of the revision committee for the 5 year California Comprehensive Cancer Control Plan.


**Education & Certifications**

MA in Business and Organizational Security Management, summa cum laude (4.0 gpa)

Webster University


BA in English, with a minor in Business Management

Florida International University


Senior Executive Education programs

- Harvard JFK School of Government
- Kellogg School of Management
- University of Michigan Business School


Board Certified Protection Professional (CPP)

International ASIS

Certified Protection Specialist (CPS)

Executive Protection Institute


LEAD San Diego


**Professional Affiliations**

Current or Former Board of Directors

- International Security Management Association (ISMA) - the worldwide organization of Chief Security Officers for the Fortune 500 and Global 200 (President 2007)
- International Organization of Standardization (ISO) / Technical Committee (TC) 8, Ships and Marine Technology, Geneva. Chairman's Strategic Advisory Group (CSAG), and U.S. representative on the project team assigned to address the global ship piracy issues.
- Red Cross Board for San Diego and Imperial Counties
- Boys and Girls Clubs of America (Carlsbad chapter)
- International Association of Professional Security Consultants (IAPSC)
- Citizens Review Board on Police Practices, appointed by San Diego Mayor Jerry Sanders (Team 2 Leader)
- High Technology Crime Investigation Association (Secretary)
- San Diego Mid-County Transportation Management Association (Chairman and President)
- San Diego Metro Transit Board Light Rail Study Group
- Private Sector Security Advisory Group with the Center for Strategic and International Studies (CSIS) in Washington, D.C.
- U.S. Chamber of Commerce Homeland Security Policy Task Force and the Pandemic Planning Workgroup, Washington, D.C.
- Two international cargo security advisory groups with U.S. Customs & Border Protection

Contact: royalsecurity@hotmail.com or 619.977.0541

14

# Ken Wheatley MA, CPP

## Speeches/Interviews/Presentations/Publications/Training Programs

- Various TV and Radio Interviews on NBC (San Diego), UT-TV, KSON, KIFM, KBZT (2013/2014) concerning lung cancer, research funding, treatment, and patient support.
- Speaker: "A More Secure Tomorrow," ASIS International Chapter Conference, San Diego, 3/15/2013
- Speaker: "Supply Chain Security & Resilience: Piracy, Terrorism, Crime Prevention and Natural Catastrophes", Confederation of Finnish Industries, Association of Finnish Marine Industries and Mechanical Engineering and Metals Industry Standardization Conference on Security in International Supply Chain, Helsinki, Finland, October 21, 2011
- Speaker: "Transcendental Security and Enterprise Risk Management" Organization of Women In International Trade, New York, March 2010
- Invited by Singapore Government to speak at the APEC (Asia-Pacific Economic Cooperation) Symposium on "Total Supply Chain Security," Singapore, July 6-7, 2006
- Speaker, "The Business Case for Security" ASIS International, San Diego, November 9, 2006
- Guest Editorial, Security Industry Association, "Your Role in Business Resilience" October 27, 2005
- Speaker: "Leadership Development and Talent Management in Security, Business Continuity, and Crisis Management: Recruitment, Training, and Retention," The Conference Board, San Francisco and New York
- Interviewed by Chief Security Officer (CSO) magazine, "To Each Nation, Its Own Security Culture"
- Interviewed by Chief Information Officer magazine, "Don't Maroon Security"
- Interviewed by Building Operating Management magazine, "Locking-in Results"
- Interviewed by CSO magazine, "Keep It Moving"
- Speaker: "Trade Secrets & Industrial Espionage" Society for Human Resources Management, San Diego 2004
- Speaker: "Workplace Violence Prevention", The Conference Board, Marina DelRey,
- Speaker: "Planning Successful Meetings," Jamaica Expo for Meeting Planners International, Jamaica BWI 2004
- Speaker: "Security for Your Meetings, Here and Abroad," Council of Engineering and Scientific Society Executives Annual Meeting, Miami, Florida
- Wrote, Security Counsel Column, CSO magazine, "Targeting Supply Chain Theft"
- Interviewed by CSO magazine, "Sea Change"
- Interviewed by Fortune Magazine for article, "Protecting America's Ports"
- Contributor to World Customs Organization's Importer & Exporter Supply Chain Security Guidelines
- Panelist/Co-Presenter with John Chen, Chairman & CEO of Sybase Inc. (now with Blackberry), for McGraw-Hill Companies Homeland Security Summit: Business & Economic Security Track: "Toward Seamlessness: Cooperation to Bridge the Value Chain & the Public-Private Divide", Arlington, VA
- Speaker: "Corporate Security & Crisis Management: Preparedness & Response", The Conference Board, San Diego and New York

- Speaker: "Risk Management for International Meetings", Meeting World Convention, New York
- Speaker: "Demonstrating Effectiveness of Security Programs",  Corporate Security Roundtable, Security Industry Association, Phoenix, Arizona
- Speaker: "Homeland Security & The Meeting Industry" Potomac Meeting Planners, Washington DC
- Speaker: "Making Meetings Secure" Meeting World Convention, New York
- Interviewed by Forbes magazine: "The New Age of Global Corporate Security: Keeping Employees and Facilities Safe"
- Wrote, "Making Meetings Secure" article in 2002 Meeting Planners Handbook for MeetingNews
- Interviewed for Oracle's *Profit* magazine, "White Collar Crime," 2002
- Interviewed for *Meeting News* magazine – "Crime Prevention" 2002
- Interviewed for *Incentive Travel Buyers Handbook* – "Safety & Security"
- Speaker: "Corporate Espionage & Protecting Trade Secrets", American Corporate Counsel Association
- Speaker: "Trade Secrets & Industrial Espionage" San Diego Employers Association
- Trainer, Children's Hospital (Emergency Room Staff) – Defensive Tactics and Workplace Violence Prevention
- Interviewed by KPBS (Public Broadcasting) for "Market Place" on cross-border (U.S. and Mexico) telecommunications issues.
- Interviewed for *Security Magazine* – "Blackout, Business Continuity Issues"
- Panelist with Gray Cary Ware & Freidenrich - "Employee Violence - Signals & Solutions"
- Presenter, South County Personnel Association - "Protecting Intellectual Property"
- Presenter, San Diego Employers Association - "Protecting Intellectual Property"
- Panelist with Gray Cary Ware & Freidenrich - "Conducting Effective Investigations"
- Israeli Deputy Minister of Finance and staff - "Sony Electronics Operations"
- Trainer, Solar Turbines Inc., (a division of Caterpillar), Human Resources Department "Workplace Violence Prevention"
- Speaker: Intercontinental Hotel's International Management Group - "International Security Management and Executive Protection"
- Designed and presented four-hour "Workplace Violence Prevention" course. Personally trained over 3,000 Sony staff (supervisors to President level) nationally
- Interviewed by *San Diego Business Journal* - "Managers Must Be Armed With Many Skills"
- Speaker: National Association of Temporary Services - "Workplace Violence"
- Speaker: ASIS/San Diego Chapter - "International Security"
- Presenter, ASIS/San Diego Chapter - "Total Quality Management in Security"
- Presenter, California Association of Temporary Services - "Workplace Violence"
- Numerous presentations before San Diego City Council, the Environmental Protection Agency, California Air Resources Board, and San Diego Association of Governments concerning Air Pollution Regulations and Traffic Demand Management Ordinances