

# LEGISLATIVE BUDGET BOARD

# Beaumont Independent School District
## Management and Performance Review



**EXHIBIT**

**E**

Legislative Budget Board Staff
McConnell Jones Lanier & Murphy LLP

**August 2013**

A-1

# Beaumont Independent School District

## Management and Performance Review

**Legislative Budget Board Staff**
**McConnell Jones Lanier & Murphy LLP**

**August 2013**

A-2



## LEGISLATIVE BUDGET BOARD

Robert E. Johnson Bldg.
1501 N. Congress Ave. - 5th Floor
Austin, TX 78701

512/463-1200
Fax: 512/475-2902
http://www.lbb.state.tx.us

August 9, 2013

Dr. Timothy Chargois
Superintendent
Beaumont Independent School District

Dear Dr. Chargois:

The attached report reviews the management and performance of Beaumont Independent School District's (ISD) educational, financial, and operational functions.

The report's recommendations will help Beaumont ISD improve its overall performance as it provides services to students, staff, and community members. The report also highlights model practices and programs being provided by Beaumont ISD.

Some of the recommendations provided in this report are based on state or federal laws, rules or regulations, and should be promptly addressed. Other recommendations are based on comparisons to state or industry standards, or accepted best practices, and should be reviewed to determine the level of priority, appropriate timeline, and method of implementation.

The Legislative Budget Board engaged McConnell, Jones, Lanier, and Murphy LLP to conduct and produce this review, with LBB staff working in a contract oversight role.

The report is available on the LBB website at http://www.lbb.state.tx.us.

Respectfully submitted,

Ursula Parks
Director
Legislative Budget Board

Mailing Address: P.O. Box 12666 • Austin, TX 78711-2666

A-3

August 9, 2013
Page 2


cc:    Mr. Woodrow Reese
       Ms. Janice Brassard
       Mr. Terry Williams
       Ms. Gwen Ambres
       Ms. Zenobia Bush
       Mr. Mike Neil
       Mr. Tom Neild

A-4

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................... 1

DISTRICT ORGANIZATION AND GOVERNANCE ........................................................ 9

EDUCATIONAL SERVICE DELIVERY .............................................................................. 33

COMMUNITY INVOLVEMENT ....................................................................................... 79

FACILITIES MANAGEMENT ............................................................................................. 101

HUMAN RESOURCES MANAGEMENT ......................................................................... 123

ASSET AND RISK MANAGEMENT .................................................................................. 147

FINANCIAL MANAGEMENT ........................................................................................... 169

PURCHASING ...................................................................................................................... 193

FOOD SERVICES .................................................................................................................. 205

TRANSPORTATION ............................................................................................................ 217

COMPUTERS AND TECHNOLOGY ............................................................................... 233

SAFETY AND SECURITY .................................................................................................... 261

# EXECUTIVE SUMMARY

The Texas Legislature created the Texas School Performance Review (TSPR) in 1990 to "periodically review the effectiveness and efficiency of the budgets and operations of school districts." (Texas Government Code, Section 322.016) The Legislative Budget Board's (LBB) School Performance Review team conducts comprehensive and targeted reviews of school districts' and charter schools' educational, financial, and operational services and programs. The review team produces reports that identify accomplishments, findings, and recommendations based upon the analysis of data and onsite study of each district's operations. A review examines 12 functional areas and recommends ways to cut costs, increase revenues, reduce overhead, streamline operations, and improve the delivery of educational, financial, and operational services. School districts are typically selected for management and performance reviews based on a risk analysis of multiple educational and financial indicators. However, the selection of Beaumont Independent School District (ISD) was based on a recommendation from the Commissioner of Education for the Texas Education Agency (TEA).

To gain an understanding of the school district's operations prior to conducting the onsite visit, the LBB review team requests data from both the district and multiple state agencies, including TEA, the Texas Department of Agriculture and the Texas School Safety Center. In addition, LBB may implement other methods for obtaining feedback on district operations, including for example, community forums, and surveys of district and campus staff, as well as parents and community members. While onsite in the district, information is gathered through multiple interviews and focus groups with district and campus administrators, staff, and board members.

Beaumont ISD was established in 1983 through the merger of the former Beaumont School District with South Park Public Schools. The district is located in Jefferson County in the City of Beaumont, Texas, approximately 85 miles east of Houston. According to the 2010 census, the city had a population of 118,296, an increase of 3.9 percent since the 2000 census. The district is served by Regional Education Service Center V (Region 5) located in Beaumont. The state legislators for the district are Senator Tommy Williams and Representatives Joe Deshotel and Allan B. Ritter.

The district has 30 instructional campuses, which include 16 elementary schools, 7 middle schools, and 3 high schools, as well as 4 alternative education campuses.

In school year 2011–12, enrollment totaled 19,848 students. Figure 1 shows the district's student demographics for school year 2011–12.

**FIGURE 1**
**BEAUMONT ISD STUDENT DEMOGRAPHICS**
**SCHOOL YEAR 2011–12**



Hispanic 19.1%
White 13.9%
Asian 3.0%
Pacific Islander or Two or More Races 2.2%
African American 61.8%

SOURCE: Texas Education Agency, Public Education Information Management System, February 2013.

In school year 2011–12, of the total student enrollment, 66.7 percent were economically disadvantaged students, 28.9 percent were at risk students, and 7.6 percent were limited English proficient students. In school year 2012–13, the percentage of economically disadvantaged students increased to 74.2 percent.

## ORGANIZATION AND GOVERNANCE

The district is led by Superintendent Timothy B. Chargois. Superintendent Chargois was appointed by the seven member Board of Trustees in September 2012. This superintendent's administration began in the midst of redistricting litigation that has continued during the time of this review. The board is currently a 7-0 single-member district board; however, the redistricting effort is seeking a 5-2 structure allowing two members to be elected at-large. Figure 2 shows the members of the district's board of trustees.

**FIGURE 2**
**BEAUMONT ISD BOARD OF TRUSTEES**
**SCHOOL YEAR 2012–13**

| NAME | TITLE | TERM EXPIRATION | LENGTH OF SERVICE | OCCUPATION |
|---|---|---|---|---|
| Woodrow Reese, District 3 | President | May 2015 | 14 years | Postmaster |
| Janice Brassard, District 7 | Vice President | May 2013 | 7 years | Self-Employed |
| Terry Williams, District 1 | Secretary | May 2015 | 24 years | Entrepreneur |
| Gwen Ambres, District 4 | Member | May 2013 | 2 years | Retired Manager |
| Zenobia Bush, District 2 | Member | May 2015 | 13 years | Management Consultant |
| Mike Neil, District 5 | Member | May 2015 | 2 years | Businessman |
| Tom Neild, District 6 | Member | May 2013 | 4 years | Self-Employed |

NOTE: Due to the U.S. Department of Justice intervening in the redistricting and election process, the May 2013 elections were canceled and have been set for a November 2013 election.
SOURCE: Beaumont ISD, Administration, Board of Trustees, February 2013.

## FINANCIAL

In 2012, Beaumont ISD's preliminary property wealth per student was $406,505. This placed the district below, and thus not subject to, the state's primary equalized wealth level (EWL) of $476,500, which is the property wealth level above which the state "recaptures" a portion of wealthy school districts' local tax revenue to assist in financing public education in other districts. This primary EWL applies to a district's tax rates up to $1.00 per $100 of valuation. The state's school finance system has a secondary EWL that applies to certain enrichment tax effort above $1.00; in 2012 Beaumont ISD exceeded this enrichment EWL, which is set at $319,500. However, because the district levied no pennies subject to the enrichment EWL, the district owed no recapture in fiscal year 2012.

Beaumont ISD's total actual expenditures were approximately $160.6 million. With enrollment of 19,848 students, the budget translates into $8,092 per student. **Figure 3** shows an overview of the district's fiscal year 2013 General Fund budget. Of the total expenditures, $133.2 million, or 83 percent, was related to payroll costs.

## EDUCATIONAL

Figure 4 shows a summary of the district's state and federal accountability ratings for school years 2008–09 to 2011–12. For state accountability, the school year 2011–12 rating is the same as school year 2010–11 due to a transition from the Texas Assessment of Knowledge and Skills (TAKS) to State of Texas Assessments of Academic Readiness (STAAR).

**FIGURE 3**
**BEAUMONT ISD GENERAL FUND BUDGET**
**FISCAL YEAR 2013**



TOTAL = $160.6 MILLION

Professional Services $12.7 Million
Supplies and Materials $6.9 Million
Other Operating Costs $6.4 Million
Capital Outlay $1.3 Million
Debt Service $163,105

Payroll Costs $133.2 Million

SOURCE: Beaumont ISD, Financial Services Department, General Fund Budget, February 2013.

**FIGURE 4**
**BEAUMONT ISD ACCOUNTABILITY RATINGS**
**SCHOOL YEARS 2008–09 TO 2011–12**

| SCHOOL YEAR | STATE ACCOUNTABILITY RATING | FEDERAL ACCOUNTABILITY RATING |
|---|---|---|
| 2008–09 | Recognized | Meets Adequate Yearly Progress |
| 2009–10 | Recognized | Missed Adequate Yearly Progress Stage 1 |
| 2010–11 | Academically Acceptable | Missed Adequate Yearly Progress |
| 2011–12 | Academically Acceptable | Missed Adequate Yearly Progress |

NOTE: Accountability ratings for school year 2012–13 were not available at the time of this report.
SOURCE: Texas Education Agency, Academic Excellence Indicator System, February 2013.

## ACCOMPLISHMENTS

The Legislative Budget Board's review team identified noteworthy accomplishments during its onsite visit based upon the district's best practices.

### DISTRICT ACHIEVEMENT RECOGNITION

By fostering a spirit of teamwork, the district has achieved recognition for academic performance for its students and a positive work environment for its staff, which resulted in both local and national award recognition during school years 2010–11 and 2011–12. The Communications Department actively supports parental programs, including the Parent Teacher Association and various parental partnership programs that encourage parents to stay involved in their children's learning. Additionally, the Beaumont Public School Foundation, a separate entity, provides students and teachers with special project grants, averaging $1,000 each. These efforts and more have contributed to the district being recognized by: U.S. News & World Report 2011; National Parent Teacher Association 2011; Houston Chronicle 2011; and National Center for Educational Achievement 2010. The district's collective efforts to encourage student achievement for all students and promote a positive workplace earned independent recognition for the district and serves as a way to showcase and validate the district's accomplishments.

### GRADUATION RATES

The district has successfully instituted measures to increase the graduation rate. Beginning in school year 2007–08, the district implemented several measures targeting at-risk students to address low graduation rates. The district created "graduate assistant coordinator" positions at each high school to provide direct support to students at risk of dropping out of school. The district also implemented classroom walkthroughs that help ensure students are consistently receiving quality content and effective teaching strategies. The district also provides opportunities for students to recover credits. Implementing these and other strategies have had a positive impact on the district's graduation rate with an increase from school year 2007–08 of 78 percent to 90 percent in school year 2010–11.

### CAREER AND TECHNICAL EDUCATION

The district has a strong, well-developed Career and Technical Education (CTE) program. The district's program is effectively aligned with federal recommendations for quality programming. CTE programming is also well integrated into the district's overall instructional program, and the district allocates funding to support the program. The district has CTE offerings in 15 of the 16 federally recognized career clusters which exceed the requirements of the *Texas State Plan for Career and Technical Education 2008–2013*. The district's CTE program is well-organized and provides students multiple options for obtaining knowledge and skills for use in the workforce.

### FOOD SERVICE FUND BALANCE

The district has maintained a $2 million fund balance for its food service operations by implementing sound business practices and cost containment measures. Some of these measures include controlling payroll costs through staffing standards; providing continuous training to all cafeteria staff on production methods; closely monitoring budgets by school; closely monitoring inventory levels; and using all of their federal government commodity allotments for meals. As a result of the support, training, and cost containment procedures, the Child Nutrition Department generates a profit each year. Its fiscal year 2012 profit was $877,445, which increased their August 31, 2012 account balance to $2,205,087. All food service revenue must be used only for the operation and improvement of the food service program.

### BOND INSURANCE

The district adopted a novel insurance initiative known as the Rolling Owner Control Insurance Program (ROCIP) as part of its bond construction program. A ROCIP protects the district by ensuring that all contractors and subcontractors that participate in the bond construction program are adequately insured. The district pays the insurance premiums on behalf of all enrolled parties. This ensures that adequate coverage is maintained and protects the district from unforeseen losses caused by otherwise uninsured or underinsured contractors. By instituting the ROCIP the district has been fiduciary in protecting the taxpayers and district's assets.

## FINDINGS AND RECOMMENDATIONS

The Legislative Budget Board's review team identified significant findings and recommendations based upon the analysis of data and onsite visit of the district's operations. Some of the recommendations provided in the review are based on state or federal laws, rules or regulations, and should be promptly addressed. Other recommendations are based on comparisons to state or industry standards, or accepted best practices, and should be reviewed by the school district

to determine the level of priority, appropriate timeline, and method of implementation.

### BOARD OF TRUSTEES OPERATION AND COMMUNICATION

The Board of Trustees lacks a formal operating structure and has ineffective communication among its members. The lack of structure and communication has created a divisive atmosphere of distrust. As a result, the board does not function as a team with common goals and objectives and is faced with negative influence from external stakeholders, which compromises the board's ability to effectively govern the district.

Review team interviews with the seven board members indicate that the board is divided into three distinct groups, with clear divisions along racial lines. Board members' comments indicate that this division appears to be the catalyst for the absence of trust and personal animosity between the groups. Not all board members operate within their roles and responsibilities of goal-setting, policy-making, and evaluation. Finally, the board lacks a formal operating structure to guide its governance activities in a logical, orderly way to efficiently conduct its business. For example, the board has not reevaluated its operating policies, protocols, and guidelines related to committee structure, regular meeting schedule, board agenda, ethics, self-assessment, and requesting information from the superintendent.

Recommendations to assist the board with operation and communication include:

- develop and adopt policies and procedures that will improve the operating structure of the board and foster effective communication and relationships amongst board members;

- set a plan and schedule a series of intensive teambuilding sessions for all board members and the superintendent; and

- develop a formal self-policing structure to address instances in which board members do not comply with board ethics policies.

### DISTRICT ORGANIZATIONAL STRUCTURE

The district's leadership has created an organizational structure that aligns incompatible functions and assigns oversight of financial services to staff without ensuring the minimum qualifications are met. As a result, the division of responsibility for instructional and non-instructional functions compromises the efficient and effective

management of district operations. In January 2013, the superintendent made some reorganization decisions which resulted in the alignment of the functions of Elementary Administration and Financial Services under the same leadership. The chief business officer (CBO) position became vacant in December 2012 and the district chose not to fill this position. The CBO title does not put emphasis on the importance of the financial aspect of the district operations. With the reorganization, the district created the deputy superintendent for Financial Services and Elementary Administration position. Secondary administration is lead by the assistant superintendent for Curriculum and Instruction and Secondary Administration. This current structure aligns elementary administration at a higher level in the organization than the secondary administration. This structure aligns the elementary and financial services administration under one position.

Additionally, the district has not established sufficient expectations for the leadership and coordination of the Human Resources Department and the functions are handled in multiple areas of the district. The district does not require that the department leadership have an educational background in a human resources concentration. Nor does the district require the department staff to have regular training in human resources topics. Also, the executive director of Human Resources position title is inconsistent with the level of leadership with other positions it is aligned with. Additionally, several human resources functions are managed in multiple areas of the district without any oversight provided from the department. Without adequate oversight and coordination of human resources functions, the district may be at risk of inconsistency with human resources-related regulations and application of the processes and resolution of human resources-related issues.

Recommendations to assist the district with organization structure include:

- eliminate the deputy superintendent for Financial Services and Elementary Administration position;

- eliminate the assistant superintendent for Curriculum and Instruction and Secondary Administration position, and create an assistant superintendent for Curriculum and Instruction, an executive director of Elementary Education and an executive director of Secondary Education positions;

- rename the CBO to the chief financial officer and realign the Financial Services functions appropriately under this position; and

- eliminate the executive director of Human Resources position and create an assistant superintendent for Human Resources position. Restructure all human resources functions under the Human Resources Department, with the department reporting directly to the superintendent, and establish stronger education and training expectations for the department's leadership and staff.

## FINANCIAL OPERATIONS AND BUDGET

The Financial Services Department does not have adequate procedures and practices in place to ensure that the district is managing all of its financial resources appropriately. In November 2007, voters approved the issuance of $388.6 million of Beaumont ISD Unlimited Tax School Building Bonds for the purpose of acquiring, constructing, renovating, improving, and equipping new and existing school buildings and school facilities. The district has not authorized a performance audit of bond expenditures to ensure that fiscal accountability and transparency is ensured. According to community members' comments, the district's process for tracking the bond funds has led to the perception that the funds were misappropriated.

Further, the district has not sufficiently addressed deficiencies in how labor and material charges are validated on cost-plus contracts before invoices are paid. Some vendors with cost-plus contracts are not required to submit any documentation to support their invoices. For example, the district failed to validate labor and materials cost with contractors related to the bond. This led to accusations that the district was being defrauded through electrical contracts.

Additionally, the district's budget process is not efficient and limits school principals and department heads' involvement by not allowing them to transfer budget funds without approval from the budget department. Allowing budget managers only limited involvement prevents those most familiar with day-to-day operations from having valuable input into the budget process. This practice does not encourage site-based budgeting.

Recommendations to assist the district with its financial operations include:
- develop a comprehensive and reliable process, with detailed procedural methods, to record, track, and

reconcile authorized bond expenses to promote successful financial accountability and transparency;

- implement a procedure and practice to validate the invoices from all cost plus contractors and require the contractors to submit documentation for all labor and materials costs associated with the invoice; and

- establish a practice that allows principals and department heads greater involvement in the budget development and control process.

## PAYROLL COST DRIVERS

The district lacks a formalized process to determine the impact various payroll cost drivers have on the immediate and future budget for the district. More than 80 percent of the district's total expenditures were spent on payroll in fiscal year 2012. The district's actual payroll costs have increased 6.8 percent over five years while the number of staff has decreased 1.2 percent during the same period. In addition to salary, the district provides campus and holiday incentives for its staff. The district paid approximately $2.2 million for campus and holiday incentives in school year 2011–12. Further the district payroll cost related to overtime and substitute teachers pay during this same year total approximately $5.7 million. The Transportation Department and the Maintenance and Operations Department account for approximately $1.4 million of overtime expenses.

Recommendations to assist with payroll cost drivers include:
- develop formal procedures to conduct an analysis of the payroll cost drivers each year and establish limits for each driver;

- establish procedures to manage and control the district's overtime practice; and

- develop and recommend to the superintendent changes to the district's policy to control the excessive absences.

## STAFFING GUIDELINES

The district has not established staffing guidelines in several of the district's operations. This practice has resulted in an inefficient use of resources in safety and security, transportation, maintenance, and technology. The district determines security staffing using an informal system based on incidents for each school, enrollment, and student and community demographics. For example, the Police Department uses a combination of police officers and public safety officers (PSOs) to meet the security demands of the

district and community. This staffing pattern and practices in the Police Department has contributed to overtime and supplement pay expenses. The district also operates a large amount of after school and extra-curricular transportation services that has resulted in the daily use of substitute drivers to meet the demand. The district does not staff the maintenance and grounds based on current staffing standards.

Additionally, the district has not developed a method to determine the appropriate number of technology staff and is not structured properly to deliver effective and proficient support to the user community. The department has requested to increase staffing to meet the additional demand for support but has been unsuccessful. For example, new hires in the department only replace staff that have left the district.

Recommendations to assist the district with staffing guidelines include:

- develop a systematic model for calculating the optimum staff size in the Police Department, eliminate the vacant lieutenant's position, and implement the organizational changes proposed to minimize overtime and supplemental pay and increase security coverage;

- revise field and extracurricular trip assignment procedures to eliminate conflicts with home-to-school bussing requirements, and reduce the percentage of substitute drivers that are retained on a daily basis;

- develop staffing guidelines for the Maintenance and Operations Department and align staff within these standards; and

- reassess technology support requirements, establish staffing guidelines, and restructure and staff the technology department accordingly.

### TECHNOLOGY IMPLEMENTATION

The district has purchased various software systems to assist with district operations; essentially, the district has invested financial resources in several systems to automate its operations, but due to a lack of training and full implementation, the district continues to use inefficient manual processes. For example, the district has not fully implemented the public information software that is used by the Communications Department to process public information requests. The system provides the district with the capabilities to track the processing of all public information requests, however the review team could not

determine the status of the requests to ensure compliance with state law. The district is also not making full use of its transportation management software to maximize system efficiency in the design and management of bus routes. The district does not use the maintenance work order system effectively, resulting in unknown work order status, duplicate requests, and a significant backlog of requests pending entry into the system. The district's Human Resources Department has not established the expectation that all district staff consistently use the online placement form system. Finally, the district has not fully implemented all the components of the financial management software to perform financial services efficiently.

To maximize the use of technology, the district should evaluate the implementation of the district's various software systems to ensure optimal use in efficiently and effectively managing district operations.

### DISCIPLINE MANAGEMENT

The district lacks a process to effectively manage and monitor its disciplinary alternative education campuses to ensure that students are properly transitioned to and from their home campuses and receive adequate academic instruction while in an alternative education setting. The district has four alternative education campuses. In school year 2011–12, the district reported approximately 14,430 disciplinary actions. The assistant superintendent for Curriculum and Instruction and Secondary Administration has primary responsibility for the alternative campuses as the position oversees the principals of the alternative schools. However, the assistant superintendent for Administration and Operations is responsible for monitoring students assigned to alternative campuses for disciplinary reasons. Management and supervision of the district's disciplinary alternative campuses is not coordinated across staff members and campuses. As a result, each disciplinary alternative education facility has different procedures for receiving students and the process for transitioning students back to their home campus is not consistent across the district. In addition, academic programming at these campuses is inconsistent with the district's adopted curriculum. Failure to establish a clear reporting and oversight structure for disciplinary alternative education campuses has implications for the quality of instruction provided.

To effectively manage the disciplinary alternative education campuses, the district should assign a staff position the

responsibility for overseeing disciplinary alternative education.

The chapters that follow contain a summary of the district's accomplishments, findings, and numbered recommendations. Detailed explanations for accomplishments and recommendations follow the summary and include fiscal impacts.

Each chapter concludes with a fiscal impact chart listing the chapter's recommendations and associated savings or costs for school year 2013–14 through 2017–18.

The following figure summarizes the fiscal impact of all 85 recommendations in the performance review.

## FISCAL IMPACT

| | 2013–14 | 2014–15 | 2015–16 | 2016–17 | 2017–18 | TOTAL 5-YEAR (COSTS) SAVINGS | ONE TIME (COSTS) SAVINGS |
|---|---|---|---|---|---|---|---|
| Gross Savings | $905,716 | $1,728,636 | $1,728,636 | $1,728,636 | $1,731,136 | $7,822,760 | $0 |
| Gross Costs | ($528,859) | ($521,359) | ($521,359) | ($521,359) | ($521,359) | ($2,614,295) | ($38,410) |
| Total | $376,857 | $1,207,277 | $1,207,277 | $1,207,277 | $1,209,777 | $5,208,465 | ($38,410) |

# CHAPTER 1

# DISTRICT ORGANIZATION AND GOVERNANCE

**BEAUMONT INDEPENDENT SCHOOL DISTRICT**

# CHAPTER 1. DISTRICT ORGANIZATION AND GOVERNANCE

An independent school district's governance structure, staff management and planning process provide the foundation for effective and efficient education of students. Each school district in Texas is governed by an elected seven-member Board of Trustees. The board focuses on the decision making process, planning, and providing resources for achieving goals. The board sets goals, objectives, and policies, and approves plans and funding necessary for school district operations. The superintendent is responsible for implementing policy, managing district operations, recommending staff levels, and allocating the resources to implement district priorities. The Board and superintendent collaborate as a leadership team to meet district stakeholder needs.

Beaumont Independent School District (ISD), established in 1983 through the merger of the former Beaumont School District (founded in 1883) with South Park Public Schools (founded in 1891), is located in Jefferson County in the city of Beaumont, Texas, approximately 85 miles east of Houston. According to the 2010 census, the city had a population of 118,296, an increase of 3.9 percent since the 2000 census.

## HISTORICAL PERSPECTIVE

Beaumont ISD's website includes a link titled "History of BISD 1983–1993" which outlines the events of that 10 year period following the merger of the two school districts into the current Beaumont ISD. According to Beaumont ISD, at the time of the merger, "Beaumont School District had a diminishing tax base and numerous old buildings in need of repair…There was a shift in the racial makeup of the district with the black population of students becoming the majority. South Park Schools had an excess of money. There were new facilities, no portable buildings, and a construction fund as part of the tax rate which collected in excess of $2.5 million per year…White students represented 70 percent of the student population… In 1981, after many lawsuits and complaints from the black community, a federal judge issued a mandate for the South Park Schools—an attendance plan for integration purposes based on a random "ping-pong" system…The plan was to begin in the 1982–83 school year. Every student would participate in the integrated system unless he moved or transferred to private schools. "Anger" is a mild term to describe the white community; "vindicated" might come close to describing the black community."

The historical perspective document also indicated that after receiving the court-ordered integration plan, "…in addition to this upheaval in South Park Schools, the issue of consolidation of the two school districts began to be discussed by the Beaumont School District in January 1983… Beaumont School trustees favored the move but South Park trustees were in opposition…Despite the vast differences of opinions in the districts, the consolidation issue was placed on the ballot for a city vote on April 2, 1983. The consolidation issue was heated, creating division between the two districts—between what some considered the 'haves and have nots.' The issue failed. Within a matter of one week some members of the Beaumont School board, administrators and patrons began discussing the dissolution of the Beaumont School District." In August 1983, "voters in the Beaumont School District dissolved the district by a 58–42 percent margin. The following week Commissioners Court attached the dissolved district to the South Park School District. The South Park School board hired the dissolved Beaumont School District's employees. The superintendent of the dissolved district became a deputy superintendent in the new district and many central office administrators served in dual capacities until their retirement…"

Shortly after the first year of the merger, the U.S. Department of Justice (DoJ) "…intervened on behalf of minorities filing a lawsuit over representation. The newly created district was ordered to establish a single member voting plan which allowed for minority representation. After much deliberation, a five single member district, two at-large, voting plan was adopted by the board and approved by the Justice Department (referred to as DoJ). One year after the merger, the new voting plan took effect and four minority members and three white members were elected. This voting plan would later be challenged and changed to seven single member districts."

In addition, according to the historical perspective document, "…the ethnic composition of the school district, and individual schools, has also been a concern from the beginning. As housing patterns changed in the city, so did the ethnicity of schools. The construction pattern for schools had been a neighborhood concept. Separation of races had been the norm, and with the intervention of the Justice Department in the 1960s, additional shifts occurred. The former Beaumont School District grew in black student

population. Some of the change was probably caused by normal growth patterns, but some of the change was certainly created by "white flight"... the primary concerns in the white community during the last ten years (ten years after the merger) centered around busing, discipline, basic skills curriculum and a lowering of standards."

### CURRENT PERSPECTIVE

In May 2011, Beaumont residents voted to have the Board of Trustees adopt a five single-member district, two at-large, redistricting plan (i.e., 5-2 plan) for selecting members of the Board of Trustees. According to an article, *Chargois Readies for New School Year; Speaks to Issues & Challenges*, posted on the district's website, "...resulting litigation, followed by the DoJ intervening caused the district's Board of Trustees to cancel the May 2013 election for all board seats and to set a November 2013 election with just three of the seven board seats placed on the ballot. The DoJ was concerned that the 5-2 plan had the potential to disenfranchise minority voters and other proposals would truncate the terms of trustees who had not served the four years they were elected to serve."

According to the superintendent's Transition Plan, the district's primary focus is to ensure every student graduates on time from high school and is ready to enter college, the workforce, or the military. The district has maintained a graduation rate of approximately 90 percent. The district's motto is: "Every Child. Every Day." Beaumont ISD's mission statement is: "The mission of the Beaumont Independent School District, as the unifying force of the community, is to guarantee that our graduates possess the necessary skills, values and knowledge to compete successfully as productive citizens in a diverse global society through an education system characterized by expectation of success for each person; optimum application of technology; an appreciation of various cultures; full involvement of parents, teachers and the community; and respect and care for each other."

### BOARD GOVERNANCE

Beaumont ISD's Board of Trustees is the policy-making body authorized by the Texas Legislature to govern the district. The board consists of seven members elected through seven single-member districts, serving alternating four-year terms. Board of Trustee elections are held the first Saturday in May, when necessary. At each election, either two or three board members are elected, depending on the number required to complete the board. There are three positions whose terms expired in May 2013 and four positions whose terms expire in May 2015. (Due to DoJ intervening in the redistricting

and election process, the May 2013 elections were delayed.) The next election is set for November 2013 for three seats. The board regularly meets at 7:15 PM on the third Thursday of each month in the board room of the Beaumont ISD's Administration Building at 3395 Harrison Avenue. The board also holds special meetings as necessary.

The superintendent and board president coordinate the preparation of the agenda for each meeting and determine the items to be included. Any board member may request specific items to be placed on the agenda through the board if at least two of them jointly present the item. The public is welcome to attend all meetings and residents wishing to address the board present their requests in writing to the secretary of the board at least 24 hours before the regular monthly meeting. These residents are allowed to speak up to three minutes. Other residents may register on the day of the meeting before it starts and are limited to speaking for one and one-half minutes. The total public comment time is 45 minutes. Residents may also address the board during special meetings and workshops if the board includes a public comment period when the district posts notice of the meetings, at which time residents may discuss items listed in the proposed agenda for up to one and one-half minutes.

The district posts an unofficial summary of board actions from the regular or special board meeting on its website. This board report includes reports received by the board, major points from the superintendent's report, academic and operations related action items, bid and proposal related items, tabled action items and discussions related to special topics included in the board agenda.

The superintendent and members of his cabinet begin organizing the board agenda two weeks before the regularly scheduled board meetings. The superintendent's cabinet is the district's executive leadership team and includes the deputy superintendent for Financial Services and Elementary Administration; the assistant superintendent for Curriculum and Instruction and Secondary Administration; the assistant superintendent for Administration and Operations; the assistant superintendent for Technology, Research, and Evaluation; the executive director of Human Resources; and the special assistant for Communications. The superintendent and board president finalize the board agenda the week before the regular board meeting. The executive assistant of Board Affairs strives to post the agenda and supporting materials on the district website by the Friday before the regular board meeting to allow board members to review the materials over the weekend. However, the board meeting

materials are typically posted on the Monday prior to the regular Thursday board meeting. The superintendent encourages board members to call him or the appropriate cabinet member for clarification of meeting agenda items before the regular board meeting.

The executive assistant of Board Affairs prepares the official minutes of open sessions and posts the minutes of the previous meeting along with the board agenda on the district website for board members to access. The secretary of the Board of Trustees, along with other board members, reviews the official minutes of all meetings for accuracy and completeness before they are approved. Minutes of executive sessions are not recorded. However, if the board conducts disciplinary hearings in executive session, the session is recorded on audio tape. The executive assistant prepares a certified agenda listing topics discussed in closed session, seals the agenda and audio tape (if any) in an envelope, and places the envelope in a locked, fireproof cabinet in her office. **Figure 1–1** shows the district's Board of Trustees for school year 2012–13.

### DISTRICT ADMINISTRATION

According to the superintendent's employment contract executed on May 1, 2012, the superintendent is the chief executive officer of the district and shall faithfully perform the duties of the superintendent of schools and as prescribed in the job description, district policy, and board directives. The contract further states the superintendent shall recommend employment of all professional staff subject to the board's approval; direct, assign, reassign, and evaluate all staff of the district consistent with board policies and federal and state law; organize, reorganize, arrange, and evaluate the staff of the district; and to develop and establish administrative

regulations, rules and procedures necessary to operate the district consistent with board policies.

Dr. Timothy Chargois is the superintendent of Beaumont ISD. Before the board appointed him superintendent, Dr. Chargois served as the assistant superintendent for Research, Evaluation, Planning and Technology for Beaumont ISD for four years. During his career in public education, Dr. Chargois served as a classroom teacher, assistant principal, principal, and administrator.

The superintendent's contract term runs through June 20, 2016, and includes provisions for the Board of Trustees to evaluate and assess his performance annually during the term of the contract. The board is scheduled to conduct the superintendent's first annual evaluation in September 2013.

The superintendent meets with his cabinet every Wednesday afternoon. Cabinet meetings are interactive and typically include extensive discussions of pertinent issues affecting administration and operation of the district. Further, the superintendent issues directives, cabinet members provide status reports of their area, and as a whole the team plans for monthly board meetings. **Figure 1–2** shows the district's organization as of January 2013.

### SCHOOL ADMINISTRATION

The district has staffing guidelines (i.e., staffing formulas) for elementary schools, middle schools and senior high schools. The district's staffing guidelines are based on student enrollment and include specific staff allocations for positions including principals, assistant principals, counselors, teachers, librarians, nurses, clerical staff and aides. The district assigns one principal to each elementary, middle, or high school and staffs assistant principals based on the

**FIGURE 1–1**
**BEAUMONT ISD BOARD OF TRUSTEES**
**SCHOOL YEAR 2012–13**

| NAME | TITLE | TERM EXPIRATION | LENGTH OF SERVICE | OCCUPATION |
|------|-------|-----------------|-------------------|------------|
| Woodrow Reese, District 3 | President | May 2015 | 14 years | Postmaster |
| Janice Brassard, District 7 | Vice President | May 2013 | 7 years | Self-Employed |
| Terry Williams, District 1 | Secretary | May 2015 | 24 years | Entrepreneur |
| Gwen Ambres, District 4 | Member | May 2013 | 2 years | Retired Manager |
| Zenobia Bush, District 2 | Member | May 2015 | 13 years | Management Consultant |
| Mike Neil, District 5 | Member | May 2015 | 2 years | Businessman |
| Tom Neild, District 6 | Member | May 2013 | 4 years | Self-Employed |

NOTE: Due to the U.S. Department of Justice intervening in the redistricting and election process, the May 2013 elections were canceled and have been set for a November 2013 election.
SOURCE: Beaumont ISD, Administration, Board of Trustees, February 2013.

DISTRICT ORGANIZATION AND GOVERNANCE                    BEAUMONT INDEPENDENT SCHOOL DISTRICT

FIGURE 1–2
BEAUMONT ISD ADMINISTRATION ORGANIZATION
JANUARY 2013



Source: Beaumont ISD, Administration, Organization Chart, February 2013.

allocation formulas included in the district's staffing guidelines. Beaumont ISD last revised its staffing guidelines in July 1995.

Each school has a Campus Educational Improvement Committee (CEIC) consisting of district and community stakeholders (i.e., teachers, parents, school administrators, community leaders and business leaders). The CEICs play an important role in school administration through campus-based decision-making. These diverse committees work collaboratively with principals and other school administrators to develop campus improvement plans and provide financial and volunteer resources to improve and sustain student performance throughout the district. Schools must have adequate resources and flexibility to develop programs that are tailored to meet the unique needs of the students they serve.

## FINDINGS

♦ The Board of Trustees is dysfunctional, lacks a formal operating structure, and with ineffective communication among its members, has created a divisive atmosphere of distrust. As a result, the board does not function as a team with common goals and objectives and is faced with negative influence from external stakeholders, which compromises the board's ability to effectively govern the district.

♦ The district's leadership has created an organizational structure that aligns incompatible functions and assigns oversight of financial services to staff without ensuring the minimum qualifications are met.

♦ Beaumont ISD lacks an effective process to control excessive legal costs and acquire legal services, incurring an average of more than $938,000 annually in legal fees and settlements during a five-year period, far exceeding those of peer districts.

♦ Beaumont ISD lacks a formal, long-term strategic planning process with a shared vision, goals, and measurable objectives to hold the superintendent accountable for efficiently and effectively meeting the needs of its students through its academic programs, operations, and administrative support functions.

♦ Beaumont ISD has not developed or communicated clear guidelines for staff transfers and reassignments between campuses throughout the district.

## RECOMMENDATIONS

♦ Recommendation 1: Develop and adopt board operating procedures that will improve the operating structure of the board and foster effective communication and relationships amongst board members as they serve the district community.

The board should begin this process with setting a plan and schedule for a series of intensive teambuilding sessions that are mandatory for all board members and the superintendent to attend. Secondly, the district's Board of Trustees should develop a formal self-policing structure to address instances in which board members do not comply with board ethics policies. Further, the board should implement a policy and related process for board members to request information from the superintendent outside of a directive from the full board. Overall, this recommendation requires the district to re-evaluate and revise its current board operating structure, policies and procedures, and related communication protocols to provide more effective governance and leadership, enhance board accountability, and establish trust among board members to efficiently oversee district operations.

♦ **Recommendation 2:** Eliminate three positions, including the deputy superintendent for Financial Services and Elementary Administration, assistant superintendent for Curriculum and Instruction and Secondary Administration, and executive director of Human Resources positions. In addition, the district should create two positions, including the assistant superintendent for Curriculum and Instruction and the assistant superintendent for Human Resources. Finally, the district should rename the chief business officer to the chief financial officer and realign the Financial Services functions appropriately under this position.

♦ **Recommendation 3:** Amend board Policy BDD (LOCAL) to include stronger language preventing individual board members from bypassing the superintendent or the board's designee to request legal services from attorneys hired by the board. The district should also explore the option of in-house counsel along with implementing structural controls to reduce its legal fees.

♦ **Recommendation 4:** Implement a comprehensive strategic planning process to develop a long-range strategic plan with measurable objectives, timelines, and assignments using elements of the traditional and stakeholder-driven strategic planning processes, for which the board will hold the superintendent and executive leadership team accountable.

♦ **Recommendation 5:** Establish clear, consistent, written operating procedures and guidelines for staff transfers and reassignments throughout the district.

## DETAILED FINDINGS

### BOARD STRUCTURE AND COMMUNICATION (REC. 1)

The Board of Trustees is dysfunctional, lacks a formal operating structure, and with ineffective communication among its members, has created a divisive atmosphere of distrust. Although, each of the seven board members expressed an understanding of their roles and responsibilities, there was concern that some members disregard their respective roles and get involved in administrative matters. As a result, the board does not function as a team with common goals and objectives and is faced with negative influence from external stakeholders, which compromises the board's ability to effectively govern the district.

The factors contributing to the dysfunctional structure of the board can be characterized by the following issues:

- lack of effective communication, trust, and teambuilding;
- failure to understand and act in accordance within defined roles and responsibilities;
- influence from external stakeholders; and
- absence of a formal board operating structure.

### COMMUNICATION, TRUST, AND TEAMBUILDING

Review team interviews with the seven board members indicate that the board is divided into three distinct groups, with clear divisions along racial lines. Board members' comments indicate that this division appears to be the catalyst for the absence of trust and personal animosity between the groups. Some of the individual feedback provided during these interviews was evidence that communication and trust is broken. For example:

- Comments from several board members indicated that the board is segmented into two groups and an individual, who often votes with the majority.
- One board member indicated the following: "I have only one trustee with whom I have a lasting relationship and regularly communicate; I speak to a second trustee about educational issues as they arise; and I do not communicate with the remaining board members because we don't like each other."

- Comments from several board members indicated that there is no trust for two board members; there are five members who work together and two members who work together, with no trust among the full board.

The review team interviews indicate that there have been several events that have contributed to the ineffective communication and distrust among board members:

- Some board members took district governance and management-related information to the Texas Education Agency (TEA) rather than addressing the issues with the board.

- Board members took the superintendent's contract to a local attorney because they had a problem with a clause in the contract related to salary increases and the manner in which draft and final versions of the contract were communicated to the board before taking a vote. The initial vote was 7–0 to approve the superintendent's contract. After voting for the contract, the board members filed a lawsuit against Beaumont ISD and the board.

- Confidential information discussed in executive session related to a potential legal settlement was provided to a local attorney who, at the time of this review, was involved in a lawsuit against the district in a case Beaumont ISD is attempting to settle.

- A group of board members have consistently defended Beaumont ISD's leadership and overall direction despite evidence indicating potential problems with construction contracts awarded during the 2007 Bond Program and the Hurricane Ike disaster.

- "One board member walked out of a retreat because this member was upset that the board was expected to approve the Comprehensive Annual Financial Report (CAFR) without having time to review it for the second year in a row."

- Some board members have openly referred to the majority of the board as a "gang of four," which African American board members perceive as a tacit reference to race because most votes are 5–2.

- Some board members perceive that the African American board members have "drawn a line in the sand" and do not give two of the Anglo board members the courtesy of "open and honest discussion."

Not all Beaumont ISD board members are committed to participating in formal teambuilding sessions. For example, despite the superintendent's suggestion that all seven board members begin the teambuilding process by attending general training in the Reform Governance in Action (RGA) program conducted by the Center for Reform of School Systems (CRSS) in February 2013, two board members refused to attend, saying they had no confidence in the training. It was expressed that "I do not buy into the Team of 8 training because the four majority members of the board want us to come to their side;" and "the attitude is 'you guys need to come to training so you guys will come over to our side,' and I got this feeling even though the superintendent suggested CRSS training because I do not believe the training will work."

Only five of the seven board members attended the RGA training, which helps board and superintendent teams improve governance practices and reform leadership primarily through policy development. One of RGA's four premises linked to creating value for school boards is: "the most effective way to transform a district for high achievement is for a strong board/superintendent team to work together with relationships built on trust, clarity regarding roles and responsibilities, and a common vision for change..." Attending CRSS training serves as a fresh start for the entire board to begin an extensive teambuilding process that will likely require multiple sessions with a facilitator to establish trust and open communication among the entire board. The reluctance of board members to participate in CRSS-sponsored teambuilding training as a full board demonstrates the difficulty the board will have resolving its communications and trust issues. Board members perceive that they could not work as a team because all seven members had not yet made the commitment to explore teambuilding to bridge the relationship gaps that exist between board members.

The cumulative effect of each of these actions and others since 2009 has diminished the board's ability to develop policy and make critical decisions. However, there was a concern that the breach of the confidentiality of executive sessions was the "high water mark" contributing to the complete breakdown of trust among the full board. Once the confidentiality of executive sessions was breached, some board members are reluctant to deliberate confidential matters in an executive session. The members are concerned that their discussions would be shared with members of the general public, media or a party on the other side of legal issues. The reluctance to deliberate confidential matters

places the district and its stakeholders at risk of potential financial loss.

When there are divides among school board members related to trust and open communication, each member must take responsibility to improve the communication and trust among all members. This process is often difficult because members must first talk candidly with each other to determine the origins of poor communication and distrust, and then make a concerted effort to change the environment. Typically, boards hire a facilitator to conduct teambuilding sessions. During the sessions, board members complete personality profiles, discuss the issues dividing the board, and participate in exercises to improve communication and trust. However, this process is only effective if all board members believe teambuilding can improve trust and communication, and make individual commitments to actively participate in the process.

In instances where internal conflicts, distrust, and poor communication exist among members of school district governing boards, the AdvancED/Southern Association of Colleges and Schools Council on Accreditation and School Improvement (AdvancED SACS CASI) recommends school districts use the services of a professional mediator to resolve these issues that may limit the overall effectiveness of the school board. An AdvancED/SACS CASI Special Review Team (Special Review Team) conducted a site visit to Atlanta Public Schools (APS) in December 2010, citing communication, operational, and personal issues among members of the school board that led to ineffective governance. In its report from the site visit to APS, the Special Review Team required the board to "secure and actively use the services of a trained, impartial professional mediator who will work with board members to resolve communication, operational, and personal issues impeding the effectiveness of the governing body." In March 2011, the board hired a mediation team from the University of Georgia's Fanning Institute to help resolve these issues. The Fanning Institute mediation team facilitated an intense two-day workshop with the board in May 2011, for eight hours each day, and followed up with two additional mediation sessions around leadership with the board. After these sessions, board members showed a drastic improvement in their ability to communicate respectfully and productively, and board members now handle personal issues that arise between them privately in a professional manner.

## ROLES AND RESPONSIBILITIES

Although the majority of Beaumont ISD's board appears to understand their roles and responsibilities, some of them have a different view of their respective roles as trustees. Board members stated that some of the trustees attempt to intervene in campus matters, from conducting campus investigations on their own to interfering in the hiring of principals. Other board members stated that they were elected to the board to expose corruption and protect the interests of Beaumont ISD taxpayers. For example, it was expressed that it is a board member's responsibility to review and discuss the district's expenditures at monthly board meetings.

Fifty-seven percent of respondents to the Beaumont ISD campus staff survey either agree or strongly agree that board members understand their role as policy makers and avoid the daily management of the district. However, review team interviews with campus principals and members of the executive leadership team indicate that some board members tend to get involved in campus staff matters. When this situation occurs, the member of the executive leadership team or the campus principal notifies the superintendent.

Members of the executive leadership team expressed that some board members participated in meetings with construction contractors during the construction of West Brook High School. This involvement blurs the "line of demarcation" that exists between policy-making and interfering in the day-to-day management of the district. Further, some board members routinely request checks and supporting documentation for specific payments to vendors from the executive leadership team. The members use this information to conduct independent reviews and analyses unrelated to directives issued by the board as a corporate body. These requests are outside the normal board agenda and are considered as board micromanagement.

Beaumont ISD's board ethics Policy BBF (LOCAL)-A, states: "…As a member of the board, I will focus my attention on fulfilling the board's responsibilities of goal-setting, policy-making, and evaluation; and I will avoid personal involvement in the activities the board has delegated to the superintendent…" Based on the review team's onsite interviews, focus groups, and observations in the district, some board members' actions may not be consistent with the board's ethics policy. Related to this policy, the board president stated that he encourages board members to "allow the superintendent to be the superintendent."

The Texas Association of School Boards (TASB) has published guidelines on self-policing for school boards as an effective vehicle to manage instances of micromanagement by board members, as well as violations of ethics policies. These guidelines, if implemented properly, encourage good governance practices.

*INFLUENCE FROM EXTERNAL STAKEHOLDERS*

It is perceived by board members and by district leadership that external stakeholders negatively influence some board members. This influence compromises the board's ability to effectively govern the district and comply with its ethics Policy BBF (LOCAL)-A, which states:

(1) "…I will be continuously guided by what is best for all students of the district…";

(2) "…I will refuse to surrender judgment to any individual or group at the expense of the district as a whole…"; and (3) "…I will base my decisions on fact rather than supposition, opinion, or public favor."

Review team interviews indicate that leaders in the African American community formulate strategy and advise the African American board members how to vote on certain issues. Further, leaders of Beaumont citizens' advocacy groups also advise Anglo board members how to vote on issues important to them. Multiple board members expressed to the review team that at least one board member has individuals representing advocacy groups in the audience at every board meeting. It has been observed that during board meetings this board member receives a signal on how to vote from the lead representative in the audience. Outside influence from members of advocacy groups and known constituencies undermine the purported independence of individual board members and can potentially contribute to board members making decisions that may not be in the best interest of the district.

External influences on board members from community and advocacy groups tend to contribute to board dysfunction, poor communication with district stakeholders, public distrust of the board, and racial hostilities that exist within the board and the community. For example, it was reported that one board member has received threats for voting with the African American board members. This voting practice has been described as the member coming over to the "dark side." The review team also learned that blogging has occurred about perceived secret meetings held by leaders in the African American community at the Appomattox Club to formulate strategy for Board of Trustees issues.

The review team conducted an online community survey that was open to the public. The survey was available on the Legislative Budget Board's website. The agency provided a link to the district, local media and community groups. There were 366 narrative responses regarding management and board governance. There were no controls on the survey to prevent multiple responses from the same individual. **Figure 1–3** shows a representative sample of the narrative comments from the survey.

*BOARD OPERATING STRUCTURE*

The Board of Trustees lacks a formal operating structure to guide its governance activities in a logical, orderly way to efficiently conduct its business in a consistent, professional, and effective manner. For example, the board has not reevaluated its operating policies, protocols and guidelines for the following areas:

- a committee structure;

- regular meeting schedule;

- submitting items for the board agenda;

- timeliness for delivering agenda material to board members before regular board meetings;

- ethics and related sanctions;

- board self-assessment; and

- process for requesting information from the superintendent.

Since the time of the onsite visit, the board has developed new policies for oversight management, constituent services and board governance. However, these policies are not expected to be adopted and implemented until approximately August 2013.

As currently organized, the board has a Buildings and Grounds Committee and a Consultation Committee and does not have a Committee of the Whole. The Buildings and Grounds Committee is responsible for overseeing the activities of the district's building and facilities, while the Consultation Committee is responsible for hearing the concerns and issues of teachers as the board makes policy decisions regarding teaching and instruction. The continued poor communication, distrust, and personal animosity among board members does not lend to this committee structure operating effectively.

**FIGURE 1–3**
**BEAUMONT ISD COMMUNITY SURVEY SAMPLE NARRATIVE COMMENTS**
**FEBRUARY 2013**

| COMMENTS |
|---|
| • "...The board also seems to have four members who have an alliance and stick together on most all issues and they seem to be racially motivated, meaning they will do what they have to do to promote/help people of African descent even if their company isn't the lowest bidder or most qualified, wasting taxpayers' money..." |
| • "...Most of the bond money was well-spent. There were several glitches that over-shadowed everything else (primarily, the problem with the electrical work done on the new buildings). The board did not handle that issue well. Now there is a problem of seven single-member district seats on the board or five single-member district seats and two at-large seats. Once again racism is raising its ugly head..." |
| • "The Beaumont ISD school district board is in disarray...Color lines are drawn here by those not typically considered majority. Management is going along with this gang of four." |
| • "The Beaumont ISD Legislative (Board) is divided by race. The blacks on the board are only committed to literally beating the 'white community' over the head with their authority and making sure that they steer any and all benefits (i.e., supervisory positions, construction contracts) to other blacks..." |
| • "The district is extremely racist and bigoted in its organization and management. If you are not a minority, you are not considered for employment in any management-type position..." |
| • "Very, very bad management. The board does not represent the wishes of their constituents, the people who put them on the board. They do things the way they want to and not for the best interests of the students. With them every issue is black and white." |
| • "This board has been the worst thing to happen to Beaumont...It's a totally black/white issue. The blacks want to do what the blacks want to do and don't make decisions based on what is best for the district and the students. I feel if you replaced all four of them with four new ones it would not change..." |

Source: Legislative Budget Board, School Review Team Community Survey, February 2013.

The Board of Trustees meets on the third Thursday of each month for its regular meeting and holds special meetings as necessary. During board member interviews the review team learned that some members are interested in meeting more frequently given the volume of information that must be absorbed to prepare for the monthly meetings. Board members also expressed a desire to have a forum to ask questions of the district's executive leadership team to help them understand the issues related to action items requiring board approval.

Board members may request specific items be placed on the board agenda through the board president if at least two members jointly present the item. Some board members circumvent this process by going straight to the executive assistant of Board Affairs to place items on the agenda without going through the board president as board protocol requires. The president often is not aware of these board members' efforts to submit items for the agenda until notified by the executive assistant. According to the board president, he continuously encourages board members to follow board structure and protocol. However, no sanctions are in place to address violations of structure and protocol.

According to some board members, the superintendent and executive leadership team do not timely deliver the agenda and supporting documents for the monthly board meeting to the executive assistant. As a result, the information is not always available to board members on the Friday before the meeting. Some board members stated that this information has not been available, as late as, the day before they vote on action items. This practice does not allow members sufficient time to review the supporting documentation before voting. For example, review team interviews indicate that the superintendent's executive leadership team delivered Beaumont ISD's CAFR on the day of the board's annual retreat for them to vote to approve the document. It was confirmed by the executive assistant of Board Affairs that the board agenda and supporting documentation has not always been electronically posted by the Friday before the regular board meeting. Rather, the board materials are posted by the Monday before the regular board meeting. Efforts are being made to work with the superintendent to obtain the information for the agenda in sufficient time to meet the Friday deadline. When board materials are not timely uploaded for access, members may not have enough time to review the board agenda and documentation, ask questions, and be prepared to vote on action items affecting district operations.

The board has not conducted a major review and updated its ethics Policy, BBF (LOCAL)-A, since Update 63 issued June 22, 2000, with the exception of minor updates for conflict of

interest disclosures (Update 80, May 22, 2007) and affidavits disclosing substantial interests in business entities or real property (Update 95, October 4, 2012). The policy cites broad values such as equity in attitude, trustworthiness in stewardship, honor in conduct, integrity of character, commitment to service, and student-centered focus (i.e., first letters of each value spells ETHICS), and includes a list of 19 ethical standards board members agree to uphold during their tenure on the board. However, the policy does not include procedures for administering the ethics policy or guidelines outlining sanctions for board members violating any of the 19 ethical standards.

Beaumont ISD's board does not routinely conduct annual self- assessments of its performance. The benefits of board self assessments include the following:

- board accountability;

- open communication among board members;

- insight into decision-making;

- improvement of board professionalism;

- clear understanding of roles and responsibilities;

- identification of strengths and weaknesses;

- effective and productive goal-setting;

- successful board meetings; and

- better board/superintendent teamwork.

Self assessments serve as helpful tools for boards to evaluate performance and identify areas for improvement.

Finally, Beaumont ISD's board lacks a process and procedures to request information from the superintendent. The absence of this process results in individual board members initiating requests to the superintendent for documents which require extensive time for district staff to process. For example, some board members inundate the superintendent with requests for contractor invoices and supporting documentation; retainer agreements, contracts, and itemized invoices for the district's legal counsel; and copies of court filings, correspondence, and all information filed with the U.S. Department of Justice related to Beaumont ISD's redistricting plan. Some of the requests for invoices and supporting documentation are challenging as they span multiple fiscal years and require a significant amount of time for staff to complete. The board members request this information as individuals, rather than as directives issued by the full board.

Each time one board member requests documents, the superintendent must provide copies of the documents to all seven members of the board. This process is time-consuming and results in staff fulfilling these requests instead of focusing on the day-to-day district operations essential to effectively manage the district.

The combination of these issues contributes to the overall dysfunctional operating structure of Beaumont ISD's Board of Trustees. Other districts have successfully addressed these issues by adopting best practices from various sources. When addressing committee structures, TASB recommends that boards abandon a formal committee structure with multiple committees when poor communication and distrust exists among its members. Rather, TASB recommends implementing a "committee of the whole" structure in which the full board acts as one committee and all deliberations and recommended actions take place with the full board. This structure facilitates open communication and dialog among board members in an effort to establish trust.

To allow board members ample time to absorb the information to be presented at a board meeting, Houston ISD conducts formal board work sessions in lieu of scheduling a second regular meeting in a given month. The work sessions are scheduled on the Monday afternoon before the regular board meeting on Thursday and allow board members to ask questions about specific agenda items prior to the meeting. These work sessions effectively serve as a second meeting which does not require board action.

Best practices suggest that school boards review, adopt, update, and sign their ethics policies each year in an effort to assist board members in behaving in an ethical, reasonable, and conscientious manner. For example, in November 2005, the Augusta, Georgia school board revised and updated its code of ethics and voted that it be adopted, updated, and signed each year. The White Bear Lake Area school board in Minnesota went further and revised its code of conduct to include procedures for administering its ethics policy and list sanctions to be imposed on an individual school board member for violating ethical standards included in the policy. The board adopted the policy in January 2011. Education experts agree that sanctions for board members violating school board ethics policies are a "must have" in any ethics policy.

Lastly, TASB's *Effective Board Practices: An Inventory for School Boards*, published in 2011, recommends school boards complete a self-assessment as part of the annual teambuilding

requirement and use it as an opportunity for the board and executive leadership team to determine what needs to be improved to function more effectively in the future. The implementation of these best practices and the adoption of board governing policies and process have been the key to dysfunctional boards beginning to operate more effectively.

Beaumont ISD's Board of Trustees should develop and adopt board operating procedures that will improve the operating structure of the board and foster effective communication and relationships amongst board members as they serve the district community.

The board should begin this process with setting a plan and schedule for a series of intensive teambuilding sessions that are mandatory for all board members and the superintendent to attend. Each session should be led by an experienced facilitator, with the initial session incorporating a personality assessment tool for all participants to help them better understand each other and how they interact with others. Personality assessment tools are designed to help people better understand and appreciate individual differences that potentially affect group dynamics and decision-making. Personality assessment tools also identify a group's type and its related problem solving and conflict management styles, as well as how an individual's personality-type preferences influence their approach and response to conflict, providing them with a framework for dealing with conflict situations more effectively and improving relationships. Future sessions should include conflict management and group dynamics to help the board establish trust and communication among its members. If communication and trust among board members does not improve from the teambuilding sessions, the board should consider contracting with a trained, impartial professional mediator as a final resort to assist them with restoring communication and trust so the board can operate and function as a cohesive body focused on educating the district's students.

Secondly, Beaumont ISD's Board of Trustees should develop a formal self-policing structure to address instances in which board members do not comply with board ethics policies. The board should incorporate the self-policing structure in board policy and accompanying procedures, and should outline specific prohibited actions and related sanctions. For example, the board, as a corporate body, could give the board president the authority to publicly reprimand board members who act individually rather than as a corporate body and the reprimand would be recorded in the official minutes of the board.

Further, the board should implement a process and related procedures for board members to request information from the superintendent outside of a directive from the full board. More specifically, this process should require a directive from the full board for all document requests that take the superintendent more than 20 minutes to fulfill. If an individual board member makes a document request that takes the superintendent more than 20 minutes to fulfill, the superintendent should forward this request to the president of the board to include in the board agenda for board approval. This process will enable the superintendent to prioritize all document requests from board members for the district's leadership team, enabling them to focus on the core activities of their respective functions.

Overall, this recommendation requires Beaumont ISD to re-evaluate and revise its current Board of Trustees' operating structure, policies and procedures, and related communication protocols to provide more effective governance and leadership, enhance board accountability, and establish trust among board members to efficiently oversee district operations. The board should implement the following changes to its operating structure and protocols:

- If communication and trust among board members does not improve through teambuilding sessions, the board should contract with a trained, impartial professional mediator to help restore communication and trust.

- Conduct annual self-assessments of the board as a part of the annual teambuilding sessions.

- Develop a formal self-policing structure and accompanying procedures.

- Establish a "committee of the whole" structure in which the full board acts as one committee and all deliberations and recommended actions take place with the full board.

- Revise the existing board meeting structure to include a work session for the board on the Monday before the regular board meeting.

- Strengthen the process for board members to place items on the board agenda by including specific guidelines and notification protocols for requesting items to be placed on the regular meeting agenda in written board operating procedures.

- Strengthen the process for providing board members information in advance of the work

sessions and regular board meetings by holding the superintendent accountable in his annual evaluation for timely delivering the board agenda and supporting documentation.

- Update the ethics policy and include specific procedures for administering the policy, as well as specific sanctions for board members violating ethics policies. The policy should require the board to review, update, and adopt ethics policies annually.

- Develop a formal process for the board and individual members requesting information from the superintendent.

Once these policies have been developed and adopted, Beaumont ISD's Board of Trustees should link the recommended changes to its operating structure and protocols to specific board policies and related operating procedures. Operating procedures supporting Beaumont ISD's board policy initiatives should be developed. TASB's *Effective Board Practices: An Inventory for School Boards*, recommends written board operating procedures for effective school boards. According to TASB, written operating procedures are intended to clearly define how to carry out regular board tasks, which are often linked to board policies and procedures. Further, TASB states: "...The absence of written operating procedures often contributes to inefficiency, inconsistency in trustee actions, and the failure to carry out important tasks."

The fiscal impact of this recommendation is $4,200 per year for annual, facilitated teambuilding and board self assessment sessions. The fiscal impact is based on the costs charged by TASB. The TASB Leadership Services, Board Development consultants' fees for teambuilding and self-assessments are $900 for two hours of telephone consultation before the sessions and up to four hours of facilitation time for consultants, plus travel expenses. The fiscal impact calculation includes:

- facilitated teambuilding session - $2,550 (one eight-hour session for $1,800, plus $750 in travel expenses, including airfare, hotel, ground transportation, and meals); and

- facilitated board self-assessment - $1,650 (one four-hour session for $900, plus $750 in travel expenses, including airfare, hotel, ground transportation, and meals).

## ORGANIZATION ALIGNMENT (REC. 2)

The district's leadership has created an organizational structure that aligns incompatible functions and assigns oversight of financial services to staff without ensuring the minimum qualifications are met. As a result, the division of responsibility for instructional and non-instructional functions compromises the efficient and effective management of district operations. **Figure 1–2** shows the district's current organization, as of January 2013.

In January 2013, the superintendent made some reorganization decisions which resulted in the alignment of the functions of Elementary Administration and Financial Services under the same leadership. The chief business officer (CBO) position became vacant in December 2012 and the district chose not to fill this position. Instead, the district created the deputy superintendent for Financial Services and Elementary Administration position. The superintendent appointed the former assistant superintendent for Elementary Administration to this newly created deputy superintendent position. The deputy superintendent position essentially combined the functions of the CBO and the assistant superintendent under one position. **Figure 1–4** shows the qualifications for the two positions, as provided by the district's job descriptions, and the current leadership experience for the deputy superintendent position. The district did not provide the review team with a job description for the deputy superintendent for Financial Services and Elementary Administration position.

**Figure 1–4** shows that the current leadership meets and exceeds the qualifications for the functions of the assistant superintendent for Elementary Education, but does not meet the minimum qualifications of the CBO position.

Aligning incompatible functions under the same leadership, without ensuring that the minimum qualifications are met to satisfy both functional areas, makes it difficult for both functions to be effectively managed. For example, during onsite interviews with key members of the superintendent's cabinet, the review team learned the deputy superintendent often relies on the background and experience of the director of Finance to answer questions related to financial services in weekly cabinet meetings. This requires the director of Finance position, which is not a position of the superintendent's cabinet, to attend all cabinet meetings. During the elementary school principal's focus group sessions, the review team learned that while the Elementary Administration function continues to be supportive, the principals had reservations about combining it with the Financial Services function

BEAUMONT INDEPENDENT SCHOOL DISTRICT                               DISTRICT ORGANIZATION AND GOVERNANCE

**FIGURE 1—4**
**BEAUMONT ISD**
**QUALIFICATIONS AND EXPERIENCE OF EXECUTIVE LEADERSHIP POSITIONS**
**FEBRUARY 2013**

| CURRENT LEADERSHIP EXPERIENCE | ASSISTANT SUPERINTENDENT FOR ELEMENTARY EDUCATION | CHIEF BUSINESS OFFICER |
|---|---|---|
| • Doctor of Education, Educational Administration and Leadership<br>• Master of Education in Supervision<br>• Bachelor of Science<br>• Superintendent's Certification<br>• Professional Mid-Management Administrator Certification<br>• Supervisor Certification<br>• Provisional Elementary Certification<br>• Six years teaching experience<br>• Sixteen years in progressive administrative and instructional leadership roles including elementary curriculum coordinator, assistant principal, elementary principal, director of Staff Development, and assistant superintendent for Curriculum, Instruction and Elementary Administration, | • Master's Degree; doctorate preferred<br>• Texas Mid-management or other appropriate Texas Certificate<br>• Certified Professional Development and Appraisal System (PDAS) appraiser<br>• Valid Texas Teaching Certificate<br>• Three years teaching experience<br>• Three years experience in administrative/instructional leadership roles | • Bachelor's Degree in Accounting or Business related field; CPA preferred<br>• Six years progressively advanced business related experience preferably in public education environment |

SOURCE: Beaumont ISD, Human Resources Department, Job Descriptions and Personnel Files, February 2013.

given the depth and breadth of oversight likely required for both functions.

The deputy superintendent for Financial Services and Elementary Administration also has a "dotted-line" reporting relationship for support functions that report directly to the superintendent, including the assistant superintendent for Administration and Operations, executive director of Human Resources, assistant superintendent for Technology, Research and Evaluation, and the special assistant for Communications. A dotted-line reporting relationship requires the deputy superintendent to provide additional oversight and guidance to cabinet members who report directly to the superintendent, giving the position the authority to provide some level of influence and leadership over the cabinet members managing support functions. These additional oversight responsibilities add a layer of administration between the superintendent and his direct reports.

The organizational structure shows the executive director of Human Resources position aligned with the assistant superintendents' positions. The alignment of this position is appropriate, but the title is inconsistent with this level of leadership. In addition, to put emphasis on the importance of the financial aspect of the district operations, district's financial leadership is typically referred to as the chief

financial officer (CFO) as opposed to the chief business officer, such as in Beaumont ISD.

Texas school districts of similar size have flatter organizations with assistant superintendents that report directly to the superintendent rather than to a deputy superintendent responsible for incompatible functions. For example, Galena Park ISD, one of Beaumont ISD's peer districts selected for this review, has a flat organization with five assistant superintendents and a chief financial officer who report directly to the superintendent; yet the superintendent has a reasonable span of control of six direct reports. **Figure 1-5** presents Galena Park ISD's organization.

A flat organization is efficient as assistant superintendents have direct access to the superintendent and can readily communicate across departments and functions, rather than potentially filtering communication through a deputy superintendent who has some level of influence and leadership over them as they lead their respective functions. Further, the absence of an additional layer of "coordinative, dotted-line management" encourages an easier decision-making process among the members of the district's leadership team.

Beaumont ISD should eliminate three positions, including the deputy superintendent for Financial Services and

**FIGURE 1–5**
**GALENA PARK ISD ORGANIZATION**
**APRIL 2013**



Source: Galena Park ISD, Administration, Organization Chart, April 2013.

Elementary Administration, assistant superintendent for Curriculum and Instruction and Secondary Administration, and executive director of Human Resources positions. In addition, the district should create two positions, including the assistant superintendent for Curriculum and Instruction and the assistant superintendent for Human Resources. (It is recommended in the Educational Service Delivery Chapter that Beaumont ISD create two executive director positions under the assistant superintendent for Curriculum and Instruction to oversee the elementary and secondary educational services.)

The district should also rename the CBO to the CFO and realign the Financial Services functions appropriately under this position. (It is recommended in the Financial Management Chapter that the superintendent require that the Financial Services Department leader meets the minimum qualifications for this position.) In this flatter organization, the superintendent will have a total of seven direct reports, including the District Educational Improvement Committee (DEIC). Additionally, the position titles will be appropriately aligned. **Figure 1–6** presents the recommended organization for Beaumont ISD.

This fiscal impact assumes that eliminating these three positions will result in an annual savings of $410,393. This savings is based on the salaries for these positions and the

district's benefit rate of 21.64 percent. The calculations are shown in **Figure 1–7**.

This fiscal impact also assumes that the salary for creating the assistant superintendent for Curriculum and Instruction is comparable to that earned by assistant superintendents in similarly sized districts. The recommended salary for this position is based on the *2010–11 TASB/TASA District Personnel Report* for the Chief Instruction/Curriculum Officer position. The minimum salary of this position in comparable sized districts ($93,048) is used to calculate the cost of this position. The fiscal impact for creating the assistant superintendent for Human Resources position is based on the salary earned by the executive director of Human Resources in the district since this is only a title change with the same responsibilities. Creating these two positions will result in an annual cost of $243,460. The calculations are shown in **Figure 1–8**.

Finally, the total impact of this recommendation will result in an annual net savings of $166,933 = ($410,393 - $243,460). The fiscal impact of this total recommendation will result in a five year savings of $834,665 ($166,933 X 5 years).

### LEGAL FEES (REC. 3)

Beaumont ISD lacks an effective process to control excessive legal costs and acquire legal services, incurring an average of

the district's attorney to ask questions or request specific legal services.

Figure 1–9 shows legal fees and settlements the district paid from its general fund from fiscal year 2008 to 2012.

### FIGURE 1–9
### BEAUMONT ISD LEGAL FEES AND SETTLEMENTS FROM GENERAL FUND
### FISCAL YEARS 2008 TO 2012



Source: Beaumont ISD, Financial Services Department, Legal Fees and Settlement, February 2013.

Beaumont ISD paid $4,693,290 in legal fees and settlements over the five-year period for fiscal years 2008 to 2012, related to:

- lawsuits and mediations for special education challenges related to the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Americans with Disabilities Act;

- construction contractors' challenges to the district bidding processes, including bids awarded to minority contractors under the district's local, minority, and women-owned businesses policy;

- continuing challenges to the district's governance, administrative, and operating decisions from Beaumont citizens' watchdog groups;

- staff grievances and employment-related lawsuits; and

- specialized legal assistance related to developing a redistricting plan to implement five single-member and two at-large districts for the Board of Trustees as voted by Beaumont citizens in May 2012, referred to as the "5-2 plan."

Legal fees and settlements increased 103.6 percent in fiscal year 2010 because the courts ruled against Beaumont ISD in a Special Education IDEA and Section 504 case filed requiring the district to establish a trust fund. Beaumont ISD deposited $462,500 in the trust fund to settle the case. Excluding settlement costs used to establish the trust fund, legal fees and settlements total $932,748 for fiscal year 2010, an adjusted increase of 36.1 percent. Legal fees continued to rise in fiscal year 2011 and fiscal year 2012 after adjusting for the cost of establishing the trust fund in fiscal year 2010, increasing 8.7 percent in fiscal year 2011 and 7.6 percent in fiscal year 2012.

Beaumont ISD experienced a noticeable increase in legal challenges from construction contractors to contracts awarded with the 2007 Bond Program through the district's competitive bidding process after the membership of the board changed with the May 2009 Board of Trustees election. Based on interviews with members of the board and the district's executive leadership team, the review team learned some contractors challenged the district's contract awards to local, minority, and women-owned businesses, including the fairness of the bidding process. Further, due to disagreements with the priorities of the 2007 Bond Program, including the emphasis on "tearing down" old schools to replace them with new schools, rather than selectively renovating existing schools at a lower cost, new board members reviewed a number of construction bids, identified problems with Beaumont ISD's bidding process, and brought the issues to the full board. Once discussions about the allegations of impropriety with the district's bidding process occurred in a board meeting, it raised a number of questions about Beaumont ISD's procurement and bidding practices of the 2007 Bond Program in the contracting community and with Beaumont citizens watchdog groups. As a result, the district was at the center of a litigious environment creating the "perfect storm" for contractors and Beaumont citizens watchdog groups, to file lawsuits and injunctions challenging the bidding process for construction projects completed during the 2007 Bond Program. For example, an injunction was filed to stop the district from conducting a proposed feasibility study to lease school district property to a hotel to build a hotel/event center which the district could use for vocational training. The district incurred legal fees to defend or settle the cases.

Beaumont ISD board Policy BDD (LOCAL) – Board Internal Organization, Attorney, requires individual trustees to "channel legal inquiries through the superintendent or

board designee, as appropriate, when advice or information from the district's legal counsel is sought." Although board policy outlines a process for individual board members to request legal services, the board policy does not have strong enforcement language to prevent individual board members from bypassing the superintendent or board designee to request legal services from the board's attorney or attorneys hired by the board to provide legal advice related to special matters such as developing redistricting plans for Board of Trustees elections. As a result, all board members do not follow the protocol for requesting legal services outlined in board Policy BDD (LOCAL), as at least two board members worked directly with attorneys and related demographers to develop an alternate 5-2 plan for redistricting.

Further, Beaumont ISD has not competitively bid its legal services for more than 20 years, retaining the same law firm as the board's attorney for this period. Failure to implement formal policies, procedures or practices to control legal fees, including periodically re-bidding legal services, often results in spiraling legal costs and legal services billed at escalating hourly rates. **Figure 1–10** compares Beaumont ISD's average annual legal fees—paid from the general fund and settlements—to legal fees paid by peer districts of similar size and demographic composition selected for this review, from fiscal year 2010 to 2012.

**Figure 1–10** shows Beaumont ISD's average annual legal fees total $1,166,317 from fiscal year 2010 to 2012, which is 7.6 times more than the average annual legal fees paid by peer districts totaling $152,263 during the same three-year period. Further, the district paid approximately 74 percent of legal fees to one law firm during the five-year period of fiscal year 2008 to 2012. **Figure 1–11** shows legal fees and settlement costs of $50,000 or more that the district paid annually, by vendor, from fiscal years 2008 to 2012.

This analysis reflects a dramatic disparity between Beaumont ISD and its peer districts for the cost of legal services, as well as the concentration of almost three-fourths of its fees with one law firm without bidding legal services to potentially obtain lower costs per hour for similar or better quality legal services. Districts that implement structural controls and best practices often experience lower legal expenses.

As a best practice, the National School Boards Association (NSBA) recommends school boards evaluate a range of options to control legal cost depending on the district's particular needs. These options include evaluating the need for in-house or outside counsel, periodically soliciting written proposals to provide legal services, evaluating the district's attorney, monitoring the legal bills against the approved scope of legal services, and implementing policies and practices to control requests for legal services. According to NSBA, "factors such as the size of the district, its past experience with legal matters and expectations for the future, the complexity of its legal needs, the availability of expertise, and the cost of outside services versus internal staff expenses must all be weighed in reaching the decision to have an in-house attorney, with the recognition that these circumstances should be periodically reviewed and evaluated." In other words, each school district's situation is unique and school boards must carefully consider its current legal environment, the ability to hire an in-house counsel in the complex and substantive area of school law, and its budget resources to recruit and retain staff attorneys and appropriate support staff.

Beaumont ISD should amend board Policy BDD (LOCAL) to include stronger language preventing individual board members from bypassing the superintendent or the board's designee to request legal services from attorneys hired by the board. This language should include control features which require all invoices submitted by attorneys for legal services requested by individuals other than the superintendent or board's designee will not be approved for payment. In addition, the district should explore the option of in-house counsel along with implementing structural controls to

**FIGURE 1–10**
**BEAUMONT ISD LEGAL FEES AND SETTLEMENTS – GENERAL FUND COMPARED TO PEER DISTRICTS**
**FISCAL YEARS 2010 TO 2012**

| FISCAL YEAR | TYLER ISD | GALENA PARK ISD | DESOTO ISD | PEER DISTRICT AVERAGE | BEAUMONT ISD |
|---|---|---|---|---|---|
| 2010 | $174,376 | $95,059 | $85,425 | $118,287 | $1,395,248 |
| 2011 | $217,503 | $84,565 | $106,452 | $136,173 | $1,013,535 |
| 2012 | $275,150 | $230,386 | $101,448 | $202,328 | $1,090,167 |
| **3-Year Annual Average** | **$222,343** | **$136,670** | **$97,775** | **$152,263** | **$1,166,317** |

Sources: Beaumont ISD, Financial Services Department, Legal Fees and Settlements, February 2013; Legislative Budget Board, School Review Team Peer District Survey, March 2013.

**FIGURE 1–11**
**BEAUMONT ISD LEGAL FEES BY VENDOR**
**LEGAL FEES AND SETTLEMENTS – GENERAL FUNDS**
**FISCAL YEARS 2008 TO 2012**

| VENDOR | 2008 | 2009 | 2010 | 2011 | 2012 | TOTAL |
|---|---|---|---|---|---|---|
| **Legal Fees – General Fund** | | | | | | |
| Wells, Peyton, Greenberg and Hunt LLP | $401,997 | $491,755 | $563,092 | $615,177 | $569,107 | $2,641,128 |
| Adams, Lynch and Loftin, P.C. | 0 | 0 | 126,965 | 0 | 0 | 126,965 |
| Haglund Law Firm, P.C. | 0 | 0 | 75,475 | 0 | 0 | 75,475 |
| Henslee Schwartz, LLP | 0 | 0 | 0 | 101,234 | 69,363 | 170,597 |
| Law Office of Michael D. Getz | 0 | 0 | 0 | 0 | 98,909 | 98,909 |
| Others less than $50,000 annually | 72,899 | 65,686 | 164,516 | 140,497 | 23,681 | 467,279 |
| **Subtotal Legal Fees** | **$474,896** | **$557,441** | **$930,048** | **$856,908** | **$761,060** | **$3,580,353** |
| **Settlements – General Fund** | | | | | | |
| Peggy S. Britt | $0 | $50,000 | $0 | $0 | $0 | $50,000 |
| Trust Account | 0 | 0 | 462,500 | 0 | 0 | 462,500 |
| Law Office of Michael D. Getz | 0 | 0 | 0 | 63,837 | 0 | 63,837 |
| Morganti Texas, Inc. | 0 | 0 | 0 | 0 | 122,486 | 122,486 |
| All Star Plumbing, Inc. | 0 | 0 | 0 | 0 | 83,380 | 83,380 |
| Others less than $50,000 annually | 34,110 | 77,893 | 2,700 | 92,790 | 123,241 | 330,734 |
| **Subtotal Settlements** | **$34,110** | **$127,893** | **$465,200** | **$156,627** | **$329,107** | **$1,112,937** |
| **Total Legal Fees and Settlements** | **$509,006** | **$685,334** | **$1,395,248** | **$1,013,535** | **$1,090,167** | **$4,693,290** |

Source: Beaumont ISD, Financial Services Department, Legal Fees and Settlements, February 2013.

reduce its legal fees. When implementing structural controls, Beaumont ISD should consider:

- soliciting competitive bids for legal services at least once every five years from law firms who regularly represent school districts within the state of Texas at least once every five years, and negotiate the scope of services and rates, requiring school board approval for any changes in scope;

- designating the board secretary to review and monitor invoices from law firms related to services the board specifically requested and require the superintendent to assign Beaumont ISD's chief business officer the responsibility to review every legal bill for services requested by the superintendent and approved by the board, and seek clarification of any questionable entry;

- requesting in advance an estimate of the cost of any significant legal research or activity and provide advance approval to outside counsel before authorizing the work; and

- conducting annual evaluations of outside counsel concerning Beaumont ISD's performance expectations and the effectiveness and overall quality of legal services.

No fiscal impact is assumed for this recommendation because the district would need to determine if hiring in-house counsel would be cost effective and competitively bid legal services to determine the amount of savings based on proposals submitted.

*LONG-RANGE STRATEGIC PLAN (REC. 4)*
Beaumont ISD lacks a formal, long-term strategic planning process with a shared vision, goals, and measurable objectives to hold the superintendent accountable for efficiently and effectively meeting the needs of its students through its academic programs, operations, and administrative support functions. The district has three primary strategic planning-related documents: the Superintendent's Transition Plan (Transition Plan), the Districtwide Student Performance Improvement Plan 2012 to 2015 (DSPIP), and the Technology Plan 2010 to 2013. Neither of these plans were

the result of a comprehensive, fully-integrated, long-term strategic planning process.

Dr. Chargois presented the Board of Trustees a transition plan after assuming the position of Beaumont ISD superintendent in September 2012. In this Transition Plan, the superintendent outlined his observations of the challenges and opportunities facing the district, communicated a vision for the district, and listed five goals, including "initial strategic actions" for each goal, necessary for the district to implement this vision. Although the Transition Plan lists goals and initial strategic actions, it is not a long-term, process-driven, comprehensive strategic planning document with measurable outcomes. **Figure 1–12** shows the goals included in the November 2012 Transition Plan.

**FIGURE 1–12**
**BEAUMONT ISD SUPERINTENDENT'S TRANSITION PLAN GOALS**
**NOVEMBER 2012**

| GOAL | STATEMENT |
|------|-----------|
| 1 | To ensure a world class education for every child. |
| 2 | To build stakeholder trust and confidence through open and transparent communication. |
| 3 | To engender a culture of collaborative governance and workforce engagement with the community. |
| 4 | To leverage technology innovations for efficient operations and effective teaching and learning practices. |
| 5 | To align organizational structures and resources with system priorities. |

Source: Beaumont ISD, Superintendent, Transition Plan, February 2013.

The District Educational Improvement Committee (DEIC) annually updates the DSPIP, which is a districtwide student performance improvement plan that focuses on student achievement. This plan is the result of input from Campus Improvement Plans (CIP) throughout the district. The DSPIP and CIPs are required by state law, specifically Texas Education Code Chapter 11, Subchapter F, Sections 11.251 and 11.252. The board approved the district's DSPIP on October 18, 2012. **Figure 1–13** shows the district's six goals included in the DSPIP. Although the DSPIP projects districtwide student achievement goals and related metrics through 2015, it is only one element of a comprehensive strategic plan.

Beaumont ISD developed the Technology Plan 2010 to 2013 (Technology Plan) during the tenure of the district's superintendent immediately preceding Dr. Chargois. The

**FIGURE 1–13**
**BEAUMONT ISD STUDENT PERFORMANCE IMPROVEMENT PLAN GOALS**
**SCHOOL YEARS 2012 TO 2015**

| GOAL | STATEMENT |
|------|-----------|
| 1 | Manage diversity among schools, 100 percent. |
| 2 | Provide a safe, orderly, and disciplined school climate not less than 95 percent. |
| 3 | Develop and implement quality schools, 100 percent. |
| 4 | Close the gap between the minority and majority learner to no more than 5 percentage points. |
| 5 | Review the hiring practices of Beaumont ISD to ensure that all students are instructed by highly qualified staff. |
| 6 | Ensure 100 percent of Beaumont ISD students will graduate and be prepared for college careers. |

Source: Beaumont ISD, District Educational Improvement Committee, Districtwide Student Performance Improvement Plan, February 2013.

Technology Plan is quite detailed and contains goals, objectives, and strategies complete with timelines, responsibility assignments, and measurable outcomes. Further, the Technology Plan includes budget priorities linked to projected budgets for fiscal years 2011 to 2013. Although the Technology Plan is comprehensive and well-done, it, too, is only one element of a comprehensive strategic plan. **Figure 1–14** shows the goals included in the Technology Plan.

The lack of a comprehensive strategic planning process for Beaumont ISD originates with the board. The board has not embraced a comprehensive, long-term strategic planning process in at least eight years. The review team learned during board member interviews that certain members have been asking for a strategic plan for eight years. All board members interviewed, as well as the superintendent, acknowledged the district did not have a comprehensive strategic plan. As a result, the district does not link its annual budget priorities to a comprehensive strategic plan. Rather, the district sets goals each year and builds its annual budget around those goals. However, during onsite interviews with the superintendent, he shared that he plans to develop a three to five-year strategic plan.

It is also clear from onsite interviews with the board, superintendent, and members of the cabinet that the board is not constructively engaged with the superintendent or district stakeholders in developing a shared vision and related goals for the district. For example, the review team learned

**FIGURE 1–14**
**BEAUMONT ISD TECHNOLOGY PLAN GOALS**
**SCHOOL YEARS 2010 TO 2013**

| GOAL | STATEMENT |
|------|-----------|
| 1 | Incorporate technology as an integral part of education. |
| 2 | Provide staff development for all in the use of appropriate emerging technologies and their integration as a natural part of education. |
| 3 | Include technology-based information systems when making district or campus instructional or management decisions. |
| 4 | The district will establish the human and technical infrastructure to encourage communication and to improve access to data and educational resources. |

SOURCE: Beaumont ISD, Technology Plan, February 2013.

that goal-setting is a "fractured" process driven by the superintendent, who develops a vision and set of goals for the district independent of the board. Moreover, the board, current superintendent, and previous superintendent have not involved Beaumont ISD stakeholders in a comprehensive strategic planning process. If the board and superintendent do not have a common vision and goals based on input from district stakeholders, it is improbable the board could develop a long-term district plan and establish goals and objectives for the superintendent. Without a comprehensive strategic plan of three to five years, the district will likely continue to react to changes in administrative, operational, and academic challenges annually rather than plan systematically through a well-defined process.

School districts use comprehensive strategic plans to set goals for all district operations. Strategic plans allow school districts to overcome unforeseen events more quickly, allocate resources to meet objectives more efficiently, and establish accountability standards more effectively.

A strategic plan includes performance measures for each goal and objective, serve as the basis for district operations, and help orientate the board when evaluating the superintendent and allocating resources. **Figure 1–15** shows a comprehensive strategic planning process.

Best practices suggest districts design a stakeholder-driven strategic planning process as a complete planning process that addresses the necessary components that move a strategic plan to an operational plan. Process development steps include:

**FIGURE 1–15**
**STRATEGIC PLANNING PROCESS**
**FEBRUARY 2013**

| STEP | PURPOSE |
|------|---------|
| 1: Vision Setting | The board, superintendent and key stakeholders engage in a vision setting process to determine what characteristics the district would have if it operated at the most optimal level. |
| 2: Mission and Goals | The board, superintendent, and key stakeholders align the district's mission and associate goals that if accomplished will bring the district closer to fulfilling its vision. |
| 3: Setting Priorities | The board prioritizes the district's most important goals to serve as the basis of the strategic plan. |
| 4: Identifying Barriers | The board, superintendent and leadership team use data to identify the key barriers to accomplishing the goals. |
| 5: Identifying Resources | The administration links the budgeting process to the planning process to ensure that the district's goals and priorities are reflected in budget allocation. |
| 6: Strategy | The superintendent, administration and key stakeholders including parents, business leaders, civic organizations and community groups develop strategies to accomplish the goals by addressing the identified barriers, creating timelines for completion, assigning accountability, identifying performance measures and allocating resources. |
| 7: Consensus Building, Review and Approval | The board, superintendent, and stakeholders build consensus, review the plan for viability and approve the final document. |
| 8: Implementation and Monitoring | Persons or departments with assigned accountability enact the plan strategies, while monitoring progress against performance measures and use of allocated funds. |
| 9: Evaluation | The district evaluates the success of the plan, including which performance measures were met, what goals were fulfilled or what obstacles prevented success. The superintendent presents the findings to the board. |

SOURCE: Legislative Budget Board, School Review Team Analysis, February 2013.

- defining what strategies the district is going to use to achieve its mission, vision, values, goals, and student learning targets;

- identifying a balanced composite of leading and lagging measures to track progress;

- designing a systems map so that everyone understands how all the functions of the district and strategic plan fit together; and

- creating a deployment plan that specifies how the plan moves to action.

Successful implementation of the stakeholder-driven strategic planning process, as described in Robert Ewy's *Stakeholder-Driven Strategic Planning in Education: A Practical Guide for Developing and Deploying Successful Long-Range Plans (2009)* includes the following:

- Clear statements of the challenges district leadership must address over the next five years.

- Clear and carefully defined statements of key student and institutional performance requirements.

- Clear statements of what standards stakeholders use to evaluate the quality of the district's education programs and outcomes.

- A clear understanding of the priorities that direct the development of financial plans and budgets.

- A sense of what the district might do to delight stakeholders.

**Figure 1–16** shows steps of a stakeholder-driven strategic planning process. As a best practice, this process introduces the strategy map and balanced scorecard as key features of the stakeholder-driven strategic planning for K–12 school districts. Strategy maps are communication tools that show a logical, step-by-step connection between strategic objectives, implementation initiatives, and desirable outcomes in the form of a cause-and-effect chain of implementation steps to improve the performance of school district operations and academic performance. According to the Balanced Scorecard Institute, (BSI) the balanced scorecard is a strategic planning management system used extensively in business and industry, government, and nonprofit organizations worldwide to align business activities to the vision and strategy of the organization, improve internal and external communications, and monitor organizational performance against strategic goals.

The balanced scorecard has evolved from its early use as a simple performance measurement framework to a full strategic planning and management system that transforms an organization's strategic plan from a passive document into daily "marching orders" for an organization. Best practice recommends implementing the balanced scorecard in school districts to help the board, superintendent, and executive leadership team identify what a district needs to do to achieve its strategic goals and what a district needs to measure to

**FIGURE 1–16**
**STAKEHOLDER-DRIVEN STRATEGIC PLANNING PROCESS, DETAILED STEPS**
**2009**

| STEP | ACTION |
|------|--------|
| 1 | Determine the membership of the planning team. |
| 2 | Plan the stakeholder survey and the stakeholder sampling process with a 95 percent confidence level with a + 2 or 3 percent margin of error. Use community meetings, evening meetings at schools, etc. to conduct focus groups with parents, students, community members, business leaders, etc. |
| 3 | Identify stakeholder requirements and expectations through the analysis of survey and focus group data. Analysis includes categorizing and prioritizing stakeholder input. |
| 4 | Develop a strategic plan based on stakeholder expectations. |
| 5 | Identify current district performance levels using an internal audit process and then complete a strengths, weaknesses, opportunities, and threats (SWOT) analysis. |
| 6 | Develop a strategy map and a balanced scorecard based on the strategic plan. |
| 7 | Finalize the strategic plan, making sure there is consistency between the plan, the strategy map, and the balanced scorecard. This step is where the strategic plan (Step 4), the strategy map (Step 6) and balanced scorecard (Step 6) are merged into the final plan that goes to the board for adoption. |
| 8 | Develop a deployment plan that cascades the plan to all levels of the district. |

Source: Stakeholder-Driven Strategic Planning in Education: A Practical Guide for Developing and Deploying Successful Long-Range Plans, Pages 8–11, Robert W. Ewy, 2009.

ensure the goals are achieved. When fully implemented in a district's strategic planning process, the balanced scorecard transforms strategic planning from a traditional "academic exercise" into the "nerve center" of the organization.

Beaumont ISD should implement a comprehensive strategic planning process to develop a long-range strategic plan with measurable objectives, timelines, and assignments using elements of the traditional and stakeholder-driven strategic planning processes, for which the board will hold the superintendent and executive leadership team accountable. The district should begin the process with a shared visioning session with the board and superintendent, and expand this traditional planning exercise into a fully-engaged, stakeholder-driven strategic planning process. This would constructively engage students, parents, teachers, administrators, community members, and business leaders in the process of shaping the vision for the district and establishing strategic priorities aligned with the shared vision. Further, this comprehensive strategic planning process will chart the long-term direction of the district with "buy-in" from stakeholders and ensure that administrative staff, principals, teachers, and other school-based staff agree with the direction of the district, prioritization of goals, and the allocation of resources for instructional, administrative, and operational areas.

The superintendent should take the opportunity to begin the strategic planning process by designating a member of his executive leadership team to oversee and lead the strategic planning process along with forming a diverse planning committee that includes members of the district's executive leadership team, community members, business leaders, teachers, and parents. Further, the superintendent should assess the availability of in-house resources to lead the district through this planning process to determine if the district will need to obtain external assistance to guide the planning process or assist the district with conducting Beaumont ISD stakeholder surveys and focus groups.

There is no fiscal impact assumed for this recommendation until the district has determined the need for external assistance.

### STAFF TRANSFERS (REC. 5)

Beaumont ISD has not developed or communicated clear guidelines for staff transfers and reassignments between campuses throughout the district. Principals reported to the review team that they had very little control over staff transfers or reassignments to and from their campuses. In

addition, the principals do not have flexibility in designating specific teachers or staff to be transferred from their campuses, nor the type of teacher or staff they preferred to accept at their respective campuses.

The district's failure to communicate clear guidelines for staff transfers and reassignments throughout the district is further exacerbated by a culture that accepts limited accountability for poor performing staff. Most of the principals interviewed shared with the review team that the district has a culture that embraces the philosophy that poor performing staff are not terminated, but moved or transferred to campuses or central administration functions where they are allowed to continue their employment with the district, despite their record of substandard performance. Principals further shared that this culture is pervasive and applies to teachers and "at-will" staff. In fact, principals cited instances when the superintendent supported well-documented terminations of "at-will" staff and recommended termination to the board at a Level 4 grievance (as described in the Human Resources Chapter of this report) hearing, only to have the recommendation overturned by the board. The employee was later transferred to another campus under a different supervisor.

Beaumont ISD board Policy DC (LEGAL), Employment Practices, Update 91, issued October 21, 2011, establishes the legal framework for the district's employment practices as it delegates the superintendent sole authority to make recommendations to the board regarding the selection of all staff. It further states that each principal must approve each teacher or staff appointment to their campus, and the board may accept or reject the superintendent's recommendation regarding the selection of district staff. The policy also states that the district's employment policy may include a provision for providing each current district employee an opportunity to participate in a process transferring to another school or position within the district.

Beaumont ISD board Policy DK (LOCAL)-X, Assignment and Schedules, Update 73, issued July 22, 2004, specifically outlines the superintendent's authority regarding reassignments and principals' authority to approve assignments to their respective campuses. The policy clearly states "all staff are employed and subject to assignment and reassignment by the superintendent or designee when the superintendent determines that the assignment is in the best interest of the district. Reassignment shall be defined as a transfer to another position, department, or facility that does not necessitate a change in the employment contract of a

contract employee. A request for a specific assignment shall be granted only if the assignment will not adversely affect the educational program of an individual campus or the district." The policy further states "the principal's criteria for approval of campus assignments and reassignments shall be consistent with district policy regarding equal opportunity employment, and with staffing patterns approved in the district and campus plans…In exercising their authority to approve assignments and reassignments, principals shall work cooperatively with the central office staff to ensure the efficient operation of the district as a whole."

While board policies seem to lay the foundation for a collaborative staff transfer and reassignment process, the district has not developed or distributed written guidelines or procedures outlining how the process will be executed consistently throughout the district. Further, the district has not issued guidelines defining what constitutes "the best interest of the district" or what conditions must exist to determine if a pending reassignment may "adversely affect the educational program of an individual campus or the district."

The absence of clear, consistent guidelines governing staff transfers and reassignments create an environment in which campus principals are unsure of the criteria for determining if pending transfers may adversely affect the educational program of their campus and may be forced to accept teachers and staff who may not match specific needs for educational program offerings at their schools. Further, principals could request transfers or reassignments of staff with continuing performance issues in lieu of going through the district's termination process, thereby shifting the burden of supervising the poor performing employee to another principal.

Principals understand the staff needs at their respective campus better than an administrator in the central office. The principals shared with the review team that they would like to have consistency in the district's staff transfer and reassignment process as well as the ability to actively participate in the process. Principals further expressed that the board and superintendent do not send a clear message to staff with grievances that they will be held accountable for poor performance rather than feeling they are "untouchable" because of the existing staff transfer and reassignment culture. Principals unanimously agreed during the focus group sessions that the district has not established clear, consistent guidelines governing staff transfers and reassignments, with the active participation of principals providing critical

feedback throughout the process, and therefore has not resulted in a collaborative effort with central administration to transform the existing culture of limited accountability where there are staff who are "untouchable."

The district should establish clear, consistent, written operating procedures and guidelines for staff transfers and reassignments throughout the district. The district should link the operating procedures and guidelines to board Policy DK (LOCAL)-X and communicate to central administration and all campus principals throughout the district the expectations established in the new guidelines.

This recommendation can be implemented with existing resources.

## FISCAL IMPACT

Some of the recommendations provided in this report are based on state or federal laws, rules or regulations, and should be promptly addressed. Other recommendations are based on comparisons to state or industry standards, or accepted best practices, and should be reviewed to determine the level of priority, appropriate timeline, and method of implementation.

| | RECOMMENDATION | 2013–14 | 2014–15 | 2015–16 | 2016–17 | 2017–18 | TOTAL 5-YEAR (COSTS) SAVINGS | ONE TIME (COSTS) SAVINGS |
|---|---|---|---|---|---|---|---|---|
| **CHAPTER 1: DISTRICT ORGANIZATION AND GOVERNANCE** | | | | | | | | |
| 1. | Develop and adopt board operating procedures that will improve the operating structure of the board and foster effective communication and relationships amongst board members as they serve the district community. | ($4,200) | ($4,200) | ($4,200) | ($4,200) | ($4,200) | ($21,000) | $0 |
| 2. | Eliminate three positions, including the deputy superintendent for Financial Services and Elementary Administration, assistant superintendent for Curriculum and Instruction and Secondary Administration, and executive director of Human Resources positions. In addition, the district should create two positions, including the assistant superintendent for Curriculum and Instruction and the assistant superintendent for Human Resources. | $166,933 | $166,933 | $166,933 | $166,933 | $166,933 | $834,665 | $0 |
| 3. | Amend board Policy BDD (LOCAL) to include stronger language preventing individual board members from bypassing the superintendent or the board's designee to request legal services from attorneys hired by the board. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 4. | Implement a comprehensive strategic planning process to develop a long-range strategic plan with measurable objectives, timelines, and responsibility assignments using elements of the traditional and stakeholder-driven strategic planning processes, for which the board will hold the superintendent and executive leadership team accountable. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5. | Establish clear, consistent, written operating procedures and guidelines for staff transfers and reassignments throughout the district. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | | $162,733 | $162,733 | $162,733 | $162,733 | $162,733 | $813,665 | $0 |

# CHAPTER 2

# EDUCATIONAL SERVICE DELIVERY

**BEAUMONT INDEPENDENT SCHOOL DISTRICT**

# CHAPTER 2. EDUCATIONAL SERVICE DELIVERY

An independent school district's educational service delivery function is responsible for providing instructional services to Texas students based on state standards and assessments. A school district should identify students' educational needs, provide instruction, and measure academic performance. Educational service delivery can encompass a variety of student groups, and requires adherence to state and federal regulations related to standards, assessments, and program requirements.

Managing educational services is dependent on a district's organizational structure. Larger districts typically have multiple staff dedicated to educational functions, while smaller districts have staff assigned to multiple education-related tasks. Educational service delivery identifies district and campus priorities, establishes high expectations for students, and addresses student behavior. The system should provide instructional support services such as teacher training, technology support, and curriculum resources. To adhere to state and federal requirements, an educational program must evaluate student achievement across all content areas, grade levels and demographic groups.

Beaumont Independent School District (ISD) has 30 instructional campuses, which include 16 elementary, 7 middle, and 3 high schools as well as 4 alternative education buildings. In school year 2011–12, enrollment totaled 19,848 with 61.8 percent African American, 19.1 percent Hispanic, 13.9 percent White, and 3.0 percent Asian. Approximately 66.7 percent of students were identified as economically disadvantaged, 28.9 percent as at risk, and 7.6 percent as limited English proficient.

Beaumont ISD has a history of successful academic achievement. Under the state accountability system, the district was rated *Academically Acceptable* from school years 2006–07 to 2007–08 and was *Recognized* in school years 2008–09 and 2009–10. In 2010–11, the last year for which state accountability data were available at the time of the review, the district received an *Academically Acceptable* accountability rating from the Texas Education Agency. At the campus level, in school year 2010–11, seven campuses were rated *Exemplary*, 10 were *Recognized*, nine were *Academically Acceptable*, and one was *Academically Unacceptable*. One alternative campus was rated *Academically Acceptable* (AEA) using state alternative education

accountability procedures, and four were not rated either because they did not have students enrolled in grades higher than kindergarten or they were a designated as a juvenile justice alternative education program or a disciplinary alternative education program.

Under the accountability provisions in the *No Child Left Behind Act*, all public school campuses, school districts, and states are evaluated for Adequate Yearly Progress (AYP). The 2012 AYP results indicated that Beaumont ISD *Missed AYP* for Reading and Mathematics and is in Stage 2 of School Improvement Program Requirements for Reading. A school is identified for Stage 2 requirements if it does not meet AYP requirements for two consecutive years for the same measure. Stage 2 School Improvement Program requirements include provision of supplemental education services. In 2012, 20 Beaumont ISD campuses *Missed AYP*, 7 *Met AYP*, and 1 was not evaluated.

## SPECIAL EDUCATION

The executive director of Special Education is responsible for all special education services provided by the district. This position oversees four special education supervisors who oversee the 16 educational diagnosticians. The district also employs 17 speech therapists, 1 social worker, 64 inclusion teachers, 142 educational aides, and 46 additional teachers for specialized areas to serve a total of 1,578 students. Students are served through a variety of instructional settings, such as inclusion (general education classroom with accommodations), life skills, adaptive behavior units, preschool programs for students with disabilities, and structured learning classrooms for students with autism.

In school year 2005–06, Texas Education Agency's Performance Based Monitoring division identified Beaumont ISD for state monitoring of special education services. **Figure 2–1** shows the monitoring results status for school years 2005–06 to 2006–07 and to 2010–2011 and 2011–12.

Since that time, as shown in **Figure 2–2**, Beaumont ISD has reduced the number of referrals for special education services in the district from 10.1 percent in school year 2005–06 to 7.4 percent in school year 2011–12.

# CHAPTER 12

# SAFETY AND SECURITY

**BEAUMONT INDEPENDENT SCHOOL DISTRICT**

# CHAPTER 12. SAFETY AND SECURITY

An independent school district's safety and security function identifies vulnerabilities and includes strategies to minimize risks to ensure a protected learning environment for students and staff. This protection includes a balanced approach of prevention, intervention, enforcement, and recovery. Risks can include environmental disasters, physical hazards, security threats, emergencies, and human-caused crises.

Managing safety and security initiatives is dependent on a district's organizational structure. Larger districts typically have a staff dedicated to safety and security, while smaller districts assign staff tasks as a secondary assignment. Safety and security includes ensuring the physical security of both a school and its occupants. A comprehensive approach to planning for physical security considers school locking systems; monitoring systems; equipment and asset protection; visibility of areas and grounds; police/school resource officers; and emergency operations. Emergency and disaster-related procedures must include fire protection, environmental disasters, communication systems, crisis management, and contingency planning. The identification of physical hazards must consider playground safety, and overall building and grounds safety. Environmental factors, such as indoor air quality, mold, asbestos, water management, and waste management, also affect the safety of school facilities.

From district and campus administrators to maintenance staff, numerous individuals and organizations play a key role in maintaining a safe and secure environment. Beaumont Independent School District's (ISD's) Police Department is a critical component of the district's safety and security organization. The department is led by a Chief of Police who reports to the assistant superintendent for Administration and Operations. The Police Department was authorized by the district's board on November 16, 2006. On April 9, 2007, the current Chief of Police, a former Chief of the Flint Police Department, and Mott College Police Department in Flint, Michigan, was hired as the district's Chief of Police with full authority from the board and the superintendent to develop and implement Beaumont ISD's Police Department. In June 2007, the district's Police Department became operational with the hiring of six police officers. The district's superintendent executed a Memorandum of Understanding with the Beaumont City Police Department in June 2007 acknowledging the district Police Department's jurisdictional

authority inclusive of the primary jurisdiction of the Beaumont City Police Department. In August 2007, after obtaining his Peace Office commission from the Texas Commission on Law Enforcement Officer Standards and Education, the current Chief of Police was officially appointed the district Chief of Police by the superintendent.

The district's police are commissioned peace officers licensed by the State of Texas with the same arrest powers and authority as other peace officers in Texas. The primary jurisdiction of the police resides within the district; however, officers may also enforce laws, as needed, throughout the city of Beaumont. The department is organized into four policing districts. Three districts police high schools, middle schools, and elementary schools, and one district polices alternative schools, middle schools, and elementary schools.

Policing districts allows for the establishment of officer accountability, while increasing police visibility and response during school hours. It also allows for officer interaction with the students, faculty, staff, and community that they serve. One of the department's sergeants and veteran police officers has over ten years of experience as a K-9 handler and conducts drug searches for the district. The district's trained police drug dog supports the department's commitment to keep the district schools drug free.

**Figure 12–1** shows Beaumont ISD's Police Department organization.

Effective planning for the safety and security program requires strategies that are linked to budgets. **Figure 12–2** shows the district's expenditures for school years 2011 and 2012, and the budget for school year 2013. The overtime credit represents a reimbursement to the Police Department and charge to the Athletics Department for games and other functions.

**Figure 12–3** shows the survey respondents' opinions regarding the district's security staff. Over 60 percent surveyed felt that security staff have a good working relationship with principals, teachers, local law enforcement and students, with only 8 percent disagreeing.

Community Oriented Policing (C.O.P.) is the philosophical perspective that guides the district's Police Department in its daily operation. C.O.P. is a process of building relationships

**FIGURE 12–1**
**BEAUMONT ISD POLICE DEPARTMENT ORGANIZATION**
**SCHOOL YEAR 2012–13**



Source: Beaumont ISD, Police Department, February 2013.

**FIGURE 12–2**
**BEAUMONT ISD SAFETY AND SECURITY EXPENDITURES/BUDGET**
**SCHOOL YEARS 2010–11 TO 2012–13**

| EXPENSE DESCRIPTION | 2010–11 EXPENDITURES | 2011–12 EXPENDITURES | 2012–13 BUDGET |
|---|---|---|---|
| Extra Duty Pay | $45,912.02 | $43,831.03 | $48,212.00 |
| Overtime | (109,830.43) | (151,452.13) | 8,000.00 |
| Part Time Support Staff | 332,524.56 | 467,720.49 | 6,900.00 |
| Salaries/Benefits | 1,682,876.09 | 1,720,912.94 | $1,546,050.00 |
| Professional Contract Services | 44,588.82 | 37,898.02 | 46,100.00 |
| Gasoline/Supplies | 44,727.64 | 56,701.09 | 90,500.00 |
| Travel/Misc. Operating Costs | 10,735.49 | 43,385.86 | 25,500.00 |
| Vehicles | 29,343.46 | 28,799.75 | 0.00 |
| **Total** | **$2,080,877.65** | **$2,247,797.05** | **$1,771,262.00** |

Source: Beaumont ISD, Budget Supervisor, February 2013.

**FIGURE 12–3**
**STAFF SURVEY RESULTS FOR BEAUMONT ISD**
**FEBRUARY 2013**

| RESPONDENT | STRONGLY AGREE | AGREE | NO OPINION | DISAGREE | STRONGLY DISAGREE |
|---|---|---|---|---|---|
| Survey Question: "Security personnel have a good working relationship with principals and teachers." | | | | | |
| District Staff | 22% | 50% | 20% | 6% | 2% |
| Campus Staff | 17% | 52% | 23% | 6% | 2% |
| Survey Question: "A good working arrangement exists between local law enforcement and the district." | | | | | |
| District Staff | 20% | 50% | 22% | 5% | 2% |
| Campus Staff | 15% | 47% | 31% | 5% | 2% |
| Survey Question: "Security personnel are respected and liked by the students they serve." | | | | | |
| Campus Staff | 13% | 48% | 31% | 7% | 1% |

Note: Percentages may not add to 100 due to rounding.
Source: Legislative Budget Board, School Review Team District and Campus Survey, February 2013.

between the police, the campus community, local government, and community stakeholders to identify and address issues of crime, disorder, and other quality of life issues. This collaborative effort identifies areas of crime and disorder and engages as many elements of the school district community as possible in developing long term solutions to these concerns. C.O.P. is a flexible philosophy that applies its core elements (Partnerships, Problem Solving, and Change Management) to the specific community served. The district's Police Department has taken a unique approach by being 100 percent committed to the C.O.P. process. The department works to support and enhance the C.O.P. process among all of its members and the campuses it serves so that a safe school environment can be a reality.

According to the Chief of Police, the department believes, implements, and exemplifies their commitment to the C.O.P. concept. The department has implemented a Police Activities League, which allows officers to provide outreach to at-risk youth through sports and mentoring programs. The department also sponsors a summer camp program that provides summer activities to youth so that they can have a stable influence in their life during the summer months. Officers are encouraged to work with students in and out of school. The department believes this approach will allow officers to maintain a positive relationship, which will appeal to other students, especially those at risk. Officers also work with community groups assisting with community problems such as kids hanging out on corners, running away from home, fighting, and committing other unlawful acts. Because of their close partnership with the Beaumont City Police Department, the District Attorney's Office, and judges, officers have been able to advocate for students who have made a mistake and may deserve a second chance.

## FINDINGS

♦ The district lacks a process to formally assess school safety and security procedures on a regular basis and provide oversight for districtwide safety and security responsibilities.

♦ The district has not established a complete process to address safety and security issues identified at the campuses.

♦ The district lacks a process and practice to regularly update and maintain the emergency operations plan and ensure campus level distribution.

♦ The district lacks a comprehensive safety and security procedures manual.

♦ The district has not developed a systematic method for calculating the optimum staff size, balancing the ratio between police officers and public safety officers, and minimizing overtime and supplemental pay.

## RECOMMENDATIONS

♦ **Recommendation 81: Establish and maintain a school safety and security committee led by the assistant superintendent for Administration and Operations to monitor and assess safety and security procedures and compliance on a districtwide basis.**

♦ **Recommendation 82: Develop and maintain a plan to prioritize, determine costs, assign responsibility, and close any open safety and security issues.**

♦ **Recommendation 83: Implement a process to regularly update the emergency operations plan to meet current standards and requirements and ensure campus level distribution.**

♦ **Recommendation 84: Draft a comprehensive safety and security procedures manual for the district.**

♦ **Recommendation 85: Develop a systematic model for calculating the optimum staff size, eliminate the vacant lieutenant's position, and implement the organizational changes proposed to minimize overtime and supplemental pay and increase security coverage.**

## DETAILED FINDINGS

### SAFETY AND SECURITY COMMITTEE (REC. 81)

The district lacks a process to formally assess school safety and security procedures on a regular basis and provide oversight for districtwide safety and security responsibilities.

Beaumont ISD's safety and security program is administered by the assistant superintendent for Administration and Operations. While all safety measures may not be fully or consistently implemented, the district designed various safety methods and policies to maintain campus security, including the following:

• Maintains a fully operational, dedicated police department.

- Assigns police officers to designated zones to maintain a physical presence on campuses and provide quick response times.

- Requires that all visitors on any campus check-in at the school office and provide proper identification.

- Installs controlled access doors in all new campuses that requires visitors to be "buzzed in" to the rest of the building.

- Directs campuses to perform emergency preparedness drills throughout the year.

- Monitors facilities by a network of over 1,300 security cameras.

- Constructs new campuses with secure door locks in place allowing simultaneous lockdown at any time.

- Conducts a safety and security audit every three years as required by Texas Education Code (TEC), Section 37.108.

According to district administration, in addition to the required safety and security audit, the district requests safety updates from campuses and departments on an ongoing basis. They are encouraged to report all safety and security issues when they are found or observed. Police officers also note safety and security concerns during their assignments. The Police Department conducts daily patrols of all district facilities. They identify and/or correct safety or security issues found. Cameras and alarms are monitored by the police dispatch center. Schools and departments have primary responsibility for monitoring access to their facilities and reporting security and safety issues to the Police Department. All safety and security related issues are referred to the Police Department for investigation. Safety and security plans for the campus improvement plans are reviewed by the assistant superintendent for Technology, Research and Evaluation. An annual safety and security report is provided to the administration and board.

However, the district lacks a safety and security committee to provide monitoring and oversight for districtwide safety and security responsibilities. Rather, these responsibilities are spread out among various departments with little coordination of their efforts. Examples include the following:

- Police Department: Provides law enforcement to sustain a safe and secure learning and working environment for the students, staff, and school community including leading the district's safety and

security audit required every three years, coordinating with the Beaumont City Police Department and crossing guards, maintaining a drug detector dog and conducting campus searches; and conducting background investigations upon authorized request for new hires. Information Technology: Maintains the security camera system and access cards for the new schools.

- Maintenance Department: Maintains the alarm systems and building keys and responds to requests for replacement keys.

- Communications Department: Maintains the intercom system used in emergency situations.

- District and Campus Administration: Develops district and campus improvement plans including safety and security goals. The focus is on students exhibiting behavior conducive to a positive learning environment through continuing At-Risk Programs, the Let's Get Real About Violence Program, and other methods. The 2011–2015 Districtwide Student Performance Improvement Plan includes a goal to provide a safe, orderly and disciplined school climate, not less than 95 percent. A review of a sample of the campus improvement plans demonstrates inconsistencies in developing strategies and objectives to meet this goal. Some campuses include strategies such as surveillance cameras, emergency drills, officers on campus, safety audits, and bullying awareness, while other campuses only address discipline and behavior management.

- Campus Administrators: Enforces safety and security regulations in their respective schools including discipline management and conducting periodic drills. Although the assistant superintendent provides checklist forms and guidance, the school administrators do not report the frequency or results of the drills.

TEC, Section 37.109(a), states that in accordance with the guidelines established by the Texas School Safety Center, each school district shall establish a school safety and security committee. Under TEC, Section 37.109(b), the school safety and security committee shall:

- participate on behalf of the district in developing and implementing emergency plans consistent with the district multi-hazard emergency operations plan required by TEC, Section 37.108(a), to ensure that

the plans reflect specific campus, facility, or support services needs;

- provide the district with any campus, facility, or support services information required in connection with a safety and security audit required by TEC Section 37.108(b), a safety and security audit report required by TEC Section 37 108(c), or another report required to be submitted by the district to the Texas School Safety Center; and

- review each report required to be submitted by the district to the Texas School Safety Center (TxSSC) to ensure that the report contains accurate and complete information regarding each campus, facility, or support service in accordance with criteria established by the center.

Without a districtwide coordination, monitoring, and oversight process, basic safety and security practices and requirements that districts perform may not be consistently performed.

Beaumont ISD should establish and maintain a school safety and security committee led by the assistant superintendent for Administration and Operations to monitor and assess safety and security procedures and compliance on a districtwide basis. The committee should consist of district and campus administrators and representation from other departments to bring together expertise from various district areas and functions.

The TxSSC's website provides safety committee guidelines that address the purpose, membership, and responsibilities of a safety committee. These guidelines should be used as a foundation for establishing a safety committee.

This recommendation can be implemented with existing resources.

### SAFETY AND SECURITY ASSESSMENT (REC. 82)

The district has not established a complete process to address safety and security issues identified at the campuses.

Beaumont ISD's Chief of Police led the required safety and security audit of all district facilities completed by the August 31, 2011 deadline in accordance with TEC, Section 37.108. The district has not formally monitored the status and resolved all issues identified in the audit. Seven staff assisted the Chief of Police in conducting the audit and completed audit questionnaires for each facility inspected. The Chief of

Police prepared a summary audit report of the key results addressed to the assistant superintendent for Administration and Operations, who discussed the audit results with the Chief of Police. The Chief of Police reported the results online to the TxSSC. The assistant superintendent submitted the audit report to the board during the September 2011 board meeting; no action plan or comments were indicated in the board meeting minutes. The audit results were also provided to principals who were reminded to conduct drills, and Information Services was advised of the need for an anonymous reporting system. District administration advised that a visitor policy was needed for non-educational facilities. After the 2011 audit, no meetings were held to develop an action plan and budget to resolve the issues. However, according to the assistant superintendent, there is an effort to identify resources and resolve the safety and security issues that are deemed priority.

Also, as a result of an inadvertent error on the district's safety audit report submitted to the TxSSC, Beaumont ISD was included in a list of school districts reported by the media as noncompliant with TxSSC's requirements. Since the time of the onsite visit, the district provided the review team with documentation for the correction.

As required by TEC, Section 37.108, each school district shall conduct a security audit of the district's facilities at least once every three years. Issues still unresolved since the August 2011 audit include the following:

- Safety Drills Frequency: All campuses have not conducted the recommended number of drills.

- Safety Drills for Non-Instructional Sites: Non-instructional sites have not conducted safety drills as recommended by the TxSSC.

- After-action Reviews: Campuses did not consistently conduct after-action reviews of the drills they conducted.

- Staff Identification Badges: District staff are not required to wear their identification badges.

- Anonymous Reporting System: The district has not established an Anonymous Reporting System.

The review team also observed the following regarding the audit process:
- All facilities were not included in the audit.

- The audit checklists completed by the audit teams do not indicate the completion date or audit team members' names.

- If the answer was no to a specific criteria on the checklist, no comments were documented to provide additional information to establish priorities in resolving potential issues. All issues are not included in the summary audit report.

- Audit teams consisted of only one to three people.

- A maintenance supervisor was assigned the audit of the maintenance buildings instead of assigning the facilities to someone who worked in another department.

The TxSSC recommends that audit teams be established to conduct the school safety audit comprised of at least three to five people such as central office administration, teachers, parents, and law enforcement staff. To the extent possible, a district can follow security audit procedures developed by the TxSSC or a comparable public or private entity. Team members should not audit their own facility to ensure neutrality and objectivity. Training of district auditing teams and staff conducting the facility audits is recommended and provides for a more accurate assessment of the overall safety and security of all district facilities and operations. Some Beaumont ISD staff did receive safety auditor training from a professional security audit consultant in May 2011. A school district is required to report the results of the safety and security audit conducted to the district's board and to the TxSSC. The TxSSC's model report template can be used in conducting the school safety and security audits.

TEC, Section 37.109 (b), School Safety and Security Committee, states that a school safety and security committee shall provide the district with any campus, facility, or support services information required in connection with a safety and security audit and review each report required to be submitted by the district to the TxSSC to ensure that the report contains accurate and complete information regarding each campus, facility, or support service in accordance with criteria established by the center.

In addition to the reported audit findings, the review team observed that district staff do not consistently apply safety and security practices to promote a safe and secure learning environment. Various safety and security issues exist that have not been addressed or corrected by the district. An effective safety and security program maintains a balanced approach of prevention and intervention. The review team observed the following issues during a tour of selected facilities and review of supporting records:

- Security cameras do not work consistently. During the onsite visit, two hard drives failed and the security videos could not be restored. The review team also observed that a camera was not working in the administration building. The Information Services Department is not aware when cameras are down until the vendor contacts them; there is no automatic notification of a problem. The director of Information Services/Technology said that new servers are needed to maintain the magnitude of security equipment.

- Campuses use visitor badges inconsistently. One school only had one visitor badge on hand. Another school that the review team visited uses color coded badges and changes the color daily, which is a security enhancement.

- One school visited did not post signs requesting visitors to check in at the campus administrative office.

- Three campus administrators interviewed did not have a copy of the campus level emergency operations plan (EOP). Two teachers interviewed were not aware of the EOP and only posted the emergency evacuation plan on the wall. One principal indicated that the EOP was stored in the library.

- The guard rails on the external fire exit stairwell at the alternative education building are not secured to the building and may be unsafe to use.

- The review team informed district administrators that one school said that the Raptor system was not working. Raptor is an electronic visitor registration system used to record, track, and monitor visitors to school campuses throughout the district. The system enhances school security by reading visitor driver's licenses and comparing information to a sex offender database in 48 states including Texas. If there is no match, then a visitor badge is printed that includes the visitor's photo and name, time, and date. This system is not available at all district educational facilities. Thus, there is no electronic visitor sign in system with the capability to check for sex offenders and to generate visitor badges at some facilities. As indicated in **Figure 12–4**, there were several locations without the Raptor system in February 2013. Also,

BEAUMONT INDEPENDENT SCHOOL DISTRICT                                    SAFETY AND SECURITY

**FIGURE 12-4**
**BEAUMONT ISD CAMPUS VISITOR SIGN IN POLICY**

| SCHOOL | USE SIGN IN SHEETS AT THE FRONT DESK? | USE RAPTOR SYSTEM TO MAKE BADGES? | USE HANDWRITTEN OR COMPUTER GENERATED ID BADGES? | CHECK ID'S FOR UNFAMILIAR VISITORS? | OTHER WAYS TO IDENTIFY VISITORS? |
|---|---|---|---|---|---|
| Central | Yes | Yes | Computer | Yes | People without ID on campus are escorted by an administrator or a police officer. |
| Ozen | Yes | Yes | Computer | Yes | Only use driver's license or state IDs. |
| West Brook | Yes | Yes | Computer | Yes | If they do not have a Drivers License they are not allowed in the main part of the building. Staff members alert the office of visitors without badges. |
| Brown | Yes | No | Computer | Yes | Sign advising all visitors to sign in. |
| Career Center | Yes | Yes | Computer | Yes | Personal identification by staff if the visitor does not have identification. |
| Oaks | Yes | No | None | Yes | N/A |
| Pathways | Yes | No | None | Yes | Check student enrollment forms. |
| Austin | Yes | Yes | Computer | Yes | N/A |
| King | Yes | Yes | Computer | Yes | N/A |
| Marshall | Yes | Yes | Both | Yes | Check the student's registration form. |
| Odom | Yes | Yes | Both | Yes | Check IDs against emergency cards and student information in TEAMS. |
| Smith | Yes | Yes | Computer | Yes | Check student enrollment forms to verify person is listed. |
| South Park | Yes | Yes but system is not working | Handwritten | Yes | All visitors enter thru the front door. |
| Vincent | Yes | Yes | Both | Yes | Unfamiliar people report to the office. Staff are required to report or escort visitors to the office who have not checked in. Ask for police help when necessary. |
| Amelia | Yes | Yes | Computer | Yes | N/A |
| Bingman Head Start | Yes | Yes | Handwritten | Yes | N/A |
| Blanchette | Yes | Yes | Computer | Yes | Check student registration forms and make calls when they have questions. |
| Caldwood | Yes | Yes | Computer | Yes | Question them and ask student if they know them. |
| Charlton-Pollard | Yes | Yes | Computer | Yes | Check student registration forms and ask staff members about identity of visitors. |
| Curtis | Yes | Yes | Computer | Yes | PTA members and volunteers wear badges while on campus. |
| Dishman | Yes | Yes | Computer | Yes | Only use photo IDs. |
| Fehl-Price | Yes | Yes | Handwritten | Yes | Check student registration form and if the name is not listed on the sheet we call the parent. |
| Fletcher | Yes | Yes | Computer | Yes | N/A |

SAFETY AND SECURITY

BEAUMONT INDEPENDENT SCHOOL DISTRICT

FIGURE 12–4 (CONTINUED)
BEAUMONT ISD CAMPUS VISITOR SIGN IN POLICY

| SCHOOL | USE SIGN IN SHEETS AT THE FRONT DESK? | USE RAPTOR SYSTEM TO MAKE BADGES? | USE HANDWRITTEN OR COMPUTER GENERATED ID BADGES? | CHECK IDS FOR UNFAMILIAR VISITORS? | OTHER WAYS TO IDENTIFY VISITORS? |
|---|---|---|---|---|---|
| Guess | Yes | Yes | Computer | Yes | Check student registration form and call parent if person is not listed. Check Raptor to see if person has ever signed into the system. |
| Homer | Yes | Yes | Computer | Yes | N/A |
| Jones-Clark | Yes | Yes | Computer | Yes | Check badges and IDs and make copies. |
| Lucas Pre-K | Yes | Yes | Both | Yes | Check student registration form and call parent if necessary. |
| Martin | Yes | Yes | Computer | Yes | Call parents to verify identification and use staff who may know the visitor. |
| Pietzsch/ MacArthur | Yes | Yes | Both | Yes | Personal recognition by staff; contact known family members. |
| Regina | Yes | Yes | Computer | Yes | Check student emergency cards. |

Source: Beaumont ISD, Administration, February 2013.

the comments column indicates that some campuses allow visitors without proper identification on campus and may escort the visitor to their destination.

- Evacuation drills are inconsistently performed and documentation varies among the campuses. Frequent emergency drills, using predetermined and appropriate protocol, reduce the possibility that students and staff may become victims in an emergency and to ensure that responses are properly executed. Frequent drills help ensure that staff and students know what their responsibilities are during any type of emergency. Campus administrators do not have a consistent method to document when a lockdown or other drill is performed or the results of the after action review. The review team noted that Fletcher Elementary has developed an After Action Review Report form that provides this type of information. Figure 12–5 shows a summary of the evacuation drills reported districtwide and depicts the lack of compliance in completing the nine monthly fire drills, documenting after action results, and periodically conducting lockdown drills.

In addition to the review team's observations, the following comments were made by district administrators:
- One elementary school has only one crossing guard provided by the City of Beaumont; two crossing

guards are needed because of the street barriers near the campus.

- Doors at all campuses are not maintained so they can be locked in the event of a lockdown or other emergency. One principal confirmed that there were classroom doors that could not be locked and needed repair.

- Some schools have enclosed areas at the front entrance requiring visitors without access cards to go to the reception area; other schools do not have enclosed areas and allow easy access to all hallways. The assistant superintendent for Administration and Operations said that the district plans to add large mirrors to some hallways in buildings where there is a wall blocking the view from the reception area.

Failure to address these issues hinders the district in maximizing development of a safe and secure environment. Failure to test the EOP, including lockdown exercises and fire drills, could yield poor results in a life-threatening situation. Unauthorized individuals or criminal offenders could enter the campus if appropriate identification is not required, and access to hallways and external doors is not adequately safeguarded. If the security camera system does not function properly and if primary reliance is on the vendor to report when cameras are not working, the Police Department and

BEAUMONT INDEPENDENT SCHOOL DISTRICT                                                                                    SAFETY AND SECURITY

**FIGURE 12–5**
**BEAUMONT ISD CAMPUS EVACUATION DRILLS SUMMARY**
**FISCAL YEARS 2012 AND 2013 (THROUGH FEBRUARY 2013)**

| CAMPUS | CAMPUS NO. | FISCAL 2012 (10 MONTHS) | | | FISCAL 2013 AS OF FEB. 2013 (7 MONTHS) | | |
|---|---|---|---|---|---|---|---|
| | | NUMBER OF FIRE DRILLS | AFTER ACTION RESULTS | NUMBER OF LOCKDOWN DRILLS | NUMBER OF FIRE DRILLS | AFTER ACTION RESULTS | NUMBER OF LOCKDOWN DRILLS |
| **High Schools** | | | | | | | |
| Central High School | 1 | 9 | | | 6 | | |
| Ozen High School | 2 | No report | | | 6 | | |
| West Brook High School | 3 | 8 | 3 | 2 | 6 | | |
| **Middle Schools** | | | | | | | |
| King Middle School | 4 | No report | | | No report | | |
| Marshall Middle School | 5 | 5 | | 2 | 3 | | 2 |
| Vincent Middle School | 6 | 5 | | | 2 | | |
| Austin Middle School | 7 | 9 | | | No report | | |
| Smith Middle School | 8 | 4 | | | 2 | | |
| Odom Academy | 9 | 9 | | | 7 | | |
| South Park Middle School | 10 | 6 | | | 1 | | |
| **Elementary Schools and Pre-K** | | | | | | | |
| Lucas Pre-K–4 | 11 | 9 | | | 4 | | |
| Amelia Elementary | 12 | 7 | | | 7 | | |
| Blanchette Elementary | 13 | 10 | | | 6 | | |
| Caldwood Elementary | 14 | 9 | | 2 | 5 | | 1 |
| Charlton-Pollard | 15 | 9 | 8 | | 6 | 5 | |
| Curtis Elementary | 16 | 8 | 8 | | 7 | 7 | |
| Dishman Elementary | 17 | 10 | | 1 | 6 | | |
| Fehl-Price Elementary | 18 | 6 | | | 5 | 5 | |
| Fletcher Elementary | 19 | 9 | | | 4 | 1 | 1 |
| Guess Elementary | 20 | 10 | | | 6 | | |
| Homer Elementary | 21 | 8 | | | 4 | | |
| Jones-Clark Elementary | 22 | 9 | | | 5 | | |
| Martin Elementary | 23 | 9 | | | 5 | | |
| Pietzsch-MacArthur | 24 | No report | | | No report | | |
| Regina-Howell Elementary | 25 | 6 | | | 3 | | |
| Bingman Pre-K–4 | 26 | 10 | | | 7 | | 1 |
| **Other Facilities** | | | | | | | |
| Pathways | 27 | No report | | | No report | | |
| Brown Center | 28 | 3 | | | 1 | | |
| Taylor Career Center | 29 | 3 | | | 3 | | |
| Ogden Adult Education | 30 | No report | | | 1 | | |

Source: Beaumont ISD, Fire Exit Drill Reports, February 2013.

campus administrators cannot continuously monitor campus activity or maintain video recordings of incidents.

Best practices consist of a systematic assessment of the safety and security status in all schools and facilities according to the TxSSC. Two of the peer districts selected for this review, Galena Park ISD and DeSoto ISD, conducted safety and security audits of all non-instructional facilities and Judson ISD audited two of nine non-instructional facilities compared to none for Beaumont ISD.

The district should develop and maintain a plan to prioritize, determine costs, assign responsibility, and close any open safety and security issues. Beaumont ISD's assistant superintendent for Administration and Operations should coordinate a comprehensive safety and security assessment of each campus and determine and implement a corrective action plan for identified issues. The assistant superintendent for Administration and Operations should coordinate with the Chief of Police, principals, maintenance staff, and other appropriate staff to monitor the status of the open safety and security issues until completion.

As part of this plan, the district should determine the estimated costs, priority, and timeline for correction of each identified issue and should maintain a status report of open issues. The plan should require that a careful analysis of findings be conducted using established criteria to identify shortcomings needing immediate attention, as well as those items that do not constitute an immediate concern. Completion of this assessment would provide the district with an understanding of safety and security issues and their needs. Questions to ask during this assessment should include the following:

- What level of risk does the condition present to the safety and security of students and district stakeholders?

- Can the situation be remedied with existing resources?

- If resources are not readily available, what are the options for securing resources?

- If the conclusion is to not implement a response to the condition, has the district adequately identified and evaluated all potential consequences?

After the assessment, the district should monitor application of safety and security practices districtwide.

This recommendation can be implemented with existing resources.

## EMERGENCY OPERATIONS PLAN (REC. 83)

The district lacks a process and practice to regularly update and maintain the emergency operations plan (EOP) and ensure campus level distribution. The latest edition of Beaumont ISD's EOP is dated January 2010, and the review team observed the following:

- Sections of the EOP are blank or missing including: EOP Distribution List, List of Emergency Operations Planning Team Members and Contact Information, Incident Command System Summary, District Site Map, District Phone Tree, and Inventory of Emergency Equipment;

- Campus maps are outdated for the elementary schools which have been replaced/combined under the 2007 Bond Program. For example, the new school, Fehl-Price Elementary, replaced the former Fehl Elementary and Price Elementary Schools. The campus maps represent the former schools;

- School names are missing from the contact information for each campus on pages 6 and 7, Section IV, Situation and Assumptions;

- Section VI Organization and Assignment of Responsibilities states that teachers will maintain classroom emergency kits; yet principals interviewed were not aware of such kits; and

- The EOP lists schools near a railroad in Section IV Situation and Assumptions, but does not address a train derailment response. The TEC Section 37.108 (d), states that a school district shall include in its multi-hazard emergency operations plan a policy for responding to a train derailment near a district school if a district school is located within 1,000 yards of a railroad track, as measured from any point on the school's real property boundary line. The school district may use any available community resources in developing a train derailment policy.

In addition, the district's Chief of Police said that he emailed the campus level EOP to all principals for distribution to the teachers. However, two teachers interviewed during the onsite visit said that they were not aware of the campus level EOP; they pointed to the one page evacuation plan posted on the classroom board. One principal said that the campus level EOP is stored in the school library. Section X, paragraphs C and D of the district's EOP, states that the district's plan and its annexes must be reviewed annually by district officials

and revised or updated by a formal change at least every three years.

Administrative staff have been encouraged to obtain National Incident Management System (NIMS) training. The NIMS is a standardized system used throughout the U.S. to coordinate emergency preparedness and incident management among various local, state, and federal agencies.

There have been problems in providing direct training to staff because of their daily schedules. At the time of the onsite visit, some staff members were in the process and/or had completed NIMS training according to the assistant superintendent. Also the Police Department is working with school staff to provide basic emergency response at their schools.

EOPs are intended to offer guidance for the inevitable emergencies and disasters that school districts face and clarify emergency roles and response. Effective EOPs outline a district's approach to emergency management and operations and provide general guidance for emergency management activities including the district's methods of mitigation, preparedness, response, and recovery. The plan also describes the emergency response organization and assign responsibilities for various emergency tasks.

TEC, Section 37.108, Multi-hazard Emergency Operations Plan states that each school district shall adopt and implement a multi-hazard EOP for use in the district's facilities. The EOP must address the mitigation, preparedness, and response and recovery phases of emergency management defined as follows:

- Mitigation/Prevention—what schools and districts can do to reduce or eliminate risk to life and property;

- Preparedness—the process of planning for the worst-case scenario;

- Response—the steps to take during a crisis or emergency; and

- Recovery—how to restore the learning and teaching environment after an event.

The EOP must also provide for:

- district employee training in responding to an emergency;

- mandatory school drills and exercises to prepare district students and staff for responding to an emergency;

- measures to ensure coordination with the Department of State Health Services and local emergency management agencies, law enforcement agencies, and fire departments in the event of an emergency; and

- implementation of a security audit as required by the TEC, Section 37.108(b).

Figure 12–6 provides an overview and description of components in an EOP as provided by the TxSSC. Guidance for EOP planning, as well as current EOP checklists and sample plan templates may be downloaded from the TxSSC website.

Without an updated EOP in place, district staff and students may not be prepared to respond to crisis situations.

Beaumont ISD should implement a process to regularly update the EOP to meet current standards and requirements and ensure campus level distribution. In addition, the district should maintain Standard Operating Guidelines (SOGs) and current call lists and rosters to supplement the EOP. The basic plan should include a distribution list that indicates who receives copies of the basic plan and any revisions to it. Copies of plans and annexes should be distributed to those individuals, departments, agencies, and organizations tasked in the document including the district emergency management coordinator and school Safety and Security Planning Committee; copies should also be provided to school officials and set aside for the emergency operating center and other emergency facilities. It may also be feasible to post the plan on the network or website with access limited to staff with authorized passwords. The "how to" information needed by specific individuals or groups should be included in SOGs.

In addition, district staff with a critical role in emergency response should complete training related to the EOP. More specifically, each staff member should receive training on Incident Command Systems (ICS) and the NIMS. The NIMS provides a consistent framework within which government agencies can work together to effectively manage emergencies and mandates the use of ICS. Any school district requesting emergency preparedness funding from the federal government is required to be in compliance with NIMS implementation activities and work in close coordination with designated members of their local government.

The assistant superintendent for Administration and Operations should be responsible for ensuring that the EOP, SOGs and current call lists and rosters and a training plan are developed and updated.

**FIGURE 12–6**
**EMERGENCY OPERATIONS PLAN COMPONENTS**

| EOP COMPONENT | DESCRIPTION |
|---|---|
| Administrative | Approval and Implementation Page signed by the superintendent; Record of Changes; and Table of Contents. |
| Authority | Identify school board of trustees and government authorities that establish the legal basis for planning and carrying out emergency responsibilities. |
| Purpose | Describe the reason for the EOP development and its annexes and identify who the plan applies to. |
| Explanation of Terms | Explain and/or define terms, acronyms and abbreviations used in the document. |
| Situation and Assumptions | Statement summarizing the potential hazards facing the district, including likelihood of occurrence and estimated impact on school health, safety, and property. |
| Concept of Operations | Describe the district's overall approach to emergency management. |
| | Statement acknowledging the adoption of the National Incident Management System (NIMS). |
| | Describe district-level incident command arrangements and the interface between district emergency operations and the City and/or County Emergency Operations Center. |
| | Outline the process to be used to obtain state or federal assistance. |
| | Summarize emergency authorities of district officials. |
| | List actions to be taken by district staff during various phases of emergency management. |
| Organization and Assignment of Responsibilities | Describe the district's emergency organization. |
| | Describe the emergency responsibilities of the school board of trustees, superintendent, and other members of the executive team. |
| | Describe the common emergency management responsibilities of all district departments and safety/ security committees. |
| | Outline responsibilities for various emergency service functions, summarize the tasks involved, and indicate by title or position the individuals with primary responsibility for each function. |
| | Outline the emergency services that community volunteer groups and businesses have agreed to provide. |
| Direction and Control | Indicate by title or position persons responsible for providing guidance for the emergency management program and directing and controlling emergency response and recovery activities. |
| | Define district emergency facilities and summarize the functions performed by each area. |
| | Summarize the line of succession for key staff. |
| Readiness Levels | Explain readiness levels, indicate who determines them, and describe general actions to be taken at various readiness levels. |
| Administration and Support | Outline policies on agreements and contracts and refer to summary of current emergency service agreements and contracts in appendices. |
| | Establish requirements for reports required during emergency operations. |
| | Outline requirements for record-keeping related to ensure compliance with NIMS requirements. |
| | Establish requirements for a post-event review of emergency operations following major district emergencies and disasters. |
| Development and Maintenance | Identify who is responsible for approving and promulgating the plan and indicate how it will be distributed. |
| | Outline the process and schedule for review and update the plan. |
| Attachments | Distribution list, EOP Team, Incident Command Summary/Structure, Site Map, Campus/Facility Maps, Interlocal Agreements, Call Tree, etc. |

Source: Texas School Safety Center, 2010 Draft District Emergency Operations Plan Checklist, February 2013.

Since the onsite visit, the district reported that it has worked with Regional Education Service Center V and the Texas School Safety Center to update its EOP and is in the process of addressing missing sections of the document, outdated campus maps, absent campus contact information and classroom emergency kits, and training for the emergency responder.

This recommendation can be implemented with existing resources.

BEAUMONT INDEPENDENT SCHOOL DISTRICT                                    SAFETY AND SECURITY

*SAFETY AND SECURITY PROCEDURES (REC. 84)*

The district lacks a comprehensive safety and security procedures manual. As a result, safety and security procedures are inconsistently performed and documented. The district does maintain the following documents:

- District Student Handbook 2012–2013: Provides information for parents and students including policies regarding absences/attendance, bullying, code of conduct, dress and grooming, safety, searches of desks, lockers and vehicles, and visitors to the school. The Safety section requires students to know emergency evacuation routes and signals and participate in drills of emergency procedures. Key safety and security sections include: (1) General Visitors: Parents and others are welcome to visit district schools. For the safety of those within the school, and to avoid disruption of instructional time, all visitors must first report to the principal's office and must comply with all applicable district policies and procedures. (2) Drills: Fire, Tornado, and Other Emergencies: From time to time students, teachers, and other district staff will participate in drills of emergency procedures. When the alarm is sounded, students follow the direction of teachers or others in charge quickly, quietly, and in an orderly manner. (3) Trained Dogs: The district uses trained dogs to alert school officials to the presence of prohibited or illegal items, including drugs and alcohol.

- District Student Code of Conduct 2012–13: Documents behavior expectations and consequences for violating the code.

- Employee Handbook: Includes a general visitor policy and employee safety guidelines. Key safety and security sections include: (1) Visitors in the Workplace: Prominent notices shall be posted at each campus that all visitors must first report to the campus administrative office. This shall apply to parents, board members, volunteers, social service workers, invited speakers, maintenance and repair persons not employed by the District, salespersons, representatives of the news media, former students, and any other visitors. (2) Emergencies: All staff should be familiar with the evacuation diagrams posted in their work areas. (3) Safety: All staff shall adhere to district safety rules and regulations and shall report unsafe conditions or practices to the appropriate supervisor. The District shall take every reasonable precaution

regarding the safety of its students, staff, visitors, and all others with whom it conducts business. The superintendent or designee shall be responsible for developing, implementing, and promoting a comprehensive safety program. The general areas of responsibility include, but are not limited to, the following: guidelines and procedures for responding to emergencies; program activities intended to reduce the ultimate cost of accidents and injuries through investigation and documentation; and traffic safety programs and studies related to staff, students, and the community. The superintendent or designee shall be responsible for the collection, storage, and analysis of relevant operational and historical data required to develop sound procedures for implementation and operation of the comprehensive safety program.

- Beaumont ISD Website: Provides link to "Procedures for Reporting Allegations of Bullying."

- Emergency Operations Plans – District and Campus Level: Guides for emergency procedures.

- Police Department Policy and Procedures Manual: Beaumont ISD's Police Department maintains a departmental policy and procedures manual to document authorized procedures and processes. Policies provide guiding principles for daily decision-making while procedures define the tasks to perform. Procedures also minimize the district's liability and risk for improper actions by police officers. The manual includes the following: mission, motto, and value statement; general rules including duty responsibility and personal conduct; equipment rules; court appearances; outside employment guidelines; administrative rules and procedures; criminal investigations; arrest procedures; use of force; and juvenile procedures/investigations.

While these procedures provide basic guidelines, detailed procedures are not available to address implementation of these guidelines and other issues that are not covered. Examples of procedures inconsistently performed or not documented in the area of safety and security include:

- Employee handbooks do not state that staff wear identification badges.

- District handbooks do not state that visitors provide identification and wear badges until checking out.

- Crossing guards for elementary schools are only provided by the City of Beaumont; there is no Memorandum of Understanding with the City of Beaumont.

- No safety or security program evaluations or other related reports are maintained.

- No security equipment planning documents are maintained.

- An inventory status of major safety and security-related equipment such as alarm systems, security surveillance and communication equipment that show the year purchased, cost of installation, maintenance and monitoring, and test schedule is not maintained.

- Teachers and principals do not maintain emergency backpack supplies in their classroom consisting of flashlights, first aid supplies, water, food, and other emergency supplies. The TxSSC and the Federal Emergency Management Agency recommends that all classrooms have an emergency Classroom Go Kit.

- Plans were not available for structured safety and security training provided to students annually on bullying, drug abuse, and gangs. Most Beaumont ISD incidents relate to violations of the local Student Code of Conduct, fighting, assault, tobacco/controlled substances, and truancy. The district's 2010–11 Safe Schools Report indicates that grant funds are used to provide information to counselors including booklets on drug abuse, inhalants, family violence, alcohol, self-confidence, and smoking. In addition, bullying books, pamphlets, and videos are provided for the elementary schools. The review team requested additional information regarding how this information is disseminated to the students and the frequency, but did not receive a response from the district.

The Texas Unified School Safety and Security Standards provide a set of criteria to assist school districts in developing and implementing a comprehensive emergency management program in keeping with laws, mandates, and directives. A comprehensive policy and procedures manual ensures that authorized practices are communicated, provides a guideline for compliance with laws and regulations, and consolidates all requirements to minimize the risk of procedures inadvertently becoming outdated or not implemented.

Beaumont ISD should draft a comprehensive safety and security procedures manual for the district. The assistant superintendent for Administration and Operations should meet with the superintendent to outline the areas for procedure development. The manual should include the following topics: safety committee, Emergency Operations Plan, emergency training, safety and security audits, preparedness drills, visitor's policy, playground safety, incident reporting, internet safety, and bullying. It should incorporate excerpts from existing employee and student handbooks and the updated EOP.

Procedures manuals from other school districts and recommendations on the TxSSC website can be reviewed to assist in identifying topics to include in the manual. The superintendent should present the outline to the board for additional input and provide examples of procedures manuals from other school districts. After the board has provided its direction, the assistant superintendent should draft the procedures manual for the superintendent's review and modifications. The superintendent should submit the final draft to the board for approval and adoption.

This recommendation can be implemented with existing resources.

## POLICE DEPARTMENT ORGANIZATION (REC. 85)

The district has not developed a systematic method for calculating the optimum staff size, balancing the ratio between police officers and public safety officers (PSOs), and minimizing overtime and supplemental pay. Rather, the district determines security staffing using an informal system based on incidents for each school, enrollment, and student and community demographics. The district does not use any documented criteria or comparison to standards in determination of the staff size.

In addition to securing the campuses daily, the district's Police Department maintains a 24 hour dispatch service to respond to calls and alarms and dispatches officers as needed. Beaumont ISD's police staff includes 20 full-time officers and one part-time officer who maintain a daily presence on the campuses and in the community. Four sergeants and one corporal report to a lieutenant; and three officers report directly to the Chief of Police. Since the lieutenant's position has been vacant since 2012, the five campus-based officers now report directly to the Chief of Police. The Chief of Police indicated the vacancy has enhanced his knowledge of issues that the officers confront as well as improved communication and camaraderie. A corporal and assigned

officers on call work night and weekend shifts to patrol and respond to alarms, and officers are scheduled for extracurricular events, board meetings, and other after-hours functions. In addition, the district maintains 20 PSOs who work part-time. Four of the PSOs assist with dispatch; six PSOs work 32 hours per week at the three high schools (two PSOs per high school); and 10 PSOs assist with traffic, monitor and patrol the elementary schools, and perform other assignments up to 20 hours per week. With the decreased need for all officers during the summer months, some officers' contracts cease at the end of May and begin again in August of the next school year.

Figure 12–7 compares Beaumont ISD with peer districts similar to Beaumont ISD that are used for comparison purposes for this review. Figure 12–7 shows that Beaumont ISD employs almost twice as much security staff than any of its peers. The district does cover a larger geographical area with more total facilities than its peers.

Figure 12–8 shows security staffing and work schedules, which show that the department does not implement staggered hours to increase daily coverage and maximize the use of PSOs to minimize overtime and extra pay.

The Police Department incurred $128,863 in overtime for school year 2011–12. The budget supervisor indicated that the portion of overtime costs attributable to security staff working athletic events is credited from the Police Department's budget and charged to the schools' athletic department, yet this remains an additional cost to the district.

In December 2012, the district's Chief of Police proposed the following organizational changes to reduce staffing costs and increase patrol coverage:

- Assign the sergeant responsible for investigation to second shift hours to increase manpower availability for evening activities. At the time of the onsite visit in February 2013, this change had been implemented and the sergeant works from 12 noon to 8:30 PM to avoid overtime charged by officers on call.

- Increase patrol of after school activities by the reassignment of two officers from their assigned police districts; officers will be rotated monthly. At the time of the review, implementation was in progress for staggered hours with officers arriving about 10:00 AM to 11:00 AM until 7:00 PM.

- Replace two full-time positions with four part-time positions. The part-time officers will be responsible for weekend patrol and will assist as needed with weekly athletic events and evening patrols. As of March 2013, two part-time positions had been filled and the officers were in training. One full-time position has been filled by the former lieutenant (with the lieutenant's position now being vacant).

- Implement Overtime Rotation Policy to ensure that overtime is distributed equally among all officers. This policy will also be used for the assignment of PSOs to special work assignments.

**FIGURE 12–7**
**BEAUMONT ISD AND PEER DISTRICT POLICE ORGANIZATIONS**
**SCHOOL YEAR 2012–13**

| BENCHMARK | BEAUMONT ISD | JUDSON ISD | GALENA PARK ISD | DESOTO ISD | TYLER ISD |
|---|---|---|---|---|---|
| Enrollment | 19,848 | 22,460 | 21,780 | 8,921 | 18,336 |
| Square Miles | 153 | 56 | 32 | 23 | 205 |
| Schools | 26 | 26 | 23 | 12 | 28 |
| Other District Facilities | 19 | 9 | 5 | 1 | 3 |
| Total Facilities | 45 | 35 | 28 | 13 | 31 |
| Police Officers | 21 | 17 | 18 | 0 | 0 |
| Public Safety Officers (20 Part Time) | 12 | N/A | N/A | 4 | 14 |
| Total Officers (excluding chief/administration) | 33 | 17 | 18 | 4 | 14 |
| Students per Security Officer | 601 | 1,321 | 1,210 | 2,230 | 1,310 |
| Square Miles per Security Officer | 4.6 | 3.3 | 1.8 | 5.8 | 14.6 |
| Facilities per Security Officer | 1.4 | 2.1 | 1.6 | 3.3 | 2.2 |

NOTE: N/A = not available.
SOURCE: Beaumont ISD, Police Department, Legislative Budget Board, School Review Team Peer District Survey, February 2013.

SAFETY AND SECURITY                                         BEAUMONT INDEPENDENT SCHOOL DISTRICT

FIGURE 12–8
BEAUMONT ISD SECURITY STAFFING AND WORK SCHEDULES
SCHOOL YEAR 2012–13

| TITLE | NO. | FULL/PART-TIME | ZONE | NO. SCHOOLS | ENROLLMENT | DAYS/TIME WORKED | EXTRACURRICULAR ASSIGNMENTS/ NIGHTS OR WEEKEND |
|---|---|---|---|---|---|---|---|
| **Police Officers-Field** | | | | | | | |
| Sergeant/ 4 Officers | 5 | FT | District I | 6 | 4,776 | M–F 7:30–3:30 | On call (Overtime-OT) |
| Sergeant/ 4 Officers | 5 | FT | District II | 7 | 4,309 | M–F 7:30–3:30 | On call (OT) |
| Sergeant/ 5 Officers | 6 | FT | District III | 7 | 6,558 | M–F 7:30–3:30 | On call (OT) |
| Sergeant/ 3 Officers | 4 | FT | District IV | 8 | 3,529 | M–F 7:30–3:30 | On call (OT) |
| Corporal | 1 | FT | All | | | Night/weekend Sun–Thurs 10 PM–7 AM | |
| | 21 | 21 FTE | | 28 | 19,172 | | |
| **Public Safety Officers** | | | | | | | |
| PSO (20 hours/week) | 4 | 2 FTE | Dispatch | | | Daily 3 shifts | |
| PSO (32 hours/week) | 6 | 5 FTE | | | | M–F at High Schools to monitor for students leaving campuses | |
| PSO (20 hours/week) | 10 | 5 FTE | Traffic | | | M–F | On call |
| | 20 | 12 FTE | | | | | |

SOURCE: Beaumont ISD, Police Department, February 2013.

- Implement an overtime cap of 25 percent. Upon reaching the cap, officers may work compensatory time or request an increase in the overtime cap. At the time of the review, implementation was in progress pending an efficient method to track the overtime status daily.

- Reassign the PSO working as a part time receptionist to the Administrative Annex for a similar assignment and security presence; at the time of the onsite visit, this change had been implemented.

- Increase the use of PSOs to work special assignments when they can safely replace sworn officers such as for walkathons and track meets.

Figure 12–9 shows that Beaumont ISD incurred over 6,000 more student disciplinary incidents than its closest peer in 2011–12, which is a factor to consider when comparing the district's security staff size to its peers. Most Beaumont ISD incidents relate to violations of local Student Code of Conduct, fighting, assault, tobacco/controlled substances, and truancy. The Police Department reviews incident reports, types of incidents, requests for services, police related calls,

special events, student population, and other related issues in determining staff assignments.

Beaumont ISD's Chief of Police should develop a systematic model for calculating the optimum staff size, eliminate the vacant lieutenant's position, and implement the organizational changes proposed to minimize overtime and supplemental pay and increase security coverage. Overtime pay related to special requests such as patrolling school or facility construction sites should be contracted and billed directly to the requestor. The Chief of Police believes that bond programs should reimburse the department for using officers after hours to patrol construction sites, or the department's budget should be increased to account for the overtime.

Staff should be deployed as demand factors dictate. Demand factors should include enrollment and school incident characteristics such as total incidents, assaults, disorderly conduct, and truancy. The Chief of Police should document how the incident statistics (Figure 12–9) are used to assign officers to the campuses. Ultimately, Beaumont ISD's staff deployment methodology should address community crime indicators (for example, calls for service and crime statistics

BEAUMONT INDEPENDENT SCHOOL DISTRICT                                    SAFETY AND SECURITY

**FIGURE 12-9**
**BEAUMONT ISD AND PEER DISTRICTS NUMBER OF STUDENT INCIDENTS**
**SCHOOL YEAR 2011-12**

| DISCIPLINE ACTION REASON | NUMBER OF INCIDENTS 2011-12 | | | | |
|---|---|---|---|---|---|
|  | BEAUMONT ISD | DESOTO ISD | GALENA PARK ISD | JUDSON ISD | TYLER ISD |
| **1. In School Suspension** | | | | | |
| 04-Controlled Substance/Drugs | N/A | | 54 | 37 | 6 |
| 05-Alcohol Violation | N/A | | N/A | 8 | N/A |
| 20-Serious/Persistent Misconduct | | | 6 | | |
| 21-Violated Local Code Of Conduct | 18,503 | 3,531 | 5,701 | 11,322 | 13,235 |
| 22-Criminal Mischief | N/A | | | 7 | N/A |
| 26-Terroristic Threat | N/A | | N/A | 12 | |
| 27-Assault-District Employee | N/A | | N/A | 7 | |
| 28-Assault-Nondistrict Employee | 11 | | | 14 | N/A |
| 33-Tobacco | N/A | 9 | 5 | N/A | 8 |
| 34-School-Related Gang Violence | | | | | 15 |
| 41-Fighting/Mutual Combat | 296 | 41 | 256 | 311 | 305 |
| 50-Non-Illegal Knife | 9 | | 6 | N/A | 12 |
| **2. Out of School Suspension** | | | | | |
| 04-Controlled Substance/Drugs | 17 | 22 | 180 | 145 | 90 |
| 05-Alcohol Violation | N/A | | 8 | 14 | 8 |
| 07-Public Lewdness/Indct Exposure | N/A | | N/A | N/A | 10 |
| 08-Retaliation Against Dist Empl | | 17 | N/A | | |
| 20-Serious/Persistent Misconduct | 21 | 8 | 7 | | |
| 21-Violated Local Code Of Conduct | 5,237 | 1,474 | 1,564 | 3,129 | 5,383 |
| 22-Criminal Mischief | N/A | | N/A | 7 | 11 |
| 26-Terroristic Threat | N/A | | N/A | 11 | |
| 27-Assault-District Employee | 9 | | N/A | 23 | 7 |
| 28-Assault-Nondistrict Employee | 25 | N/A | N/A | 33 | 6 |
| 33-Tobacco | 46 | 20 | N/A | N/A | 11 |
| 34-School-Related Gang Violence | N/A | | | N/A | 19 |
| 36-Felony Controlled Subs Violat | | N/A | N/A | | 9 |
| 41-Fighting/Mutual Combat | 750 | 428 | 322 | 516 | 782 |
| 50-Non-Illegal Knife | 16 | | 6 | 9 | 21 |
| **3. DAEP** | | | | | |
| 02-Conduct Punishable As A Felony | | | | N/A | 5 |
| 04-Controlled Substance/Drugs | 16 | 28 | 190 | 147 | 62 |
| 05-Alcohol Violation | N/A | | 9 | 12 | 8 |
| 07-Public Lewdness/Indct Exposure | N/A | N/A | N/A | 6 | 7 |
| 08-Retaliation Against Dist Empl | | 27 | | | |
| 20-Serious/Persistent Misconduct | | | N/A | 16 | |
| 21-Violated Local Code Of Conduct | 546 | 117 | 96 | 228 | 134 |

**FIGURE 12–9 (CONTINUED)**
**BEAUMONT ISD AND PEER DISTRICTS NUMBER OF STUDENT INCIDENTS**
**SCHOOL YEAR 2011–12**

| DISCIPLINE ACTION REASON | NUMBER OF INCIDENTS 2011–12 | | | | |
|---|---|---|---|---|---|
| | BEAUMONT ISD | DESOTO ISD | GALENA PARK ISD | JUDSON ISD | TYLER ISD |
| **3. DAEP (Continued)** | | | | | |
| 22-Criminal Mischief | N/A | | N/A | | 5 |
| 26-Terroristic Threat | N/A | | N/A | 11 | |
| 27-Assault-District Employee | 5 | | N/A | 22 | 6 |
| 28-Assault-Nondistrict Employee | 24 | | 7 | 38 | 5 |
| 33-Tobacco | 7 | 5 | | N/A | |
| 36–Felony Controlled Subs Violat | | | | | 6 |
| 41-Fighting/Mutual Combat | 56 | 29 | 9 | 44 | 8 |
| 50-Non-Illegal Knife | 7 | | N/A | 8 | 6 |
| **4. JJAEP** | | | | | |
| 14-Prohibited Weapon | N/A | | N/A | 6 | N/A |
| 20-Serious/Persistent Misconduct | 20 | 5 | | N/A | |
| 36–Felony Controlled Subs Violat | | | 5 | | N/A |
| **5. Expulsion** | | | | | |
| 09-Title 5 Felony - Off Campus | | | N/A | | |
| **6. Truancy Charges Filed** | | | | | |
| 42-Truancy - Parent Contribute To | 278 | | N/A | N/A | 57 |
| 43-Truancy - 3 Unexcused Absences | 327 | 39 | N/A | N/A | 18 |
| 44-Truancy - 10 Unexcused Absence | 437 | | | 536 | 166 |
| **7. Mandatory Action Not Taken** | | | | | |
| 36–Felony Controlled Subs Violat | | | | | 6 |
| Total | 26,663 | 5,800 | 8,431 | 16,679 | 20,437 |

NOTE: N/A = Numbers Less Than Five Have Not Been Cited Due To The Family Educational Rights And Privacy Act (FERPA) 34Cfr Part 99.1 And Texas Education Agency Procedure Op 10-03.
SOURCE: Texas Education Agency, Public Education Information Management System, February 2013.

by policing district). This practice should position Beaumont ISD to ensure that its deployment of security staff resources will reflect projected community needs. Changes in community characteristics could have profound implications for individual school safety and security programs. For instance, if serious offenses (for example, student violence and gun possession) increase dramatically, there may be a need to increase police officers on campus. However, if serious offenses continue to decline, and simple assaults (Class C offenses) predominate, PSOs may be more appropriate. A flexible staffing model, employing a blend of sworn officers (directly and by contract) and PSOs would position the district to fully address the diverse needs of all schools.

The fiscal impact depends on the results of developing a staffing matrix to determine the optimum staff size and balance between police officers and PSOs. Eliminating the vacant lieutenant's position will result in an annual savings of $46,831, which includes a $3,000 stipend plus starting base salary of $35,500 plus $8,331 for benefits (21.64 percent x $38,500).

## FISCAL IMPACT

Some of the recommendations provided in this report are based on state or federal laws, rules or regulations, and should be promptly addressed. Other recommendations are based on comparisons to state or industry standards, or accepted best practices, and should be reviewed to determine the level of priority, appropriate timeline, and method of implementation.

| RECOMMENDATION | 2013–14 | 2014–15 | 2015–16 | 2016–17 | 2017–18 | TOTAL 5-YEAR (COSTS) SAVINGS | ONE TIME (COSTS) SAVINGS |
|---|---|---|---|---|---|---|---|
| **CHAPTER 12: SAFETY AND SECURITY** | | | | | | | |
| 81. Establish and maintain a school safety and security committee led by the assistant superintendent for Administration and Operations to monitor and assess safety and security procedures and compliance on a districtwide basis. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 82. Develop and maintain a plan to prioritize, determine costs, assign responsibility, and close any open safety and security issues. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 83. Implement a process to regularly update the EOP to meet current standards and requirements and ensure campus level distribution. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 84. Draft a comprehensive safety and security procedures manual for the district. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 85. Develop a systematic model for calculating the optimum staff size, eliminate the vacant lieutenant's position, and implement the organizational changes proposed to minimize overtime and supplemental pay and increase security coverage. | $46,831 | $46,831 | $46,831 | $46,831 | $46,831 | $234,155 | $0 |
| **TOTAL** | **$46,831** | **$46,831** | **$46,831** | **$46,831** | **$46,831** | **$234,155** | **$0** |

BEAUMONT INDEPENDENT SCHOOL DISTRICT