**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **DARON JEROME WILLIS, ET AL** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.  1:14-CV-314(RC)** |
| | § | |
| **BEAUMONT INDEPENDENT SCHOOL** | § | |
| **DISTRICT, ET AL** | § | |

<u>**PLAINTIFFS' RESPONSE TO BEAUMONT
INDEPENDENT SCHOOL DISTRICT'S
MOTION FOR SUMMARY JUDGMENT**</u>

TO THE HONORABLE JUDGE OF THE COURT:

COME NOW Plaintiffs, Daron Jerome Willis and Subrina Lynn Coleman, Individually and as Next Friend of SDW, a Minor, and file this Response to Defendant Beaumont Independent School District's Motion for Summary Judgment and asks this Court to deny Defendant's motion.

## I. **INTRODUCTION**

Plaintiffs sued the Beaumont Independent School District and one of its police officers, Steven Rivers ("Rivers"), for a broken arm suffered by minor Plaintiff on March 7, 2014.  Defendant seeks dismissal of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56.  Unbelievably, BISD argues that, although minor Plaintiff was unarmed and did not pose a threat of serious harm to anyone, Rivers' actions were objectively reasonable and as such Minor Plaintiff's constitutional rights were not violated when his arm was snapped by Officer Rivers.  Additionally, BISD contends there was no policy or custom violated by the BISD and therefore it is not liable under 42 USC §1983.  The Court should deny Defendant's motion because the undisputed video evidence clearly demonstrates Officer Rivers' force was unreasonable and excessive to the need. Furthermore, the BISD Board of Trustees was found to be wholly dysfunctional and failed to implement state regulations and recommendations that were crucial to ensuring an ample and effective police presence for each campus as detailed more fully below.

## II. RESPONSE TO STATEMENT OF THE ISSUES

**1.**

The force used by Officer Rivers was not objectively reasonable under the circumstances facing him because minor Plaintiff had been subdued by the time his arm was snapped by Officer Rivers.

2.  Plaintiffs are not asserting a claim for unlawful arrest or seizure, which is separate and distinct from excessive force claims.

3.  BISD failed to implement state-mandated safety and security policies, as well as state recommended police staffing guidelines, which caused injury to minor Plaintiff.

4.  The Board of Trustee's failure to implement state regulations and recommendations that were crucial to ensuring an ample and effective police presence for each campus, resulted in the board's deliberate indifference to the obvious consequences that a constitutional violation of excessive force would follow these decisions.


## III. FACTUAL BACKGROUND

### A.  Chaotic Scene - Spring Break 2014

On the day of the incident, Public Safety Officer ("PSO") Moore was on the scene and characterizes her role as basically a security officer who carries no weapons. (Ex.A, Moore depo., p 9-10, ll 3-5).   The incident occurred after school on the Friday before Spring Break. (Ex. A, Moore depo, p 28, ll 9-15).   Once school lets out for the day, the officers have 2600 students exiting the school all at once and congregating in the same vicinity that must be managed. (Ex. A, Moore depo, p 41, ll 4-17).  PSO Moore knew there was aware there was going to be a big fight that day after school. (Ex.A, Moore depo, p 41, ll 4-5).

On the day of the incident, there were only two officers on staff performing duties outside and the two officers were overwhelmed. (Ex. A, Moore depo, pp 21-23, ll

13-14).   The incident was chaotic, comparable to that of a riot with a large crowd of people cheering and egging on the fight making it difficult to get through to the incident. (Ex. A, Moore depo, pp 30-31, ll 24-8; pp 79-80, ll 24-21). If there would have been more officers on duty to address the situation, the riot would have been better managed. (Ex. A, Moore depo, p 24, ll 13-22; p 37, ll 3-19).   BISD admits there were hundreds of spectators and Officer Rivers had no way of knowing how many participants were involved or who else might be a potential threat. (Doc. # 28, BISD Motion for Summary Judgment, p 8; see also Ex.B, youtube video).

### B.  BISD Board is "dysfunctional" and failed to follow state recommendations and state mandated policies:

In August 2013, the State of Texas Legislative Budget Board reviewed the management and performance of BISD with consideration to the district's educational, financial and operational functions. (Ex. E, BISD Management and Performance Review, p A-3).  The BISD Board of Trustees was found to be "dysfunctional" by the review. (Ex. E, BISD Management and Performance Review, p 12).    More specifically, the review found that the board does not function as a team with common goals and objectives, and is negatively influenced by external stakeholders.  Due to its dysfunction, the board's

ability to effectively govern the district is compromised. (Ex.E, BISD Management and Performance Review, p 4 & 12-13).  Since 2009, the board's ability to develop policy and make critical decisions has diminished. (Ex. E, BISD Management and Performance Review, p 4 & 12-14).

Significantly, eight months after this review and a month after the incident giving rise to Plaintiffs' claims, the Texas Education Agency ("TEA") lowered BISD's accreditation status to that of Accredited-Probation citing failures in areas of financial compliance and special education services.   More importantly, TEA took over the operations of BISD by appointing a board of managers and a new superintendent effective immediately. (Ex.F, April 14, 2014 TEA letter).

The Texas Legislative Budget Board found that the police department lacked any formal staffing guidelines. (Ex. E, BISD Management and Performance Review, p 4). That is, BISD did not use any documented criteria or standards to determine appropriate security staff size or any statistical data to determine the number of officers to be assigned to the various campuses. (Ex. E, BISD Management and Performance Review, p 274 & 276).  This was significant because in 2011-12, BISD "incurred over 6,000 more student disciplinary incidents than its closest peer."  (Ex. E, BISD Management and Performance Review, p 276).   These incidents included fighting, assault, controlled substance and truancy. (Ex. E, BISD Management and Performance Review, p 276).

A key area that the BISD Board of Trustees was cited for inadequate policies and procedures included police staffing.  The review recommended that BISD develop a systematic model for calculating the optimum staff size to be assigned to each campus, balancing the ratio between the police officers and the public safety officers. (Ex.E, BISD Management and Performance Review, p 263).  Demand factors to be considered in its implementation include the number of students enrolled at a particular campus as well as the total number of incidents of assault, disorderly conduct and truancy. (Ex. E, BISD Management and Performance Review, p 276).

Additionally, contrary to the requirements of Chapter 37 of the Texas Education Code and the guidelines established by the Texas School Safety Center, BISD did not have a District School Safety and Security Committee ("Safety and Security Committee") established, which responsibilities include monitoring and providing oversight for districtwide safety and security. (Ex. E, BISD Management and Performance Review, p 264). See Tex. Educ. Code, 37.109.  This is vital because without an established Safety and Security Committee as required by the Texas Education Code, BISD lacked a formal process to assess and address safety and security policies and procedures, such as determining and assigning the appropriate number of police staff to the various BISD campuses, as well as developing and implementing a Multihazard Emergency Operations Plan. (Ex. E, BISD Management and Performance Review, p 263).

Furthermore, without an established Safety and Security Committee, BISD lacked a formal procedure to provide safety and security oversight districtwide. (Ex.E, BISD Management and Performance Review, p 263). As it was, and contrary to the mandates of Chapter 37, the duties were informally delegated by the Board of Trustees to different departments with very little coordination of efforts. (Ex. E, BISD Management and Performance Review, p 264). Chief Hall said it best when he testified that the former board of trustees "wasn't the greatest" having "no clue what [the] police officer or police departments have to do or how they…are run." (Ex. D, Hall dep, p 10, ll 20-25; p 12, ll 11-18).

The summary judgment evidence shows that the state-mandated Safety and Security Committee is responsible for developing and implementing a Multihazard Emergency Operations Plan for the district. TEC 37.108(a) & 37.109(b).[1] With no Safety and Security Committee established, the district did not effectively implement a Multihazard Emergency Operations Plan. (Ex.E, BISD Management and Performance Review, p 266). In reality, the last Multihazard Emergency Operations Plan on record for BISD was dated January 2010 with no evidence of districtwide distribution or that it was implemented by the requisite Safety and Security Committee as required under Texas law. TEC 37.108(a) & 37.109(b); Ex.E, BISD Management and Performance Review, p 270). In addition, significant portions of the existing plan were blank or missing (Ex. E, BISD Management and Performance Review, p 270).

An effective Multihazard Emergency Operations Plans in accordance with TEC 37.108, include general guidelines for emergency management. (Ex. E, BISD Management and Performance Review, p 271). Having an Multihazard Emergency

---

[1] The Safety and Security Committee is also required to conduct a safety and security audit, and report the results to Texas School Safety Center. TEC 37.108(b) & (c). Although the police chief conducted the requisite audit back in 2010, BISD never monitored the status and resolved the issues identified in the audit. (Ex. E, BISD Management and Performance Review, p 265). Additionally, the review found that not all of the campuses were included in the audit, and audit completion date and team members' names were left blank. (Ex.E, BISD Management and Performance Review, p 266). Contrary to recommended practices by the Texas School Safety Center, the audit teams consisted of one to three people and some of the audit members monitored their own building, which raised issues of bias. (Ex. E, BISD Management and Performance Review, p 266).

Operations Plan is vital for Texas school districts because this type of plan should address all types of crises occurring on campus, including anything "from a broken water pipe to an active threat violence", such as the riot-type situation that was presented on March 7, 2014. (Ex. E, Role of Districts in Emergency Management).   The plan was to include specific steps to take during a crisis, employee training to address same, as well as mandatory school drills and exercises to prepare students and staff for the various types of crisis.   Without a comprehensive Multihazard Emergency Operations Plan in place, district staff and students were not prepared to respond to a crisis situation (Ex. E, BISD Management and Performance Review, p 271).

### C.  Excessive Force was used by Officer Rivers

At the time of the incident, which occurred on March 7, 2014, Officer Rivers had only been employed on a part-time basis by BISD since January 2013, and prior to that time he had not been employed as a peace officer, but had worked as a salesman for an electric company for the past 27 years. (Doc. #28-2, p 2 Declaration of Rivers; (Ex. C, Rivers depo, p 53, ll 10-21).[2]  If fact, it was his first week to ever be assigned to the West Brook campus. (Ex. C, Rivers depo, p 9, ll 8-10).   His police work experience never occurred in a high school setting and he never received training in a school-based law enforcement. (Defendant's summary judgment exhibits - Doc. #28-2, p 2 Declaration of Rivers; & Doc. #28-4, p 3-7).

In his deposition, Mr. Hall testified that Chief Duncan believed that Rivers used improper technique on minor Plaintiff and should not have broken the child's arm. (Ex. D, Hall dep, p 32-34, ll 10-19).  Thirteen seconds into the youvideo, Chief Hall testified at the point when minor Plaintiff was face first on the ground with both officers are on top of him, he was no longer a threat to anyone around him. (Ex. D, Hall dep, p 66-67, ll 1-22; Ex .B, youtube video at 13).   "They had him", he was subdued. (Ex. D, Hall dep, p 67-68, ll 15-11; Ex. B, youtube video at 14-24).  Ten seconds later is when Officer Rivers snapped his

---

[2] He worked as a reserve officer for the sheriff's department, which is a volunteer position to assist the county. (Ex.C, Rivers depo, p 53, ll 10-21).

arm. (Ex. B, youtube video at 24).  With the maneuver used by Rivers, Minor Plaintiff's arm "wound up over the top of his head." (Ex.C, Rivers depo, p 28, ll 21-22).  This maneuver was excessive to the need. (Ex. D, Hall dep, p 78, ll 3-8). As a result of his actions that day, Officer Rivers was disciplined being placed on nonpaid leave. (Ex. D, Hall dep, p 40, ll 5-25).

## III. ARGUMENTS AND AUTHORITIES

## A.  SUMMARY JUDGMENT STANDARD

Although summary judgment is proper if there remains no genuine dispute of material fact, this is not a case in which the Court should grant summary judgment. Fed. R. Civ. P. 56(a).  A defendant moving for summary judgment on plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either submitting evidence that negates the existence of a material element of plaintiff's claim, or showing there is no evidence to support an essential element of the plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In determining whether there is a genuine dispute of material fact that prevents summary judgment, a court must consider all evidence in light most favorable to plaintiff as the nonmovant. *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1236-37 (10th cir. 2002).  The court must also resolve all reasonable doubts about the facts in favor of plaintiff as the nonmovant. *Cooper Tire & Rubber co. v. Farese*, 423 F.3d 446, 455-56 (5th Cir. 2005).

In its first issue, BISD asserts that Plaintiff has failed to raise fact issues as to whether the force used by Officer Rivers was clearly excessive and whether it was objectively unreasonable in violation of the Fourth Amendment (Doc. # 28, BISD Motion for Summary Judgment, p 4).

## B.  4TH AMENDMENT EXCESSIVE FORCE & STANDARD OF REASONABLENESS:

As a preliminary matter, Defendant asserts a list of "undisputed" facts, which Plaintiffs vehemently dispute.  Relying on self-serving declarations provided by Officer Rivers and PSO Moore (both on the scene and participating in the excessive force used on minor Plaintiff), Defendant notes it is undisputed: 1) that the minor Plaintiff was

attempting to physically strike PSO Moore; 2) Officer River verbally commanded minor Plaintiff to "stop"; and 3) minor Plaintiff took a swing at Officer Rivers.  (Doc. # 28, BISD Motion for Summary Judgment, pp 6-7).   The video of the actual events raises factual disputes as to each. (Ex.B, youtube video).

The video clearly shows you cannot hear Officer Rivers verbally commanding minor Plaintiff to "stop, but you can vividly hear the snapping of his arm and afterwards Officer Rivers telling him, "It's alright."   Also, the video does not show minor Plaintiff deliberately trying to strike PSO Moore, but rather attempting to pull away from her.  PSO Moore's testimony confirms this where she says, "minor plaintiff was just trying to get away and was not trying to deliberately strike her." (Ex.A, Moore depo, pp , ll ).  Likewise, the video does not show minor Plaintiff attempting to take a swing at Officer Moore.  In Officer Rivers' statement, he noted that minor Plaintiff took a swing at him with left hand.  (Doc. #28-2, p 8, BISD Offense Report).  The video shows minor Plaintiff's left arm was already being held by PSO Moore when Officer Rivers came into the picture. (Ex. B, youtube video).  These statements not only raise fact issues, but also issues of witness credibility, which are inappropriate for summary judgment. *Bazan* v. *Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001).  Additionally, the Court does not have to rely on the parties' subjective construction of the event because the youtube video produced by Defendant catches the entire scene. *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009).

### 1.  Legal Standard of excessive force claims

To prevail on an excessive force claim in violation of the Fourth Amendment, Plaintiff must establish "1) injury, 2) which resulted directly and only from a use of force that was clearly excessive, and 3) the excessiveness of which was clearly unreasonable. *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005).  Whether the force was reasonable requires careful attention to the facts and circumstances of the case, including whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v.*

*Connor*, 490 U.S. 386 at 396; *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (the question is "whether the totality of the circumstances justifie[s] a particular sort of…seizure").

The reasonableness of the force used in a particular instance is an objective standard and is judged from the perspective of a reasonable officer on the scene, without regard to hindsight or the officer's claimed interpretation of the situation. *Graham*, 490 U.S. at 396; *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994).  To gauge the objective reasonableness of the force used by the officer, the amount of force used must be balanced against the need for force. *Flores v. City of Palacios*, 381 F.3f 391, 399 (5th Cir. 2004).  Also, the excessive force inquiry is confined to whether the officer was in danger *at the moment of the threat* that resulted in the officer injuring the Plaintiff. *see Bazan*, 246 F.3d at 492;  *citing Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir.1992)("Regardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.").

## 2.  Analysis of Excessive Force claims

The totality of the circumstances demonstrate the epitome of an unreasonable use of excessive force in violation of minor Plaintiff's constitutional rights.[3]  First, assessing the severity of the crime, it is undisputed that minor Plaintiff was on the BISD school campus and was attempting to engage in a fight with another student. (Ex.B, youtube video; see  Doc. #28-1, pp 2-3 Declaration of Moore; Ex. A, Moore depo, pp 89-90, ll 23-6).  PSO Moore testified that she did not believe the minor Plaintiff was intentionally trying to strike or injure her, but rather he was trying to get away from her to fight with another student. (Ex. A, Moore depo, pp 46-48, ll 12-9: pp 92-93, ll 22-10).  She admittedly approached him from behind grabbing him by the waist, never identifying herself as an officer. (Ex. A, Moore depo, p 46, ll 12-18).  Minor plaintiff then began throwing elbows so that he could continue his pursuit to get the other student. (Ex. A, Moore depo, p 47, ll 14-

---

[3] It is undisputed by the parties that minor Plaintiff was severely injured by Officer Rivers' use of force.

25).  PSO Moore believes at the time, minor Plaintiff did not know who was holding him and he may have thought it was another student getting involved in the fight. (Ex. A, Moore depo, p 76, ll 16-24).

Secondly, the evidence demonstrates at the time Officer Rivers used force, Minor Plaintiff did not pose a *significant* threat of death or *serious* injury to PSO Moore, Officer Rivers, or anyone else in the vicinity.  Confining this inquiring to the moment when minor Plaintiff was injured by Officer Rivers, regardless of the struggle that transpired up to this time, there was no serious threat presented by minor Plaintiff. *Bazan*, 246 F.3d at 492; *citing Fraire*, 957 F.2d at 1276.  Considering minor Plaintiff was laying unarmed, face first on the ground, at a time when both officers were laying on top of him, a reasonable officer would conclude that the situation was under control and nobody at the scene was in danger.  Indeed, it appears as though Officer Rivers is in complete control of the situation as he takes the time to adjust his grip on minor Plaintiff's arm and thrusts it forward with his weight. (Ex.B, youtube video).

Citing *Graham*, BISD reminds the Court that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."  490 U.S. at 397 (Defendant's motion, p 5).  Plaintiffs acknowledge this.  But the time for split-second judgment ended when both Moore and Rivers were on top of minor Plaintiff and Officer Rivers took several more "split-seconds" to adjust his grip (and his weight) in an effort to forcefully break minor Plaintiff's arm as seen on the video. (Ex.B, youtube video).  Thirteen seconds into the youtube video, Chief Hall testified at the point when minor Plaintiff was face first on the ground with both officers are on top of him, he was no longer a threat to anyone around him. (Ex.D, Hall dep, p 66-67, ll 1-22; Ex. B, youtube video at 13).  "They had him", he was subdued. (Ex. D, Hall dep, p 67-68, ll 15-11; Ex. B, youtube video at 14-24).  Ten seconds later is when Officer Rivers snapped his arm. (Ex. B, youtube video at 24).  PSO Moore agrees that too much force was used by Officer Rivers

and that the incident occurred because the police department was understaff to deal with the riot-type situation effectively. (Ex. A, Moore depo, p 67, ll 16-23).

What is clear from the video, at the moment minor Plaintiff's arm was broken and several seconds prior, without a doubt, Officer Rivers was not trying to prevent serious injury or death when he snapped minor Plaintiff's arm because he was already subdued and under Rivers' control. He was no longer able to resist or evade arrest. At that point, balancing the amount of force used by Rivers against the need for force, it becomes clear that the maneuver used by Rivers to effectuate the arrest of minor Plaintiff was clearly excessive to the need and objectively unreasonable. *Flores*, 381 F.3d at 399. Accordingly, summary judgment should be denied because the evidence demonstrates that it would be clear to a reasonable officer that Rivers' conduct was unlawful in the situation he confronted.

### C. LAW PERTAINING TO BISD LIABILITY PURSUANT TO 42 USC § 1983:

When evaluating claims of municipal liability under 42 USC § 1983, three elements must be proven by plaintiff: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010)(quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir.2002). A municipality may not be liable merely for employing a tortfeasor, but rather deliberate action attributable to the municipality that is a direct cause of the constitutional violation is required. *City of Canton v. Harris.* 489 U.S. 378, 391-92 (1988). As the Court will see, BISD Board of Trustees took deliberate action that directly caused minor Plaintiff's constitutional rights to be violated.

#### 1. An official policy or custom standard

An official policy can consist of an ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmakers or by an official the lawmakers have delegated policymaking authority. *Burge v. St. Tammany Parish,* 336 F.3d 363, 369

(5th Cir. 2003).   Secondly, an official policy may be established when "[a] persistent, widespread practice of city official or employees, which, although not authorized by officially adopted…policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *Id.; citing Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984).   Under the second scenario, a policy may encompass allegations that a policymaker failed to act affirmatively. *Id.*

A city's failure to adequately train its employees can constitute an official policy or custom capable of subjecting a city to liability under §1983. *City of Canton,* 489 U.S. at, 380; *see also Brown v. Bryan County, OK.*, 219 F.3d 450, 461-62 (5th Cir. 2000).   The requisite elements establishing a city's liability under a §1983 theory of failure to train include: 1) the training procedures of the city were inadequate; 2) the city was deliberately indifferent in adopting the training policy; and 3) the inadequate training policy directly caused the violation in question. *Zarnow*, 614 F.3d at 170; *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).   Compliance with state requirements is also a factor to consider when assessing a failure to train. *Zarnow v. City of Wichita Fall TX*, 614 F.3d 161, 171 (2010); citing *Conner v. Travis Cnty.*, 209 F.3d 794, 798 (5th Cir. 2000).

## 2.  Official policy or custom analysis

It is undisputed by the parties that the Board of Trustees ("Board") is an official policy maker for BISD.   The summary judgment evidence clearly establishes that the BISD Board was dysfunctional and engaged in a persistent and widespread practice of failing to implement state requirements and failing to implement recommendations by the state, both generally and in key areas related to the police department. (Ex. E, BISD Management and Performance Review, pp 4, 12-13, 263-66, 276).   In August 2013, the State of Texas Legislative Budget Board found the Board's dysfunction was attributed in part to negative influence by external stakeholders. (Ex. E, BISD Management and Performance Review, pp 4, 12-13).   The review concluded the Board was unable to effectively govern the district, as well as unable to develop policy and make critical decisions on BISD's behalf.  (Ex. E, BISD Management and Performance Review, pp 4,

12-13.  Due to numerous infractions by the Board of Trustees related and unrelated to the review, TEA took over the operations of BISD by appointing a board of managers and a new superintendent effective immediately. (Ex. F, April 14, 2014 TEA letter).

a.

### Failing to implement state recommended formal police staffing guidelines

A key area that the BISD Board of Trustees was cited for inadequate policies and procedures included police staffing.  The Texas Legislative Budget Board found that the police department lacked any formal staffing guidelines. (Ex. E, BISD Management and Performance Review, p 4).  That is, BISD did not use any documented criteria or standards to determine appropriate security staff size or any statistical data to determine the number of officers to be assigned to the various campuses. (Ex. E, BISD Management and Performance Review, p 274 & 276). The review recommended that BISD develop a systematic model for calculating the optimum staff size to be assigned to each campus, balancing the ratio between the police officers and the public safety officers. (Ex. E, BISD Management and Performance Review, p 263).  Demand factors to be considered in its implementation include the number of students enrolled at a particular campus as well as the total number of incidents of assault, disorderly conduct and truancy. (Ex. E, BISD Management and Performance Review, p 276).        This was significant because in the 2011-12 school year, BISD "incurred over 6,000 more student disciplinary incidents than its closest peer."  (Ex. E, BISD Management and Performance Review, p 276).  These incidents included fighting, assault, controlled substance and truancy. (Ex. E, BISD Management and Performance Review, p 276).  Regardless of this staggering statistic for which the Board was fully aware, the summary judgment evidence shows that the district failed to implement the state recommended police staffing guidelines.  It was well known by the BISD police department that the West Brook campus, where the incident occurred, had an excessive amount of fights occurring there. (Ex. A, Moore depo, p 15, ll 18-20).  PSO Moore admits at the time of the incident, there

was an insufficient number of police employees on the premises to perform her job in a safe and efficient manner so as to prevent serious bodily injury from occurring under the riot-type circumstance. (Ex. A, Moore depo, p 26-28, ll 9-4; pp 31-32, ll 24-8).   Even further, PSO Moore's sergeant and boss at the time, David Hall, was well aware that the West Brook campus did not have enough safety and security presence to deal with the population of 2,600 students and keep the students safe. (Ex.A, Moore depo, p 21, ll 17-21; pp 31-32, ll 3-24; pp 33-34, ll 11-13; p 41, ll 14-17).   He was well aware that PSO Moore "was trying to keep up the whole campus by [herself]", but nothing was ever done about it and it was something she had to struggle with every day. (Ex. A, Moore depo, pp 33-34, ll 23-13).

March 7, 2014 was no different, when two lone officers were presented with an overwhelming riot-type situation. (Ex. A, Moore depo, pp 21-23, ll 13-14; pp 30-31, ll 24-8; pp 79-80, ll 24-21; Ex. B, youtube video).   The incident occurred after school at a time when 2,600 students were all being dismissed from the campus on the Friday before spring break. (Ex. A, Moore depo, p 28, ll 9-15; p 41, ll 14-17).   Unbelievably, the officers knew there was going to be a "big" fight that day after school; still only two officers were present at a location on the campus where most if not all of the 2,600 students would congregate outside to catch their ride home. (Ex. A, Moore depo, p 41, ll 4-17).   Since that time, and as a result of the incident, more officers are assigned to the Westbrook campus. (Ex.A, Moore depo, pp 34-35, ll 1-1).

The summary judgment evidence shows that if there would have been more officers on duty to meet the needs of the large student population at Westbrook, the riot would have been better managed. (Ex. A, Moore depo, p 24, ll 13-22; p 37, ll 3-19).   BISD admits when the incident occurred, there were hundreds of spectators and Officer Rivers had no way of knowing how many participants were involved or who else might be a potential threat. (Doc. # 28, BISD Motion for Summary Judgment, p 8; see also Ex. B, youtube video).   PSO Moore testified that too much force was used by Officer Rivers on minor Plaintiff, and that the incident occurred because the police department was

understaffed to effectively deal with the riot-type situation that ensued that day, and generally the large student population present at Westbrook. (Ex. A, Moore depo, pp 30-31, ll 24-8; p 67, ll 16-23: pp 79-80, ll 24-21).   Accordingly, fact issues remain as the evidence shows that the Board failed to implement formal police staffing policy, guidelines that were recommended by the Texas Legislative Budget Board.  This failure on behalf of the Board directly relates to the insufficient number of police staff assigned to the massive Westbrook campus that day, and historically every day.

   b.    **Failing to implement state mandated policy to establish a safety and security committee**

   Contrary to the requirements of Chapter 37 of the Texas Education Code and the guidelines established by the Texas School Safety Center, BISD did not have a District School Safety and Security Committee ("Safety and Security Committee") established, which responsibilities include monitoring and providing oversight for districtwide safety and security. (Ex. E, BISD Management and Performance Review, p 264). See Tex. Educ. Code, 37.109.  This is vital because without an established Safety and Security Committee as required by the Texas Education Code, BISD lacked a formal process to assess and address safety and security policies and procedures, such as determining and assigning the appropriate number of police staff to the various BISD campuses, as well as developing and implementing a Multihazard Emergency Operations Plan. (Ex. E, BISD Management and Performance Review, p 263).

   Furthermore, without an established Safety and Security Committee, BISD lacked a formal procedure to provide safety and security oversight districtwide. (Ex. E, BISD Management and Performance Review, p 263).  As it was, and contrary to the mandates of Chapter 37, the duties were informally delegated by the Board of Trustees to different departments with very little coordination of efforts. (Ex.E, BISD Management and Performance Review, p 264).  Chief Hall said it best when he testified that the former board of trustees "wasn't the greatest" having "no clue what [the] police officer or police

departments have to do or how they…are run." (Ex. D, Hall dep, p 10, ll 20-25; p 12, ll 11-18).

Undeniably, the BISD police department begged for oversight with the department incurring over 6,000 more student disciplinary incidents than its closest peer in the 2011-12 school year. (see Ex. E, BISD Management and Performance Review, p 276; See also Ex. G (G-3) where Chief Duncan was accused of altering another officer's report; Ex. (G-2), another officer was accused of aggravated sexual assault; Ex. (G-1), BISD police officer drew her gun and arrested parent for driving in wrong driveway).  With the state-mandated Safety and Security Committee, the district failed to consistently apply safety and security practices resulting in an unsafe environment for the students, which was very apparent on March 7, 2014, the day of the incident (see Ex. E, BISD Management and Performance Review, p 266).   It was also found that the district did not have a comprehensive safety and security manual, which would assist in ensuring authorized practices are communicated districtwide and provide guidelines for compliance with state laws and regulations. (Ex. E, BISD Management and Performance Review, p 274).

### c. Failing to implement state mandated multihazard emergency operations plan and failing to train related to same.

The summary judgment evidence shows that the state-mandated Safety and Security Committee is responsible for developing and implementing a Multihazard Emergency Operations Plan for the district. TEC 37.108(a) & 37.109(b).[4]  With no Safety and Security Committee established as noted above, the district did not implement a

---

[4] *The Safety and Security Committee is also required to conduct a safety and security audit, and report the results to Texas School Safety Center. TEC 37.108(b) & (c). Although the police chief conducted the requisite audit back in 2010, BISD never monitored the status and resolved the issues identified in the audit. (Ex.E, BISD Management and Performance Review, p 265). Additionally, the review found that not all of the campuses were included in the audit, and audit completion date and team members' names were left blank. (Ex. E, BISD Management and Performance Review, p 266). Contrary to recommended practices by the Texas School Safety Center, the audit teams consisted of one to three people and some of the audit members monitored their own building, which raised issues of bias. (Ex. E, BISD Management and Performance Review, p 266).*

Multihazard Emergency Operations Plan in compliance with state law. (Ex. E, BISD Management and Performance Review, p 266).    The last Multihazard Emergency Operations Plan on record for BISD was dated January 2010 with no evidence of districtwide distribution or that it was implemented by the requisite Safety and Security Committee as required under Texas law. TEC 37.108(a) & 37.109(b); Ex .E, BISD Management and Performance Review, p 270).    Notably, significant portions of the existing plan were blank or missing (Ex. E, BISD Management and Performance Review, p 270).

An effective Emergency Operations Plans in accordance with TEC 37.108 provide guidelines for emergency management, such as incidents of school violence. (Ex. E, BISD Management and Performance Review, p 271).    Having an Multihazard Emergency Operations Plan is vital for Texas school districts because this type of plan should address all types of crises occurring on campus, including anything "from a broken water pipe to an active threat violence", such as the riot-type situation that was presented on March 7, 2014. (Ex. H, Role of Districts in Emergency Management).    The plan should include specific steps to take during a crisis, employee training to address same, as well as mandatory school drills and exercises to prepare students, staff and police personnel for the various types of crisis.    Without a comprehensive Multihazard Emergency Operations Plan in place, district staff and students are not prepared to respond to a crisis situation (Ex. E, BISD Management and Performance Review, p 271).

The current police chief confirms BISD's continued failures relating to the ineffective implementation of a Multihazard Emergency Operations Plan to address school violence and crisis intervention situations.    Chief Hall has worked for BISD the past 34 years, was a sergeant at the time of the incident and currently the interim chief, replacing Chief Duncan in November 2014. (Ex. D, Hall dep, p 5, ll 10-13; p 6, ll 23-25; p 8, ll 10-20; p 16, ll 18).[5]    Despite his extensive tenure at BISD and current position as the

_____

[5]Chief Duncan was forced out by the new board (Ex. A, Hall dep, pp 7-8, ll 16-13).

Chief of the BISD police department, he is unaware if the district has a safety and security manual as recommended by the Texas Legislative Board (Ex. D, Hall dep, p 20-21, ll 7-4). He also has no knowledge if there is an established School Safety and Security Committee as required by Texas Education Code 37.109, which is necessary for the development and implementation of the Multihazard Emergency Operations Plan. (Ex. D, Hall dep, p 20-21, ll 7-4).  At the time of the incident, as a sergeant with the department, Mr. Hall was unaware if there was a Multihazard Emergency Operations Plan in place, and he knew for sure he did not assist in implementing one and he did not provide or participate in any type of training or drills related to one. (Ex. D, Hall dep, p 22-24, ll 24-3). Although he admitted he ought to know, Chief Hall had no knowledge that BISD incurred over 6,000 more student disciplinary incidents than its closest peer in the 2011-2012 school year.  (Ex. D, Hall dep, p 25, ll 1-6; Ex. E, BISD Management and Performance Review, p 276).

Having a Multihazard Emergency Operations Plan in place would have addressed issues of inadequate training with the summary judgment evidence showing PSO Moore was the lead PSO on the campus, yet she had no training on how to appropriately take people down in a crisis situation. (Ex. A, Moore depo, p 69, ll 11-13; Ex.D; Hall depo, pp 5-6, ll 14-10). Additionally, Officer Rivers never received training in school-based law enforcement, which is recommended and provided by the Texas School Based Safety Center. (Defendant's summary judgment exhibits - Doc. #28-4, p 3-7).  Finally, since their Sergeant at the time was unfamiliar with and did not assist in implementing or conducting any drills or training related to the district's required Multihazard Operations Plan, it can be inferred that both PSO Moore and Officer Rivers were not trained and did not participate in crisis intervention drills and prevention related to crises identified for the volatile Westbrook campus.

On the day of the incident, there were only two officers performing duties outside and they were overwhelmed. (Ex. A, Moore depo, pp 21-23, ll 13-14).  The incident was chaotic, comparable to that of a riot with a large crowd of people cheering and egging on

the fight making it difficult to address. (Ex. A, Moore depo, pp 30-31, ll 24-8; pp 79-80, ll 24-21).  If there would have been more officers on duty and a Multihazard Operations plan in place to address the chaotic crowd, the situation would have been prevented and/or better managed. (Ex. A, Moore depo, p 24, ll 13-22; p 37, ll 3-19).

### 2. Actual Knowledge

The Beaumont Independent School District Management and Performance Review dated August 2013, clearly establishes that the Board of Trustees had actual knowledge that it was failing to implement state law requirements by failing to implement a Multihazard Operations Plan and Safety and Security Committee.  The Board was also well aware that implementation of formal police staffing guidelines were necessary as recommended by the state. (Ex. E, BISD Management and Performance Review). Despite the extensive review and numerous courses of action recommended by the Legislative Budget Board, the summary judgment evidence indicates the board declined to implement them.  The fact that the current BISD police chief is oblivious to the state requirements as detailed above and there was a police   confirms this.

### 3. "Moving Force" causation

In the final prong, the plaintiff must prove "moving force" causation. *Valle*, 613 F.3d at 542.  The Plaintiff must demonstrate that the Board of Trustee's decision reflects deliberate indifference to the risk that a violation of a particular constitutional right will follow the decision. *Id.*; *citing Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Deliberate indifference requires proving that the municipal actor disregarded known or obvious consequences of his actions. *Brown v. Bryan County, OK*, 219 F.3d 450, 457 (5th Cir. 2000).    Municipal "liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations." *Brown*, 219 F.3d at 459; citing *City of Canton*, 489 U.S. at 396; *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997).  This occurs in situations where "a violation of federal rights may be a *highly predictable* consequence of a failure to equip

law enforcement officers with specific tools to handle *recurring situations*." *Bryan County*, 520 U.S. at 409 (emphasis added).

Here, the Board's failure to implement the state mandated Multihazard Emergency Operations plan, and provide drills and training related thereto, constitutes an official policy or custom subjecting BISD to liability under §1983. The summary judgment evidence clearly demonstrates historically, there was a high rate of violence occurring on the Westbrook campus, and the district in general. (Ex. A, Moore depo, p 15, ll 18-20). Just six months prior to the incident, the board was made acutely aware that the district had 6,000 more incidents of disciplinary incidents than its closest peer. (Ex. E, BISD Management and Performance Review, p 276). Even further, it was common knowledge that the Westbrook campus with 2,600 students has a high rate of violence and fights. Additionally, the Board was well aware that the district had an ineffective police/campus ratio with an insufficient number of police officers being present at Westbrook. The implementation of both of these policies would have prepared the district for riot-type situation such as the one presented on the day of the incident and prevented the excessive forced utilized by Officer Rivers. As a result of inadequate police department staffing, training and poor crisis intervention preparation, Officer Rivers became overwhelmed by the chaotic scene and used excessive force on minor Plaintiff. PSO Moore agrees that too much force was used by Officer Rivers and that the incident occurred because the police department was understaff to deal with the riot-type situation effectively. (Ex. A, Moore depo, p 67, ll 16-23).

The Board of Trustee's failure to implement state regulations and recommendations that were crucial to ensuring an ample and effective police presence for each campus, resulted in the board's deliberate indifference to the obvious consequences that a constitutional violation of excessive force would follow these decisions, such as the one occurring on March 7, 2014. Therefore, Plaintiff has shown a failure on behalf of the Board to implement state-mandated policy, which was the moving force behind the

excessive force by Officer Rivers.  For these reasons, BISD's summary judgment should be denied.


**C. PLAINTIFFS ARE NOT ASSERTING UNLAWFUL ARREST CLAIM:**

BISD makes the argument that the evidence does not support a claim for unlawful arrest. (Doc. # 28, BISD Motion for Summary Judgment, pp 9-12).  Plaintiffs are not alleging unreasonable detention or seizure.  Excessive force claims are separate and distinct from an unlawful arrest claim. *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007)(although the arrest of Freeman was unlawful as alleged, this does not mean that any force used by the officers to effectuate the arrest was necessarily excessive).

CONCLUSION

Defendants summary judgment should be denied because there is ample evidence that Officer Rivers used excessive force as demonstrated by the the undisputed video evidence.  Furthermore, the BISD Board of Trustees was found to be wholly dysfunctional and failed to implement state regulations and recommendations that were crucial to ensuring an ample and effective police presence for each campus as detailed more fully below.

WHEREFORE, for these reasons aforestated, Plaintiffs ask the Court to deny Defendant BISD's Motion for Summary Judgment.

Respectfully submitted,

**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**


By: /s/  *B. Adam Terrell*
  **B. ADAM TERRELL**
  **Texas Bar No. 19790900**
  **Post Office Box 350**
  **Beaumont, TX 77704-0350**
  **Phone: (409) 838-0101**
  **Fax:    (409) 832-2940**

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of this instrument has been served upon all counsel of record in this cause and all other parties entitled to same via CM/ECF efile system on this 6th day of February, 2015.

                        /s/   ***B. Adam Terrell***
                        **B. Adam Terrell**