## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DARON JEROME WILLIS AND          *
SUBRINNA LYNN COLEMAN,           *
Individually and as Next Friend of *
SDW, a Minor,                    *
        Plaintiffs               *
                                 *
VS.                    * CA NO. 1:14-CV-00314
                                 *
BEAUMONT INDEPENDENT             *
SCHOOL DISTRICT, ET AL,          *
        Defendants  *

---

ORAL and VIDEO DEPOSITION OF
MELISA MOORE
JANUARY 30, 2015

---

ORAL DEPOSITION OF MELISA MOORE, produced as a witness duly sworn by me at the instance of the Plaintiff, taken in the above-styled and numbered cause on January 30, 2015, from 10:08 a.m. to 12:02 p.m., before STACY AMY BAKLIK, CSR, Certified Shorthand Reporter No. 2680 in and for the State of Texas, at the offices of Weller, Green, Toups & Terrell, 2615 Calder, Suite 400, Beaumont, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.
* * * * *

## Page 2

1      APPEARANCES
2
3   FOR THE PLAINTIFF:
4      MR. B. TERRELL
       Weller, Green, Toups & Terrell
5      2615 Calder
       Suite 400
6      Beaumont, TX  77702
7
8   FOR THE DEFENDANT, STEPHEN RIVERS:
9      MS. KELLEY L. KALCHTHALER
       Walsh, Anderson, Gallegos, Green & Trevino
10     10375 Richmond Ave.
       Suite 750
11     Houston, TX  77042
12
13  FOR THE DEFENDANT, BEAUMONT INDEPENDENT SCHOOL DISTRICT:
14     MS. FRANCES BROUSSARD
       Thompson & Horton
15     3200 Southwest Freeway
       Suite 2000
16     Houston, TX  77027
17
18  ALSO PRESENT:
19     Leo Stringer, CLVS
       TrialTech
20
       Stephen Rivers
21
22
23
24
25

Electronically signed by Amy Baklik (601-0...

EXHIBIT
A

## Page 3

1                 I N D E X
2
3                       PAGE
4   Appearances ............................... 2
5   Stipulations ............................. 4
6
7   MELISA MOORE
8      Examination by Mr. Terrell     4
9      Examination by Ms. Kalchthaler    68
10     Examination by Mr. Terrell    89
11     Examinatino by Ms. Kalchthaler    90
12     Examination by Mr. Terrell    92
13
14
15                 EXHIBITS
16
17  NUMBER    DESCRIPTION              PAGE MARKED
18   1       Declaration              38
19
20
21
22
23
24
25

## Page 4

1        THE COURT REPORTER:  What are the agreements?
2        MR. TERRELL:  By the Rules.
3              MELISA MOORE,
4   having been first duly sworn to testify the truth, the whole
5   truth, and nothing but the truth, testified as follows:
6              (10:08)
7              EXAMINATION
8   BY MR. TERRELL:
9      Q.  Will you give us your name?
10     A.  MeLisa Moore.
11     Q.  Are you still in the police department?
12     A.  No, sir, I'm with Patriot Security now.  I'm a
13  commissioned officer.
14     Q.  So, I'll address you as Ms. Moore; is that okay?
15     A.  That's fine, sir.
16     Q.  My name is B. Terrell, and I have filed a lawsuit
17  against the school district and Officer Rivers.  You
18  understand that?
19     A.  Yes, sir.
20     Q.  If I ask a question that doesn't make any sense,
21  will you ask me to repeat that question?
22     A.  Yes, sir.
23     Q.  Okay.  You are going to have to answer -- and we've
24  got you on video -- so, I know what you are saying when you
25  nod, but Amy is going to have to have a verbal response,

Page 5

1  okay?
2      A.  Yes, sir.
3      Q.  If you do not ask me to repeat my question, I'm
4  going to assume that you understood it and answered it in a
5  truthful manner; is that okay?
6      A.  Yes, sir.
7      Q.  Will you give me your address?
8      A.  1128 Sun Meadow Drive.
9      Q.  And your date of birth?
10     A.  8/14/1977.
11     Q.  And where do you work right now?
12     A.  Patriot Security.
13     Q.  And what do you do for Patriot Security?
14     A.  I'm a commissioned security officer.
15     Q.  And when you -- did you go directly from BISD to
16  Patriot Security?
17     A.  Yes, sir, I did.
18     Q.  And when you went to Patriot Security, who did you
19  interview with?
20     A.  Robert Kramer.
21     Q.  Did you tell Mr. Kramer about the incident we are
22  here about today?
23     A.  No, sir.
24     Q.  Did he ask?
25     A.  No, sir.

Page 6

1      Q.  Did you fill out an employment application?
2      A.  Yes, sir, I did.
3      Q.  Were you truthful on that employment application?
4      A.  Yes, I did.
5      Q.  Did they ask about any disturbances or incidents or
6  lawsuits or anything that you might have been involved in?
7      A.  No, sir.
8      Q.  After BISD, your employment, did you apply for any
9  other jobs as a police officer?
10     A.  No, sir.
11     Q.  Why not?
12     A.  Repeat that question again.
13     Q.  Did you -- my question is, did you apply to be a --
14  you are a security guard now.  That's not a peace officer,
15  right?
16     A.  Right.  I'm a security officer.
17     Q.  Yeah.  Did you -- my question was, did you apply for
18  any jobs being a peace officer?
19     A.  Oh, no, sir.  No, sir.
20     Q.  And my question, then, was, why did you not do
21  that?
22     A.  Because I'm good at being a security officer.
23     Q.  It's a better job?
24     A.  Yes.
25     Q.  Pays more?

Page 7

1      A.  Yes.
2      Q.  Better hours?
3      A.  Yes, sir.
4      Q.  Do you carry a gun?
5      A.  Yes, sir, I do.
6      Q.  Where are you a security officer?
7      A.  I'm at Golden Triangle Emergency Center in Port
8  Arthur.
9      Q.  Now, let's talk about your background, okay?  Did
10  you go to high school?
11     A.  Yes, sir, I did.
12     Q.  Where?
13     A.  Mount Vernon, Ohio.
14     Q.  Did you graduate?
15     A.  Yes, sir, I did.
16     Q.  And what year did you graduate?
17     A.  1996.
18     Q.  After you graduate from high school, what did you do
19  then?
20     A.  I was a CNA for ten years, certified nurse's aide.
21     Q.  Did you go to any school to be a CNA?
22     A.  Yes, sir, I did.
23     Q.  What school?
24     A.  It was Panola College.  Panola College in Center,
25  Texas.

Page 8

1      Q.  How long did you go to school to be a CNA?
2      A.  CNA, I believe it was a three-week school.
3      Q.  And did you take the test?
4      A.  Yes, sir, I did.
5      Q.  Did you pass the test?
6      A.  Yes, sir, I did.
7      Q.  Did you pass it on the first occasion?
8      A.  Yes.
9      Q.  So, you know a little bit about medicine, fair?
10     A.  Not medicine, it's just --
11     Q.  About being a nurse?
12     A.  Yeah.  Yes, sir.
13     Q.  More than your average person?
14     A.  Yes, sir.
15     Q.  Okay.  As a CNA, did you work for nursing homes or
16  who?
17     A.  I worked in nursing homes, and then I did a hospital
18  in Center, Texas.
19     Q.  Okay.  Were you in any particular specialty for
20  CNA?
21     A.  Just taking care of the elderly people.  I did
22  nursing homes more than anything.
23     Q.  Okay.  You then, at one time, I take it, went to
24  police academy?
25     A.  No, sir.  I didn't go to the police academy.

Page 9

1     Q. How were you trained -- well, let me ask. At the
2 time of this incident at BISD, what was your title?
3     A. I was a corporal public safety officer, corporal
4 public safety officer.
5     Q. What does that mean?
6     A. Public safety officer, just basically security, just
7 a better name, and I was a corporal rank.
8     Q. Okay. Was Officer Rivers the same or was he
9 actually with the --
10     A. He's actually a peace officer.
11     Q. Okay.
12     A. He carries a gun. I don't.
13     Q. Okay. So, you are -- and I'm not trying to demean
14 what you were doing out there, but you are walking around
15 making sure fights -- making sure people don't get things
16 stolen. You are the eyes and ears.
17     MS. KALCHTHALER: Objection, form.
18     MS. BROUSSARD: Objection, form.
19     A. Yes, sir.
20     Q. Is that correct?
21     MS. KALCHTHALER: Same objection.
22     A. Yes.
23     Q. And Officer Rivers is the one, if somebody has to,
24 like, pull out handcuffs or, God forbid, shoot somebody or
25 tase somebody, he would do that?

Page 10

1     MS. BROUSSARD: Objection, form.
2     MS. KALCHTHALER: Objection, form.
3     A. Yes.
4     Q. You, when you are out there, have no weapons?
5     A. I have no weapons whatsoever.
6     Q. Now, on this date, how many police officers were on
7 the campus?
8     MS. KALCHTHALER: Objection, form.
9     MR. TERRELL: Why?
10     MS. KALCHTHALER: It's vague.
11     MR. TERRELL: How many police officers were on the
12 campus?
13     MS. KALCHTHALER: On this date, how many police
14 officers were on the campus. That's my objection.
15     MR. TERRELL: That's vague?
16     MS. KALCHTHALER: Yes.
17     Q. Okay. On this date, how many police officers were
18 on the campus? She can object.
19     MS. KALCHTHALER: You'll hear us object from time to
20 time. And unless you -- you are here for Beaumont, so,
21 unless they tell or instruct you otherwise, you can go ahead
22 and answer. This is just lawyer stuff.
23     A. Okay. At the time, it was Officer Rivers, Officer
24 Jackson, Corporal San Miguel. And then the public safety
25 officers, was three of us.

Page 11

1     Q. Corporal who?
2     A. It was three public safety officers.
3     Q. You said Corporal San --
4     A. Corporal San Miguel.
5     Q. Corporal San Miguel, what did he have to do with
6 this?
7     A. He was the officer on campus, also. He's considered
8 a supervisor when Sergeant Hall is not there.
9     Q. And is that the San Miguel that previously was with
10 the City of Beaumont, or do you know?
11     A. I don't know where he was from.
12     Q. Do you know if he was terminated with the City of
13 Beaumont for excessive force on three or four occasions? Is
14 that the same one?
15     A. I do not have any knowledge.
16     Q. But he was a corporal at BISD?
17     A. Yes, sir.
18     Q. He was in charge of you-all?
19     A. Yes, sir, when Sergeant Hall wasn't on campus.
20     Q. Okay. I'm going to get this straight. I'm not
21 trying to repeat or be confusing. My understanding is that
22 BISD employed Officer San Miguel, correct?
23     A. Yes.
24     Q. Do you remember his first name?
25     A. Johnny.

Page 12

1     Q. Juan San Miguel, does that ring a bell?
2     A. Johnny, yes.
3     Q. And you are telling me that he was over you-all on
4 this occasion?
5     A. Yes, sir.
6     Q. And are you aware of his history with Beaumont
7 police at all?
8     A. No, sir.
9     Q. Did you ever talk to him about his history?
10     A. No, sir.
11     Q. Do you know whether or not he was terminated for
12 excessive force from Beaumont PD?
13     A. I have no knowledge of his background whatsoever.
14     Q. So, let's go back. San Miguel was the corporal?
15     A. Yes, sir.
16     Q. And was he there at the time?
17     A. Yes, sir.
18     Q. And he was the one that was you-all's supervisor?
19     A. Yes.
20     Q. And he was the one that was telling you-all what to
21 do and how to do it?
22     A. Yes, sir.
23     Q. And he was the one that enforced the policies and
24 procedures of the police -- of the BISD?
25     A. Yes, sir.

Page 13

1    Q. And he was the one that you-all had to take orders
2  from, right?
3    A. Yes, sir.
4    Q. And he was your authoritative figure?
5    A. Yes, sir, when Sergeant Hall was not on campus.
6    Q. And Sergeant Hall wasn't on campus at this time?
7    A. He was not on campus at the time.
8    Q. And, so, the -- do you agree with me that Corporal
9  San Miguel's beliefs about police work were instilled in you
10 while you were there?
11   A. Yes, sir.
12   Q. And you believe he was a fine example of police --
13 of a police officer?
14   A. Yes, sir.
15   Q. And my understanding is on this occasion, you
16 believe that both you and Officer Rivers did everything in a
17 correct manner?
18   A. Yes, sir.
19   Q. You-all did everything perfectly in dealing with
20 this riot situation, correct?
21   A. Yes, sir.
22   Q. So, the whole thing that we are going to show in a
23 little bit on videotape, would you say it was a riot
24 situation?
25      MS. KALCHTHALER: Objection, form.

Page 14

1      MR. TERRELL: Why?
2      MS. KALCHTHALER: You can answer, if you know.
3   It's vague.
4      MR. TERRELL: Why is it vague?
5      MS. KALCHTHALER: Riot situation. It's up to her to
6   answer.
7    Q. Okay. Do you know what a riot is?
8    A. Yes, sir, I do.
9    Q. Do you know what a riot situation is?
10   A. Yes, sir, I do.
11   Q. When I asked a question about whether this was a
12 riot situation, it's not vague in your mind, is it? You
13 understand what I'm talking about?
14   A. No, I don't understand.
15   Q. Okay. Why do you not understand it?
16   A. Because I don't know the word "vague," what that
17 means.
18   Q. Okay. You don't know vague, but you know what a
19 riot is.
20   A. I know what a riot is, yes, sir.
21   Q. You know what a riot is. You know what a riot
22 situation is, and you know you were in one on this occasion.
23   A. Yes, sir.
24   Q. This -- in your time of being a security guard, was
25 this the scariest situation you've ever been in?

Page 15

1    A. No, sir.
2    Q. What was the scariest situation you've ever been
3  in?
4    A. The scariest situation I ever been in, that was my
5  first year working. We had an eight-person fight in front of
6  the band hall, and there was a bunch of kids around. And it
7  was like I was helping a public safety officer trying to
8  break up a fight, and I had to call for back up. And that's
9  when we got every police officer, every administrator out
10 there to get the situation detained.
11   Q. So, other than that, where you had eight or nine
12 people in a fight, would you say this was the scariest you've
13 ever been in?
14   A. Yeah, that was the scariest I ever been in was the
15 eight-person fight, yes.
16   Q. Was this the second?
17   A. No. I broke up so many fights in six years' time.
18   Q. Now, would you say there was an excessive amount of
19 fights at the school that you were in charge of?
20   A. Yes, sir.
21   Q. It was a -- the safety of the students was your
22 number one priority?
23   A. Yes, sir.
24   Q. And it was Officer Rivers' number one priority,
25 right?

Page 16

1    A. Yes, sir.
2    Q. And it was Corporal San Miguel's number one
3  priority?
4      MS. KALCHTHALER: Objection, form.
5    A. Yes.
6    Q. And -- well, from dealing with Corporal San Miguel,
7  was safety, from what you saw, his number one priority?
8    A. Yes, sir.
9    Q. And you felt he was a glowing example of how a
10 corporal should act in trying to keep students safe at West
11 Brook High School, correct?
12   A. Yes, sir.
13   Q. And you thought he was a glowing example of police
14 work, correct?
15      MS. KALCHTHALER: Objection, form.
16   Q. In your mind, what you saw.
17   A. Yes, sir.
18   Q. And you think, leading up to this incident, he did
19 everything perfectly?
20   A. Yes, sir.
21   Q. Okay. Now, we know that BISD has a world of
22 problems, fair?
23   A. Yes, sir.
24   Q. And that world of problems was clearly there during
25 your term at West Brook High School, correct?

Page 17

1    A. Yes, sir.
2    Q. And you would have to agree with me that that
3    problem with BISD was systemic all the way from the top to
4    the bottom, fair?
5        MS. BROUSSARD: Objection, form.
6        MS. KALCHTHALER: Objection, form.
7    Q. You can answer.
8    A. Yes.
9    Q. I mean, another way of putting it, BISD,
10   specifically West Brook, was a disaster during your six
11   years, in your opinion?
12       MS. BROUSSARD: Objection, form.
13       MS. KALCHTHALER: Objection, form.
14   A. No, I don't think it was a disaster.
15   Q. It was truly problematic?
16       MS. BROUSSARD: Objection, form.
17       MS. KALCHTHALER: Objection, form.
18   A. Yes, sir, it was.
19   Q. And the health and safety of the students during
20   that time you felt was one concern, fair? Safety issues were
21   a major concern during this problem time for BISD. Do you
22   agree with that statement?
23   A. No, because we were brought in to help protect the
24   students.
25   Q. Okay. But the problems that you -- you saw a bunch

Page 18

1    of problems with West Brook, fair, while you were there?
2    A. Yes.
3    Q. There were problems with the principals, correct?
4    A. Yes.
5    Q. There were problems with the teachers, correct?
6    A. Yes.
7    Q. There were problems with the students, right?
8    A. Yes.
9    Q. And there were huge problems with the school
10   district, right?
11   A. Yes, sir.
12   Q. And the board, the school board, you are aware,
13   being an employee, you are aware of all their problems?
14       MS. KALCHTHALER: Objection, form.
15   A. Yes.
16   Q. In your opinion as an employee that was involved in
17   this for six years, did the problems that you saw start with
18   the school board and work their way down to the janitor?
19       MS. BROUSSARD: Objection, form.
20       MS. KALCHTHALER: Objection, form.
21   A. It's hard to answer that question. I mean, you
22   know, my job, I go and do what I got to do. I don't worry
23   about what else goes on.
24   Q. I know you don't worry about it, but you saw it.
25   A. Yes.

Page 19

1    Q. You've already told us you saw it, right?
2    A. Right.
3    Q. You saw a disaster.
4    A. Yeah.
5        MS. KALCHTHALER: Objection, form.
6    Q. And you saw problems with the school district, with
7    the specific West Brook High School, right?
8        MS. KALCHTHALER: Objection, form.
9    Q. You can answer.
10   A. Yes.
11   Q. And that problem -- I mean, you read the paper,
12   right?
13   A. Yes, sir.
14   Q. You actually hear what the school district says and
15   does, right?
16   A. Yes, sir.
17   Q. You understand that that was a big problem that
18   trickled down to West Brook school district, in your
19   opinion?
20       MS. BROUSSARD: Objection, form.
21       MS. KALCHTHALER: Objection, form.
22   A. Yes.
23   Q. And that showed itself at West Brook in what ways?
24       MS. BROUSSARD: Objection, form.
25       MS. KALCHTHALER: Objection, form.

Page 20

1    Q. What problems did you see?
2    A. The problems that I saw is, how do I say it? We
3    didn't have enough funding to do what we needed to do, you
4    know, to make the campus better, you know. I mean, yes,
5    teachers, some teachers do have problems with students. And,
6    yes, you know, students have problems with principals. But
7    that's a normal cycle of learning from mistakes.
8    Q. And you-all were there specifically to try to
9    protect all these students at West Brook?
10   A. Protect the students, the staff, everybody on that
11   campus, yes.
12   Q. Just protect everything. And would it have been
13   easier for you to perform your job and the officers to
14   perform their job if you'd had more officers?
15       MS. KALCHTHALER: Objection, form.
16   A. Yes, I believe so.
17   Q. And have you -- are you aware of the school district
18   being audited, you know there was a big audit coming out, are
19   you aware of that?
20   A. Yes, sir.
21   Q. Have you seen any of the conclusions of that
22   audit?
23   A. No, sir.
24   Q. If the audit said that the school board did not
25   provide sufficient funding for police and security at West

Page 21

1   Brook High School, would you agree with that?
2       MS. KALCHTHALER: Objection, form.
3   Q.  From what you saw?
4       MS. KALCHTHALER: Same objection.
5   A.  Would I agree?
6   Q.  Yeah.  Would you agree that the school board -- the
7   very first thing you said, there wasn't enough funding.
8       MS. KALCHTHALER: Objection, form.
9   Q.  And if -- okay.  Did -- the very first thing when I
10  asked you the problems, did you tell me there wasn't enough
11  funding?
12  A.  Yes, I did.
13  Q.  Okay.  And you told me that if there would have been
14  more security officers and police officers, that it would
15  have been easier to keep the students safe, correct?
16  A.  Yes.
17  Q.  And you felt when you were there it was hard to keep
18  the students safe with the amount of employees that you had.
19      MS. KALCHTHALER: Objection, form.
20  Q.  Correct?
21  A.  Yes.
22  Q.  And it made your job more difficult, correct?
23  A.  Yes, because there was only two of us outside.
24  Q.  Are you aware of any policy or procedure on how many
25  were supposed to be there?

Page 22

1   A.  No, sir.
2   Q.  Okay.  If there was supposed to be two officers and
3   three security officers at all times, was that policy
4   violated at West Brook?
5       MS. BROUSSARD: Objection, form.
6       MS. KALCHTHALER: Objection, form.
7   A.  No.
8   Q.  Okay.  There were three people outside at all
9   times?
10  A.  No, it was actually two security officers outside,
11  one inside walking the building.  And then two police
12  officers on campus.
13  Q.  Okay.  So, the whole time there was -- there was two
14  police officers on campus?
15  A.  Yes.
16  Q.  And there were three security officers, correct?
17  A.  Yes, sir.
18  Q.  And that was all?
19  A.  That was it.
20  Q.  And two security officers outside, in your mind, was
21  not sufficient to keep the students safe, fair?
22  A.  I mean, I believe we did the best of our ability to
23  keep them safe.
24  Q.  I'm not saying -- we are dealing with a riot
25  situation here ultimately, right?

Page 23

1   A.  Yes.
2   Q.  And we are dealing with a situation that you-all
3   were being overwhelmed, fair?
4   A.  Yes.
5   Q.  And we are dealing with a situation that needed more
6   security, right?
7       MS. KALCHTHALER: Objection, form.
8   Q.  In your opinion?
9   A.  Yes, in my opinion.
10  Q.  And I believe that there had been complaints at West
11  Brook from either you or the officers, that there were not
12  sufficient police force on duty; is that right?
13      MS. KALCHTHALER: Objection, form.
14  A.  Yes.
15  Q.  Okay.  And who made those complaints?  Was that
16  you?
17  A.  I never made a complaint.
18  Q.  Who made the complaints about not having sufficient
19  police force?
20      MS. KALCHTHALER: Objection, form.
21  A.  I have no idea.  I don't know.
22  Q.  Did you know they were made?
23  A.  Not that I know of.
24  Q.  Did you hear they were made?
25  A.  Not that I know of.

Page 24

1   Q.  In your mind, that's what you believe, though, there
2   wasn't sufficient police force?
3   A.  Yes.
4   Q.  Okay.  And when you are dealing with a riot
5   situation like we are dealing with today, the more police
6   force the better.  We can agree on that?
7   A.  Yes, sir.
8   Q.  And we can agree that you felt you needed much more
9   police presence at West Brook to maintain safety, right?
10      MS. KALCHTHALER: Objection, form.
11      MS. BROUSSARD: Objection, form.
12  A.  Yes.
13  Q.  And on this occasion, if there were more police
14  presence, the riot would have been easier to dispel, fair?
15      MS. BROUSSARD: Objection, form.
16      MS. KALCHTHALER: Objection, form.
17  Q.  In your opinion?
18  A.  Yes.
19      MS. KALCHTHALER: Objection, form.
20  Q.  And you were the one that was actually there in the
21  trenches doing it, correct?
22  A.  Yes, sir.
23  Q.  You and Officer Rivers, correct?
24  A.  Yes, sir.
25  Q.  And I think you can say the last thing you wanted in

Page 25

1   this world was snap this little boy's arm, right?
2        MS. KALCHTHALER: Objection, form.
3        A. Yes.
4        Q. I mean, that was the -- I would think you felt
5   horrible about the situation ever since; is that right?
6        A. Yes, sir.
7        Q. Has it haunted you?
8        A. It's bothered me, yes.
9        Q. How so?
10       A. You know, it bothered me to where if we could have
11  done something different, you know, it was just -- that's one
12  thing that we never do is hurt a kid, you know. That's
13  not in our mind and not in our intention, you know. We want
14  to keep these kids safe. So, that's, you know, if we could
15  have done anything different, yes.
16       Q. And there are some things that we could have done
17  different, right?
18       MS. KALCHTHALER: Objection, form.
19       Q. From a school -- from a school district standpoint,
20  there are things that could have been done different that
21  would have eliminated the potential to be in this situation,
22  fair?
23       MS. KALCHTHALER: Same objection.
24       A. I think we did everything that we could possibly --
25       Q. I asked a bad question. And I realized I asked it,

Page 26

1   okay. You and Officer Rivers are two people faced with a
2   riot situation, and you did what you thought is the only
3   thing you could do, right?
4        MS. KALCHTHALER: Objection, form.
5        A. Yes.
6        Q. Is that right?
7        MS. KALCHTHALER: Same objection.
8        A. Yes.
9        Q. But the -- if you had had more officers and more
10  security guards, it would have been significantly easier to
11  deal with this situation, right?
12       MS. BROUSSARD: Objection, form.
13       MS. KALCHTHALER: Objection, form.
14       A. Yes.
15       Q. No question about it?
16       MS. KALCHTHALER: Same objection.
17       A. Right.
18       Q. And that's what you-all were lacking in the five or
19  six years leading up to this incident that you worked there,
20  was sufficient funding to have sufficient police force and
21  security guards, right?
22       MS. KALCHTHALER: Objection, form.
23       A. Yes, sir.
24       Q. And if you would have had the personnel you needed
25  in the police force, a riot situation like we are dealing

Page 27

1   with could have been dispelled in a much different manner,
2   fair?
3        MS. BROUSSARD: Objection, form.
4        MS. KALCHTHALER: Objection, form.
5        A. Yes.
6        Q. And that's what you would have wanted, correct?
7        A. Yes.
8        Q. Because let's give -- give an example. If you had
9   three or four outside security officers like yourself, more
10  than likely -- on the scene -- more than likely you wouldn't
11  have had this situation, right?
12       MS. BROUSSARD: Objection, form.
13       MS. KALCHTHALER: Objection, form.
14       A. Yes.
15       Q. You agree with me?
16       A. Yes.
17       Q. Okay. And the job of the school was to, in your
18  mind, as a security officer down in the trenches, was to
19  dispel incidents before they got to the point where you had
20  to cause serious bodily harm to a student, correct?
21       MS. BROUSSARD: Objection, form.
22       MS. KALCHTHALER: Objection, form.
23       A. Yes.
24       Q. But unfortunately, because there wasn't sufficient
25  employees on the premises at this time, serious bodily injury

Page 28

1   ended up occurring to the student, fair?
2        MS. BROUSSARD: Objection, form.
3        MS. KALCHTHALER: Objection, form.
4        A. Yes.
5        Q. And after this incident, it's my understanding you
6   took a couple of days off?
7        A. No.
8        Q. You didn't?
9        A. This was a week before spring break.
10       Q. Okay. Okay. Did you ask for, hey, I need a little
11  time, this was a traumatic incident for me, from the school
12  district or San Miguel or anybody?
13       MS. KALCHTHALER: Objection, form.
14       A. It happened that Friday. So, I had that whole week
15  off for spring break.
16       Q. I understand. I'm going to ask my question. My
17  question is, did you, just in your mind, think, well, I got
18  the whole week to get myself together, I'm going to be fine?
19  Or did you go to somebody and say, look, this was a bad deal,
20  I need a few days off, and they say, well, you got spring
21  break?
22       MS. BROUSSARD: Objection, form.
23       MS. KALCHTHALER: Objection, form.
24       A. No, I never asked for a day off or anything. I felt
25  like that whole week --

Page 29

1  Q.  Would have been sufficient to get yourself
2  together?
3  A.  Yes, sir.
4  Q.  When is the first time you saw the video on YouTube
5  or anything?
6  A.  I first saw the video, I want to say, that Tuesday
7  when we came back from that week.  I didn't even know it was
8  on YouTube until somebody told me, you know, a week after
9  spring break.
10  Q.  What is the first thing you thought of when you saw
11  it?
12  A.  The first thing I thought?  I was trying to do my
13  job as much as I could, to my ability.  And I believe that we
14  did everything we could.  We did not have any intention of
15  hurting the student.
16  Q.  Sure.
17  A.  If he wasn't resisting, it would have not ended this
18  way.
19  Q.  No, I understand.  You-all did everything perfectly,
20  that's your opinion, correct?
21  A.  Yes, sir.
22  Q.  But when you heard the snap, you saw what happened,
23  what did you think?
24  A.  I didn't see what happened.  I just heard the snap,
25  and I got back.  I didn't know what was going on because I

Page 30

1  was telling the kid, I was looking at him saying, stop
2  resisting, several times.
3  Q.  Okay.
4  A.  And when I heard that, I backed off.  I didn't know
5  what happened.  It was confusion.
6  Q.  Okay.
7  A.  And that's when he said, you know, call for a nurse.
8  And, so, I did.
9  Q.  Who said call for the nurse?
10  A.  Stephen Rivers, call for the nurse, help.
11  Q.  Now, did the resisting student punch you with his
12  fist?
13  A.  No, he didn't punch me with his fist.  He elbowed me
14  when I had ahold of him trying to hang onto him to keep him
15  from going after the other student and administrator.
16  Q.  He was going to go after the administrator as well,
17  did you say?
18  A.  Yes, the administrator had the other kid.  And
19  that's when I came in, put my hands around his waist, trying
20  to hold him until help arrived.
21  Q.  Okay.
22  A.  And he was elbowing me as, you know, dragging me,
23  trying to go after the other student.
24  Q.  And there was a bunch of people around?
25  A.  Oh, yes, sir, there was lots of kids.

Page 31

1  Q.  And that's what heightened the situation?
2  A.  Yes.
3  Q.  And that's why you said there wasn't enough
4  employees of the police force to do you-all's job in a safe,
5  efficient manner, right?
6  MS. BROUSSARD:  Objection, form.
7  MS. KALCHTHALER:  Objection, form.
8  A.  Yes.
9  Q.  How long had you known, as a security officer out
10  there, that there weren't enough security officers?
11  MS. KALCHTHALER:  Objection, form.
12  A.  When I first started.
13  Q.  And --
14  A.  Then they started getting more security officers
15  because I was the only one on campus outside, and then they
16  gave me another person to be outside with me.  And then the
17  district was trying to expand the police department more
18  because, I mean, we were small when we first started, but
19  it's just slowing building up.  I want to say it was my third
20  year being there, you know, we got two more security
21  officers.  And --
22  Q.  Had you talked to somebody about, hey, I got to get
23  some more help?
24  A.  No, sir, my boss already knew that.  He was trying
25  to --

Page 32

1  Q.  Who was your boss?
2  A.  Sergeant David Hall.
3  Q.  And, so, Sergeant Hall had issues that you were
4  aware of about not having enough employees?
5  MS. KALCHTHALER:  Objection, form.
6  A.  Yes.
7  Q.  And was this the entire time that you were there?
8  A.  No, sir.  When he got me, the other two security
9  officers, you know, we worked with what we had, so --
10  Q.  Well, I understand you work with what you have, you
11  know.  My question is, at no time, and I think you answered
12  this, at no time while you were at West Brook did you think
13  you had sufficient police presence to deal with the
14  population, fair?
15  MS. BROUSSARD:  Objection, form.
16  MS. KALCHTHALER:  Objection, form.
17  A.  Yes.
18  Q.  And certainly at the time of this riot and the time
19  that we have an injury, there weren't sufficient personnel,
20  in your opinion, to dispel the type of situation you dealt
21  with on a day-in and day-out basis, right?
22  MS. BROUSSARD:  Objection, form.
23  MS. KALCHTHALER:  Objection, form.
24  A.  Yes.
25  Q.  And that was because the board would not provide

Page 33

1  you-all enough employees, right?
2      MS. BROUSSARD: Objection, form.
3      MS. KALCHTHALER: Objection, form.
4      A. Yes.
5      Q. And you had this conversation with your boss, is it
6  Chief Hall? Am I --
7      A. He's Chief Hall now, yes.
8      Q. Chief Hall.
9      A. Yes.
10     MS. KALCHTHALER: Objection, form.
11     Q. Let me ask it again to make sure. You had the
12  conversations that you-all were -- didn't have enough
13  employees with Chief Hall?
14     A. Yes, I mean --
15     Q. And he expressed the same concerns that you did; is
16  that right?
17     MS. KALCHTHALER: Objection, form.
18     A. Yes.
19     Q. He told you on numerous occasions, we don't have
20  enough employees in the police department to deal with some
21  of the situations that we have to do, right?
22     MS. BROUSSARD: Objection, form.
23     A. No, sir. He just knows that, you know, me trying to
24  do my job, he knows I didn't have enough people, but we never
25  discuss. He seen that, you know, we were struggling, you

Page 34

1  know. I was struggling trying to keep up the whole campus by
2  myself. And he knows, you know, by, you know, working.
3      MS. KALCHTHALER: Objection, nonresponsive.
4      Q. On this occasion --
5      A. Yes.
6      Q. On this occasion there were just -- there weren't
7  enough security officers outside to stop this, right?
8      MS. BROUSSARD: Objection, form.
9      MS. KALCHTHALER: Objection, form.
10     A. Yes.
11     Q. And Chief Hall knew about this going way back?
12     MS. KALCHTHALER: Objection, form.
13     A. Yes.
14     Q. After this, did you talk to Chief Hall, say --
15  you-all have this conversation, hey, man, we knew this was
16  going to come, you know? Or hey, you know, what are we going
17  to do now, or how are we going to deal with this situation?
18  Did you-all have any conversation like that?
19     MS. BROUSSARD: Objection, form.
20     MS. KALCHTHALER: Objection, form.
21     A. No.
22     Q. Did they give you more help after this?
23     MS. BROUSSARD: Objection, form.
24     A. Yes.
25     Q. As a result of this?

Page 35

1      A. Yes.
2      Q. And who told you they were giving you more help as a
3  result of this incident?
4      A. Nobody told me.
5      Q. You just --
6      A. I just seen it.
7      Q. Okay. Did it make you feel a little bit better?
8      A. Yes, sir.
9      Q. Does it make you feel kind of sad that something
10  like this has to happen to get more help like you needed
11  before?
12     MS. BROUSSARD: Objection, form.
13     MS. KALCHTHALER: Objection, form.
14     A. Yes, sir.
15     Q. Did it upset you?
16     A. Yes.
17     Q. Why?
18     A. Because that student could have been my child. And,
19  you know, being there for six years, I am like a second
20  mother to some of these kids, you know. I mean, I was known
21  as Officer Moore, Mama Moore. You know, I look at these kids
22  as mine. So --
23     Q. I'm going to paint this part with a broad brush, and
24  I'm sure I'll get an objection, but anyway, we'll just deal
25  with that later. You were employed; and when you got there,

Page 36

1  you knew this is a bad situation?
2      MS. BROUSSARD: Objection, form.
3      MS. KALCHTHALER: Objection, form.
4      A. A bad situation?
5      Q. A difficult situation because of the lack of help
6  with the police department, fair?
7      MS. KALCHTHALER: Same objection.
8      A. Yes.
9      Q. And you, and I can see it in your eyes, you thought
10  of these students as your family.
11     A. Yes.
12     Q. And the last thing you wanted was to have one of
13  these students hurt.
14     A. Yes.
15     Q. And the only way to deal with the type of situation
16  you were in would be get more employees of the school
17  district that were in charge of security, fair?
18     MS. KALCHTHALER: Objection, form.
19     A. Yes.
20     Q. And it was very obvious to Chief Hall that he needed
21  more help?
22     A. Yes.
23     MS. KALCHTHALER: Objection, form.
24     Q. And it was very obvious to you you needed more
25  help?

Page 37

1     A. Yes.
2         MS. KALCHTHALER: Objection, form.
3     Q. And you truly believe in your mind as being out
4  there for six years and being involved in this horrible
5  incident, that more help would have prevented this type of
6  situation, right?
7         MS. KALCHTHALER: Objection, form.
8     A. Yes, sir.
9     Q. And because if you had more help, you don't have to
10 be as aggressive, right?
11        MS. BROUSSARD: Objection, form.
12        MS. KALCHTHALER: Objection, form.
13    A. Yes, sir.
14    Q. If you had more help, you don't have to do some of
15 the things that Officer Rivers had to do on this occasion,
16 right?
17        MS. BROUSSARD: Objection, form.
18        MS. KALCHTHALER: Objection, form.
19    A. Yes.
20    Q. And you are upset with the school board be -- you
21 are upset with the school board because something like this
22 had to happen to one of your own in order to get the help you
23 actually needed.
24        MS. KALCHTHALER: Objection, form.
25    Q. Correct?

Page 38

1     A. Yes.
2         (AT THIS TIME, THERE WAS AN OFF-THE-RECORD
3  DISCUSSION AFTER WHICH TESTIMONY RESUMED AS FOLLOWS:)
4         (THIS TIME DOCUMENT WAS MARKED AS EXHIBIT NO. 1.)
5     Q. (BY MR. TERRELL) I'm going to show you what is
6  marked as Exhibit No. 1. And I bet you've looked at that in
7  the last little bit, have you not?
8     A. Yes.
9     Q. And who provided you that?
10    A. Who provided me with this?
11    Q. Yeah, within the last day or couple of days.
12    A. Ms. Frani Broussard.
13    Q. Now, this is something I should have asked earlier.
14 Do you have a lawyer here to serve as your lawyer for this
15 deposition?
16    A. No.
17    Q. Have you ever had a lawyer at any time during this
18 process?
19    A. No.
20    Q. And, so, let's then talk about who you've talked to
21 that is in this room or with a law firm, okay?
22    A. Okay.
23    Q. And how many times -- not fun to talk to lawyers, is
24 it?
25    A. No, sir.

Page 39

1     Q. When is the first time that you spoke to an
2  attorney?
3     A. First time I spoke to an attorney was Miss Frani.
4     Q. Okay. And did you ever speak to Mr. Rivers'
5  criminal attorney?
6     A. No.
7     Q. Did you testify for the grand jury?
8     A. No.
9     Q. Did you give any other statements other than what we
10 have here?
11    A. No other statements except this.
12    Q. When you spoke to Frani, when was that about after
13 the incident?
14    A. It was about setting up for this deposition.
15    Q. Okay. So, you never spoke to any lawyer other than,
16 hey, you got to come down here?
17    A. Yeah, that's it.
18    Q. Okay. And I certainly apologize. I have a response
19 due at the Court. The reason -- we usually give a lot of
20 notice. I have a response that's due fairly soon. So, we
21 had to ask you to come here on fairly short notice, and I
22 certainly appreciate you doing that.
23    A. It's not a problem.
24    Q. After the incident, who did you talk to as far as
25 investigation-wise?

Page 40

1     A. Investigation-wise, I talked to a -- my supervisor
2  which was, he was on scene after it happened, Sergeant
3  Hall.
4     Q. Okay.
5     A. He took my statement, and then I talked to a Texas
6  Ranger.
7     Q. Big guy?
8     A. Yes.
9     Q. Cowboy hat?
10    A. Oh, yeah, couldn't miss him. He's kind of
11 intimidating.
12    Q. Did you give him a statement?
13    A. Yes, sir, I did.
14    Q. And did you give him that statement, as well?
15    A. Yes. It's basically the same thing that I had
16 written. I wasn't with Patriot at the time. I was with
17 BISD.
18    Q. Okay.
19    A. I gave him the statement on what happened from the
20 beginning to the end.
21    Q. Now, that was Ranger Jones; is that right?
22    A. I believe so, yes, sir.
23    Q. Have you reviewed anything else in preparation for
24 your deposition today?
25    A. No.

## Page 41

1    Q.  Okay.  Let's just briefly then -- and feel free to
2    look at this if you need to.  Let's just briefly take me
3    through what happened.
4    A.  Okay.  I can briefly take you through what happened.
5    I remember it because -- we got a word that there was going
6    to be a big fight.  So, we had --
7    Q.  How do you get word?
8    A.  Kids tell us all the time.  You know, they say, hey,
9    something is going to happen, you know.  So, we try to, even
10   though if it's not going to happen, if it is going to happen,
11   we try to be out there to make sure nothing happens.  And I
12   remember me, Rivers, Officer Jackson, San Miguel and then two
13   other public safety officers, we were all scattered out
14   through the front of the school because when school lets out,
15   I mean, we have 2600 kids.  I mean, everybody is flowing out
16   through the front trying to either get to their car, to their
17   parents, to their bus.
18              So, I was out there on the patio area when I was
19   hearing a bunch of kids screaming and that brought my
20   attention.  And I ran over there and realized there was a
21   fight going on.  I radioed for help, saying, hey, we got a
22   fight over here by the buses.  And when I get there,
23   Ms. Guidry, the assistant principal, was already there.
24   Q.  Okay.
25   A.  She had the one student.

## Page 42

1    Q.  Let me ask you about Ms. Guidry.  Ms. Guidry has no
2    law enforcement background, to your knowledge?
3    A.  No.
4    Q.  She is not the proper person to be dealing with some
5    sort of criminal situation?
6              MS. KALCHTHALER:  Objection, form.
7    A.  No.
8    Q.  That's what you-all are for?
9              MS. KALCHTHALER:  Objection, form.
10   A.  Yes.
11   Q.  Okay.  Go ahead.
12   A.  But the principals, you know, they always break up
13   fights.
14   Q.  Well, sure.
15   A.  Even when we are not there, if we are not there.
16   Q.  I mean, if I see a fight today, I'm going to go try
17   and break it up, and I don't have anything to do with it.  I
18   understand that.
19   A.  Yes.
20   Q.  What I'm saying is, she is not trained or her job is
21   not to deal with these sort of situations, fair?
22              MS. KALCHTHALER:  Objection, form.
23   A.  Yes.
24   Q.  Okay.  Go ahead.
25   A.  And I seen she had the one student.  And then I seen

## Page 43

1    him, he was still, you know, cranked up, ready to fight.  And
2    I grabbed my hands around his waist and just hanging onto him
3    until somebody helped me.
4    Q.  Now, my understanding from looking at the video is
5    the only way for you to have grabbed him in a safe way was
6    from the back?
7              MS. KALCHTHALER:  Objection, form.
8    A.  Yes, because you don't want to approach kids face
9    first --
10              MR. TERRELL:  Why objection, form?
11              MS. KALCHTHALER:  This is your characterization of
12   the testimony and the video.  We haven't watched it.  It's
13   assuming facts that aren't in evidence.  We haven't seen the
14   video.
15              MR. TERRELL:  My question is what is your objection
16   to the Court?
17              MS. KALCHTHALER:  My objection is that that question
18   assumes facts that are not in evidence.
19              MR. TERRELL:  Okay.  That's fine.
20   Q.  You were there.  You know what happened, right?
21   A.  Yes, sir.
22   Q.  You know the facts?
23   A.  Yes.
24   Q.  Okay.  The fact was that you had to approach him
25   from the rear, correct?

## Page 44

1    A.  Yes.
2    Q.  And when you approached him from the rear, it
3    startled him, correct?
4              MS. KALCHTHALER:  Objection, form.
5    A.  No, it did not startle him.
6    Q.  It didn't startle him at all?
7    A.  No, he kept on going after the other kid, dragging
8    me trying to get to the other kid.
9    Q.  At what point did you identify yourself as a police
10   officer?
11   A.  I didn't identify myself because I had a bright neon
12   vest.  When I grabbed ahold of him, I kept telling him stop.
13   Q.  Okay.
14   A.  But he never stopped.
15   Q.  I understand.  But you are approaching him from the
16   rear, correct?
17   A.  Yes.
18   Q.  He concerned with the altercation with the other
19   boy, right?
20              MS. KALCHTHALER:  Objection, form.
21   A.  Yes.
22   Q.  The other boy was in front of him, correct?
23   A.  Yes.
24   Q.  His eyes were on that boy.
25   A.  Yes.

Page 45

1    Q.  That was your concern.  He's focused on that other
2    boy, going to go fight that other boy, correct?
3    A.  Yes.
4    Q.  Your neon vest does no good in that situation,
5    right?
6        MS. BROUSSARD:  Objection, form.
7        MS. KALCHTHALER:  Objection, form.
8    A.  Yes.
9    Q.  The only way he would -- there is no way at that
10   point that he could possibly know that you were who you are,
11   right, a police officer?
12       MS. KALCHTHALER:  Objection, form.
13   A.  Yes.
14   Q.  So, at that point, I believe you said you did not
15   identify yourself as a peace officer?
16   A.  Yes.
17   Q.  At some point during the altercation, did you
18   identify yourself as a police officer?
19   A.  No.
20   Q.  Did Officer Rivers, at some point, identify himself
21   as a police officer?
22   A.  He approached him face first.
23   Q.  Okay.
24   A.  So, you know, face first, you see the uniform.
25   Q.  Sure.

Page 46

1    A.  And by the time we got to the ground, he kept
2    telling him, stop resisting.  I was telling him.
3    Q.  Stop.  We don't want to hurt you.  Stop.
4    A.  Exactly.
5    Q.  Yeah.
6    A.  And he was continuing, you know, struggling with us.
7    And I was looking right at him, face-to-face, telling him,
8    stop resisting.
9    Q.  Well, let's take this a little bit at a time.  We've
10   jumped.  You've got him from behind right now.
11   A.  Yes, sir.
12   Q.  You agree with me at the point you had him from
13   behind, he has no idea out there who you are, right?
14   A.  Yes.
15   Q.  You didn't identify yourself, he could not see that
16   you had the uniform, correct?
17       MS. KALCHTHALER:  Objection, form.
18   A.  Yes.
19   Q.  And shortly after that is when he elbows you.
20   A.  He was elbowing me and dragging me going after the
21   other kid.
22   Q.  Yeah.  In other words, you've got him by the waist.
23   A.  Yes.
24   Q.  And he does not have any idea, in your mind, who you
25   are.

Page 47

1        MS. KALCHTHALER:  Objection, form.
2    A.  Yes.
3    Q.  And he is elbowing --
4    A.  Swinging his arms.
5    Q.  -- whoever is grabbing him around the waist, he is
6    swinging his arms trying to get away, right?
7        MS. KALCHTHALER:  Objection for.
8    A.  Yes.
9    Q.  He wasn't -- he wasn't, like, oh, I'm going to get
10   you right in the face.  Let's fight this.  He's trying to
11   knock you off so he could go get the other boy, right?
12       MS. KALCHTHALER:  Objection, form.
13   A.  Yes.
14   Q.  And you were the one that was holding him.  You felt
15   that his actions were trying to get the other boy, not trying
16   to injure you, at that point, right?
17       MS. KALCHTHALER:  Objection, form.
18   A.  At that point, yes.
19   Q.  And I believe you said he elbowed you two times in
20   the shoulder?
21       MS. KALCHTHALER:  Objection, form.
22   A.  It was a several times in the shoulder, yes.  It
23   caused slight pain.
24   Q.  It caused slight pain.
25   A.  But no injury.

Page 48

1    Q.  No injury.
2    A.  Yes.
3    Q.  We can agree that, at least from your standpoint,
4    that those two blows were unintentional, fair?
5        MS. KALCHTHALER:  Objection, form.
6    A.  I believe so.  He was going after the other kid.
7    Q.  At no time did SDW, I'm going to use his name, okay,
8    intend to punch or hit you, right?
9    A.  Yes.
10       MS. KALCHTHALER:  Objection, form.  Just before we
11   go any further with naming student names, I don't know if you
12   want to come to an agreement that later if the transcript
13   could read initials, just so that if this stuff gets in the
14   front of the board, keep people from having to redact it
15   every time.  You want to agree to that?
16       MR. TERRELL:  I was doing real good before.
17       MS. KALCHTHALER:  I just wanted -- before we started
18   saying the student's name and other students' names.
19       MR. TERRELL:  If it's okay with everybody, the only
20   time I used it was awhile ago.  Let's just say the injured
21   boy or --
22       MS. KALCHTHALER:  Can we use his initials, either
23   SDW or SW?
24       MR. TERRELL:  Okay.  That's fine.  I'll just do
25   that.

Page 49

1    (AT THIS TIME, THERE WAS AN OFF-THE-RECORD DISCUSSION
2    AFTER WHICH TESTIMONY RESUMED AS FOLLOWS:)
3        Q.  (BY MR. TERRELL)  At that point, you know that SDW
4    had unintentionally struck you two times with his elbow?
5        MS. BROUSSARD:  Objection, form.
6        MS. KALCHTHALER:  Objection, form.
7        A.  Yes.
8        Q.  What happens after that?
9        A.  I lose my grip with my right hand on him and
10   trying -- and that's when Rivers is rushing us at the same
11   time and we all fell to the ground.
12       Q.  Okay.  So, Officer Rivers approaches you at that
13   point; is that correct?
14       A.  Yes.
15       Q.  And you knew that SDW unintentionally elbows you,
16   right?
17       A.  Yes.
18       MS. KALCHTHALER:  Objection, form.
19       Q.  And you would think that everyone, all the --
20   everybody in the area that saw the same thing would think
21   that he unintentionally elbows you trying to get to the other
22   boy, right?
23       MS. BROUSSARD:  Objection, form.
24       MS. KALCHTHALER:  Objection, form.
25       A.  Yes.

Page 50

1        Q.  Now, did Officer Rivers identify himself as a police
2    officer before getting in the tussle?
3        A.  I mean, he approached him with his uniform.  That
4    should be enough.  We don't have split time to identify
5    ourselves.  We are trying to get in and, you know, detain
6    it.
7        Q.  And these things are all in a moment's notice --
8        A.  I --
9        Q.  -- you are dealing with a riot and all this, and I
10   understand that.  My question specifically is, did he say,
11   stop, I'm a police officer, Officer Rivers, don't -- anything
12   like that?
13       A.  He just said stop.
14       Q.  Okay.  Just stop.
15       A.  And he kept telling him put his arm behind his back,
16   but he kept resisting.  And I kept telling him and looking at
17   him in his face saying, stop resisting.
18       Q.  So, you looked at him on how many occasions, said,
19   look, let's stop this?
20       A.  Because he was laying on my right arm, and I'm face
21   to face with him saying, stop resisting, stop resisting.
22       Q.  You are doing real good, and I'm asking bad
23   questions because we are jumping too far.  After the two
24   unintentional elbows --
25       MS. KALCHTHALER:  Objection, form.

Page 51

1        Q.  -- how many -- how long was it before Officer Rivers
2    made contact with the two of you-all?
3        A.  Maybe five seconds after that.
4        Q.  And how many times during that five seconds did you
5    tell SDW to calm down?
6        A.  Two or three times.
7        Q.  Then Officer Rivers arrives and you are still
8    telling him to calm down.
9        A.  Yes.
10       Q.  Because you don't want him to get hurt.
11       A.  Exactly.
12       Q.  That's the last thing you want in this world,
13   right?
14       A.  Right.
15       Q.  And after Officer Rivers makes contact with the two,
16   how long was that before you heard the snap, about?
17       A.  Maybe, after we hit the ground, maybe eight
18   seconds.
19       Q.  Okay.  And in that eight seconds, you were still
20   telling him to give up, give up, give up?
21       A.  Yes.
22       Q.  How many times did you tell him to give up after you
23   hit the ground?
24       MS. KALCHTHALER:  Objection, form.
25       A.  Two times.

Page 52

1        Q.  So, it was two times before Officer Rivers arrived.
2        A.  Yes.
3        MS. KALCHTHALER:  Objection, form.
4        Q.  And two times --
5        MR. TERRELL:  What --
6        MS. KALCHTHALER:  I believe she's testified it's two
7    or three -- or three times.
8        Q.  Okay.  Maybe I misspoke.  How many times did you
9    tell SDW to calm down before Officer Rivers made contact?
10       A.  I told him stop at least two times.  Rivers
11   interacted, and then I kept telling him three times, stop
12   resisting.
13       Q.  Okay.
14       A.  And then the injury to the arm.
15       Q.  So, on five occasions from the time that you made
16   contact with SDW, you were able to tell him, stop
17   resisting?
18       A.  Yes.
19       Q.  And you did this in a forceful, calm tone.
20       MS. KALCHTHALER:  Objection.
21       A.  I was basically screaming it, you know.  That's the
22   only thing you can do.
23       Q.  Okay.  Now, did Officer Rivers use some sort of a
24   hold that you-all are taught on SDW?
25       A.  I didn't see that part.  Like I said, I was facing

Page 53

```
1    him.
2        Q.  In the video, did you see it?
3        A.  I seen in the video, yes.  He had his arm behind his
4    back, but I'm not, how do you say it, I'm not trained on
5    looking at stuff like that.
6        Q.  You don't know if he did it right or wrong?
7        A.  Right.
8        Q.  Did somebody tell you he did it wrong?
9        A.  No.
10       Q.  Did you read anything anywhere that he did it
11   wrong?
12       A.  No.  I'm not trained in that.  And I can't really
13   answer that if I don't know the right or the wrong way.
14       Q.  I know you are not -- well, we know the wrong way is
15   to not break somebody's arm, right?
16           MS. KALCHTHALER:  Objection, form.
17       A.  Yes.
18       Q.  And if you break somebody's arm, you use the wrong
19   hold.  You can agree with that certainly?
20           MS. BROUSSARD:  Objection, form.
21           MS. KALCHTHALER:  Objection, form.
22       A.  Yes.
23       Q.  But you don't know the right way?
24       A.  Yes, sir.
25       Q.  Okay.  Now, my question was something different.
```

Page 54

```
1    Did somebody tell you after that he used the hold in the
2    wrong way?
3        A.  Nobody told me.
4        Q.  Okay.  You just presumed that?
5            MS. KALCHTHALER:  Objection, form.
6        A.  Yes.
7        Q.  And you presumed it because of what?
8        A.  Because the kid got his arm broke.
9        Q.  Because you shouldn't put enough force on the
10   child's arm to break it like it broke, right?
11           MS. BROUSSARD:  Objection, form.
12           MS. KALCHTHALER:  Objection, form.
13       A.  Yes.
14       Q.  I mean, common sense will tell you, as a security
15   officer, to not do that, right?
16           MS. KALCHTHALER:  Objection, form.
17       A.  Yes.
18       Q.  And you've actually told people that, right?
19           MS. KALCHTHALER:  Objection, form.
20       A.  Yes.
21       Q.  Who all have you told that?
22       A.  I have -- okay.  Come back.
23       Q.  You've actually told people that Officer Rivers
24   shouldn't have put that much force on SDW's arm, right?
25           MS. KALCHTHALER:  Objection, form.
```

Page 55

```
1        A.  No, I never told anybody that.
2        Q.  But you just know that --
3        A.  Yes.
4        Q.  -- from common sense?
5            MS. KALCHTHALER:  Objection, form.
6        Q.  Correct?
7        A.  Yes.
8        Q.  And from being employed by the school district for
9    six or seven years, right?
10           MS. KALCHTHALER:  Objection, form.
11       A.  Yes.
12       Q.  And being the employee that was actually involved in
13   this incident, right?
14           MS. KALCHTHALER:  Objection, form.
15       A.  Yes.
16       Q.  So, you think excessive force was applied in this
17   case, right?
18           MS. KALCHTHALER:  Objection, form.
19       A.  In my own mind, no, because I know the officer never
20   intentionally, you know, tried to use that kind of force, but
21   I don't think it -- in my mind, I don't think he did
22   excessive force.  He did what he had to do.
23       Q.  Okay.  I understand your belief that he didn't try
24   to break -- intentionally say, I'm going to break SDW's arm.
25   And you said that and I understand that and I respect that,
```

Page 56

```
1    okay?
2            My question is, we know he shouldn't have exercised
3    enough force to break his arm, right?
4            MS. BROUSSARD:  Objection, form.
5            MS. KALCHTHALER:  Objection, form.
6        A.  Right.
7        Q.  And we know he did exercise enough force to break
8    SDW's arm, right?
9        A.  Yes.
10           MS. KALCHTHALER:  Objection, form.
11       Q.  And you know, then, he exercised excessive force on
12   this occasion, even though he might not have intended to
13   break SDW's arm, right?
14           MS. BROUSSARD:  Objection, form.
15           MS. KALCHTHALER:  Objection, form.
16       A.  Yes.
17       Q.  Now, afterwards, I've been told that a whole bunch
18   of cell phones were taken from the students.
19       A.  Yes.
20       Q.  Is that a rumor, or is that true?
21       A.  That's true.
22       Q.  And who took all the cell phones?
23       A.  I only took two because I knew they had evidence.
24   And we asked them if we could have the video, and they gave
25   us the video.
```

Page 57

1    Q. Now, there were more than taken, though, right? You
2    took two, but some other people took more.
3    A. No, there was only two, two phones taken.
4    Q. Okay. What happened to those?
5    A. Those, the principal, you know, wanted to see the
6    video to see what actual happened. And he downloaded the
7    video to his computer so the officer can get a piece of the
8    evidence.
9    Q. Okay. And that's not the YouTube video. That's a
10   different video.
11   A. That's a different video. That was the video that
12   was never seen.
13      MS. KALCHTHALER: Objection, form.
14   Q. Why do we not have that video?
15      MS. KALCHTHALER: Objection, form.
16   A. I don't know.
17   Q. Okay. So, there was --
18   A. It was a video of showing what happened, what
19   started the -- who started the fight through -- it started
20   from the beginning and then when Ms. Guidry came in, and then
21   it was cut off after that.
22   Q. It was a more comprehensive video.
23      MS. KALCHTHALER: Objection, form.
24   A. Yes, to show what was going on.
25   Q. Now, you took that because you knew it was evidence,

Page 58

1    right?
2    A. Yes.
3    Q. You knew --
4    A. I asked a kid.
5    Q. -- it should be preserved.
6    A. Yes.
7    Q. The school knew it should be preserved.
8       MS. KALCHTHALER: Objection, form.
9    A. Yes.
10   Q. Everybody should know, I mean, in the police force,
11   you know to preserve that evidence, right?
12      MS. KALCHTHALER: Objection, form.
13   A. Yes.
14   Q. If the evidence was not preserved, that was
15   certainly an error on somebody's part, right?
16      MS. KALCHTHALER: Objection, form.
17   A. Yes.
18   Q. That's why you got the phones, to preserve the
19   evidence, right?
20      MS. KALCHTHALER: Objection, form.
21   A. But the video that you were talking about that's 30
22   seconds, that didn't come out until we came back to work from
23   spring break.
24   Q. That's what I'm saying. Am I correct that you or
25   Officer Rivers asked one student, give me your phone; he said

Page 59

1    no?
2       MS. KALCHTHALER: Objection, form.
3    A. One kid gave us his phone.
4    Q. One kid gave you the phone.
5    A. Yes.
6    Q. You took it from another child, correct?
7    A. Yes, the principal checked to see if he had
8    anything.
9    Q. And then one of them said, I ain't giving it to you.
10   A. Yes.
11   Q. And that's the one that's on YouTube.
12   A. Yes.
13      MS. KALCHTHALER: Objection, form.
14      MR. TERRELL: Why?
15      MS. KALCHTHALER: It calls for speculation. We
16   haven't even shown what the YouTube video is.
17      MR. TERRELL: That's fine. That's fine.
18   Q. You know for a fact, do you not, that -- that one
19   video you-all got and downloaded and it showed a very good
20   angle of the fight, right?
21      MS. KALCHTHALER: Objection, form.
22   A. Yes.
23   Q. There is another phone that somebody looked at that
24   wasn't that good of a view -- video, right?
25      MS. KALCHTHALER: Objection, form.

Page 60

1    A. Yes.
2    Q. You couldn't see much in that video, correct?
3    A. Yes.
4       MS. KALCHTHALER: Objection, form.
5    Q. The third video, to your knowledge, is the one that
6    you-all tried to get and the kid refused.
7       MS. KALCHTHALER: Objection, form.
8    A. Yes.
9    Q. And you know that for a fact, right?
10      MS. KALCHTHALER: Objection, form.
11   A. Yes.
12   Q. How do you know it for a fact?
13   A. Because he said he wasn't giving it to us.
14   Q. And he's the one that put it on YouTube?
15      MS. KALCHTHALER: Objection, form.
16   A. I don't know if he put it on YouTube.
17   Q. But that's the same video that is on YouTube?
18      MS. KALCHTHALER: Objection, form.
19   A. Yes.
20   Q. And you know that for sure?
21      MS. KALCHTHALER: Objection, form.
22   A. Yes.
23   Q. How do you know that?
24   A. Because he said he wasn't giving it to us.
25   Q. Now, were there a bunch of other phones taken, but

## Page 61

1    they just didn't show anything?
2        A.  No.  There was only two phones that was taken.  The
3    third one, they wouldn't take it.  But the rest of the kids
4    showed the principals out there in front of everybody they
5    didn't have anything on their phone.  They just had it out,
6    was going to try to take pictures and stuff, so --
7        Q.  So, these students, I guess, were going to take
8    pictures of the broken arm and stuff like that?
9        MS. KALCHTHALER:  Objection, form.
10       A.  Yes.
11       Q.  And did you-all say they couldn't do that?
12       MS. KALCHTHALER:  Objection.
13       A.  Yes, we told them.
14       Q.  So, in other words, you-all forbid the student body
15   from taking pictures of SDW's broken arm and the aftermath of
16   the incident?
17       MS. KALCHTHALER:  Objection, form.
18       A.  Yes.
19       Q.  And you-all -- somebody lost -- if I don't have
20   it -- let me tell you.  I'm supposed to be given everything
21   that would be useful in this case, okay?
22       A.  Yes.
23       Q.  That's -- federal court requires that.  You
24   understand that?
25       MS. KALCHTHALER:  Objection, form.

## Page 62

1        A.  Yes.
2        Q.  And if I wasn't given that other tape, do you have
3    an explanation?  The one that you saw that was a clear --
4        MS. KALCHTHALER:  Objection, form.
5        A.  It was clear of the whole fight, and it was taken
6    into the principal's and put on the computer.
7        Q.  That's my problem.  I mean, I don't have that, okay?
8    Do you know why I wouldn't have that?
9        A.  No, sir, I don't know why.
10       Q.  The principal should have preserved it, right?
11       A.  Yes.
12       Q.  The police force should have preserved it, right?
13       MS. KALCHTHALER:  Objection, form.
14       A.  Yes.
15       Q.  To do that, it would be obstruction of evidence,
16   would it not?
17       MS. BROUSSARD:  Objection, form.
18       MS. KALCHTHALER:  Objection, form.
19       A.  Yes.
20       Q.  You know that from your police training and Officer
21   San Miguel taught you that if you destroy this evidence,
22   that's obstruction of evidence, right?
23       MS. BROUSSARD:  Objection, form.
24       MS. KALCHTHALER:  Objection, form.
25       A.  Yes.

## Page 63

1        Q.  And that's a bad violation of policy, correct?
2        MS. BROUSSARD:  Objection, form.
3        MS. KALCHTHALER:  Objection, form.
4        A.  Yes.
5        Q.  Do you have -- and I asked this before -- do you
6    have any knowledge or any sort of information as to why that
7    piece of evidence would be destroyed?
8        MS. KALCHTHALER:  Objection, form.
9        A.  I have no knowledge because once I turn it over to
10   them, it's out of my hands.
11       Q.  Okay.  You didn't make an extra copy?
12       A.  No, sir.
13       Q.  Now, did you take the name of these students?
14       A.  No, sir.
15       Q.  Did anybody take the name of the students?
16       A.  The principals did.
17       Q.  Okay.  So, I should be given from -- the school
18   knows who these two people are, right?
19       MS. KALCHTHALER:  Objection, form.
20       A.  Yes.
21       Q.  And maybe I can go back on their phone and see if it
22   hadn't been deleted or something and get the full deal, or
23   did you-all download the whole thing from the guy's phone?
24       MS. BROUSSARD:  Objection, form.
25       MS. KALCHTHALER:  Objection, form.

## Page 64

1        A.  He downloaded it to the computer.
2        Q.  You saw it?
3        A.  Yes.
4        Q.  They showed it to you?
5        A.  Yes.
6        Q.  Was Officer Rivers there when they showed it?
7        A.  No.
8        Q.  Who else was there when they showed it?
9        A.  It was just the principal, me, Sergeant Hall.
10       Q.  Sergeant Hall?
11       A.  Yes.  He's now Chief Hall.
12       Q.  Okay.  Where is he now?
13       A.  He's a chief now.
14       Q.  Where?
15       A.  BISD Police Department.
16       Q.  Oh, he is?
17       A.  David Hall, he's the chief now.  At the time, he was
18   a sergeant.
19       Q.  Is San Miguel still there?
20       A.  I don't know.  I don't keep up.
21       Q.  When is the last time you talked to Chief Hall?
22       A.  The last time I talked to him was June.
23       Q.  Did he talk about this case?
24       A.  No.
25       Q.  So, I mean, we know where he is right now.  He's

Page 65

```
1    probably down at West Brook?
2         MS. KALCHTHALER: Objection, form.
3    A.  Probably, yes, sir.
4    Q.  Was that tape clearer than the one on YouTube?
5         MS. KALCHTHALER: Objection, form.
6    Q.  The one that you took.
7         MS. KALCHTHALER: Objection, form.
8    A.  It wasn't clear of the arm breaking. It's just
9    clear of how the fight started, what got it started, and
10   during the whole -- from the beginning to end, but it's not
11   as clear as the one on YouTube. You know, it just shows the
12   whole story, you know, how they got started on the fight.
13   Q.  Who was preventing all the students from taking
14   pictures of the broken arm?
15        MS. KALCHTHALER: Objection, form.
16   A.  Me, the police officers and the administrators. We
17   was trying to get them to back up, and we circled him so that
18   way --
19   Q.  But why would you-all prevent them from taking
20   pictures?
21   A.  Because we didn't want the kid to be, how do you say
22   it?
23   Q.  You don't want him to see what had happened or --
24   A.  No, we didn't want them to take pictures of a kid's
25   arm that was broke and humiliating him.
```

Page 66

```
1    Q.  Okay.
2    A.  You know, because --
3    Q.  So, the reason you didn't want them to take pictures
4    was because you thought it would humiliate SDW?
5    A.  Yes.
6    Q.  When did you-all make the decision, look, we are not
7    going to let anybody take any pictures of what happened?
8    A.  After it happened.
9    Q.  Who told you to not let them take pictures?
10        MS. KALCHTHALER: Objection, form.
11   A.  I wouldn't want them taking pictures. That's why I
12   tried to stop them. And the administrator is doing the same
13   thing.
14   Q.  You may have answered my question. Did anybody say,
15   look, we don't want them taking pictures of his broken arm?
16   A.  No, we just --
17   Q.  You just said, look, you are not getting any
18   pictures of what happened here --
19   A.  Yes.
20   Q.  -- break it up.
21   A.  Yes.
22   Q.  Okay. Did anybody take a picture?
23   A.  Not that I know of, to my knowledge.
24   Q.  Okay. Do you know if the two students who got the
25   video got their phones back?
```

Page 67

```
1    A.  Yes, they got their phones back.
2    Q.  How do you know that?
3    A.  Because I seen they were handed back to them.
4    Q.  Okay. After they were downloaded?
5    A.  Yes.
6    Q.  I think I'm almost done. You're glad to hear that,
7    aren't you?
8    A.  Yes, sir.
9    Q.  Let me make sure I got this right. Horrible
10   tragedy, right?
11        MS. KALCHTHALER: Objection, form.
12   A.  Yes.
13   Q.  You do not believe that Officer Rivers intentionally
14   snapped SDW's arm?
15   A.  Yes.
16   Q.  You do believe that excessive force was applied for
17   the circumstances that inadvertently snapped SDW's arm?
18        MS. KALCHTHALER: Objection, form.
19   A.  Yes.
20   Q.  The whole thing occurred because you-all were
21   understaffed, fair?
22        MS. KALCHTHALER: Objection, form.
23   A.  Yes.
24        MR. TERRELL: I appreciate your time. Thank you
25   ma'am.
```

Page 68

```
1         (11:18)
2         MS. KALCHTHALER: Do you mind if we take a quick
3    break?
4         (WHEREUPON, THERE WAS A BREAK IN THE PROCEEDINGS,
5    AFTER WHICH THE TESTIMONY RESUMED AS FOLLOWS:)
6         (11:33)
7         EXAMINATION
8    BY MS. KALCHTHALER:
9    Q.  Ms. Moore, I just want to take a moment. I know we
10   met briefly outside, but I'm Kelley Kalchthaler, and I
11   represent Stephen Rivers. I don't represent Beaumont ISD. I
12   just want to make sure that is clear. And then this is
13   Ms. Frani Broussard who probably won't be asking any
14   questions today, but she represents Beaumont ISD School
15   district. I just want to make clear who we are in our
16   capacity.
17        And I know you've already been told by the attorney
18   for SDW and his parents that there is a lawsuit that's been
19   filed, and you are familiar with that. And it's against
20   Beaumont and Officer Rivers individually. In that lawsuit,
21   what they have claimed, I don't know if you are familiar with
22   it, is that there was excessive use of force. In a lawsuit,
23   under the law, excessive use of force is a term of art. Are
24   you familiar with what that means under the law?
25        MR. TERRELL: Object to form.
```

Page 69

1   A. No.
2   Q. Have you had any legal training on excessive use of
3   force?
4   A. No.
5   Q. Have you had any specific law enforcement training
6   on excessive use of force?
7   A. No.
8   Q. Since leaving Beaumont ISD, have you had any
9   specific training on excessive use of force?
10  A. Yes.
11  Q. Can you tell me what that training was?
12  A. Basically, basic training, you know, handcuffing
13  and -- but not taking them down and stuff like that. It's
14  just the school I went to, there are certain things that they
15  tell us.
16  Q. So, in that, it sounds like there might have been a
17  course within a larger training program?
18  A. Yes.
19  Q. Is that correct? So, I just want to make sure the
20  stuff that you would have covered in there, seems like
21  handcuffing, correct?
22  A. Yes, handcuffing.
23  Q. What else, or is it really limited to proper use of
24  handcuffs?
25  A. Yes.

Page 70

1   Q. So, anything else about use of force other than
2   handcuffing?
3   A. That's it.
4   Q. Okay. On the day of the incident, which I know we
5   haven't specified the exact day, but my understanding is it's
6   March 7, and that was a Friday right before spring break. Is
7   that your recollection?
8   A. Yes, yes.
9   Q. On that day, you mentioned that there were two
10  police officers and three security officers at the school; is
11  that correct?
12  A. Yes.
13  Q. And that at some point, Sergeant David Hall was on
14  campus?
15  A. Yes.
16  Q. Do you know when he arrived on the campus?
17  A. Right after we had the fight.
18  Q. Do you know, is it possible he would have arrived
19  before?
20  MR. TERRELL: Object to the form.
21  A. No.
22  Q. Did you see him arrive? So, rather, when he showed
23  up after the incident, was that just the first time you saw
24  him?
25  MR. TERRELL: Object to the form.

Page 71

1   A. He goes on and off campus all day long. So, I mean,
2   he might have been on campus without my knowledge. It's
3   just, he's one of them, poof, you are there, poof, you are
4   gone, so --
5   Q. It seems like his job duties take him to different
6   campuses during the day.
7   A. Yes, yes.
8   Q. So, he may or may not have been on campus before the
9   end of the school day?
10  MR. TERRELL: Object to the form.
11  A. Yes.
12  Q. But you didn't see him until after --
13  A. Yes.
14  Q. -- the incident. Okay. Earlier you were asked a
15  couple of questions about the Beaumont ISD School Board and
16  about audits. Do you remember that kind of line of
17  questioning?
18  A. Yes.
19  Q. And the gentleman over here was talking about an
20  audit. Are you familiar with what that means?
21  A. Means that they are auditing their financial, you
22  know, where their money is going.
23  Q. Have you ever had any training on auditing?
24  A. No.
25  Q. Or any certified public accountant license?

Page 72

1   A. No.
2   Q. Did you attend any of the board meetings that --
3   where that was discussed?
4   A. No.
5   Q. Have you ever attended a Beaumont ISD board
6   meeting?
7   A. Yes, I have.
8   Q. When was that?
9   A. That was to back up the police department from being
10  disbanded.
11  Q. And that would have been after the incident?
12  A. Way after the incident, yes.
13  Q. So, and for your attendance at a board meeting,
14  there was no audit being discussed?
15  A. No.
16  Q. Okay. Have you ever had a chance to look at that
17  audit paperwork?
18  A. No.
19  Q. Do you know how it's compiled?
20  A. No, ma'am.
21  Q. Do you have any -- any knowledge about how that
22  audit is created?
23  A. No.
24  Q. Earlier we were also -- and I'm going to kind of
25  jump around. I don't want to go through each part again, but

Page 73

1  I'll just refer to what you were discussing earlier.  You
2  were talking about the incident itself.  So, this was when
3  you had SDW around the waist.
4     A.  Yes.
5     Q.  And at that time, you said that he was elbowing
6  you?
7     A.  Yes.
8     Q.  And, so, your head would have been, I guess, below
9  his elbows?
10    A.  Well, he's actually a very --
11    Q.  Can you describe where you were?
12    A.  He's a very tall kid.  And, I mean, he's got some
13  long arms, you know.  I mean, it was just, he was elbowing me
14  like right in these areas, you know.
15    Q.  And for the record, I know we have a video here, but
16  for the court reporter, can you describe what areas he
17  hitting you?
18    A.  Right here.
19    Q.  This would be --
20    A.  Edge of my shoulders.
21    Q.  The edge of the shoulders, like up toward your neck;
22  is that correct?
23    A.  Yes.
24    Q.  Anywhere else that you recall being hit by SDW?
25    A.  No.

Page 74

1     Q.  At the time you worked for Beaumont ISD when you
2  were assigned to West Brook High School --
3     A.  Yes.
4     Q.  -- were you on campus every day?
5     A.  Every day, 7:00 to 3:30.
6     Q.  Would you see students come in and out, you know,
7  beginning and end of the day?
8     A.  Yes, because we have to keep precise paperwork that
9  they have permission to leave.  We kept their passes if they
10  had to leave, but if they tried to leave and didn't have
11  permission, we sent them back in the school.
12    Q.  So, I know you've described yourself as -- the
13  students knew you as Mama Moore --
14    A.  Yes.
15    Q.  -- and that you were very familiar with them.
16    A.  Yes.
17    Q.  So, it seems a like you were a -- frequently on
18  campus, correct?
19    A.  Yes.
20    Q.  And well-known by the students?
21    A.  Yes.
22    Q.  And I know, and this is from my experience, so you
23  can tell me if this is the same on West Brook High School's
24  campus, is that the school officers are usually very
25  recognizable to students; is that correct?

Page 75

1     A.  Yes.
2     Q.  They see you guys every day.
3     A.  Yes.
4     Q.  They interact with you every day.
5     A.  Yes.
6     Q.  And, so, while you may -- I don't know if before
7  that day, did you know or did you remember seeing SDW
8  before?
9     A.  No.
10    Q.  But as a school resource officer, would you be
11  surprised if he would be able to recognize you?
12    A.  Yes.
13    Q.  Or -- sorry.  So, you think he would have been
14  recognizable to you?  For students -- let me go back.  Any
15  time -- if you have any questions about the clear -- please
16  just ask me and I'll say it a different way.  I don't always
17  ask it the way I mean to.
18    A.  Okay.
19    Q.  So, as a student at West Brook High School --
20    A.  Yes.
21    Q.  -- would the students have been able to recognize
22  security officers?
23    A.  Yes.
24    Q.  And police officers?
25    A.  Yes, because we have very distinctive uniforms and

Page 76

1  we make sure our presence is known.
2     Q.  During the incident, you had mentioned that you had
3  SDW around the waist.  And I think it wasn't clear, some of
4  the questions and answers that were given there.  So, I'm
5  going to try to clarify some of those.
6        When you grabbed SDW around the waist and you
7  were -- I remember you saying you were telling him to stop.
8     A.  Yes.
9     Q.  Is that correct?  Do you remember what words
10 specifically you used?  I know we used resisting or stopping
11 or give up, but --
12    A.  When I had my hands around the waist, I told him to
13 stop, you know, at least twice.  But by the time we got to
14 the ground, I kept telling him stop resisting, stop
15 resisting, and I was looking at him.
16    Q.  When you had him around the waist, was there any
17 reason to think, in your -- to your knowledge, is there --
18 would there have been any reason for SDW to think you were
19 another student?
20    A.  Possibly, yes.
21    Q.  You think he had no idea who you were?
22    MR. TERRELL:  Objection to form.
23    A.  I don't think he knew who I was because I came from
24 behind.
25    Q.  When you were holding him around the waist, do you

Page 77

1  think he couldn't see you at all?
2      MR. TERRELL: Objection to the form.
3  A.  I don't think he could see me because I'm so
4  short.
5  Q.  And I know this sounds kind of silly, but --
6  A.  I have a bright neon vest, I mean, you know, because
7  I direct traffic after school.
8  Q.  But you don't know if he -- you are not inside of
9  SDW's head, correct?
10  A.  No.
11  Q.  So, you don't know if he did or didn't know that you
12  were a police officer?
13  A.  Yes.
14      MR. TERRELL: Object to the form.
15  Q.  When do you think he became -- when did he give you
16  some kind of communications that made you think, he knows I'm
17  an officer?
18  A.  When we hit the ground and I was looking at him and
19  kept telling him, stop resisting.
20  Q.  And did he stop?
21  A.  No.  Even when he saw Mr. Rivers' face first, you
22  know, uniform is distinctive.
23  Q.  Do you remember, and I know it was a chaotic
24  situation, right?  Like he's -- you are there, there are kids
25  around and Officer Rivers is running.  Do you remember

Page 78

1  Officer Rivers yelling, stop, police, or police, stop?
2      MR. TERRELL: Object to the form.
3  A.  I don't remember any of that.  There is so much
4  going on and screaming, you know.  It's just trying to
5  remember certain things.
6  Q.  Okay.  So, you don't know whether or not he did
7  yell, stop, police or police, stop?
8  A.  He just said, stop.  And then I remember when he was
9  trying to handcuff him, he's saying, you know -- you know,
10  stop resisting, give me your arm so I can handcuff you.
11  Q.  But you don't -- you don't have any way to say
12  whether or not he did or didn't say, stop, police before?
13  A.  No.
14  Q.  You were focused -- I'm sorry.  Is that a yes or no?
15      MR. TERRELL: Object to the form.
16  A.  No.
17  Q.  You just became aware of him when he approached you
18  two; is that correct?
19  A.  Yes.
20  Q.  At that point you -- you could see Officer Rivers,
21  correct?
22  A.  I could see him out of the corner of my eye, but I
23  was looking at the kid, yes.
24  Q.  Earlier, and this is -- and I apologize for this.
25  I've lived most of my life in Texas.  So, I usually catch it

Page 79

1  whenever somebody has an accent.  I'm mishearing it.  But
2  earlier when Counsel was talking he kept saying -- what I
3  thought he was saying was a right situation which didn't make
4  any sense to me.  But I understand now that it sounded like
5  he was saying riot situation?
6      MS. KALCHTHALER: Counsel, I just want to be clear,
7  is that what you were calling --
8      MR. TERRELL: Yeah.  You understood, didn't you,
9  what I was saying?
10      THE WITNESS: Yes.
11      Mr. TERRELL: Riot, yeah.
12  Q.  (By Ms. Kalchthaler)  I did not understand that.
13  So, I want to ask a couple of questions now that I have a
14  better idea of what questions were being asked.  Do you know
15  that riot is defined in the Texas Penal Code?
16  A.  Yes.
17  Q.  Are you familiar with that?  Do you know what
18  provision or what section of the Texas Penal Code that's in?
19  A.  No.
20  Q.  Do you know what that section says about a riot?
21  Can you -- let me ask a better question.  Can you tell me
22  what your understanding of what a riot is under the Texas
23  Penal Code?
24  A.  A riot is where people are fighting, and it's a big
25  crowd.

Page 80

1  Q.  Is there any specific number of people that have to
2  be involved to make it a riot?
3  A.  No, not that I know of.
4  Q.  Okay.  So, when you were asked if it was a riot
5  situation, any time that there are two students fighting, do
6  you consider that a riot?
7  A.  No.  It's just a crowd around.
8  Q.  Okay.  What about this crowd made you think it was a
9  riot situation?
10  A.  Because everybody was cheering, egging on.  I mean,
11  it was just -- it's hard for police officers and security
12  officers to get through when there is -- around this, you
13  know, particular incident.
14  Q.  Were there any other students, to your knowledge,
15  that were fighting other than --
16  A.  Not that I know of.
17  Q.  So, to your knowledge, it was only SDW and I believe
18  the other student's initials are DH.  I don't know if you
19  know that.  So, just two students fighting?
20  A.  Yes, two students fighting, but it was a big
21  crowd.
22  Q.  Were you there when the administrators first -- were
23  you there at the same time that there were administrators at
24  the fight?
25  A.  I was just coming in as one administrator had the

Page 81

1  other kid, and I seen he was still amped up. And that's when
2  I tried to detain him to keep him from going after the other
3  student with the principal.
4      Q.  When you say amped up, can you describe what you
5  remember SDW doing?
6      A.  Screaming, you know, swinging his arms wildly, you
7  know, like he was -- he wasn't done fighting. He was ready
8  to fight again, so --
9      Q.  Was he swinging at -- near other students?
10     A.  I mean, he was just swinging his arms, acting wild,
11  basically.
12     Q.  How far do you think he would have been from -- I
13  don't want to talk about the student who he was fighting
14  with, just the crowd. So, how close would he have been to
15  other students at that point?
16     A.  At least 3 feet, possibly.
17     Q.  I know you said he had long arms. Would that have
18  been within arm's length?
19     A.  Yes.
20     Q.  Did you see the administrator or any of the
21  administrators tell him to stop?
22     A.  No.
23     Q.  So, you didn't see administration give him any
24  commands?
25     A.  No, I just know she just grabbed the other kid and

Page 82

1  was trying to take him with her.
2      Q.  What did the other student do? After he was with
3  the administrator, do you remember what he did?
4      A.  He listened to her. She got him in the building
5  while I still had SDW.
6      Q.  Okay.
7      A.  But what my main concern was the kids around, and
8  plus the front of the school is nothing but glass. You know,
9  I had so many scenarios running through my head. I was
10  worried that either if he went after them, he could have
11  pushed them through the windows, he could have knocked some
12  kids down, or, you know, it was just all about safety.
13     Q.  Did you think that SDW then posed a threat to the
14  students in the area?
15     A.  Yes.
16     Q.  Did you think he posed a threat to you?
17     A.  Yeah.
18     Q.  Did you think he posed a threat to Officer Rivers?
19     A.  Yes.
20     Q.  At any time from when you first grabbed SDW until
21  after the injury, did SDW ever stop resisting your efforts?
22     A.  No.
23     Q.  I know you've been asked a lot of questions about
24  excessive force. We were talking about it earlier and about
25  whether or not -- how many officers were on campus and

Page 83

1  assigned there. Do you have any specific training about
2  running a police force?
3      A.  No.
4      Q.  Any experience with running a police force?
5      A.  No.
6      Q.  Any experience with running -- or I say running, but
7  I mean managing a security force.
8      A.  Yes, because I was a corporal.
9      Q.  Okay. Can you describe what that means?
10     A.  What I mean is, you know, basically I would tell the
11  other people, you know, how I want things run on the campus,
12  you know, how to secure the campus, keep the kids safe,
13  challenge people that comes on and off, you know.
14     Q.  Do you have any training or know of any specifics
15  about number of officers needed for a given size event?
16     A.  No, no. I just try to do the best I can, you know,
17  with what I got. I knew that the police department tried to
18  do the best they can, so --
19     Q.  I don't want to keep you any longer; so, I'm just
20  looking over my questions real quick.
21         Did you -- so, under the Texas Penal Code, seems
22  that you are familiar, generally, with what that is.
23     A.  Yes.
24     Q.  Under the Texas Penal Code, are you considered -- at
25  the time you were at Beaumont ISD during the incident, were

Page 84

1  you considered a public servant?
2      A.  Yes.
3      Q.  Had you -- and are you aware that assaulting a
4  public servant is a crime?
5      A.  Yes.
6      Q.  We also had a lot of questions about various videos,
7  and I want to kind of clear that up. From your testimony, I
8  just want to make sure I've got this right and that we're
9  clarified, you remember there being two cell phone videos
10  that were turned over as evidence.
11     A.  Yes.
12     Q.  And then when we keep talking about a YouTube video,
13  have you viewed any -- any video of the incident on
14  YouTube?
15     A.  No, not at the time. Until I was told -- after me
16  and him was aware that there was videos of us on YouTube.
17     Q.  That's the question I want to ask.
18     A.  Yes.
19     Q.  Have you ever gone onto YouTube and looked at videos
20  on there?
21     A.  I go to YouTube all the time and look at stuff, I
22  mean.
23     Q.  When is the last time you looked at -- or did a
24  search for videos of this incident?
25     A.  Last time I did a search, couple months ago.

Page 85

1    Q. When you searched, did you find more than one video
2  of the incident?
3    A. It just shows that one particular video and then
4  still pictures of me and him.
5    Q. When you say the one particular video, what you --
6  make sure I'm saying this right, on YouTube, it's maybe clips
7  of all of the same video. So, not necessarily the exact same
8  video, but portions of the same?
9        MR. TERRELL: Object to the form.
10    A. Yes.
11    Q. And then for the YouTube videos, it seems like there
12  are several of them. My understanding of how YouTube works,
13  and you tell me if this is different, is that individual
14  YouTube users post videos to YouTube under -- through a user
15  name; is that fair?
16    A. Yes.
17    Q. For any of the videos that you looked at, did you
18  recognize any of the user names?
19    A. No.
20    Q. Did you know who had any of those user name
21  accounts?
22    A. No.
23    Q. Has any student ever come up and told you, hey, I'm
24  this user name?
25    A. No.

Page 86

1    Q. Do you know anyone -- the identity of any of those
2  user names?
3    A. No. It could be -- they could be fake user names,
4  you know, that's how the things work these days. I mean, but
5  I don't know any of the user names that posted those videos.
6    Q. When you looked at the videos that were on YouTube,
7  before seeing them on YouTube, did you recognize the video?
8    A. Before seeing them on -- no, I didn't recognize.
9  This was a totally different video.
10    Q. So, you didn't have -- that was -- on YouTube was
11  the first time --
12    A. Yes.
13    Q. -- you viewed the video, the videos that appear to
14  be YouTube?
15    A. Yes.
16    Q. Do you have any way to know if those videos were
17  ever altered?
18    A. No, I don't know.
19    Q. We were also -- I'm going to just continue talking
20  about the cell phones and that part there. You had mentioned
21  that you were the one who collected some of the cell phones.
22    A. Yes.
23    Q. Did anyone else participate in collecting cell
24  phones?
25    A. Not to my knowledge.

Page 87

1    Q. Did Officer Rivers participate in collecting the
2  cell phones?
3    A. No.
4    Q. So, would you have told him that you collected cell
5  phones?
6    A. I told him and the principal that we had two kids
7  that was willing to give the videos to show what happened.
8    Q. So -- make sure. So, you did tell Officer Rivers
9  and the principal --
10    A. Yes.
11    Q. -- that you collected videos? Did you tell anyone
12  else?
13    A. No, I don't think so.
14    Q. And then after collecting the videos, what did
15  you -- do you know what happened to them?
16    A. Mr. Bryan East was the principal, and he was
17  downloading it on his computer so he could put it on a disk
18  for the police department at the investigation, give it to
19  them.
20    Q. Did you physically take it to the police
21  department?
22    A. No. I just turned the phone over to them and then
23  they gave the kids their phone back after they downloaded it.
24  I don't know what happened to that after this.
25    Q. To your knowledge, did Officer Rivers do anything --

Page 88

1    A. No.
2    Q. -- to destroy a video?
3    A. No.
4    Q. To damage a video?
5    A. No.
6    Q. To do anything to hide a video or conceal it?
7    A. No.
8    Q. Did you?
9    A. No.
10    Q. To your knowledge, did anybody try to --
11    A. No.
12    Q. -- hide a video or conceal a video --
13    A. No, ma'am.
14    Q. -- or destroy? Are you familiar with -- there is a
15  law school administrators are usually familiar with, so you
16  might not be familiar with it yourself, called the Family
17  Educational Rights and Privacy Act. Sometimes it's referred
18  to as FERPA. Have you ever heard of that?
19    A. No.
20    Q. So, you wouldn't have any training or knowledge of
21  that, correct?
22    A. No.
23        MS. KALCHTHALER: I think that's all my questions
24  for today. You may have some more questions. That's what I
25  have.

Page 89

1    MS. BROUSSARD: We'll reserve ours until time of
2    trial.
3        (11:56)
4        EXAMINATION
5    BY MR. TERRELL:
6    Q.   Now, I hope I'm just going to be short this time
7    because I was long before, right? My understanding is --
8    your testimony is that SDW made contact with you with his
9    elbows unintentionally.
10    A.   Yes.
11    Q.   And that unintentionally making contact with a peace
12    officer such as yourself is not a crime, right? I mean, you
13    have to intend -- to be assault of a police officer --
14    A.   Yes.
15    Q.   -- he would have to have intent, correct?
16    MS. KALCHTHALER: Objection, form.
17    A.   Yes.
18    Q.   So, since he inadvertently elbowed you, you don't
19    think that he was trying to assault you in any way, shape or
20    form, correct?
21    MS. KALCHTHALER: Objection, form.
22    A.   No.
23    Q.   Well, I think I asked a double negative. You are
24    agreeing with me that you don't think SDW was trying to
25    assault you --

Page 90

1    A.   Oh, no.
2    Q.   -- or Officer Rivers in any way, shape or form,
3    right?
4    A.   No.
5    Q.   He was trying to assault the other boy.
6    A.   Yes.
7    Q.   Okay.
8    MR. TERRELL: Thank you.
9        (11:57)
10        EXAMINATION
11    BY MS. KALCHTHALER:
12    Q.   Ms. Moore, do you know for sure, did SDW ever tell
13    you that he didn't mean to hit you?
14    MR. TERRELL: Object to the form.
15    A.   No.
16    Q.   Did anyone ask him if he intended -- or to your
17    knowledge, if he intended to hit you?
18    A.   No.
19    Q.   Do you think he knew you were holding him around his
20    waist?
21    A.   No, I don't think he knew I was behind him because I
22    approached him from the back.
23    Q.   I mean, when he was -- when you had your arms around
24    him, he certainly knew that somebody was grabbing him,
25    right?

Page 91

1    MR. TERRELL: Objection to the form.
2    A.   Yes, yes.
3    Q.   There is no question that you were -- I mean, you
4    had full body contact with him, right?
5    A.   Yes.
6    Q.   When you say unintentional, from where Officer
7    Rivers was standing, would he have known if that was
8    intentional or not?
9    MR. TERRELL: Object to the form.
10    A.   Repeat the question.
11    Q.   So, my understanding is Officer Rivers was some
12    distance away, that's correct?
13    A.   Yes.
14    Q.   And he approached you two from the front, correct?
15    A.   Yes.
16    Q.   When he arrived, did you say anything to indicate
17    this isn't intentional?
18    A.   No, he saw the kid, you know, elbowing me.
19    Q.   Okay.
20    A.   And he knew I was trying to detain him, and he
21    assisted with me.
22    Q.   When you say unintentional, he intended to move his
23    arms, correct?
24    MR. TERRELL: Objection to the form.
25    A.   Yes.

Page 92

1    Q.   But you don't think that he was -- let me change
2    that. Are you familiar with the Texas Penal Code statute on
3    assault?
4    A.   No.
5    Q.   Do you know what the elements of a crime are for
6    assault?
7    A.   No.
8    Q.   Are you aware of what the mental requirement is for
9    assault?
10    A.   No.
11    Q.   So, you don't know, as you sit here today, whether
12    or not intentional is part of that crime?
13    A.   Yes.
14    Q.   Sorry. So, that's correct, that you don't know if
15    intentional is something that is required as part of that
16    crime, correct?
17    A.   Yes.
18    MS. KALCHTHALER: That's all.
19        (12:00)
20        EXAMINATION
21    BY MR. TERRELL:
22    Q.   One more, and I think we covered this on your
23    direct. You do know that SDW swinging his arm was an attempt
24    to get away from you, right?
25    A.   Yes.

Page 93

```
1         MS. KALCHTHALER:  Objection, form.
2     Q.  Everybody sitting -- everybody that saw it could see
3  that, right?
4         MS. KALCHTHALER:  Objection, form.
5     A.  Yes.
6     Q.  Anybody that had any common sense would know the
7  contact he made with your shoulder was him trying to get
8  away, not him trying to assault you, right?
9         MS. KALCHTHALER:  Objection, form.
10    A.  Yes.
11       MR. TERRELL:  Thank you.
12       MS. KALCHTHALER:  We reserve the rest until trial.
13              (12:02)
14              (CONCLUSION OF DEPOSITION)
15
16              * * * * *
17
18
19
20
21
22
23
24
25
```

Page 95

```
1     Mr. Terrell - 1 hour, 13 minutes
2     Ms. Kalchthaler - 26 minutes
3        That pursuant to information given to the
4  deposition officer at the time said testimony was taken, the
5  following includes counsel for all parties of record:
6        MR. B. TERRELL, Attorney for Plaintiff;
7        MS. KELLEY L. KALCHTHALER, Attorney for Defendant;
8        MS. FRANCES BROUSSARD, Attorney for Defendant.
9        That $818.00 is the deposition officer's charges to
10  the Plaintiff for preparing the original deposition
11  transcript and any copies of exhibits;
12        I further certify that I am neither counsel for,
13  related to, nor employed by any of the parties or attorneys
14  in the action in which this proceeding was taken, and further
15  that I am not financially or otherwise interested in the
16  outcome of the action.
17        Certified to by me this 1st day of February, 2015.
18
19
20
        _____
                STACY AMY BAKLIK, CSR
21              Texas CSR No. 2680
                Firm Registration No. 30
22              Expiration Date: 12/31/2016
                P. O. Box 566
23              Nederland, Texas 77627
                (409)729-3838
24
25
```

Page 94

```
1         IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2              BEAUMONT DIVISION
3  DARON JEROME WILLIS AND        *
   SUBRINNA LYNN COLEMAN,         *
4  Individually and as Next Friend of *
   SDW, a Minor,                  *
5        Plaintiffs        *
                            *
6  VS.                  * CA NO. 1:14-CV-00314
                            *
7  BEAUMONT INDEPENDENT          *
   SCHOOL DISTRICT, ET AL,      *
8        Defendants        *
9
10  _____
11        REPORTER'S CERTIFICATION
12        DEPOSITION OF MELISA MOORE
13            JANUARY 30, 2015
14
15        I, STACY AMY BAKLIK, Certified Shorthand Reporter
16  in and for the State of Texas, hereby certify to the
17  following:
18        That the witness, MELISA MOORE, was duly sworn by
19  the officer and that the transcript of the oral deposition is
20  a true record of the testimony given by the witness;
21        That the deposition transcript was submitted on
22  2/1/2015 to the witness or the attorney for the witness for
23  examination, signature and return to me;
24        That the amount of time used by each party at the
25  deposition is as follows:
```

Page 96

```
1         CHANGES AND SIGNATURE
2  WITNESS NAME: MELISA MOORE
3  DATE OF DEPOSITION: JANUARY 30, 2015
4
5  PAGE LINE      CHANGE         REASON
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

Page 97

```
1        I, MELISA MOORE, have read the foregoing deposition
2   and hereby affix my signature that same is true and correct,
3   except as noted above.
4
5        _____
6              MELISA MOORE
7
8   THE STATE OF TEXAS:
9   COUNTY OF JEFFERSON:
10       Before me, _____, on this day
11  personally appeared MELISA MOORE, known to me or proved to me
12  under oath or through_____ (description of
13  identity card or other document) to be the person whose name
14  is subscribed to the foregoing instrument and acknowledged to
15  me that they executed the same for the purposes and
16  consideration therein expressed.
17       Given under my hand and seal of office this
18  _____ day of_____, _____.
19
20       _____
21          NOTARY PUBLIC IN AND FOR
22          THE STATE OF _____
23
24
25
```



EXHIBIT

*1*

M. Moore

IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF TEXAS BEAUMONT DIVISION

| | |
|---|---|
| DARON JEROME WILLIS AND | § |
| SUBRINNA LYNN COLEMAN, | § |
| Individually and as Next Friend of | § |
| SDW, a Minor | § |
| Plaintiffs | § |
| | § |
| VS. | § |
| | § |
| | § |
| BEAUMONT INDEPENDENT | § |
| SCHOOL DISTRICT, ET AL, | § |
| Defendant | § |

CIVIL ACTION NO. 1:14-cv-00314

## DECLARATION OF MELISA MOORE

I, Melisa Moore, declare that I have personal knowledge of the facts contained in this Declaration, and that such statements are true and correct. If called and sworn as a witness, I would testify competently to those facts. I make this Declaration entirely of my own free will and choice. I have not been promised any benefit nor have I been threatened with any detriment in connection with giving this declaration.

1.      My name is Melisa Moore. I am a commissioned law enforcement officer and currently employed with Patriot Security as an armed commissioned security officer. I have been in this position since June 2014. Prior to this, I was a Corporal Public Safety Officer ("PSO") with the Beaumont Independant School District Police Department ("BISD"). I was in that position for 6 years.

2.      During my employment at BISD, I was assigned to West Brook High School located at 8750 Phelan Boulevard in Beaumont, Texas. As a PSO, my job was to ensure the safety and security of all district personnel and students on campus. My duties included responding to accidents or crimes on school property, patrolling the parking lots, stopping and checking identification of individuals on campus, directing traffic, and providing assistance to administrators and other police officers.

3.      On March 7, 2014, I was on duty at West Brook High School. At approximately 3 p.m., I observed two black male students fighting in front of the main doors of the campus. There was cheering and screaming and approximately 300-400 students were in the immediate vicinity because it was the end of the school day. In an attempt to prevent the students involved in the fight from hurting each other, I attempted to break up the fight with verbal commands and by pulling away one of the juveniles by his waist. I was directly behind the student holding onto

pg 1

his waist as he was slinging me around as I continued to give him orders to stop fighting. The student was later identified to me as Sudarian Willis. Sudarian then struck me with his elbow a couple of times in the shoulder area causing slight pain, but no injury. Officer Stephen Rivers observed Sudarian strike me with his elbow and intervened to prevent Sudarian from assaulting me further. Officer Rivers and I took Sudarian to the ground and while Officer Rivers had a hold of Sudarian's left arm he sustained an injury to that arm. The school nurse and EMS were immediately notified and Sudarian was transported to the hospital for treatment.

I DECLARE UPON PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON JANUARY _19_, 2015.

MELISA MOORE