## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DARON JEROME WILLIS AND *
SUBRINNA LYNN COLEMAN, *
Individually and as Next Friend of *
SDW, a Minor, *
    Plaintiffs *
   *
VS.   * CA NO. 1:14-CV-00314
  *
BEAUMONT INDEPENDENT *
SCHOOL DISTRICT, ET AL, *
    Defendants *

---

ORAL AND VIDEO DEPOSITION OF
STEPHEN RIVERS
JANUARY 30, 2015

---

    ORAL DEPOSITION OF STEPHEN RIVERS, produced as a witness duly sworn by me at the instance of the Plaintiff, taken in the above-styled and numbered cause on January 30, 2015, from 3:21 p.m. to 4:43 p.m., before STACY AMY BAKLIK, CSR, Certified Shorthand Reporter No. 2680 in and for the State of Texas, at the offices of Weller, Green, Toups & Terrell, 2615 Calder, Suite 400, Beaumont, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached therein.

\* \* \* \* \*

## Page 2

          APPEARANCES

FOR THE PLAINTIFF:
    MR. B. TERRELL
    Weller, Green, Toups & Terrell
    2615 Calder
    Suite 400
    Beaumont, TX 77702

FOR THE DEFENDANT, STEPHEN RIVERS:
    MS. KELLEY L. KALCHTHALER
    Walsh, Anderson, Gallegos, Green & Trevino
    10375 Richmond Ave.
    Suite 750
    Houston, TX 77042

FOR THE DEFENDANT, BEAUMONT INDEPENDENT SCHOOL DISTRICT:
    MS. FRANCES BROUSSARD
    Thompson & Horton
    3200 Southwest Freeway
    Suite 2000
    Houston, TX 77027

ALSO PRESENT:
    Leo Stringer, CLVS
    TrialTech

EXHIBIT C

## Page 3

          I N D E X

                         PAGE
Appearances ............................... 2
Stipulations ............................. 4

STEPHEN RIVERS
    Examination by Mr. Terrell     4
    Examination by Ms. Kalchthaler   64
    Examination by Mr. Terrell     65
    Examination by Ms. Kalchthaler   69

## Page 4

1      THE COURT REPORTER: What are the agreements?
2      MR. TERRELL: By the Rules.
3      STEPHEN RIVERS,
4 having been first duly sworn to testify the truth, the whole
5 truth, and nothing but the truth, testified as follows:
6      (3:21)
7      EXAMINATION
8 BY MR. TERRELL:
9    Q. Will you give us your name?
10    A. Stephen Rivers.
11    Q. Officer Rivers, my name is B. Terrell, and I
12 represent some people that have a case against you. You
13 understand that?
14    A. Yes, sir.
15    Q. If I ever ask you a question that you don't
16 understand, will you ask me to repeat it?
17    A. Yes.
18    Q. Have you given a deposition before?
19    A. No, this is my first deposition.
20    Q. Okay. You are employed by who right now?
21    A. BISD in the police department.
22    Q. Wait. You confused me a little bit. Right now, who
23 writes your checks? Beaumont Independent School District?
24    A. Beaumont Independent School District.
25    Q. Now, I was reading -- and I should have cleared this

Page 5

1  up earlier today -- where at one time the City of Beaumont
2  was actually in charge of the police force at BISD.
3      A. I cannot answer that. Before my time.
4      Q. Never while you were?
5      A. No.
6      Q. Okay.
7      A. Uh-huh, no.
8      Q. I want to make sure --
9      A. Now, there are Beaumont officers that work special
10 events. They will be called in if we don't have sufficient
11 officers, say, for a football game. We need 18 instead of
12 the 17 that we have on staff or we need 20, they'll bring in
13 additional officers at that point.
14     Q. Do you have an extra job, like you worked at Valero
15 as security or anything?
16     A. No.
17     Q. You only work for --
18     A. For BISD.
19     Q. -- at BISD? And you've been there for how long?
20     A. Now, I have done some security work as far as
21 pipeline, just what they call security, but that's -- that's
22 independent and on the weekends and completely apart from
23 anything on the school district.
24     Q. My question is, there are police officers, Port
25 Arthur police officers, I know, go out to the plant as a

Page 6

1  second job --
2      A. Oh, no, sir.
3      Q. -- and they monitor traffic and things like that.
4      A. No.
5      Q. I'm wondering if you have a steady second job like
6  that.
7      A. No, sir.
8      Q. Now, do you agree with the proposition that once a
9  suspect is subdued that you do no more harm?
10         MS. KALCHTHALER: Objection, form.
11     A. Once subdued, yes.
12     Q. And especially when you are dealing with, I guess,
13 children?
14     A. Correct.
15     Q. And they teach you to do no harm unless it's
16 absolutely required, especially when you are in school,
17 right?
18         MS. KALCHTHALER: Objection, form.
19     A. When you say teach me, I don't -- you talking about
20 as far as the academies?
21     Q. I asked a bad question. They -- you have a boss.
22     A. Correct.
23     Q. Your boss has a boss.
24     A. Correct.
25     Q. They have a policy that, especially when you are

Page 7

1  with a school district, to do as little possible as you can
2  while subduing a suspect, right?
3          MS. KALCHTHALER: Objection, form.
4      A. No. They have a policy in place as far as use of
5  force for, you know, subduing, but as far as for telling you
6  what you can and can't do, no, sir. It just tells you that,
7  you know, what you -- what is legal in the State of Texas, I
8  guess, through the education code.
9      Q. By what's legal, we are talking about --
10     A. Through the education code.
11     Q. -- if somebody pulls out a gun, then you can shoot
12 them?
13     A. Right. Then, but see, that's use of force
14 continuum. That goes back -- that's not talking about --
15 that's not BISD. That's State of Texas. That's our -- our
16 TCLE training, which this Texas Commission on Law
17 Enforcement.
18     Q. You heard Ms. Moore?
19     A. I did hear MeLisa, yes.
20     Q. And did you disagree with anything Ms. Moore said?
21         MS. KALCHTHALER: Objection, form.
22     A. Concerning the riot, yes, sir. There was no riot.
23     Q. Okay.
24     A. A riot is seven people or more. And these were two
25 individuals that were fighting. Now, there is a group of

Page 8

1  people standing there, but that does not constitute a riot.
2  Now, in her opinion, because of the large number of people
3  there, I can see her -- but she has not gone through -- what
4  security officers have to know as far as the law and what we
5  as peace officers have to know as far as the law are two
6  different levels.
7      Q. In Ms. Moore's opinion, she was dealing with a riot
8  situation, correct?
9      A. That was what she said, yes.
10     Q. In your opinion, this was not a riot situation?
11     A. That is correct. It was a fight.
12     Q. Her opinion, it what a riot situation because you
13 had two people fighting and then a bunch of people around,
14 correct?
15         MS. KALCHTHALER: Objection, form.
16     A. That's correct.
17     Q. Your opinion was it was not a riot because it was
18 just two people fighting?
19     A. That's correct.
20     Q. So, you-all have a disagreement in that respect?
21     A. I disagree on the legal aspect of it as far as what
22 the penal code says. And as I say, she is not familiar with
23 the penal code.
24     Q. Okay.
25     A. We are back to the penal code, and that's where I'm

Page 9

1  deriving my statement of a riot from.
2  Q. Maybe I asked a bad question. You-all have a
3  different opinion of riot in this case, right?
4  A. Correct, yes. I don't -- she used it because there
5  was a crowd of people.
6  Q. Do you disagree with anything else she said?
7     MS. KALCHTHALER: Objection, form.
8  A. As far as for the people at West Brook, I cannot
9  respond because I had been at West Brook one calendar week at
10 the time that this incident took place.
11 Q. Okay.
12 A. Now, I had been with the department a much longer
13 period of time and I had been at various campuses over that
14 period of time, but my main assignment was evenings and
15 midnights. And I was doing -- I mean, we were doing -- at
16 that time, we were still doing traffic stops. I mean, we
17 were doing basic police work at night, you know. And we were
18 also -- we went -- we went to each individual school for
19 security to make sure that the cameras were working, no one
20 had broken in. We responded to runaway calls. We responded
21 to burglaries, you know, because of the video cameras that we
22 had there. Because if you remember, there was some copper
23 wire that was being stolen on basically a weekly basis there
24 at our chillers at various schools.
25    So, we were, you know, there was a lot of activity

Page 10

1  going on that required a nighttime officer. In fact, there
2  were multiple nighttime officers at that time.
3  Q. Okay. Is it fair to say that you had just gotten to
4  West Brook?
5  A. Correct. As I said, I had been there a week.
6  Q. And this is --
7  A. On that particular assignment.
8  Q. On this particular job, and this is a different
9  assignment and type of police work than you've ever done
10 before?
11    MS. KALCHTHALER: Objection, form.
12 A. No. No.
13 Q. It's not?
14 A. It's just a different form of -- it was, I mean, I
15 had been on campuses before.
16 Q. Oh, okay. Okay. I didn't mean --
17 A. I had been on campuses before, but it was just at
18 this point in time, I had been at West Brook for a week.
19 Q. Okay.
20 A. I had been at Central. I had been at Ozen and
21 various other middle schools in the daytime. This was just
22 the first week that I had been at West Brook.
23 Q. So, what you can't dispute or what you don't know is
24 the -- the staffing and --
25 A. Correct. Yeah, I have no -- I have no -- I know who

Page 11

1  was there.
2  Q. Yeah.
3  A. I know what officers were onsite during that
4  particular week. We had an officer that I was replacing at
5  that particular school that was going to work for Lumberton
6  PD.
7  Q. And who was that?
8  A. Chad Ainsworth.
9  Q. Okay.
10 A. And he was there Monday, Tuesday and Wednesday. And
11 I was with him those three days because he was just showing
12 me the ropes around West Brook, what he did at West Brook
13 because he had specific assigns. At lunchtime he was here,
14 at breaks, he was here. At dismissal, he was here. Because
15 every officer has a post, basically, throughout the day as
16 you get into -- especially at a high school level.
17 Q. Okay. I guess my point is, with regard to her
18 statements about not getting sufficient staffing, you heard
19 her --
20    MS. KALCHTHALER: Objection, form.
21 A. I can't -- I can't respond to that. I have no
22 personal knowledge.
23 Q. Did you hear her say that?
24 A. I heard her say that, but I have no personal
25 knowledge of it.

Page 12

1  Q. And that's my point, you have no opinion one way or
2  the other on that?
3  A. No.
4  Q. You have no opinion on her testimony about not
5  getting sufficient support. You heard her say that?
6  A. I can't -- as I say, I have no opinion. I can't say
7  because I don't know.
8  Q. You can't disagree with her on any points up until
9  the time that the actual fight started, fair?
10 A. That's -- I mean, yes.
11 Q. About procedures --
12 A. Yeah, yeah.
13 Q. -- and what she had asked for and what the police --
14 A. Yeah, because I have --
15 Q. -- and all that?
16 A. Yeah, because I have no idea. I saw her, you
17 know -- on a normal day, we would interface with MeLisa on
18 what her -- you know, when the kids are changing from class
19 to class. I would see her either -- there are times that
20 she -- because they had a golf cart, she would be in various
21 places monitoring activities of the students. And we would
22 see each other. And occasionally we spoke, I mean, we spoke
23 because we knew each other, but she was outside for the
24 duration of the day. I was inside for the duration of the
25 day. So, we very seldom, except when she came to the office,

## Page 13

1  did we interface with each other.
2  Q. And she had said you need more outside help?
3  A. She said that. I heard her say that, but I couldn't
4  say.
5  Q. And I just want to make sure. The reason we are
6  doing your deposition, I want to make sure we don't get down
7  to the courthouse in front of Judge Clark and you say, oh,
8  man, we had plenty of people -- or, oh, man, we didn't
9  need -- you know -- we had more than enough people at the
10  time that MeLisa said that.
11  A. I can say this, in my opinion, that we had
12  sufficient people. Number one, we had five officers that
13  were there at that school.
14  Q. Okay.
15  A. At lunchtime, we would have six.
16  Q. Okay.
17  A. Because we had -- there were five permanent officers
18  assigned to that district. There was Ms. Cooper, Officer
19  Jackson, Sergeant Hall, Corporal San Miguel and myself. And
20  for a period of time there was six because Chad was still
21  there.
22  Q. Okay. You're --
23  A. So, that's a lot. That's more, considerably more
24  than what we have now. Now there's two officers at every
25  high school and one at various middle schools, but because of

## Page 14

1  the staff reduction through the new board, you know, they
2  told us, you know, chief had to reduce staff.
3  MR. TERRELL: Okay. Object to the nonresponsive
4  portion of that answer.
5  Q. You believe that there was sufficient police
6  presence at the time of this incident, correct?
7  A. Oh, yes, sir. Yes, sir.
8  Q. Ms. Moore believes there was not, correct?
9  A. That would be her opinion, I suppose, yes.
10  Q. So, you-all differ in that opinion, right?
11  A. Yes.
12  Q. Okay.
13  A. But see, I'm -- and to follow that up, MeLisa also
14  did not know exactly how many officers were inside the school
15  because she referenced in her conversation with you two when,
16  indeed, there were five.
17  MR. TERRELL: Okay. Object to the nonresponsive
18  portion of the answer.
19  Q. Ms. Moore said that she needed more help outside,
20  right?
21  A. And that out there, that was the PSO's. That was
22  not -- you see, you have to differentiate between the two.
23  She is looking for help with parking cars, getting the chains
24  up, getting -- making sure all the exits are covered so that
25  the school -- students can't slip out. So, she could -- that

## Page 15

1  would be her opinion, that yes, she needed more help.
2  MR. TERRELL: Objection to the nonresponsive portion
3  of that answer.
4  Q. She said that she needed more help outside to
5  protect the health and safety of the students, correct?
6  MS. KALCHTHALER: Objection, form.
7  A. That is part of the health and safety of the
8  students.
9  Q. Is that what she said?
10  A. Yeah. That -- what I just --
11  Q. Do you have an opinion -- she is going to get to ask
12  you some questions, okay?
13  A. Yeah.
14  Q. And she is going to get to ask you anything that she
15  wants to ask you, and you can say anything you want to.
16  A. Okay.
17  Q. But I'm going to ask the question. And if we -- I'm
18  okay to do it like this, but I'm just going to tell you,
19  we'll be here all day.
20  A. Okay.
21  Q. I'm going to try to ask specific questions I need
22  answers to because those are questions I think I'm going
23  to -- are going to be relevant when we get down to the
24  courthouse. And I don't want you to change your opinion, or
25  if you do change it, I want to know where you changed it.

## Page 16

1  You understand?
2  A. Okay.
3  Q. Okay. I know you've never done this before, but
4  that's the way -- she is going to get to ask you, either at
5  the courthouse or today, any questions, okay?
6  A. Okay.
7  Q. So, my question is, do you have an opinion of
8  whether or not there was sufficient police presence outside
9  on the day of the incident?
10  A. No.
11  Q. Okay. You heard Ms. Moore say that she felt that it
12  was not sufficient.
13  A. I heard her say that.
14  Q. Okay. And you cannot disagree with outside --
15  A. Correct.
16  Q. -- but you say inside there was plenty of police?
17  A. Absolutely, yes.
18  Q. Okay. Now, after the incident, did anyone ever tell
19  you that they used improper technique?
20  A. No one.
21  Q. Did you -- is the first time anybody ever told you
22  that the chief thought you used improper technique today from
23  Chief Hall?
24  A. When I saw that, that thing that you passed around
25  was the first time I had ever seen that.

Page 17

1  Q. But you heard Chief Hall say that the chief at the
2  time said you used improper technique?
3  A. I heard Chief Hall say that, yes.
4  Q. And -- but the chief at the time never told you you
5  used improper technique?
6  A. He did not.
7  Q. Would you have liked for him to tell you that?
8     MS. KALCHTHALER: Objection, form.
9  A. I guess, I mean, because --
10 Q. I mean, if that's what --
11 A. If that's --
12 Q. -- what your boss is feeling.
13 A. Yes, yes.
14 Q. And I take it you would dispute that.
15    MS. KALCHTHALER: Objection, form.
16 A. Yes.
17 Q. Why would you dispute that?
18 A. Because during the situation we were in, when I was
19 standing on those stairs and I see -- you would have to have
20 been at the point where I was standing. I hear the noise of
21 the fight. I realize there is a fight. We had been told
22 earlier there was a possibility of a fight. I was trying to
23 locate, in this mass of people in front of me, where the
24 fight was located before I started out because there was so
25 many people. You don't want to go here when the fight is 10

Page 18

1  feet to the left or to the right of that.
2  Q. Would you classify it as a chaotic situation?
3  A. What I saw was the back of people at that time. All
4  of a sudden, a gap comes open in that crowd because Officer
5  Moore and the subject, later identified as SDW, comes
6  through, and I see them. At that point in time, I see the
7  subject striking Officer Moore with his elbows.
8  Q. Intentionally?
9  A. That is -- I have no way to form an opinion whether,
10 in his mind or not, he was -- he was doing it, in my opinion,
11 intentionally, yes. That's my opinion, yes.
12 Q. In your statement, you stated that SDW was
13 intentionally striking Ms. Moore.
14 A. Yes, he was making a conscious effort to strike
15 Ms. Moore, yes, a conscious effort.
16 Q. You heard her say that was not true.
17 A. At the time, I couldn't hear -- oh, you are talking
18 about today?
19 Q. Yes.
20 A. I heard her say -- yes, I heard her say that, yes.
21 Q. You heard her say anyone with common sense would
22 know that he was not intentionally striking her.
23    MS. KALCHTHALER: Objection, form.
24 A. But that's not an accurate statement.
25 Q. That's what she said, though.

Page 19

1     MS. KALCHTHALER: Objection, form.
2  A. That's what she said, but that's not an accurate
3  statement. I understand. Yes, she said that.
4     MS. KALCHTHALER: Objection, form.
5  Q. Let's go back. You understand she said SDW did not
6  intentionally strike her, in her opinion.
7  A. I heard her say that.
8  Q. You heard her say that any person with common sense
9  could visualize that SDW was not intentionally striking
10 her?
11    MS. KALCHTHALER: Objection, form.
12 A. I heard her say that.
13 Q. And you heard her say that anybody looking at the
14 video could see that SDW was not intentionally striking her.
15    MS. KALCHTHALER: Objection, form.
16 Q. Right?
17 A. I heard her say that.
18 Q. You disagree with all three of those statements.
19 A. Absolutely.
20 Q. Because you thought he was intentionally striking
21 her, trying to do serious bodily injury to a peace officer?
22 A. That's correct. When I left those stairs, I was
23 going with the intent to arrest the man.
24 Q. Okay. Well, I didn't ask that.
25 A. Okay.

Page 20

1  Q. The person in the scuffle did not feel that SDW
2  intentionally struck her.
3  A. That's her opinion, yes.
4  Q. Did not feel that SDW was assaulting a police
5  officer in any way, shape or form, correct?
6     MS. KALCHTHALER: Objection, form.
7  A. That's what I heard her --
8  Q. That's what she said.
9  A. That's what she said. I'll agree she said that,
10 yes.
11 Q. She also said anybody with common sense could see
12 that, right?
13    MS. KALCHTHALER: Objection, form.
14 A. Yes, she said that, yes.
15 Q. You disagree because you say, I have common sense
16 and he was intentionally striking a peace officer?
17    MS. KALCHTHALER: Objection, form.
18 A. Yes.
19 Q. You also heard Ms. Moore testify that when you-all
20 had him down, that he was subdued, correct?
21 A. I don't recall her saying that.
22    MS. KALCHTHALER: Objection, form.
23 Q. Okay. That's fine.
24 A. I recall someone else saying that, but that was at
25 your -- go ahead. I'm sorry.

Page 21

1  Q. In fact, Chief Hall just said he was --
2  A. You-all were --
3  Q. -- subdued at 14, right?
4     MS. KALCHTHALER: Objection, form.
5  A. That's what he said, yes.
6  Q. And before you snapped SDW's arm --
7     MS. KALCHTHALER: Objection, form.
8  Q. -- did you --
9     MR. TERRELL: Why?
10    MS. KALCHTHALER: That's argumentative.
11 Q. Okay. Did his arm snap?
12 A. His arm was broken, yes.
13 Q. I mean, it sounded like a snap, right?
14 A. Yes, his arm was broken. Yes, sir.
15 Q. I mean, there are breaks where you, you know, maybe
16 fall on something, and then there is a snap where you
17 actually hear it, it snaps.
18 A. I did hear an audible snap, yes, sir. His arm was
19 broken.
20 Q. So, is it okay if I use his arm was snapped?
21 A. That's fine.
22 Q. When SDW -- at any time, did you have SDW subdued
23 before his arm snapped?
24 A. No.
25 Q. He was still a physical threat to you, right?

Page 22

1  A. Yes.
2  Q. Ms. Moore?
3  A. Yes.
4  Q. And everybody around?
5  A. Yes.
6  Q. And did Ms. Moore agree or disagree with that?
7     MS. KALCHTHALER: Objection, form.
8  A. I can't remember what she said --
9  Q. That's fine.
10 A. -- what she said when we were on the ground because
11 once we got on the ground, if I'm not mistaken, she said that
12 he was still resisting which made him a threat to anyone in
13 the area.
14 Q. Can you tell the jury why his arm was pulled all the
15 way over his head?
16 A. Because when I was attempting to maneuver, he was
17 resisting me. I slid my arm up to attempt to get ahold --
18 control of his arm and pull it up along his back and it
19 released. I mean, it just -- it just -- the end of that was
20 post the break. It was a release. It just continued on its
21 own.
22 Q. You didn't try to pull his arm over his head?
23 A. No, no.
24 Q. If you had tried to put pressure with his arm over
25 his head, that would be improper, correct?

Page 23

1     MS. KALCHTHALER: Objection, form.
2  A. Once again, I can't answer that, no. I mean, I
3  can't answer that.
4  Q. Why -- well, I mean, the proper police procedure is
5  to keep his arm close to his body and pull up just enough to
6  subdue him, correct?
7  A. And in -- at that point --
8  Q. I'm sorry. I asked a question, and then I'll let
9  you explain.
10 A. Yes.
11 Q. Am I correct that the proper police procedure --
12 well, here. Let's do it on me. And you're -- I'm
13 six-foot-one, one and a half, two, 240 pounds. So, about how
14 big was he?
15 A. He was probably your height and a little thinner.
16 Q. He's about 6'2", 190?
17 A. Roughly.
18 Q. So, SDW, at the time of the incident, in your
19 opinion, was 6'2", 190, which is a fairly imposing figure.
20 A. He's just a little taller than me, yes.
21 Q. And about 190, pretty strong kid?
22 A. Appeared to be, yes.
23 Q. Okay.
24 A. Now, that's your right arm. It's not the arm we
25 used.

Page 24

1  Q. Okay.
2  A. He came -- as I said, now, this arm presented itself
3  right here.
4  Q. He's trying to punch you in the face?
5  A. That is my opinion, yes. I caught his arm.
6  Q. Hold on. Hold on. Go back.
7  A. Okay.
8  Q. So, I'm SDW. He's trying to punch you with his left
9  hand to your jaw.
10 A. He's just trying -- there is an arm coming at me in
11 what appears to be a punch. I don't know where he was
12 aiming. He looked like he would be aiming for my head, yes.
13 Q. In your opinion, he was trying to punch you in your
14 jaw with his left hand?
15    MS. KALCHTHALER: Objection, form.
16 A. He was trying to hit me. I can't tell where he was
17 trying to hit me. The arm, it --
18 Q. Was it above your shoulder?
19 A. -- it missed.
20 Q. Was he trying to hit you above the shoulder?
21 A. Yes, above the shoulders.
22 Q. Okay. And he goes in front of you?
23 A. And I managed to get this, right here.
24 Q. You managed to get that right there --
25 A. That's what I'm doing right now. Now, I got ahold

Page 25

1  of this arm. And now, at this point in time, I begin to be
2  what would be this maneuver --
3     Q. Which way is he pulling his arm?
4     A. He's still trying to take his arm that direction.
5     Q. He's trying to pull it this way?
6     A. And, so, I get that arm. And I'm trying to get it
7  back here. Now, we have -- now, before I get it anywhere
8  near there --
9     Q. Okay.
10    A. -- we fall onto the ground.
11    Q. Okay.
12    A. Now we are on the ground.
13    Q. Okay.
14    A. Now, in a normal position --
15    Q. Now, you're on the ground under normal --
16    A. I'm going to tell you right here, I'm going to hold
17 your hand right here. I'm going to reach behind my back.
18 I'm going to get my handcuffs. I'm going to snap them on
19 here. I'm going to hold on to this side, and I'm going to
20 pull this arm back around your back, and I'm going to snap
21 you up. That's normal procedure.
22    Q. Okay. In this case, you are saying when the arm
23 came up, it just -- in fact, his arm was pulled all the way
24 up over his ear?
25    A. It ended up there. His arm was not pulled up there,

Page 26

1  it ended up there.
2     Q. Okay. You quit pulling right here and his arm just
3  snapped for some reason?
4     A. When it snapped, it -- the continuance of my motion
5  to get his arm behind his back carried it. Because you see
6  it -- you see it release all of a sudden. It just goes --
7     Q. So, something was wrong with his arm. I mean, it
8  snapped way down here with no -- with no pressure?
9     A. I honestly can't say. I don't know.
10       MS. KALCHTHALER: Objection, form.
11    Q. But it snapped way down here --
12    A. Somewhere along in here, it snaps. Now, I had slid
13 my arm down because here is what I wanted to do.
14    Q. It just voluntarily slipped all the way over his
15 head?
16    A. No, I've got tension on it coming up. I've got
17 tension on it. When it released -- and you can see it from
18 the video -- all of a sudden it goes from slow, slow, slow,
19 fast.
20    Q. So, everything was being done -- when the arm
21 snapped, you weren't actually putting pressure on it?
22    A. No, I was putting pressure on it to -- I'm trying to
23 get it up to where I can get this other hand up to get to my
24 hand, because I want to be able to hold onto it with my left
25 hand and get my right hand on it and get my handcuffs.

Page 27

1       At the point -- now, that's where MeLisa is lying on
2  top of him. So, this is, this is the fight situation. I'm
3  thinking --
4     Q. At that point he's fighting all get out, right?
5     A. He's trying to get his arm back.
6     Q. Is he fighting?
7     A. Yes, he wants his arm back. He wants to continue
8  his activities.
9     Q. When you have his left arm behind his back before it
10 snaps and we hear it on the videotape, he was still fighting?
11    A. Okay.
12    Q. Was he?
13    A. Yes.
14    Q. And he was still a danger to you?
15    A. He was still resisting.
16    Q. Was he fighting?
17    A. He was resisting.
18    Q. My question was, was he fighting?
19    A. No, he was resisting. That's two different -- two
20 different effects. I know what you are saying, but he was
21 not fighting; he was resisting.
22    Q. That's why I've got to ask the question. At the
23 point when you had his arm behind his back, was he or was he
24 not fighting?
25    A. Yes.

Page 28

1     Q. He was fighting?
2     A. Yes.
3     Q. At the point that his arm broke, was he fighting?
4     A. Yes.
5     Q. And his arm broke -- you did it in the regular, just
6  like you did to me --
7     A. Uh-huh.
8     Q. -- correct?
9     A. No, there is -- that's what I'm fixing to say.
10 There's a caveat to that.
11    Q. What is the caveat?
12    A. It's a fight situation. What I'm thinking is the
13 plane of his back is actually partially his side and MeLisa's
14 back. So, when his arm -- when I'm pulling his arm over, it
15 is, in reality, and unbeknownst to me, it's coming up because
16 of the angle of her back. It's pulling it away from his body
17 and up. But I don't know that when I'm on the ground. It's
18 only until after I look at it, after the fact and see what
19 has happened, you can see that I'm going over MeLisa's
20 back.
21    Q. How high did you pull his arm?
22    A. Well, it wound up over the top of his head.
23    Q. How far before it snapped?
24    A. I'd say probably -- I can't say it was still down.
25 You can tell from the video from where I'm going slowly to

1  where it releases. I mean, you see it all of a sudden here,
2  like that. It released. There was -- all the pressure
3  released off of his harm.
4  Q. Is that when it snapped?
5  A. I'm assuming so.
6  Q. Okay. If it snapped later, what is your
7  explanation? If it snapped when you got it up above his
8  shoulder, what is your explanation?
9  A. I heard it snap well before then.
10 Q. Okay.
11 A. And I'm right on top of him.
12 Q. The snap, it was down before the last pull?
13 A. That's correct.
14 Q. Okay.
15 A. That wasn't --
16 Q. Let's go on --
17    MS. KALCHTHALER: Objection, he's allowed to
18 finish.
19 Q. No, he can. Sure.
20 A. I mean, that was just a -- you could see from the
21 video, and, it's -- there is a motion. It's slow, slow,
22 slow, and then it releases up over his arm.
23 Q. You can come around here. We are going to do it
24 like this. I want to just --
25 A. I'll go here.

1      (PLAYING VIDEO)
2  Q. Here it is right here. Isn't that you?
3  A. That is me.
4  Q. We got to do it just right. Where are you at this
5  point?
6  A. Coming from the front steps. At that point, I'm
7  probably still trying to determine where the fight is.
8  Q. Okay. That's at number three.
9  A. In fact, I know I was.
10 Q. Where are you when Ms. Moore gets SDW?
11 A. I cannot see that.
12 Q. Okay. You heard Ms. Moore testify that she got him
13 from behind. He probably wouldn't know she was a peace
14 officer.
15 A. As I said --
16 Q. Do you have any idea -- any reason to disagree with
17 that?
18 A. No.
19 Q. Okay. Did you hear her say police or stop or I'm
20 MeLisa or anything?
21 A. Over the din of that crowd, I couldn't hear
22 anything. Now, this is where I see them, right here.
23 This is when they come into vision for me, is when he's
24 frantically flailing about trying to strike her and striking
25 her.

1  Q. So, this is where you think -- this is where you
2  think he's trying, as you showed earlier, trying to get her
3  right --
4  A. Right about there is where I see them.
5  Q. Okay.
6  A. Here is where I come in, because I finally found
7  them in the crowd.
8  Q. And you take him down.
9  A. No, I did not take him down.
10 Q. They are already down.
11 A. We fall down. And I have no how idea how we wound
12 up on the ground.
13 Q. Looks to me like -- you don't have him by the arm
14 right here, huh?
15 A. I cannot tell.
16 Q. Okay. At what point do you -- well, you certainly
17 don't there. Let's see.
18    MS. KALCHTHALER: Can you turn up the brightness?
19 A. It's already happened. His arm -- they didn't --
20 it's not on the video.
21 Q. Oh, his arm had already snapped?
22 A. No, no. His arm has already come by my head. I've
23 got ahold of him.
24 Q. Where he tried to punch you in the face is not on
25 the video?

1  A. Right. Because here we disappear.
2  Q. Wait, did I just see something?
3  A. See, now, there my shoulder is blocking
4  everything.
5  Q. So, in other words -- in other words, he tried to
6  punch you in the face right there?
7  A. That's my opinion, yes.
8  Q. Right here at Number 10, he tried to punch you in
9  the face and missed?
10 A. Right -- okay. Between -- between 10 and there,
11 yes.
12 Q. Between 10 and 11, your opinion is he tried to punch
13 you in the face like I showed up here?
14 A. Yes.
15 Q. At that point, you got him by the arm?
16 A. Yes.
17 Q. Okay. That's not shown on video. You agree with
18 that?
19 A. Right, right. And we fought. You see, I'm not
20 even -- I'm so far back, I'm just going down with them.
21 Q. You are going down. They fall.
22 A. Going down.
23 Q. Now, at that point, you heard Chief Hall say you-all
24 had him subdued?
25    MS. KALCHTHALER: Objection, form.


**Page 33**

1  Q. Number 14?
2  A. I --
3    MS. KALCHTHALER: Objection, form.
4  A. He may have said that. I don't know at what
5  point -- because there was he was, he wasn't, he was, he
6  wasn't.
7  Q. Did you have him subdued in Number 14, in your
8  opinion?
9    MS. KALCHTHALER: Objection, form.
10 A. No. He's fighting.
11 Q. Okay. Now, you are holding him down and you are
12 going to, like you said, get your cuffs. And you thought you
13 were going to pull his arm straight up to --
14   MS. KALCHTHALER: Objection, form.
15 A. There's another hand over here that you can't see --
16   MS. KALCHTHALER: Objection, form.
17 A. -- that's got ahold of his arm. See, I've got ahold
18 of it. Now, I'm going back. I'm trying -- because it's
19 taking both hands for me to subdue his arm. He is trying so
20 desperately to get his arm loose. You can see his arm. He's
21 trying to pull it. He's out here, and I'm trying to get it
22 back behind him.
23 Q. Right here, he's fighting trying so desperately to
24 get his arm out, right there?
25 A. Yes.

**Page 34**

1  Q. That's 15.
2  A. Now, I slid my hand up to get ahold of his wrist. I
3  took it back.
4  Q. Okay. At what point does it break? Do you know?
5  A. There.
6  Q. Right there is when it broke?
7  A. Roughly, in my opinion, yeah.
8  Q. That's No. 21, right?
9  A. Uh-huh.
10 Q. 21, right there is when it broke?
11 A. That's my opinion.
12 Q. And you're still pulling it?
13 A. Yes. No, it's rolling forward now.
14 Q. Okay. Right there, it's going forward at its own,
15 you are not forcing it at that point?
16 A. No.
17 Q. You are not --
18 A. It has -- it has released --
19 Q. Number 23, 24 you are not forcing his arm up,
20 right?
21 A. That is correct.
22 Q. So, 23, right here, and 24, you are not forcing his
23 arm up, right?
24 A. Right. Now, I told MeLisa, I said, call an
25 ambulance, his arm is broke. That's the first thing I told

**Page 35**

1  her. I said, call an ambulance, his arm is broken. And he's
2  screaming, and I still hear that. I mean, he's -- and I'm
3  trying to tell him, calm down, because he's still trying to
4  get that arm. He's still trying to get that arm --
5  Q. Right here, he's still trying?
6  A. Yes, he is.
7  Q. Let's go --
8  A. Because he finally -- at some point in time, it
9  flops down on the ground. And I finally put my hand on his
10 side to keep him from flailing around.
11 Q. Wait. Let's go around here. All this time, he's
12 still trying to -- he's still fighting with the other arm.
13 A. No. No, he's not fighting, he's trying to get his
14 arm loose. He won't -- he's wanting to get loose now. And
15 as you can see, no pressure on that arm. None. I'm just
16 merely holding his arm so that it doesn't rotate. His arm is
17 broken. I know his arm is broken. I don't want it to
18 rotate. I don't want it to slip. I don't want it to go in
19 or out. I want to hold it as immobile as I can hold it
20 knowing full good and well that his arm is broken.
21 Q. This is the same one. Oh, here is the -- here's
22 that thing right there in it. The one that you said you
23 never saw.
24 A. I've never seen that.
25   MS. KALCHTHALER: Objection, form.

**Page 36**

1  Q. Well, here.
2  A. I've got one.
3  Q. I mean, that's the same deal, right?
4    MS. KALCHTHALER: Objection, form.
5  A. I'm assuming so.
6  Q. Yeah. Okay. That's you.
7  A. Yeah.
8  Q. Let's see. We can't do that one. That is --
9  A. Clydell Duncan.
10 Q. -- Chief Duncan. Let me go back to the other real
11 quick. I need to go over this one more time, and I hope I'm
12 going to be done.
13    Okay. That's -- you didn't see that part?
14 A. Not -- that part right -- right there is where I
15 start seeing them.
16 Q. Right there is where you start.
17 A. I'm basically coming into the picture right there.
18 Q. Okay.
19 A. Now, here I am.
20 Q. And between -- let's go back.
21 A. See, I'm not even putting any pressure. I'm just --
22 we are going down to the ground. I'm trying --
23 Q. Between 10 and 11 is when he tries to punch you like
24 I tried to punch you here --
25 A. Yeah.

Page 37

1  Q. -- and you got his hand, between 10 and 11, right
2  there.
3  A. Right. That's when I managed to get ahold of his
4  hand. And I got him with this hand.
5  Q. He tried to hit you in the face?
6  A. I got him with my right hand.
7  Q. Okay. Got him with your right hand. Now, right
8  here. Right there, you're trying to pull his arm up close to
9  his back.
10  MS. KALCHTHALER: Objection, form.
11  A. Uh-huh.
12  Q. Just like you showed, right?
13  MS. KALCHTHALER: Objection, form.
14  A. As you can see, though, the plane of his back is not
15  available. I thought this was him.
16  Q. Oh, you thought that yellow thing was him?
17  A. No. What I'm saying is, I'm thinking that this is
18  the flat part of his back, not this, not his side here.
19  Q. Could you not see the big yellow --
20  MS. KALCHTHALER: Objection, form.
21  Q. I mean, I'm just asking.
22  A. We are talking tenths of a second here in a fight.
23  I'm trying to get control of an individual who is resisting
24  me.
25  Q. Okay.

Page 38

1  A. I'm not paying attention to the -- if I'm lateral or
2  post on his body.
3  Q. Okay.
4  A. I'm just trying my best to get his arm under control
5  in a position where I can get ahold of it.
6  MR. TERRELL: Object to the responsiveness.
7  Q. Did you not see that the yellow bright thing was
8  right there on top of him?
9  MS. KALCHTHALER: Objection, form.
10  A. At that moment, I don't remember seeing yellow.
11  Q. Okay. That's fine.
12  A. I mean, that's what I'm saying. We are in the midst
13  of a fight.
14  Q. You didn't see yellow right here?
15  MS. KALCHTHALER: Objection, form.
16  A. As I say, I'm not paying attention to her. I'm
17  paying attention to him fighting. I can't answer your
18  question any more than to say no because --
19  Q. I've got to have an answer -- well, that's all I
20  need is yes or no.
21  MS. KALCHTHALER: Objection, form.
22  A. It's no, but it's yes, too.
23  Q. Let me ask you a question, yes or no --
24  MS. KALCHTHALER: Objection, form.
25  Q. -- did you see yellow at this point, or do you

Page 39

1  know?
2  A. I do not know.
3  Q. If you had seen yellow, you certainly wouldn't have
4  put the arm the way you did, right?
5  MS. KALCHTHALER: Objection, form.
6  A. Correct, yes.
7  Q. So, if you had seen this big yellow, I guess, it's
8  like one of a -- it's glow-in-the-dark sort of deal, right?
9  MS. KALCHTHALER: Objection, form.
10  Q. Is that what it is?
11  A. That one is, yes. That particular vest is, yes.
12  Q. If you had seen that, you never -- it would have
13  been an improper police move to pull his arm up?
14  MS. KALCHTHALER: Objection, form.
15  A. See, I'm looking right here. I'm not looking here.
16  I'm looking here. So, you see, you are taking -- you are
17  twisting my words around.
18  Q. I'm not twisting your words around. I'm trying to
19  get an answer.
20  A. But there is no yes or no. I'm looking at his body
21  in respect to trying to get his arm around.
22  Q. In all respect, look, I'll ask the question. I can
23  get an answer or you can give me a narrative and I'll file a
24  motion to go before the judge and get an answer to the
25  question. My question is very simple. If you had seen the

Page 40

1  yellow glow-in-the-dark jacket on MeLisa Moore, which I know
2  you are in a fight and you don't have that time, you would
3  never pull the individual's arm the way you did?
4  A. That's correct.
5  Q. But you are saying, in fairness to you -- and I'm
6  going to give you equal opportunity -- you are saying you
7  never saw that?
8  A. Yes.
9  Q. Okay.
10  A. I was not focused on her back.
11  Q. Yeah. And still at this point, you thought you were
12  pulling his hand up straight against his body?
13  A. Against his --
14  Q. That's what you thought were you doing right here
15  because you were not looking at the yellow glow in the dark
16  jacket?
17  MS. KALCHTHALER: Objection, form.
18  A. Yes.
19  MR. TERRELL: Why?
20  MS. KALCHTHALER: You are mischaracterizing his
21  testimony.
22  Q. Okay. Did I mischaracterize that?
23  A. Once again, you told me that you didn't like my
24  answer. I answered your question.
25  Q. No, I --

Page 41

1   A.   Yes, I think you mischaracterized it.
2   Q.   Okay. How did I mischaracterize it?
3   A.   Yes, that's a yellow jacket.
4   Q.   Yes, that's a yellow jacket. And at this point, if
5   you'd seen the yellow jacket, you never would have put --
6   pulled the arm up the way you did?
7   A.   If I had taken note of the fact that was a yellow --
8   that was her back in that yellow jacket there, I would not
9   have done that maneuver, correct.
10  Q.   That would have been an improper maneuver under that
11  scenario?
12       MS. KALCHTHALER: Objection, form.
13  A.   Correct.
14  Q.   Now, at this point, 17, has the arm broken yet?
15  A.   No.
16  Q.   18, is the arm broken?
17  A.   Well, you can hear the snap.
18  Q.   Okay. So, it hasn't broken?
19  A.   No. Right there.
20  Q.   Right there. Wait, did I go -- I want to know --
21  A.   In fact, you went past it.
22  Q.   I know. I'm sorry about that. I did. Is it right
23  there or where that it actually snaps?
24  A.   It's right in there. It's in that millisecond of
25  time between there, and it releasing all the way up over the

Page 42

1   top of his head.
2   Q.   Okay.
3   A.   But you can -- if you -- if you -- you will notice,
4   even if you keep it at slow speed, it's slow, slow, slow and
5   then it releases and just flies up over the top of his
6   head.
7   Q.   Okay. At this point, at 23, his arm is broken?
8   A.   His arm is broken.
9   Q.   And it's just -- you are not actually putting your
10  weight or anything on it.
11  A.   Correct.
12  Q.   It's just going -- it's just free flowing.
13  A.   It's going now. And if you will notice, in
14  moments -- just within a moment, my hand -- this right hand
15  is going to drop down to his neck to try to immobilize him.
16  Once I realized his arm is broken and MeLisa rolls back out
17  of the way, I'm telling her, he's not -- get off of him. His
18  arm is broken. Call -- and I'm trying now to hold his arm
19  right here and hold him down so he doesn't resist --
20  resist isn't the right -- and doesn't flail about causing
21  more injury to this left arm.
22  Q.   Okay. Right now you know this is a bad deal.
23       MS. KALCHTHALER: Objection, form.
24  Q.   You heard a snap.
25  A.   I'm not going to say it's a bad -- it's an

Page 43

1   unfortunate -- it's an unfortunate deal.
2   Q.   Okay. Let me -- at this point you know it's an
3   unfortunate deal. This poor kid got a bad break on his arm.
4   A.   His arm is broken. I have no idea how bad it is. I
5   just know it's broken. I don't know -- I don't know if it's
6   his elbow. See, I don't know if it's his elbow or his arm or
7   his shoulder at this point.
8   Q.   But you heard it snap.
9   A.   I heard it snap.
10  Q.   Now, at this point right here, you are putting no
11  pressure on his arm?
12  A.   The amount of -- the amount that I --
13  Q.   Or it's very, very light.
14  A.   The amount that I had down here is -- I don't know
15  how -- if you are pulling on something and it releases, you
16  can't just stop that instant. You are going to continue to
17  go a brief bit before you --
18  Q.   Okay.
19  A.   -- before you have the ability to control your own
20  muscles. Right --
21  Q.   At what point did you stop all pressure. Let's go.
22  A.   When he -- right. No. Keep going. Stop right
23  there. Right there. I stopped.
24  Q.   Okay. You stopped. Wait, wait, wait. I stopped it
25  too soon. Let's go back. Is it right here you stopped?

Page 44

1   A.   No.
2   Q.   No? The next one?
3   A.   No. Right along in there is where it's completely
4   over with and I realize, I've got to immobilize this.
5   Q.   You are not trying to put pressure on it?
6   A.   No, he's -- it's free flinging, for lack of a better
7   word.
8   Q.   Because it broke way back there?
9        MS. KALCHTHALER: Objection, form.
10  A.   Right. See. See, I've got -- I've got ahold of it.
11  I'm trying -- I'm trying to keep it because I heard it. Now,
12  I'm not trying -- I can't cuff him anymore because he's got a
13  broken arm. That fell off the table right there. The minute
14  his arm broke, handcuffs went out the window.
15       Now I've got to immobilize this young man and get
16  him medical attention.
17  Q.   Okay. Well, at that point, he's basically done,
18  right?
19       MS. KALCHTHALER: Objection, form.
20  A.   Correct, there is no more fight in him there. Well,
21  no, he's -- and see, we went from the fight here to me trying
22  to keep him from further injuring himself by jerking about,
23  flailing about, trying to move this broken arm because he
24  could still move this arm. I mean, he still had a limited
25  range of mowing. In fact, you'll notice here in a little bit

Page 45

1  that he finally does it enough -- well, the tape doesn't last
2  long enough. It winds up down by his side. And I put my
3  hand on top of his wrist and on his neck saying, son,
4  relax.
5    Q. Is it right here?
6    A. See, he lifted his shoulder. He's lifted his
7  shoulder there.
8    Q. You didn't do it; that's him?
9    A. He's lifting his shoulder. And he's -- see he's
10 still, he's trying and he's got him arm under him. Now, this
11 arm, at some point in time, is not going to be under him any
12 more. He's going to get it loose because MeLisa gets off of
13 him.
14   Q. Okay. Let's go --
15   A. I'm saying, stop struggling. I tell MeLisa, call an
16 ambulance. And she finally realizes, hey, he's telling me to
17 call an ambulance. And she is fixing to get up and go take
18 care of that. See, I'm holding his arm.
19   Q. Okay.
20   A. Trying to keep it -- I've taken my hand off of his
21 neck. Now I've got it back down to his arm again.
22   Q. Okay. I think I got it now.
23   A. You're --
24      THE COURT REPORTER: You've got to wait.
25      THE WITNESS: Sorry. I apologize.

Page 46

1    A. I realize what you're trying to say -- our, it's a
2  different interpretation. And I know you're, what -- you
3  know, I mean no disrespect.
4    Q. Oh, no, no. None taken, trust me. And I mean no
5  disrespect to you. You understand this isn't pleasant for
6  me, either.
7    A. I understand.
8    Q. Now, you yelled, police, stop; stop, police, how
9  many times?
10   A. I cannot answer that.
11   Q. More than --
12   A. I know -- I know I did it at least twice. But see,
13 now, here is the thing. I'm standing on the steps at West
14 Brook. And from the steps to the first stanchion where they
15 are at is approximately 50 to 70 feet. The first time I
16 yelled it was at the top of the steps when I first see them.
17 And then as I'm going, I'm hollering, police. But by the
18 time I get to him, I'm just hollering stop, because he's
19 flinging her around like a rag doll.
20   Q. Because he's 6 foot, you know, 190 pounds?
21   A. And she is 4 foot nothing.
22   Q. And he's almost my size. A little skinnier.
23 Everybody is a little skinnier than me.
24   A. Everybody -- way skinnier than me.
25   Q. But, I mean, he's almost, you would say --

Page 47

1    A. He's a good size boy.
2    Q. He's almost as imposing as I would be?
3    A. Yes.
4    Q. Okay. Between 10 and 11, he swung his left hand at
5  you. And that's what -- he was trying to strike you --
6    A. Now, you see, that's what I'm saying --
7      MS. KALCHTHALER: Objection, form.
8    A. -- I don't know that he was actually swinging at my
9  face. Because MeLisa said something and it could have
10 been -- she made the statement that he was flailing about.
11   Q. Okay.
12   A. And it could have been that he wasn't trying to
13 strike me as much as that was just the position his arm
14 presented itself in at that moment in time. But until I
15 heard her testimony today, I would have said that he was
16 trying to strike me in the head.
17   Q. Now, at which time you -- you are going to give him
18 one of these standard empty hand arm pin maneuvers?
19   A. That's correct. Because you can do it with a baton
20 or you can do it with your hand.
21   Q. Yes. And in a split second when you had him down,
22 you were unable to see that Ms. Moore was on top of him and
23 you thought Ms. Moore's back was his back?
24   A. To the degree that she was on top, that's what I was
25 trying to explain. I could see his shirt. And what I'm

Page 48

1  thinking is his back is his side. So, that's what I'm trying
2  to explain. With her laying there, it wasn't that I didn't
3  see the yellow vest, but the part of his body that I'm
4  looking at appears to be his back, not his side. And that's
5  what I'm saying. When I'm coming up at that angle, yes, in
6  looking back at it, that was not a good thing to do because
7  of the angle that it was. But when I'm there on the ground
8  in this experience, I see his side and that is his back.
9    Q. Okay. And -- well, I'm going to have to go back to
10 the video, and I think I'm almost done with my questions
11 about this. Ms. Moore being on top of him is what prevented
12 the regular maneuver?
13   A. Yes.
14   Q. And your second -- you know, you got seconds to do
15 this. That's what prevented you from seeing her yellow
16 jacket on top of him?
17   A. Right. I was not focused on her.
18   Q. You were not focused on the yellow jacket. You just
19 pulled his arm up. And then for some reason, you are
20 barely -- I mean, you don't have his arm up very far and it
21 just snaps and it pulls over.
22   A. Correct.
23   Q. And as soon as you heard it snap, you let the
24 pressure off immediately, correct?
25   A. That's correct.

Page 49

1  Q. You weren't trying to pull his arm down at all?
2  A. Absolutely not, absolutely not. In fact, I go back
3  to the video with the care that I took immediately post to
4  the action. I tried my best to assist the young man.
5  Q. Were there students very, very mad at you right
6  on --
7      MS. KALCHTHALER: Objection, form.
8  A. I can't answer that.
9  Q. Did you make a statement that --
10 A. Well, now --
11 Q. Yes.
12 A. Let me state, that was the Friday prior to spring
13 break. Class had dismissed. So, in the interim, we are off
14 for a week.
15     When I come back on Monday, I have a call from Chief
16 Duncan asking me to come to his office. And when I present
17 myself at his office, he says, I need for you to go back to
18 West Brook and get with Sergeant Hall and -- because we are
19 reviewing this video that we just got. Because apparently
20 sometime either late Monday, he got that video. And Tuesday
21 morning, he called me and I got my CLEAT attorney, you know,
22 Mr. Friesz, and we went to his office and spoke, which is
23 what time he gave me a letter of suspension and stated that
24 because I was part-time, because I was a part-time employee,
25 that they do not pay part-time employees for anything that is

Page 50

1  an administrative leave. They only pay full-time
2  employees.
3  Q. Okay. If -- Okay. That's fine.
4  A. And I have -- I have a copy of that letter at the
5  house.
6  Q. If there was a statement made that you were put on
7  administrative leave without pay as a penalty, that would be
8  untrue?
9  A. Yes.
10 Q. Okay.
11 A. As I say, I have the letter. I mean, I have the
12 letter.
13 Q. Okay. That's fine. Did you talk to Mr. Jones or
14 Ranger Jones?
15 A. I can't remember if -- I don't remember if his name
16 was Jones.
17 Q. Big guy?
18 A. He's a big guy.
19 Q. Cowboy hat?
20 A. Jones doesn't sound right. Seems like it was his
21 counterpart. Isn't there two of them here? I think Jones
22 did a telephone interview with me, and the other one did an
23 interview with me at the courthouse. And I don't have --
24 Jones just don't sound -- it may well be. Jones doesn't
25 sound right. He was -- both of these guys are good size men.

Page 51

1  I mean, they are -- and they both wear Stetsons, and they are
2  both silver bellies. They are almost two peas in a pod if
3  you see them. They are big guys.
4  Q. Did you ever make a statement immediately after this
5  incident that, if you don't behave, I'll break your arm, too,
6  to another student at West Brook?
7  A. No. Those words -- those words have never left my
8  lips.
9  Q. If they testify to that under oath, you would say
10 that is untrue?
11 A. That is untrue.
12 Q. Okay. Did you -- were you involved in taking up all
13 the telephones?
14 A. No. From the time that -- from the time that SDW
15 was injured to the time that he was put in the ambulance, and
16 I helped load him onto the gurney for him to go to the
17 ambulance -- I mean to go -- be put in the ambulance, I left
18 his side for maybe ten seconds because Mr. Maxwell, who is
19 the principal at West Brook, asked me a question. I could
20 not hear him.
21 Q. What did he ask you?
22 A. For the life of me, I don't even remember what he
23 asked me. Because my response, I said, I can't talk right
24 now. I need to take care of this, then I'll get back with
25 you. He could have asked me what time it was for all I know.

Page 52

1  I don't remember.
2  Q. Okay.
3  A. Other than that, I was at SDW's side, trying to keep
4  his arm -- they went and got ice. We applied ice, but
5  because of -- he had on a long sleeve, if I'm not mistaken,
6  it was a thick -- like a windbreaker -- I mean like a hoodie
7  type material that was think, thicker than normal. So the
8  ice wasn't doing any good. So, we -- once his arm was down
9  by his side, I immobilized it because then I could tell -- I
10 could tell that it was broken here.
11    The first -- I thought it was his elbow that broke.
12 I thought it was elbow that dislocated, broke is not the
13 right -- I thought it was dislocated because of the sound
14 that it made. It didn't sound like a break. It sounded more
15 like -- because I've dislocated my elbow. I know what it
16 sounds like, and it was that same sound. But unfortunately
17 this one was -- it was his arm.
18 Q. Have you ever gone in front of Internal Affairs?
19 A. Never.
20 Q. At any time?
21 A. Never.
22 Q. Not for this incident or any other incident?
23 A. Well, I mean, I had to respond to this one with --
24 yes, I misspoke. As far as for any other department other
25 this incident, no.

Page 53

1   Q. Okay. So, you've never been terminated from any
2   peace officer job?
3   A. Never.
4   Q. Never been disciplined in any way by any of your
5   jobs in the past?
6   A. No.
7   Q. You were an electrician for a number of years?
8   A. At Mobil Oil, yes, and at Gulf States.
9   Q. And you retired from that?
10  A. No, I retired from Graybar Electric. I was -- I was
11  a reserve officer in the -- I started in 1988 and got my
12  commission in '92. I mean -- I'm sorry. It was earlier than
13  that. Anyway, I was a reserve officer at that time and --
14  which is with the sheriff's department. And that's what that
15  is. We work -- you could work as many hours as you wanted
16  to, but it was just a nonpaid position. You did it to assist
17  the county.
18  Q. But where was your permanent job?
19  A. Graybar Electric.
20  Q. Okay. As an electrician?
21  A. No. I was sales. I was a salesman. I did both,
22  that's what I'm saying --
23  Q. Who runs Graybar?
24  A. It's out of St. Louis. I mean, it's a corporation.
25  They are nationwide. It's a national electrical wholesale

Page 54

1   distributor.
2   Q. And then you retired from there and you went back
3   into --
4   A. To law enforcement.
5   Q. -- to law enforcement where you are actually getting
6   paid?
7   A. Yes.
8   Q. And you are still there?
9   A. Yes.
10  Q. Okay. Is there any doubt that what we've shown here
11  on the videotape was the incident?
12  A. I can't say. I can't say no, but I can't say yes,
13  either, you know what I'm saying? It's on YouTube. I mean,
14  it is a video that is --
15  Q. That's you --
16  A. -- that is me.
17  Q. That's you, that's him, that's Ms. Moore?
18  A. That's correct, yes.
19  Q. Okay. And your affidavit, you've had a chance, I
20  take it, to look at that?
21  A. Yes.
22  Q. And that's true and correct; is that right?
23  A. Yes, sir, yes.
24  Q. This was -- was this recorded or something, this
25  affidavit, or how did this get on paper?

Page 55

1   A. Actually, myself and -- I'm trying to think of who
2   was -- which -- trying to think.
3       MS. KALCHTHALER: Keep -- yeah --
4   Q. Look, look, look, if this is with your lawyer --
5   A. Yeah, it was the lawyer, yes.
6   Q. But I need to know if this was the CLEAT lawyer,
7   Mr. Friesz, or if it was with your present lawyer --
8   A. It was with the present lawyer. It's a combination
9   of both. We took the statement from -- that I had originally
10  and just basically, through the other law firm, redid the
11  same -- I had to do one for the grand jury.
12  Q. Okay.
13  A. That was --
14  Q. Did you actually go to the grand jury?
15  A. Yes, I did, and was no-billed.
16  Q. Who else went to the grand jury?
17  A. Myself, I couldn't -- I know that the Texas Ranger
18  went and testified. I know that myself --
19  Q. Did he testify there was probable cause to bring you
20  before the grand jury or what?
21  A. I cannot answer that.
22  Q. You don't know?
23  A. I know what he told me in private and --
24  Q. What did he tell you in private?
25  A. He told me, he said, I've reviewed this and it was

Page 56

1   an unfortunate accident.
2   Q. That's what the Texas Ranger told you in private?
3   A. Yes. We were sitting at the courthouse. We were
4   sitting at the courthouse when he said that.
5   Q. Which Texas Ranger was this? Do you know?
6   A. Now, you there go.
7   Q. You got it on your cell phone?
8   A. Just got to find him. I don't know if I have it
9   under Ranger.
10      MS. KALCHTHALER: In the interest of time, we can
11  always add this to the errata sheet if you --
12  A. Bobby.
13      MS. KALCHTHALER: I know --
14  A. Bobby, Bobby Smith.
15  Q. Bobby Smith.
16  A. Because I -- that -- I have his number because we
17  were corresponding back and forth.
18  Q. Nothing you want to do to change your statement or
19  anything; is that fair?
20  A. That's fair, yes, sir.
21  Q. Okay. Your opinion about what happened from being
22  the one actually doing it and what Ms. Moore saw and what
23  actually Chief Hall saw is different --
24      MS. KALCHTHALER: Objection, form.
25  Q. -- from you-all's testimony, right?

14 (Pages 53 to 56)

Page 57

1   MS. KALCHTHALER: Objection, form.
2   A. Okay.
3   Q. Do you agree with that?
4   A. Yes, okay.
5   Q. Okay. And you are saying, I think, that the real
6   difference, the intricacy, is they can't see that at the
7   point that you just got his arm, that it just -- it just
8   broke. And then that's where all the -- all the pressure
9   just went because there was no resistance?
10      MS. KALCHTHALER: Objection, form.
11  A. Correct.
12  Q. Is that what you'd say the difference in what they
13  saw and what you actually did, that's where that is?
14      MS. KALCHTHALER: Same objection.
15  A. I believe that's what the video shows.
16  Q. That's what the video -- and that's what you felt?
17  A. Yes.
18      MS. KALCHTHALER: Same objection.
19  A. Yes.
20  Q. You heard both of them say, you know, well, it was a
21  little excessive.
22  A. But see, I heard both of them say that there was a
23  whole lot other going on other than what's just on the video.
24  That video is just one part of a much bigger picture. You've
25  got a student that is kicking around, trying to get loose,

Page 58

1   you know. There is more going on than just the -- just the
2   limited view that you can see in that particular video.
3   Q. Okay. So, I want to get this right. Just from the
4   video, which is all Chief Hall saw and probably all Ms. Moore
5   saw because she was, you know, in the process, it looks like
6   there was excessive force used --
7       MS. KALCHTHALER: Objection, form.
8   Q. -- when --
9   A. See, I'm going to say no.
10  Q. Okay. That's fine. That's fine.
11  A. I mean, I don't think it was excessive force.
12  Q. Okay.
13  A. That's my opinion.
14  Q. Even from the video?
15  A. Yes.
16  Q. Okay. That's fine.
17  A. I mean, the result is, believe me, there is not one
18  day that I don't think about SDW's situation. I mean, there
19  is not. I don't -- I watched that video with you because I
20  had to. I don't -- I don't watch that. The first time I saw
21  that video was when Channel 6 played the segment that they
22  played on Channel 6, which they redacted the very end of it,
23  was the very first time --
24  Q. They redacted the snap part, okay?
25  A. Yeah, that was the very first time that I saw that

Page 59

1   video, and I saw it one other time after that.
2   Q. Okay.
3   A. Now, there was a -- I mean, I just don't know how
4   to -- it's -- that was -- I've got access to it through the
5   internet, but I just -- I choose not to look at it because
6   it's -- it's disturbing, to know that you broke someone's
7   arm, whether intentional or unintentional. The biggest
8   accident in the world, still makes me feel bad that the young
9   man's arm was broken. But I did not, with any malice of any
10  kind, nor with forethought to go out and intentionally harm
11  this young man. I had never seen SDW except for a brief
12  moment earlier in that day on the patio at West Brook.
13  Q. What was he doing there?
14  A. Well, there was an altercation with two girls, and
15  he just happened to be one of the participates that was
16  egging it on. And my interaction with him at that point was
17  to pull him aside and put him up against the glass there at
18  West Brook by the cafeteria and just say, stand here. The
19  fight that I thought was going on when that was going on,
20  what I thought initially was those two girls -- because
21  that's why we were stationed like we were. ==We were told that
22  those two girls were going to finish their fight after
23  school.==
24  Q. Okay.
25  A. So, the fight between this individual and -- I don't

Page 60

1   even know who the other individual. I never, to this day,
2   have a never met, seen or even know who the other individual
3   was in the fight. All I know --
4   Q. He was already gone by the time you got there.
5   A. I don't even know his name.
6   Q. Was he gone by the time you got there?
7   A. I couldn't say. By the time I left SDW's side, he
8   obviously was gone because that was at least 15 minutes.
9   Because in the whole comedy of errors, the ambulance came
10  down the wrong road, they had to back up and come around. It
11  was -- and I mean, it was unfortunate he was -- he was laying
12  there for a few more minutes because the ambulance didn't pay
13  attention to where the officers were trying to direct them to
14  come in. So, they wound up in the wrong place.
15  Q. Did anyone, after this, any of the students or
16  parents or anybody threaten you?
17  A. Yes, sir. I received -- I had to change my phone
18  number. I had to change my e-mail. I had to shut down my
19  FaceBook account. I was receiving calls from out of state,
20  numerous out-of-state places, that were threatening my
21  life.
22  Q. It looks like -- I mean, people -- I mean, there
23  was -- there was tons of stuff, hate, written on the
24  YouTube?
25  A. Uh-huh. And what our media, in their infinite

Page 61

1  wisdom, published my address and phone number, everything in
2  the world about me.
3      Q. What was going on about that? Were the people
4  coming by your house?
5      A. I had some people come by my house. None of them
6  were -- these were people that knew me, but it was people
7  that knew me from other times that did not know where I lived
8  that came to express their support.
9      Q. Okay.
10     A. They knew where I lived based on what was in the
11 newspaper.
12     Q. But there were threats for your life?
13     A. I had -- my life, my family's, yes.
14     Q. I mean, did you read all this stuff?
15     A. No, sir.
16     Q. Okay. You had to change your --
17     A. Phone number.
18     Q. -- phone number. Anything else?
19     A. I had to change my FaceBook account. I had to do
20 numerous things just to kind of privatize. And
21 unfortunately, I can't move. So, that's --
22     Q. I mean -- yeah, because --
23     A. You can't just up and jerk your address. I
24 guarantee you that's in there. I know it's in there because
25 I've had people tell me, it's got your Zip code and your

Page 62

1  phone number. I said, well, it's got the old phone number.
2      Q. Yeah, because, I mean, in here -- I was just
3  wondering about that. There is all sorts of, you know,
4  something -- you know, the kids, basically they are saying
5  the kids shouldn't have been fighting, but, my God, he
6  shouldn't have broke his arm and we are going to get him and
7  all that.
8          MS. KALCHTHALER: Objection, form.
9      Q. You've read those sort of things?
10     A. No. Once again, I have not.
11     Q. That's my question, how were you getting the
12 threats?
13     A. Over the phone. I had a man call me up and said,
14 I'm going to come kill your -- this is what he said -- I'm
15 going to come kill your nigger-hating ass.
16     Q. Did you --
17     A. And I immediately hung up. He called me --
18     Q. Did you report that or something?
19     A. I did.
20     Q. What happened with that?
21     A. It was out-of-state. And when I was talking to --
22 it was -- I know, being police department, we know other, you
23 know, police officers. Well, we can, you know -- it was so
24 vague. We can try, but there is not going to be a whole lot
25 we can do unless we can call back and get it recorded.

Page 63

1      Q. How many --
2      A. After the first time, I had my phone number changed.
3  I mean, I hung up. I called my carrier and said change my
4  phone number. I mean, it was done within minutes of the
5  second call.
6      Q. What did the second call say.
7      A. That's what I said, it was just a continuation of
8  the first one.
9      Q. Same guy?
10     A. I'm assuming so.
11     Q. Did anybody else threaten you?
12     A. Not once I had the phone number changed, no.
13     Q. Nothing about SDW's parents or anything? They
14 didn't threaten you?
15     A. I've never met SDW's parents.
16     Q. And SDW didn't threaten you?
17     A. No.
18     Q. And his brother didn't threaten you?
19     A. I know he has a brother. I couldn't tell you what
20 he looks like.
21     Q. Okay.
22     A. I honestly can't say.
23         MR. TERRELL: Okay. Well, look, I appreciate your
24 time. I have no further questions.
25         (4:27)

Page 64

1                    EXAMINATION
2  BY MS. KALCHTHALER:
3      Q. I just have one quick area I wanted to cover. At
4  the beginning of your deposition, Mr. Terrell asked you if
5  there was anything -- basically if you disagree with anything
6  from Ms. Moore's testimony. Do you remember that?
7      A. Uh-huh.
8      Q. Without looking at her transcript, is it difficult
9  to know everything that you could have disagreed with?
10     A. Yeah, because, I mean, I remember some of the basic
11 things she said, but I don't remember everything she said.
12     Q. So, what you've given in your deposition here today
13 was just a couple of the things that you could remember from
14 that?
15     A. Correct, yes.
16     Q. And her deposition, for the record, you were here
17 for that, correct?
18     A. Yes, I was in the room.
19     Q. And that was several hours long?
20     A. Correct, yes.
21         MS. FALCHTHALER: So, okay. I just want to make
22 that clear.
23         MS. BROUSSARD: We'll reserve our questions until
24 trial.
25         (4:28)

Page 65

EXAMINATION
BY MR. TERRELL:
Q. And I'll be more than happen to clear that up. That's okay. I know you can't remember everything we talked about, but the key points that you really disagreed on, key issues, we talked about a couple of those, did we not? There may be other minutia that you disagree with --
A. The main thing was, and this is just -- this is just me speaking.
Q. Yeah.
A. I'm standing there. I see an individual, unknown individual, striking a public servant.
Q. Yeah.
A. Okay. Now, let me finish.
Q. Okay. Go ahead.
A. I see an unknown individual striking a public servant. It's my duty now as a peace officer -- and you know just as well as I do, if I don't act, I'm in trouble because I did not act, failure to act. So, now I've got to go down there and do something about it.
Now, I don't -- his intent is -- I don't know his intent. His intent is irrelevant because all I can see is Individual A striking a public servant. The minute I see that, that falls under assault of a public servant. Now, when it gets to the DA's office, the DA's office may say,

Page 66

yes, but, and they may throw it out. They may reduce the charges. They may do whatever they want to. But it doesn't negate the thought that I had when I'm looking at this incident taking place in front of me.

I mean, that's all that I have to base mine. And then I have got to make my decision right now. What am I going to do? I'm going to affect an arrest on that young man. I did not know SDW. I still don't know SDW. If he were to walk in this room right now, I might recognize him, and I mean that -- because I don't know him. That brief encounter that we had right there was the only time that he and I had ever interfaced except for that brief moment on the patio. And I haven't seen him since. And I know he still goes to West Brook, and I work at West Brook. Of all the time that I've been at West Brook, and I've been there since -- for the last three, four months now at West Brook, I have never even seen SDW, but I know he still goes there. I know his brother still goes there. But I couldn't tell him from Adam if he walked up and said hello to me or walked by and wanted to threaten me. I mean, I don't know the man.

But I have to decide right now what am I going to do about this situation that I see? Now, she may say that it was this or she may say that it was that. What I see is an individual, unknown individual, striking a peace officer with his elbows. That's all I see. I have to right now decide,

Page 67

what am I going to do? I mean, that's -- textbook goes out the window and all the, you know, he may have thought or she may have thought, all that, that's not what you get to decide. That's all later. That's all hindsight. You have to make that decision based on what you see right in front of you. And that's what I did.

And as I say, I still have to contend with what I did, and I can tell you it bothers me. I am exceptionally unhappy that the young man was injured. I mean that very sincerely. But I had no malice in my heart nor forethought when I went down there to go to this guy and do bodily injury to him at any level. Everything was as a fluid motion. It started, and unfortunately it ended the way it did. And I can't change that. I can't, you can't, no one can. But it was not an intent. That was not what I went down there to do.

And you say, you know, could you do something else? Hindsight, man, you could do a thousand other things. But at that moment in time, at that moment in time, I'm trying to do the thing that works best for me. And I can honestly say that I have done that maneuver on no less than 30 to 40 individuals and never once -- and I've scuffled with them -- and never once has that ever happened, ever. I mean, it's just -- it's so -- it's -- it's unique. I mean, it just -- I cannot tell -- it just was weird. That's all I can say.

Page 68

It's never occurred. Of all those occurrences, this was number one.

Now, in checking with other officers, I talked to them after the event and they said, well, yeah, you know that happened to so-and-so here and there and such and such because, you know, the kid had, you know, this or the person had that or just this or -- but, as I say, I had no -- I have to make a decision.

MR. TERRELL: Objection to nonresponsive portion of that answer.
Q. (By Mr. Terrell) Did we talk about a couple of instances that your testimony disagreed with Ms. Moore's?
A. Yes.
Q. And those are the ones that you recall. I know you didn't go back and read every single word of her deposition, but those are -- we hit the highlights; is that fair?
MS. KALCHTHALER: Objection, form.
A. Like I say, I can't -- I don't -- I read -- kind of scanned McLisa's statement. I didn't read it in any kind of depth, so --
Q. I meant her deposition.
A. So, yes, sir. I guess, yes.
Q. Okay.
MR. TERRELL: Thank you. That's all I have.
THE WITNESS: Okay.

## Page 69

```
 1              (4:34)
 2      MS. KALCHTHALER: I am not done.
 3      MR. TERRELL: Oh, you're not?
 4              EXAMINATION
 5   BY MS. KALCHTHALER:
 6      Q. I want to go over a couple of things from
 7   Ms. Moore's deposition because I just want to make sure our
 8   record is clear about anything we disagree with because I
 9   don't want Mr. Terrell later to tell me, well, you had an
10   opportunity to say it and we didn't say it. So, that's where
11   we are.
12      If you remember, Ms. Moore talked about her opinions
13   on excessive use of force. Did you agree with those?
14      A. No.
15      Q. She spoke about the number of officers she thought
16   were on the campus that day. Did you agree with that?
17      A. No, because it because incorrect.
18      Q. And to be clear, there was a lot of discussion about
19   the assistance or support needed at the campus and for
20   everything prior to the incident, you have no opinion on
21   that?
22      A. No, I wasn't there.
23      Q. So, the idea is you can't agree or disagree because
24   you just don't have any information?
25      A. Correct, correct.
```

## Page 70

```
 1      Q. Okay. Did you agree with her opinions regarding
 2   sufficiency of the force, generally, how many people were
 3   needed to -- at the campus?
 4      A. No, no.
 5      Q. And when she -- she was talking a lot, and I just
 6   want to make sure this is clear, about the people outside and
 7   the people inside. She was talking about officers. And when
 8   she is talking about that, if you can explain what the
 9   outside officers and inside officers do. Because what I'm
10   worried about, so I can explain this and then you can let us
11   know, is that no one -- inside officers don't stay inside all
12   day, obviously, or after school. So, if you could explain a
13   little bit about what the duties of those officers are and
14   when their duties might intersect.
15      A. Okay. I'm going to start with the peace officer.
16      Q. Okay.
17      A. We work traffic in the morning to get the students
18   into the campus, get their cars parked. Then we go into the
19   lunchroom to make sure that all the students disburse to
20   their classes as they are supposed to. Then we, at each
21   break in class, we -- some officers go onto the patio area in
22   the back. There is a large kind of a quadrangle back in the
23   back where it's kind of an L-shaped area where a lot of
24   activity goes on, where most of the students move between the
25   out buildings at West Brook. So, they are in there. And
```

## Page 71

```
 1   then in between each class, we're back and forth between the
 2   office because we'll go back to the office because if we have
 3   to do a report on a phone, a stolen phone -- so, we are back
 4   to where we get to the computers.
 5      And then in the afternoon, it works in reverse.
 6   Some officers stay in the cafeteria as the students are
 7   leaving the building, going out to the buses. And then there
 8   are two officers that are out on the street that are working
 9   traffic to get the buses out, to get the students off of
10   campus in an orderly fashion without having a horrific
11   traffic jam out on Phelan.
12      Now, the PSO's -- now, some of this, I've seen it,
13   they come in in the morning. They assist with getting the
14   traffic onto the campus. That was MeLisa'a main function in
15   the mornings. She came in. She was right where the buses
16   turn to go into the bus lane and the traffic turns, they keep
17   the traffic away from the bus lanes.
18      Q. Okay.
19      A. Now they are combined. They can go where they want
20   to. But then when she finishes with that, once all the
21   students are on campus and they've gone into the classroom,
22   they secure wire cables between stanchions out in the parking
23   lot to prevent the students from being able to drive off
24   campus, which is unfortunate because, you know, but they --
25   they go in and out to their cars all day long, some with
```

## Page 72

```
 1   permission and some not. So, the ones that have a slip to go
 2   do whatever at their car, they get that from the office.
 3   Those that don't have a slip, MeLisa or the outside PSO,
 4   these outside officers, send them back inside to the office
 5   just to secure the appropriate information for them.
 6   Otherwise, they are skipping, you know. That's what they are
 7   basically doing, they are skipping.
 8      Q. Okay.
 9      A. So, they get them back on campus or back into the
10   building. Then in the evening, once again, the same thing.
11   They are assisting the students to get out of the parking lot
12   in an orderly fashion because there is a student gate and
13   then there is the main U-shaped driveway that most of the
14   students -- in fact, all of the students exit through a gate
15   that's closer to Major Drive there on Phelan, whereas the
16   parents as they come in make the loop, they exit out closer
17   to Keith Road onto Phelan. And we keep those two areas --
18   there are units sitting at both of them to direct traffic.
19      Q. Okay.
20      A. That's the two differences.
21      Q. All right. So, when Officer Moore said that she
22   wished she had more outside support, she wasn't clear if she
23   meant -- she didn't say it was I need more help at the
24   parking lot, correct?
25      A. As I say, I can't really form an opinion on what she
```

Page 73

1  needed because I had been there for such a short period of
2  time. I couldn't say.
3      Q. Ms. Moore also testified about the student not
4  knowing she was an officer or thinking -- her belief that she
5  didn't think he knew she was an officer. Do you agree with
6  that?
7      A. I can't -- I can't say. I can't get into his mind
8  to know if he knew or not. I would -- logic would dictate
9  that if you hear someone hollering at you, telling you to
10 stop and actually trying to restrain you and not pummeling
11 you about your hand and shoulders, that that's not a
12 combative -- that's someone of authority trying to stop that
13 from happening.
14     Q. To your knowledge, do the students -- does the
15 administration and police officers communicate to students
16 that fighting is not allowed?
17     A. Oh, yes.
18     Q. Okay. Do you agree with Officer Moore's, something
19 about her recollection about how many times you told SDW to
20 stop?
21     A. I can't remember exactly. I don't know how many
22 times she said, but I can't remember exactly how many times
23 she said that I did. With the noise coming from that crowd,
24 I couldn't hear her. So, I doubt seriously she could hear
25 me.

Page 74

1      Q. Okay.
2      A. And I know she was hollering because once I got
3  close enough, I could hear her interacting with him, but I
4  couldn't -- I was not focused on what she's saying because,
5  once again, you are going into a combative situation and
6  that's not something you are paying attention to.
7      Q. Okay. I think to the extent Ms. Moore made comments
8  about any videos on YouTube, I don't even know if you can
9  agree or disagree about what she saw --
10     A. I have no opinion.
11     Q. -- or what the content was?
12     A. I have no idea. I don't look at YouTube.
13     Q. And this is my last question for you, then we can
14 all go home. When you approach or when you saw whatever
15 incident with the students there, as you approach, what was
16 in your mind?
17     A. I'm going to arrest this young man. Best case
18 scenario, I get him in handcuffs. I bring him back into the
19 building. We go through the process, because he was a minor
20 at that time, we go through the process. I get ahold of
21 Minnie Rogers, relate to them that we've got an assault on a
22 public servant. And they will tell us, yes, we have room at
23 this facility, or no, release them into the custody of their
24 parents. One of those two things is going to happen.
25     Most of the time, unless it is a severe crime where

Page 75

1  actual bodily harm was done, they are going to release them
2  back into the custody of their parents. So, even though SDW
3  may have been arrested at that point and handcuffed and taken
4  inside, odds are he would have gone home with his parents
5  once he was processed. Now, they are still going to have to
6  appear in court. Once all our paperwork makes its way
7  through the DA's office and gets into court, you know, they
8  are going to have to respond to the complaint that was lodged
9  against them and make a pleading, you know, innocent or
10 whatever. Once it gets to that point, we are -- we are gone
11 from it. The only thing we have to do is get them processed
12 to the point where we can get information, which would be my
13 report to the DA's office.
14     Q. I guess I wasn't specific enough. As you are
15 running toward them, what was your thought in your mind?
16     A. I'm going to arrest this man.
17     Q. And based on what?
18     A. He was assaulting a public servant.
19        MS. KALCHTHALER: No further questions.
20        MR. TERRELL: No further questions.
21        (4:43)
22        (CONCLUSION OF DEPOSITION)
23
24        * * * * *
25

Page 76

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DARON JEROME WILLIS AND        *
SUBRINNA LYNN COLEMAN,         *
Individually and as Next Friend of *
SDW, a Minor,                  *
        Plaintiffs             *
                               *
VS.                  * CA NO. 1:14-CV-00314
                               *
BEAUMONT INDEPENDENT           *
SCHOOL DISTRICT, ET AL,        *
        Defendants             *

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN RIVERS
JANUARY 30, 2015

I, STACY AMY BAKLIK, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, STEPHEN RIVERS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on 2/1/2015 to the witness or the attorney for the witness for examination, signature and return to me within 20 days;

That the amount of time used by each party at the deposition is as follows:

Page 77

1  Mr. Terrell - 1 hour, 12 minutes
2  Ms. Kalchthaler - 10 minutes
3  That pursuant to information given to the
4  deposition officer at the time said testimony was taken, the
5  following includes counsel for all parties of record:
6  MR. B. TERRELL, Attorney for Plaintiff;
7  MS. KELLEY KALCHTHALER, Attorney for Defendant;
8  MS. FRANCES BROUSSARD, Attorney for Defendant.
9  I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties or attorneys
11 in the action in which this proceeding was taken, and further
12 that I am not financially or otherwise interested in the
13 outcome of the action.
14 That $709.00 is the deposition officer's charges to
15 the Plaintiff for preparing the original deposition
16 transcript and any copies of exhibits;
17 Certified to by me this 1st day of February, 2015.
18
19
20 STACY AMY BAKLIK, CSR
21 Texas CSR No. 2680
   Firm Registration No. 30
22 Expiration Date: 12/31/2016
   P. O. Box 566
23 Nederland, Texas 77627
   (409)729-3838
24
25

Page 78

1  CHANGES AND SIGNATURE
2  WITNESS NAME: STEPHEN RIVERS
3  DATE OF DEPOSITION: JANUARY 30, 2015
4
5  PAGE LINE        CHANGE        REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 79

1  I, STEPHEN RIVERS, have read the foregoing
2  deposition and hereby affix my signature that same is true
3  and correct, except as noted above.
4
5  _____
6  STEPHEN RIVERS
7
8  THE STATE OF TEXAS:
9  COUNTY OF JEFFERSON:
10 Before me, _____, on this day
11 personally appeared STEPHEN RIVERS, known to me or proved to
12 me under oath or through_____ (description of
13 identity card or other document) to be the person whose name
14 is subscribed to the foregoing instrument and acknowledged to
15 me that they executed the same for the purposes and
16 consideration therein expressed.
17 Given under my hand and seal of office this
18 _____ day of _____, _____.
19
20
21 NOTARY PUBLIC IN AND FOR
22 THE STATE OF _____
23
24
25