## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DARON JEROME WILLIS AND     *
SUBRINNA LYNN COLEMAN,      *
Individually and as Next Friend of *
SDW, a Minor,                 *
      Plaintiffs   *
                    *
VS.           * CA NO. 1:14-CV-00314
                    *
BEAUMONT INDEPENDENT     *
SCHOOL DISTRICT, ET AL,     *
      Defendants  *

ORAL and VIDEO DEPOSITION OF
DAVID HALL
JANUARY 30, 2015

ORAL DEPOSITION OF DAVID HALL, produced as a witness duly sworn by me at the instance of the Plaintiff, taken in the above-styled and numbered cause on January 30, 2015, from 12:43 p.m. to 3:06 p.m., before STACY AMY BAKLIK, CSR, Certified Shorthand Reporter No. 2680 in and for the State of Texas, at the offices of Weller, Green, Toups & Terrell, 2615 Calder, Suite 400, Beaumont, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.
            * * * * *

## Page 2

1
2
3             APPEARANCES
4    FOR THE PLAINTIFF:
       MR. B. TERRELL
       Weller, Green, Toups & Terrell
5       2615 Calder
       Suite 400
6       Beaumont, TX 77702
7
8    FOR THE DEFENDANT, STEPHEN RIVERS:
9       MS. KELLEY L. KALCHTHALER
       Walsh, Anderson, Gallegos, Green & Trevino
10     10375 Richmond Ave.
       Suite 750
11     Houston, TX 77042
12
13   FOR THE DEFENDANT, BEAUMONT INDEPENDENT SCHOOL DISTRICT:
14     MS. FRANCES BROUSSARD
       Thompson & Horton
15     3200 Southwest Freeway
       Suite 2000
16     Houston, TX 77027
17
18   ALSO PRESENT:
19       Leo Stringer, CLVS
       TrialTech
20
       Stephen Rivers
21
22
23
24
25

## Page 3

1             I N D E X
2
3              PAGE
4  Appearances ................................. 2
5  Stipulations ............................... 4
6
7  DAVID HALL
8     Examination by Mr. Terrell     4
9     Examination by Ms. Kalchthaler    50
10    Examination by Mr. Terrell     63
11
12
13           EXHIBITS
14
15  NUMBER   DESCRIPTION       PAGE MARKED
16   1     Online Article         27
17   2     Offense Report        46
18   3     Disclosures, Attachments, etc.    46
19
20
21
22
23
24
25

## Page 4

1       THE COURT REPORTER:  What are the agreements?
2       MR. TERRELL:  By the Rules.
3           DAVID HALL,
4 having been first duly sworn to testify the truth, the whole
5 truth, and nothing but the truth, testified as follows:
6          (12:43)
7          EXAMINATION
8 BY MR. TERRELL:
9    Q.  Will you give us your name?
10   A.  David Hall.
11   Q.  Chief Hall; do I have that right?
12   A.  Yes, sir.
13   Q.  My name is B. Terrell, and I represent a person that
14 brought a lawsuit against the school district.  You
15 understand that?
16   A.  Okay.
17   Q.  If I ask a question that doesn't make any sense,
18 will you ask me to repeat it?
19   A.  All right.
20   Q.  If you don't ask me to repeat it, I'm going to
21 assume you understood it and answered it in a truthful
22 manner; is that okay?
23   A.  That's fine.
24   Q.  Have you ever given a deposition before?
25   A.  Yes, I have.

EXHIBIT
D

Page 5

1    Q. Okay. Under what context? Probably -- were you a
2    traffic --
3    A. Yes.
4    Q. For a while. So, a lot of wrecks?
5    A. Lot of wrecks.
6    Q. Anything related to your employment with the school
7    district?
8    A. No, I haven't done a deposition for them yet. This
9    is the first time.
10   Q. You have been an employee of the school district for
11   how long?
12   A. Full-time, this is the eighth year. I did it as
13   contract, it's a total of 34 years.
14   Q. Ms. Moore, do you know her?
15   A. Yes, sir.
16   Q. I don't remember how she pronounced it, I think
17   Merissa or something.
18   A. No, McLisa.
19   Q. McLisa. She was under -- what was her job while you
20   were there?
21   A. She was the public safety officer. She was actually
22   a corporal. She was in charge of the PSO's on the campus.
23   Q. So, she was actually a corporal?
24   A. Yes.
25   Q. What does that mean?

Page 6

1    A. Well, she didn't get any extra money, but it just
2    showed that she -- she had been there longer than any of my
3    PSO's. So, I put her in charge of --
4    Q. She is like the lead man?
5    A. Lead person.
6    Q. Okay. And, so, the police force or the health and
7    safety portion of the school district encompasses licensed
8    police officers as well as security officers?
9    A. That's correct.
10   Q. And they are actually part of the police force.
11   A. Yes.
12   Q. Now, was she a good employee?
13   A. Yes.
14   Q. I'm going to go through some things that she said in
15   her deposition and just a brief -- I'm going to ask you do
16   you agree or disagree with them, okay?
17   A. Okay.
18   Q. And I hope -- I don't actually have the transcript.
19   It would be better if I could just read the transcript and
20   say, do you agree or disagree. I'm going to try to summarize
21   or remember what she said, okay?
22   A. Okay.
23   Q. Now, at the time of this incident, what position
24   were you?
25   A. Sergeant of the district.

Page 7

1    Q. And who was over you?
2    A. Chief Clydell Duncan.
3    Q. Where is he?
4    A. Retired. He's in Arkansas.
5    Q. What town in Arkansas?
6    A. I can't even -- it's a long name.
7    Q. When is the last time you talked to him? Not
8    Arkadelphia?
9    A. Yeah, maybe. No, no. I'm not sure. I talked to
10   him probably week and a half ago.
11   Q. Okay. About what?
12   A. Just how he's doing, what he was doing, if he got a
13   house. We are good friends.
14   Q. You-all worked together for a number of years?
15   A. Yes.
16   Q. Did he voluntarily retire, or did they make him
17   retire?
18   A. It was kind of forced.
19   Q. They fired him, right?
20   A. Right.
21   Q. The new board came in.
22   A. Right.
23   Q. And they thought he was doing a horrible job, as I
24   understand it.
25   MS. BROUSSARD: Objection, form.

Page 8

1    MS. KALCHTHALER: Objection, form.
2    Q. Well, what is your -- you are with him.
3    MS. KALCHTHALER: Objection, form. You'll hear
4    us -- I know you are familiar with saying this from time to
5    time -- but please go ahead and answer.
6    A. I disagree that he wasn't doing a good job.
7    Q. No, I didn't -- I didn't say you agreed or
8    disagreed.
9    A. Okay.
10   Q. The new board that took over came in and at least
11   felt that he should not be employed in his position
12   anymore?
13   A. That's correct.
14   Q. And they thought he was not doing a good job.
15   MS. KALCHTHALER: Objection, form.
16   A. I'm not sure what they thought.
17   Q. Well, they thought that he needed to be replaced.
18   A. Right.
19   Q. And who did they replace him with?
20   A. With me.
21   Q. Okay. And did they talk to you about changing the
22   way they were going to operate the BISD police force?
23   A. No. Actually, they asked me what my opinion and how
24   I wanted the police department to go forward.
25   Q. They wanted to restore integrity in the police force

Page 9

```
1   of Beaumont School District, correct?
2        MS. KALCHTHALER: Objection, form.
3        A.  Yes.
4        Q.  And they told you that, correct?
5        A.  Yes.
6        Q.  And they wanted to restore a sense of faith in the
7   police force?
8        A.  Yes.
9        Q.  And they told you that, correct?
10       A.  Yes.
11       Q.  And basically, what you took from it, I'm going to
12  be given this job of chief, which is a big -- a promotion,
13  right?
14       A.  Right.
15       Q.  And they want you to change the culture of the
16  police force at BISD, correct?
17       MS. KALCHTHALER: Objection, form.
18       A.  Yes.
19       Q.  By providing some integrity, right?
20       MS. KALCHTHALER: Objection, form.
21       A.  Yes.
22       Q.  Some transparency?
23       MS. KALCHTHALER: Objection, form.
24       A.  Yes.
25       Q.  And some, I guess -- some, I guess, respect from not
```

Page 10

```
1   only the students but the administrators, correct?
2        MS. KALCHTHALER: Objection, form.
3        A.  I think we had respect from the administrators.
4        Q.  Maybe from the -- from the students?
5        A.  Maybe for some of the students.  They just wanted
6   the officers to be more visible.  And, so, we've moved in a
7   different direction now, and they are pleased with it.
8        Q.  And that different direction is -- the new board is,
9   they are on top of you?
10       MS. KALCHTHALER: Objection, form.
11       A.  Right.
12       Q.  You certainly agree that what we had -- what had
13  deteriorated from the school district's standpoint was a
14  disaster?
15       MS. BROUSSARD: Objection, form.
16       MS. KALCHTHALER: Objection, form.
17       Q.  You can answer.  I'm not saying specifically the
18  police force.
19       A.  Right.
20       Q.  I'm saying the school district, in and of itself,
21  had become an ultimate disaster?
22       MS. BROUSSARD: Objection, form.
23       MS. KALCHTHALER: Objection, form.
24       A.  Yeah, I would say that the old board probably wasn't
25  the greatest board, some of the people.
```

Page 11

```
1        Q.  That's probably the understatement of the year,
2   isn't it?
3        MS. KALCHTHALER: Objection, form.
4        A.  Right.  I mean, they had some good people on there,
5   and they had some that had been there, I think, too long.
6        Q.  Yeah.  And really, now you are the chief, right?
7        A.  Interim chief.
8        Q.  Interim chief.  But as we sit here today, you're in
9   charge of the police department at BISD?
10       A.  Right, I am.
11       Q.  That's a big job, right, lots of students?
12       A.  Yes.
13       Q.  And the present board has set a tone for you.
14       MS. KALCHTHALER: Objection, form.
15       A.  Yes.
16       Q.  And given you a direction.
17       MS. KALCHTHALER: Objection, form.
18       A.  Yes.
19       Q.  And is, I think, making the school district, at
20  least police force, more accountable?
21       MS. KALCHTHALER: Objection, form.
22       A.  Yes.
23       Q.  Ms. Moore testified earlier that you and her had had
24  some conversations before this incident with -- and we're
25  going to call, say SDW, okay?  SDW is the guy that got his
```

Page 12

```
1   arm broken by Mr. Rivers.  You understand that?
2        A.  Right.
3        Q.  She said you-all had had some conversations about
4   the fact that she had not had sufficient people outside, you
5   know, she thought to control West Brook before this.
6        MS. BROUSSARD: Objection. form.
7        MS. KALCHTHALER: Objection, form.
8        Q.  I thought she had said that.  We can go back and
9   read it.  If it wasn't you, I apologize.
10       A.  I don't think it --
11       Q.  This is a better question, okay?  Did the board,
12  before this incident, in your opinion, provide proper
13  guidance to the police department?
14       MS. KALCHTHALER: Objection, form.
15       A.  I think the police chief is the one that should make
16  those type of decisions.  The board has no clue what a police
17  officer or police departments have to do or how they -- how
18  they are run.
19       Q.  But the board funds it?
20       A.  Right, that is correct.
21       Q.  Yeah.  And if Ms. Moore is correct, and I don't
22  remember who she said she talked to, but if she is correct in
23  saying that she did not feel there were enough police
24  presence at the school before the incident, who could provide
25  the additional services?  Would that be the board?
```

Page 13

1     MS. BROUSSARD: Objection, form.
2     MS. KALCHTHALER: Objection, form.
3     A.  Actually, the chief could, if he has the positions
4  open, he can fill those positions, but I think we were at
5  full staff at that time.
6     Q.  This is one thing.  If Ms. Moore testified that she
7  did not feel there was enough police presence at the time
8  prior to the SDW incident, would you disagree with that
9  statement?
10     MS. KALCHTHALER: Objection, form.
11     A.  I would disagree.
12     Q.  Were you involved in the investigation of the SDW
13  incident?
14     A.  I was not involved in the investigation, no.
15     Q.  Were you involved in any way?
16     A.  I was there when it happened.
17     Q.  Okay.  Where were you?
18     A.  Actually, when it started, I was on the patio out
19  front.  And then we found out there was a fight, when
20  actually MeLisa called on the radio, Officer Rivers took off.
21  Myself and the principal took off around to the front where
22  the incident occurred.  You could tell there was a crowd of
23  kids around, so, normally where there is a crowd of kids,
24  there is usually a fight.
25     Q.  Were you involved in the gang fight that was in the

Page 14

1  paper, like, last week?
2     A.  No.  I've been at the school district 34, 35 years.
3  I haven't seen a gang fight.  The fight, I mean, you know --
4     Q.  Something was in the paper about all these --
5     A.  They admit that bigger than what it is.  There is
6  fights in schools every place in the United States.  They
7  make a big deal because it's BISD, but, you know, there was
8  one kid that got -- I mean, they planned this fight because
9  everybody went out the gym.  That never happens over at West
10  Brook.  They come out through the front, through the front,
11  through the cafeteria.
12     So, they had already had that planned because
13  everybody went through the gym.  And when they came out, we
14  watched it on the video, they all had their cameras, their
15  phones out ready to video.  So, they knew there was going to
16  be a fight.  So, they were walking out and one kid gets
17  sucker punched.  And then, you know, two or three kicks him.
18  But as far as a gang fight, no, it wasn't a gang fight.  It
19  was just a fight.
20     Q.  So, your opinion is that there is no more violence
21  in the BISD or West Brook than there is at any school across
22  the United States.  It's about normal?
23     A.  It's normal, actually --
24     Q.  You've been told that?
25     A.  Well, I'll tell you, in Houston, there is a lot more

Page 15

1  violence in the schools than there is in BISD.
2     Q.  Are you familiar with the Legislative Budget Board
3  which is a Beaumont Independent School District management
4  and performance review?  Are you familiar with that?
5     A.  No, I'm not.
6     Q.  If they come to a total different conclusion about
7  violence in BISD schools than you, would you disagree with
8  this report?
9     MS. KALCHTHALER: Objection, form.
10     A.  Yes, I would disagree.
11     Q.  So, just so I understand, you are disagreeing with
12  BISD Management and Performance Review if that review states
13  that violence is greater in BISD than any other school in the
14  United States?
15     MS. BROUSSARD: Objection, form.
16     MS. KALCHTHALER: Objection, form.
17     A.  Yes, I disagree.
18     Q.  And you know more about that than the Beaumont
19  Independent School District Management and Performance Review
20  Board, correct?
21     MS. KALCHTHALER: Objection, form.
22     A.  I know by what I hear from other police officers in
23  other school districts.
24     Q.  Okay.  And that's what you base your opinion on?
25     A.  Yes.

Page 16

1     Q.  And that's what you are saying right now, that BISD
2  is average as far as violence?
3     A.  I would say they were.
4     Q.  Maybe below average, you think a little below
5  average?
6     A.  For the size city, you know, I'd say probably
7  average.
8     Q.  Okay.  Has anybody told you that it's way above
9  average?
10     A.  No.
11     Q.  Would you be the one that should know about that?
12     A.  I would hope so.
13     MS. KALCHTHALER: Objection, form.
14     Q.  And I mean, if the violence in BISD is significantly
15  more than anywhere else, you, at this point, would be the
16  person that should be on top of that, right?
17     MS. KALCHTHALER: Objection, form.
18     A.  Well, I just started this job two months ago.  So,
19  there is a lot of stuff that I haven't got around to, but,
20  yeah, hopefully somebody would make -- will make me aware of
21  it.
22     Q.  Yeah, because that's something that you have no
23  idea, even though you've worked at the school for many, many
24  years, right?
25     A.  Oh, yeah.

## Page 17

1  Q. You thought throughout this whole BISD incident
2  that, at least from a police force standpoint, that you-all
3  were doing great, right?
4  A. Yeah.
5  MS. KALCHTHALER: Objection, form.
6  A. Yeah, I thought we were doing pretty good.
7  Q. Well, from excellent, good, average or poor?
8  A. I'd say good, we were doing good.
9  Q. Okay. So, were you involved in any way in talking
10 to any of the investigators that came into the BISD,
11 specifically the police department, and took statements?
12 MS. KALCHTHALER: Objection, form.
13 A. For that there, for -- somebody came in, but I don't
14 know exactly who it was.
15 Q. Who came in, and what did they say?
16 A. LBB or something.
17 Q. Did they talk to you?
18 A. Yes, they did. I think it was more like asking
19 questions about they're cutting different positions and what
20 we thought about how many officers it took.
21 Q. Okay. Do you agree with these statements: The
22 district lacks a process -- before you got in -- before you
23 were -- you were put in charge as being the chief, do you
24 agree with these statements or disagree: The district lacks
25 a process to formally assess school safety and security

## Page 18

1  procedures on a regular basis and provide oversight for
2  district wide safety and security responsibilities.
3  Do you agree or disagree?
4  A. Disagree.
5  Q. Do you agree or disagree with the following
6  statement: The district has not established a complete
7  process to address safety and security issues identified at
8  the campuses.
9  A. Disagree.
10 Q. Do you agree or disagree that the district lacks a
11 process and practice to regularly update and maintain the
12 emergency operation plan and ensure campus level
13 distribution?
14 A. I think they do that every couple of years.
15 Q. Do you agree or disagree?
16 A. That we do not?
17 Q. With the statement. I'm going to read the statement
18 again. Do you agree or disagree with this statement: The
19 district lacks a process and practice to regularly update and
20 maintain the emergency operation plan and ensure campus level
21 distribution.
22 MS. KALCHTHALER: Objection, form.
23 A. I disagree.
24 Q. Do you agree or disagree that the district lacks a
25 comprehensive safety and security procedures manual?

## Page 19

1  MS. KALCHTHALER: Objection, form.
2  MR. TERRELL: Why?
3  MS. KALCHTHALER: Lack of personal knowledge. He
4  told you he has not seen this report. He doesn't know
5  anything --
6  MR. TERRELL: I'm not asking him about the report.
7  I'm asking his opinion.
8  Q. You are the chief of police, right?
9  A. Right.
10 Q. You've been there for a number of year?
11 A. I've only been chief two months.
12 Q. No, but you've been there for a number of years?
13 A. Yes.
14 Q. You have opinions about these things I'm asking
15 about, right, from personal knowledge?
16 A. Yes.
17 Q. And so far you've disagreed with everything that
18 I've read, every statement I've read, right?
19 A. Yes.
20 Q. And do you agree or disagree that the district lacks
21 a comprehensive safety and security procedures manual? And
22 I'm saying before the SDW incident.
23 A. I'm not sure if they had a manual.
24 Q. Okay. Do you agree or disagree that the district
25 has not developed a systematic method for calculating the

## Page 20

1  optimum staff size, balancing the ratio between police
2  officer and public safety officers and minimizing overtime
3  and supplemental pay.
4  Do you agree or disagree with that?
5  MS. KALCHTHALER: Objection, form.
6  A. I disagree.
7  Q. Okay. Do you know what a -- do you know anything
8  about TC Section 37109 which states that: In accordance with
9  the guidelines established by the Texas School Safety Center,
10 each school district shall establish a school safety and
11 security committee.
12 MS. KALCHTHALER: Objection, form.
13 A. I'm not aware of it.
14 Q. You don't know anything about that?
15 A. No.
16 Q. You don't know if you all had one or didn't have
17 one?
18 A. I do not.
19 Q. Do you agree that the district lacks a safety and
20 security committee to provide monitoring and oversight for
21 district wide safety and security responsibilities?
22 MS. KALCHTHALER: Objection, form.
23 A. Repeat the question.
24 Q. Do you agree or disagree with the statement that:
25 The district lacks a safety and security committee to provide

Page 21

```
1    monitoring and oversight for district wide safety and
2    security responsibilities.
3         MS. KALCHTHALER: Same objection.
4         A.  I'm not aware if they have one or not.
5         Q.  Okay.  That's fine.  It says here that BISD should
6    -- and you understand I'm talking about, this is before the
7    new board.
8         A.  Right.
9         Q.  Okay.
10        A.  Okay.
11        Q.  All these questions have been before the new board
12   and your answers have been before the new board, right?
13        A.  Okay.  Yes.
14        Q.  BISD should establish and maintain a school safety
15   and security committee led by the assistant superintendent
16   for administration and operations to monitor and assess
17   safety and security procedures in compliance on a district
18   wide basis.  Has that been done?
19        MS. KALCHTHALER: Objection, form.
20        A.  Yes.
21        Q.  That was done after --
22        A.  I'm not sure.
23        Q.  Since the new board?
24        A.  I do know it's been done.
25        Q.  That's been done since the new board took over,
```

Page 22

```
1    correct?
2         MS. KALCHTHALER: Objection, form.
3         A.  Oh, God.  I'm not positive.
4         Q.  Okay.  How long ago was it done, then?
5         A.  I know we just had one.  I mean, I know Mr. Brooks
6    has it.  He's the man that's in charge of that, I think.  I'm
7    not positive.  I'm not sure exactly when it was done.
8         Q.  Do you agree that the district staff does not
9    consistently apply safety and security practices to promote a
10   safe and secure learning environment?
11        MS. KALCHTHALER: Objection, form.
12        A.  No, I disagree.
13        Q.  Do you agree or disagree that various safety and
14   security issues exist that until the new board took over had
15   not been addressed or corrected by the district?
16        MS. KALCHTHALER: Objection, form.
17        A.  I'm not sure.
18        Q.  You don't know about that?
19        A.  I don't know about that.
20        Q.  Now, you understand that before the new board took
21   over, there was no emergency operation plan, correct?
22        MS. KALCHTHALER: Objection, form.
23        A.  I'm not aware of it.
24        Q.  Okay.  And today, is there an emergency operation
25   plan?
```

Page 23

```
1         A.  I think there is.
2         Q.  Okay.  And that was created since the new board took
3    over, correct?
4         A.  I know that there is -- yeah, we've been doing
5    that.
6         Q.  Let me ask question again.
7         MS. KALCHTHALER: Objection, nonresponsive.
8         Q.  Before the new board took over and the old, you
9    know, school board was taken out, there was no emergency
10   operation plan, to your knowledge, correct?
11        A.  Again, I'm not sure, you know.  I was a sergeant
12   over a district.  So, I really -- I'm not aware if there was
13   one or if there wasn't one.
14        Q.  If there was one, you didn't know about it.
15        A.  No, I did not.
16        Q.  And you didn't implement it.
17        MS. KALCHTHALER: Objection, form.
18        A.  No.
19        Q.  And you had nothing to do with it.
20        MS. KALCHTHALER: Objection, form.
21        A.  No.
22        Q.  But you know since the new board took over, there is
23   an EOP plan that you are forced to follow.
24        A.  Yes.
25        Q.  If there was an EOP plan before, you didn't teach it
```

Page 24

```
1    on your campus.
2         MS. KALCHTHALER: Objection, form.
3         A.  No, I didn't.
4         Q.  Your opinion is that the BISD disciplinary issues
5    are about the same as other schools, based upon your
6    practices and procedures.
7         MS. KALCHTHALER: Objection, form.
8         Q.  What you've seen.
9         MS. KALCHTHALER: Same objection.
10        A.  Repeat the question.
11        Q.  Okay.  You said the violence or the disciplinary
12   related issues in BISD are about the same as other districts
13   of similar size, correct?
14        MS. KALCHTHALER: Objection, form.
15        A.  Correct.
16        Q.  You don't think there is a problem with BISD before
17   or after the new district, right?
18        MS. KALCHTHALER: Objection, form.
19        A.  No, I don't.
20        Q.  Let me tell you, there is a figure here, Beaumont
21   ISD, and it's in this booklet, it says:  It shows that
22   Beaumont ISD incurred over 6,000 more student disciplinary
23   incidents than its closest peer in 2011 and 2012, which is a
24   factor to consider when comparing the district security staff
25   size to its peers.
```

Page 25

1    You had no idea that there were 6,000 more
2    disciplinary incidents in BISD than any of its peers, did
3    you?
4        MS. BROUSSARD: Objection, form.
5        MS. KALCHTHALER: Objection, form.
6    A. No.
7    Q. That's pretty ridiculous, isn't it?
8        MS. BROUSSARD: Objection, form.
9        MS. KALCHTHALER: Objection, form.
10    A. Depends on -- depends on what you call disciplinary,
11    you know. Disciplinary could be from a disruption in the
12    classroom to --
13    Q. Okay. I'll read the next thing, these are bad
14    disciplinary things, aren't they? Most Beaumont ISD
15    incidents relate to violations of the local student code of
16    conduct, fighting, assault, tobacco, controlled substances,
17    truancy. The police department reviews incident reports,
18    types of incidents, request for services, police related
19    calls.
20        MS. KALCHTHALER: Objection, form.
21    Q. So, that's what this says.
22        MS. KALCHTHALER: Objection, form.
23    A. Okay. You saying fighting and tobacco.
24    Q. Yeah, tobacco, fighting, assault. There are 6,000
25    more at BISD that require some involvement with the police

Page 26

1    force than the next district of its size. That's what this
2    is saying.
3        MS. BROUSSARD: Objection, form.
4        MS. KALCHTHALER: Objection, form.
5    A. So, what was --
6    Q. So, that's just something you didn't -- just didn't
7    know about and still don't know about?
8    A. No, I don't.
9    Q. At this point, wouldn't you be the person that
10    should know about if there are 6,000 more problems in BISD
11    than everywhere else, wouldn't you be the one who should know
12    about that?
13        MS. KALCHTHALER: Objection, form.
14    Q. Above anybody else?
15        MS. KALCHTHALER: Same objection.
16    A. Well, I would think I should know.
17    Q. And you've never seen anything called the -- the
18    Beaumont Independent School District Management and
19    Performance Review printed August, 2013?
20    A. No, I haven't seen that.
21    Q. Nobody made you aware of that?
22    A. (Witness shakes head).
23    Q. Have you ever heard of a seminar or booklet entitled
24    Emergency Management Tool Kit?
25    A. I don't recall it.

Page 27

1    Q. It's called the Role of Districts in Emergency
2    Management. You don't know about that?
3    A. I don't remember.
4    Q. Okay.
5    A. I just don't remember.
6    (AT THIS TIME DOCUMENT WAS MARKED AS EXHIBIT NO. 1)
7    Q. Now, I don't know where this came from, but this is
8    an article that somebody provided me about this incident.
9    I'm going to ask you to take a look at that and see if you've
10    seen that before.
11        MS. KALCHTHALER: Can we get a copy of this?
12        MR. TERRELL: Yeah, you-all have it.
13        MS. KALCHTHALER: I haven't seen a copy --
14        MR. TERRELL: You haven't seen that?
15        MS. KALCHTHALER: No.
16        MR. TERRELL: I thought you-all sent that to us.
17        MS. KALCHTHALER: No, I've never seen a copy of
18    it --
19        MR. TERRELL: You can take a look at it. I'm
20    attaching it as Exhibit 1. It's an article from somewhere.
21        MS. BROUSSARD: Do you want to go off the record for
22    a second?
23        (1:15)
24        (AT THIS TIME, THERE WAS AN OFF-THE-RECORD
25    DISCUSSION AFTER WHICH TESTIMONY RESUMED AS FOLLOWS:)

Page 28

1        (1:22)
2    Q. (BY MR. TERRELL) Okay. Have you ever seen this
3    article?
4    A. No.
5    Q. Did -- are you aware of a report done after the
6    incident or any sort of investigation?
7        MS. KALCHTHALER: Objection, form.
8    A. Yes.
9    Q. Tell me what the investigation looked like.
10    A. Probably on one of our report forms.
11    Q. Okay.
12    A. I mean, any time an incident like this, we would
13    have had a report, either the investigator or some -- one of
14    the officers on the campus. I'm not sure who might have done
15    the report. I'm sure there was a report done on it.
16    Q. Have you seen that?
17    A. No. I mean, I probably did see it back then, but I
18    don't recall it.
19    Q. Is this what you are talking about? It's called --
20    A. Yeah.
21    Q. Is that the only report that you are aware of?
22    Let's mark that as Exhibit No. 2.
23    A. Offense report. That's what it would be done on,
24    with the investigator.
25    Q. And that's the extent of it?

**Page 29**

1    MS. KALCHTHALER: Objection, form.
2    Q.  That's all that was produced.  I'm representing
3  to you, that's all that was produced.
4    MS. KALCHTHALER: Objection, form.
5    MR. TERRELL:  Is there something else?  Do you have
6  other things?
7    MS. KALCHTHALER: I don't think this is the entire
8  report.
9    MR. TERRELL:  Well, look, I need to get -- okay.  We
10  need to just stop right there because that's the all the
11  report I got.  So, if you-all got more reports, I need
12  them.
13    MS. BROUSSARD: What does he have?
14    STEPHEN RIVERS: He's got my incident report.
15    THE WITNESS:  This is his incident report.
16    MR. TERRELL:  I mean, I can't take his deposition if
17  there is another one.
18    MS. KALCHTHALER: No, this is it, but there's -- I'm
19  saying, I doesn't look like the full report.
20    THE WITNESS:  I don't think there's other reports.
21  There could be witness statements.
22    MR. TERRELL:  I've got to have the full report.
23    THE WITNESS:  I'm not saying that there is, but a
24  lot of times if there are witnesses, there would be witness
25  statements.  But I'm not saying that they had any because I'm

**Page 30**

1  not aware of it.
2    MR. TERRELL:  Yeah, but she is telling me, I think,
3  that's not the full report, I don't have the full report,
4  then.  That's the problem.  I can't take this deposition
5  without the full report.  I mean, if she has more of a
6  report, just let's make a copy of it.
7    STEPHEN RIVERS: There is a report from MeLisa.
8  I've seen it.
9    MR. TERRELL:  Let's stop this deposition until we
10  can get the right report.
11    (1:25)
12    (WHEREUPON, THERE WAS A BREAK IN THE PROCEEDINGS,
13  AFTER WHICH THE TESTIMONY RESUMED AS FOLLOWS:)
14    (1:26)
15    Q.  (BY MR. TERRELL) Chief, I handed you what was
16  attached to my discovery, and that's the only incident report
17  that I've been given.  Did you hear Officer Rivers just say
18  that there are other things that should be attached?  Did you
19  hear him tell you that?
20    A.  Yes.
21    Q.  And we are going to take a break until I get the
22  entirety because that is -- you understand how important that
23  would be to not only question you but question anybody that
24  might be a witness in this case.
25    A.  Correct.

**Page 31**

1    Q.  Because the only thing I had was that little --
2  where did it go?
3    A.  Offense report.
4    Q.  Yeah, little offense report.  And then I have a
5  statement of Ms. Moore.  I got a statement of Rivers that's
6  obviously not -- that was something done all the way in this
7  case, United States District Court, which wouldn't have been
8  done at the time.  You see --
9    A.  Right.
10    Q.  So, we are missing a bunch of stuff.  And you
11  understand why it would be real important for me to have
12  that.
13    A.  Yes.
14    Q.  And I should have it before asking you any
15  questions, right?
16    MS. KALCHTHALER: Objection, form.  We can take this
17  off the record, if he doesn't know about this, so --
18    MR. TERRELL:  No.  I just don't want somebody to
19  say -- Judge Clark later saying, hey, you didn't, you know,
20  do what you should have done to preserve these.
21    Q.  But you understand if there is more to the offense
22  report, how it would be important for me to ask you questions
23  about it?
24    MS. KALCHTHALER: Objection, form.
25    A.  Yes.

**Page 32**

1    Q.  Okay.  Thanks.
2    (1:27)
3    (WHEREUPON, THERE WAS A BREAK IN THE PROCEEDINGS,
4  AFTER WHICH THE TESTIMONY RESUMED AS FOLLOWS:)
5    (1:44)
6    Q.  (BY MR. TERRELL) Okay.  We are having some issues
7  with some documents, and I think I understand.  I confused
8  you-all, and I wasn't trying to.  I have a police report,
9  okay, I have this report.  What I do not have and what I was
10  asking about in relationship to Exhibit No. 1 was an
11  interview with Clydell Duncan.
12    A.  Okay.
13    Q.  Okay?
14    A.  All right.
15    Q.  Now, you've had a chance to review that newspaper
16  article, right?
17    A.  Yes.
18    Q.  Okay.  It looks like Chief Duncan made some
19  pretty -- if the article is correct, made some pretty damning
20  statements against Officer Rivers, right?
21    A.  Correct.
22    Q.  And he basically, if the newspaper article is
23  correct, he basically said he used improper technique,
24  right?
25    MS. KALCHTHALER: Objection, form.

Page 33

```
1    A. Correct.
2    Q. And he basically should not have broken the child's
3    arm.
4        MS. KALCHTHALER: Objection, form.
5    A. That's his statement.
6    Q. Yeah. Now, my understanding, there is a statement
7    or interview from the school board of Clydell Duncan, okay?
8        MS. KALCHTHALER: Objection, form.
9    A. Okay.
10   Q. Are you aware of that?
11   A. No.
12   Q. Did Clydell Duncan ever make these statements that
13   are made in Exhibit No. 1 to you?
14   A. He did.
15   Q. And what specifically did Clydell Duncan say that
16   Officer Rivers did wrong? And by the way, Officer Rivers is
17   sitting in here today, right?
18   A. Yes.
19   Q. Is he still employed by you-all?
20   A. Yes.
21   Q. And, so, is it uncomfortable talking about your
22   employee in this manner?
23   A. No.
24   Q. It doesn't bother you at all?
25   A. No.
```

Page 34

```
1    Q. Okay. That's fine. Chief Duncan made some damning
2    statements after this incident about Officer Rivers, fair?
3        MS. KALCHTHALER: Objection, form.
4    A. Yes.
5    Q. Tell me what damning statements Chief Duncan made
6    about Officer Rivers.
7        MS. KALCHTHALER: Objection, form.
8    A. Well, he said he used improper technique.
9    Q. And I know you are looking at the article, but he
10   actually talked to you.
11   A. Yeah, he said in his opinion.
12   Q. In other words, Chief Duncan said, in his opinion,
13   to you --
14   A. To me.
15   Q. -- forget this article.
16   A. Right.
17   Q. To you he said, Officer Rivers used improper
18   technique, correct?
19   A. That's what he said.
20   Q. He said he used improper force, correct?
21   A. He didn't say improper force. He just said improper
22   technique.
23   Q. And that improper technique is what caused the
24   breaking of the child's arm.
25       MS. KALCHTHALER: Objection, form.
```

Page 35

```
1    Q. Is that what he told you?
2    A. He didn't --
3    Q. Or is that what he implied to you?
4    A. That's what he implied, but -- okay.
5    Q. Okay. Go ahead.
6    A. But I told him I disagreed with him.
7    Q. Okay. So, but the chief at the time looked at the
8    video of the incident, correct?
9    A. I have no idea if he did or not.
10   Q. At any rate, he said Officer Rivers used improper
11   technique?
12       MS. KALCHTHALER: Objection, form.
13   A. He did make that statement.
14   Q. In what way did Officer Rivers use improper
15   technique, according to Chief Duncan?
16   A. He said he brought his arm forward and then forced
17   it back, and I disagreed with him.
18   Q. Because bringing it forward and forcing it back is
19   something you would never do as a peace officer in using
20   proper technique, correct?
21       MS. KALCHTHALER: Objection, form.
22   A. In a perfect situation?
23   Q. In a perfect situation.
24   A. Right, but that's not what happens when you fight.
25   Q. Okay. You are taught to do not do what Officer Rivers
```

Page 36

```
1    did, fair?
2        MS. KALCHTHALER: Objection, form.
3    A. I've been through a lot of training. I've never
4    been taught not to do that way, you know. You are taught
5    to --
6    Q. Is it a true statement to say you were taught to do
7    it in a different way?
8    A. Yes.
9    Q. It is a true statement that if we look at the
10   videotape, it is an incorrect way of doing it according to
11   the way police procedures are written.
12       MS. KALCHTHALER: Objection, form.
13   A. Under normal circumstances, you would use a
14   different technique.
15   Q. Okay. And under normal circumstances, that would be
16   what?
17   A. That would be if the person you are dealing with is
18   compliant with your verbal commands.
19   Q. Okay. But --
20   A. If they are not and they start to resist, then that
21   technique is not going to -- you have to get control of the
22   situation.
23   Q. All bets are off.
24       MS. KALCHTHALER: Objection, form.
25   Q. Is that what you are saying?
```

Page 37

1    MS. KALCHTHALER: Objection, form.
2    A. What I'm saying is that the officer has to get the
3    subject subdued in the best way he can to make sure that he
4    doesn't get hurt.
5    Q. And you think -- you think in this case that SDW was
6    striking Ms. Moore, right?
7    MS. KALCHTHALER: Objection, form.
8    A. He was --
9    Q. He was attempting to attack Ms. Moore, and that's
10   why you had to do it this way. Is that what you are
11   saying?
12   MS. KALCHTHALER: Objection, form.
13   A. I'm saying that he resisted Ms. Moore and also
14   Officer Rivers.
15   Q. And, so, it was perfectly okay, and you would
16   condone what he did today with the new board in snapping this
17   child's arm?
18   MS. KALCHTHALER: Objection, form.
19   A. I'm not saying that I condone snapping an arm, that
20   it was an accident, you know, he --
21   Q. But do you condone the way he did it to snap his
22   arm?
23   MS. KALCHTHALER: Objection, form.
24   A. I think the way he did it was an accident. I don't
25   think he did it on purpose.

Page 38

1    Q. Okay. In all due respect, that wasn't my question.
2    Do you condone the way he held SDW down and snapped his
3    arm?
4    MS. KALCHTHALER: Objection, form.
5    A. I don't really know how to answer that question, you
6    know. I'm not saying I condone it or don't condone it.
7    What -- all I'm saying is that what happened was an
8    accident.
9    Q. Okay.
10   A. So, I'm not -- I'm not saying I condone it or I
11   don't condone it. I do not condone purposely hurting any
12   prisoner, and I don't think that's what happened. What I
13   saw, and I was standing there, that he was resisting. He was
14   told to quit resisting. And when he tried to place his arm
15   behind him, and I was standing there, and I didn't see where
16   it was improper, but, you know, there was a lot of kids and
17   there was a lot of movement, you know. He tried to get his
18   arm behind him. And any time you resist, something is going
19   to snap. And that's just in every case.
20   And I think, you know, it's been a proven fact that
21   under normal circumstances, it probably wouldn't have
22   happened. When the prisoner is -- or the guy that's
23   fighting, the suspect, does what the police officer says,
24   that would have never happened.
25   MR. TERRELL: Okay. Objection to the nonresponsive

Page 39

1    portion of that answer.
2    Q. Would you teach a police officer today to get a
3    suspect down like Officer Rivers did?
4    MS. KALCHTHALER: Objection, form.
5    A. No, we don't teach that, you know. And as a matter
6    of fact, we have a class coming up about takedown techniques
7    and handcuffing techniques.
8    Q. My question was, is this a proper takedown
9    technique, what he used, a proper way of subduing SDW?
10   MS. KALCHTHALER: Objection, form.
11   A. Under normal circumstance --
12   Q. Under any circumstance, under this circumstance, was
13   it proper?
14   MS. KALCHTHALER: Objection, form.
15   A. I don't know if it was proper or not proper.
16   Q. Okay. Is it fair to say, Chief, that you cannot
17   tell us if Officer Rivers did things properly or improperly
18   on this occasion as we sit here today?
19   MS. KALCHTHALER: Objection, form.
20   A. No, I cannot.
21   Q. You don't have an opinion one way or the other,
22   fair?
23   A. I don't.
24   Q. Okay. But we do know that Chief Duncan, who was
25   chief at the time, had an opinion that it was done

Page 40

1    improper?
2    A. Yes.
3    Q. And he expressed that opinion to you?
4    A. Yes.
5    Q. Okay. Since it was done improperly, did Officer
6    Rivers get in any kind of trouble?
7    MS. BROUSSARD: Objection, form.
8    MS. KALCHTHALER: Objection, form.
9    Q. Since Chief Duncan, he's the one making the
10   decisions, right?
11   A. Right.
12   Q. He's the chief?
13   A. Right.
14   Q. He tells you, Officer Rivers did something
15   improper?
16   A. Yes.
17   Q. And, so, he's the person that should discipline
18   Officer Rivers, right?
19   A. Correct.
20   Q. Did he discipline Officer Rivers?
21   A. He did.
22   Q. What did he do?
23   A. Put him on leave.
24   Q. And that is nonpaid administrative leave, correct?
25   A. That's correct.

## Page 41

1  Q. And how long was that?

2  A. I'm not sure, until an investigation was done.

3  Q. And that was actually a --

4  A. Texas Ranger.

5  Q. It was actually a penalty or something?

6     MS. KALCHTHALER: Objection, form.

7  A. What's that?

8  Q. Did the Texas Ranger say that Officer Rivers did

9  everything properly?

10    MS. KALCHTHALER: Objection, form.

11 A. I'm not sure. He did give a report.

12 Q. You've seen the Texas Ranger report?

13 A. I have not.

14 Q. Do you-all have the Texas Ranger report?

15 A. I have no idea.

16 Q. How do you know he did a report?

17 A. Because he was investigating. I would assume that

18 he would do a report and give it to someone.

19 Q. Okay. Did you have to go before the grand jury with

20 Officer Rivers?

21 A. I did not.

22 Q. Do you know anybody that went before the grand

23 jury?

24 A. I do not.

25 Q. Did Chief Duncan express any concern about Officer

## Page 42

1  Rivers other than he did this improperly?

2  A. No.

3  Q. Did he -- did he say anything like, man, I, don't

4  know what we're -- you know, he's a -- I don't know what we

5  are going to do, if we are going to let him come back or

6  not?

7     MS. KALCHTHALER: Objection, form.

8  A. He never made that statement to me.

9  Q. Did he ever say that Officer Rivers had a history,

10 that maybe we shouldn't have hired him in the first place?

11    MS. KALCHTHALER: Objection, form.

12 A. No.

13 Q. Have you ever heard that?

14    MS. KALCHTHALER: Objection, form.

15 A. Never heard it.

16 Q. To your knowledge, had Officer Rivers ever been

17 terminated from a job as a peace officer?

18 A. No, not to my knowledge.

19 Q. Had he ever been suspended in any way?

20 A. Not to my knowledge.

21 Q. Has he ever been put on probation?

22 A. Not to my knowledge.

23 Q. And you would be the one now that would have to know

24 that because you are hiring him, right?

25    MS. KALCHTHALER: Objection, form.

## Page 43

1  A. He's already -- he was already hired.

2  Q. Well, but, I mean, if it comes up he's a violent

3  person and beat people up or anything like that, you would --

4  you would know about it, wouldn't you?

5     MS. KALCHTHALER: Objection, form. Objection,

6  form.

7  A. Hopefully, I would know.

8  Q. I mean, you are the one that needs to be in the know

9  about his background at this time, right?

10    MS. KALCHTHALER: Objection, form.

11 A. Right.

12 Q. Because you, as a chief, take the background of

13 peace officers very seriously.

14 A. I do.

15 Q. Because if there is anything in that peace officer's

16 background that would maybe make them unemployable, you

17 should know about it and make that decision on information

18 you gain?

19    MS. KALCHTHALER: Objection, form.

20 A. If they had something that -- in their background,

21 they wouldn't be peace officers in the department.

22 Q. Okay. Well, Officer San Miguel, does he work there

23 still?

24 A. He does.

25 Q. And are you aware of anything in his background?

## Page 44

1  A. As far as what?

2  Q. As far as anything untoward about his issues --

3     MS. KALCHTHALER: Objection, form.

4  Q. -- when he was with the Beaumont Police

5  Department?

6     MS. KALCHTHALER: Same objection.

7  A. I know he was an officer at Beaumont Police

8  Department.

9  Q. Do you know about an incident that occurred at

10 Dillard's with him?

11 A. No, I do not.

12 Q. Do you know of an incident that occurred -- well, do

13 you know whether or not two or three incidents occurred with

14 him where he was alleged to have been violent towards

15 suspects?

16    MS. KALCHTHALER: Objection, form.

17 A. No, I don't.

18 Q. Is he a good officer?

19 A. Very good.

20 Q. San Miguel?

21 A. Yes.

22 Q. He's the type you'd want representing your school?

23 A. Yes.

24 Q. Officer Rivers, he's the type that you would want

25 representing your school district?

Page 45

1  A. Yes.
2  Q. He's, in your opinion, he's done everything
3  perfectly?
4      MS. KALCHTHALER: Objection, form.
5  A. I think he's a good officer.
6  Q. Do you think he did everything perfectly in this
7  incident?
8      MS. KALCHTHALER: Objection, form.
9  A. In my opinion, I don't think he did anything
10 wrong.
11 Q. Now, let's talk about the incident. Did you hear
12 the arm break?
13 A. No.
14 Q. Were you involved in getting the cell phones?
15 A. No.
16 Q. Were you involved in downloading the incident on a
17 computer for the school?
18 A. No.
19 Q. What was your involvement? Just take me through
20 what happened.
21 A. I was a supervisor trying to keep the crowd back,
22 making sure that a report was done and given to our
23 investigator.
24 Q. And the report just — what I'm going to do, because
25 we've had some confusion, is I'm going to mark —

Page 46

1      (AT THIS TIME DOCUMENTS WERE MARKED AS EXHIBITS 2 - 3)
2      MR. TERRELL: Exhibit 3. And I'm just doing — this
3  is a notice, Defendant Stephen Rivers, first supplemental
4  disclosures. Second document is Defendant Stephen Rivers,
5  initial disclosures. A third document is Defendant Stephen
6  Rivers, designation of experts. Next one is Defendant
7  Beaumont Independent School Districts Rule 26 Disclosures.
8  And I'm going to attach all of these to this deposition so we
9  know what we have and where we are going.
10     MS. KALCHTHALER: Does this include the first
11 supplemental disclosures?
12     MR. TERRELL: No, I'm just — yeah, includes your
13 first supplemental.
14     MS. KALCHTHALER: Okay. Just want to be sure —
15     MR. TERRELL: I just want to make sure I have all
16 these reports.
17     MS. KALCHTHALER: Looking at that and seeing, I know
18 the BISD has given you more than I can see in this stack just
19 recently.
20     MR. TERRELL: I got some stuff yesterday. I got
21 some stuff last night.
22     MS. KALCHTHALER: Just want to make it clear for the
23 record, I don't —
24     MS. BROUSSARD: I think — personnel records that
25 we've produced, as well.

Page 47

1      MR. TERRELL: Yeah.
2      MS. BROUSSARD: That's the report.
3      MS. KALCHTHALER: Bates labeled 193 is the highest
4  number I've seen that came through the other day. I sent it
5  as an e-mail to everybody, for the record.
6      MR. TERRELL: I got some stuff. I just want to make
7  sure —
8      MS. KALCHTHALER: I just want the record to be
9  clear. That's all.
10     MR. TERRELL: I mean, I think there — and it may be
11 through nobody's fault; may be through everybody's fault. I
12 just think there is some stuff that we may be missing that we
13 need to track down.
14     MS. KALCHTHALER: This is what I was referring to
15 earlier when I was talking about — when you had mentioned a
16 report, investigation. I didn't want it to be confusing on
17 the record of what consisted of the investigation report
18 because it wasn't clear to begin with. Those are the
19 documents, in general, that I was talking about.
20     STEPHEN RIVERS: That's what I was talking about.
21     MS. KALCHTHALER: And for the record, that is BISD
22 Rule 26 disclosures and the attachments.
23     MR. TERRELL: Yeah, yeah.
24     MS. KALCHTHALER: That's part of Exhibit 3, last
25 part of that. That's what I was referring to earlier. I

Page 48

1  wanted to make sure you had previously received those. It's
2  my understanding you had, and it looks like you have.
3  Q. (BY MR. TERRELL) Did you ever talk to Gordon
4  Friesz, a lawyer?
5  A. Have I talked to him?
6  Q. Yes.
7  A. In a different case.
8  Q. Tell me about your conversation with Gordon Friesz.
9      MS. KALCHTHALER: Before we get —
10     THE WITNESS: This has nothing to do with —
11     MS. KALCHTHALER: — is this your attorney?
12     THE WITNESS: No, no.
13     MS. KALCHTHALER: He didn't represent you?
14     MR. TERRELL: If he's his attorney, I need to know,
15 gordon Friesz was his attorney.
16 Q. But I need to know if you've ever talked to him.
17 A. Not in — on his case.
18 Q. On anything.
19 A. On a child custody case.
20 Q. Okay. That's what I wanted to know. I don't need
21 to know anything about it. I was just —
22 A. Okay.
23 Q. As far as this investigation and the pictures, that
24 didn't have anything to do with you?
25 A. No.

Page 49

1      MS. KALCHTHALER: Objection, form.
2      Q.  Is that true?
3      A.  What are you saying?
4      Q.  I'm going to hand you this incident report.
5      A.  Okay.
6      Q.  Okay. And that is a part of Exhibit No. 3. I'm
7   going to ask you, did you put that together or have anything
8   to do with it?
9      A.  No, I did not.
10     Q.  Okay. Has Officer Rivers had any other disciplinary
11  action taken since his administrative leave without pay?
12     A.  No, not to my knowledge.
13     Q.  And that was -- just so -- that was a disciplinary
14  action taken against him, correct?
15     MS. KALCHTHALER: Objection, form.
16     A.  Yes.
17     Q.  And that should be in his personnel file somewhere.
18     A.  I would assume.
19     Q.  Okay. After this, did you-all kind of keep a closer
20  watch on Officer Rivers or anything?
21     A.  No.
22     Q.  Ms. Moore?
23     A.  No.
24     Q.  Okay. I'm going to boil this down. I'm going to be
25  done, I think, and most of this was document issues. Chief

Page 50

1   Duncan said he used an improper technique, correct?
2      MS. KALCHTHALER: Objection, form.
3      A.  Correct.
4      Q.  You do not have an opinion as to whether or not he
5   used an improper technique or not as we sit here today,
6   correct?
7      MS. KALCHTHALER: Objection, form.
8      A.  Correct.
9      Q.  You were not involved in the investigation in any
10  way.
11     A.  Correct.
12     MR. TERRELL: I appreciate your time. Thank you
13  sir.
14          (2:08)
15     MS. BROUSSARD: We'll reserve our questions until
16  time of trial.
17     MS. KALCHTHALER: I do have some questions, but if
18  we could take a quick break.
19          (2:08)
20     (WHEREUPON, THERE WAS A BREAK IN THE PROCEEDINGS,
21  AFTER WHICH THE TESTIMONY RESUMED AS FOLLOWS:)
22          (2:22)
23          EXAMINATION
24  BY MS. KALCHTHALER:
25     Q.  Chief Hill -- is it okay if I call you Chief Hill?

Page 51

1   I know you are interim.
2      A.  That's fine.
3      Q.  Or Hall. Sorry. Just to clarify now that we're
4   back on the record, just so you know who everybody is here.
5   Frani Broussard represents Beaumont ISD, and I represent,
6   Walsh Anderson does, just Stephen Rivers. And I've got some
7   questions on his behalf that I'd like to go through today.
8   I'm going to jump around to kind of different topics. So,
9   I'll hopefully try to orient you a little bit, but I don't
10  want to cover all the ground that you've already covered
11  here, but I just want to go back and clarify a few things.
12      You had been asked questions about various budgets
13  and reviews, legislative budget. If I've got the name right,
14  Legislative Budget Board Performance Review. Were those done
15  while you were a police chief?
16     A.  No.
17     Q.  Those would have been done previous to your coming
18  into the interim chief position, correct?
19     A.  That's correct.
20     Q.  And you mentioned it's been about two months on the
21  job; is that correct?
22     A.  Correct.
23     Q.  Okay. And, so, is it -- would be -- can you --
24  would it be fair to say you've got a lot of things as you get
25  started to look at?

Page 52

1      A.  Yes.
2      Q.  And I apologize while I jump around, try to reread
3   my handwriting here. There was a lot of questioning about
4   the technique that Officer Rivers used to subdue SDW. And I
5   know that the plaintiff's attorney over here, represents SDW
6   and his parents, asked you a lot of questions about whether
7   it was proper or improper. And I think the problem there was
8   that he wasn't asking you quite the right question.
9      MR. TERRELL: Object to the form.
10     Q.  When he was talking about technique -- I want to
11  give you that opportunity -- when we're talking about
12  technique, when you talk about proper and improper technique,
13  I want to make the distinction and give you a chance to
14  explain what the difference is between what you learn in
15  training and how things are kind of on the streets when you
16  are actually applying it. What would be -- how is what you
17  are taught in training applied to the streets, how is that
18  different?
19     A.  In training, you have a subject that is not
20  combative and not fighting against you. They are standing
21  there, you are doing the technique in the proper manner. So,
22  they are not struggling with you. You are not fighting with
23  them, you know. They want you to get the technique down.
24      When you go on the street, and you can use that, and
25  in some cases when you are dealing with traffic stops.

## Page 53

1    Normally, and I'm not saying all the time, they do not put up
2    a fight. Normally you'll take them to jail, maybe they have
3    a warrant, or, you know, some minor infraction. They go, you
4    know, do what's proper, you know. You tell them put your
5    hands behind you, they put their hands behind you. And then
6    you can handcuff them in what is a routine manner.
7         Now, if they start fighting, then it's different,
8    you know. You only have a split second. And that's what a
9    lot of people don't understand. Police officers have a split
10   second to make a decision. You hope you are making the right
11   decision, you know. Can I say I've made the right decision
12   every time that I've done something? No, you know. But I
13   want to go home to my family. And the thing is, is you want
14   to get this person under control with the least amount of
15   force because I don't want to hurt that person, either. I
16   don't want him hurting me, either.
17        So, I think what happened there was -- it was an
18   accident. The proper technique was trying to be used. When
19   you get a person that's not compliant, you know, you do the
20   best you can to get them under control.
21        MR. TERRELL: Object to the nonresponsive portion of
22   that answer.
23        Q. In your opinion, then, is how techniques are applied
24   on the streets, they involve a lot of police discretion and
25   judgment calls?

## Page 54

1         MR. TERRELL: Objection to the form.
2         A. Yes.
3         Q. Can you explain that?
4         A. Again, things aren't perfect when you -- you get in
5    a fight with somebody, because those people that don't want
6    go to jail or be handcuffed, they are going to fight you.
7    So, you do what it takes to get them under control, you know.
8    So, you have a split second to decide, okay, I'm going to ask
9    him to quit resisting, and then you do what you have to do to
10   handcuff them and get them under control.
11        MR. TERRELL: Object to the responsiveness.
12        Q. In your opinion, was the force that Stephen Rivers
13   used necessary to subdue SDW?
14        A. In my opinion, yes.
15        Q. You mentioned that you were there, able to see the
16   incident, or parts of it. I understand there were a lot of
17   students around; is that correct?
18        A. That's correct.
19        Q. In your opinion, from what you saw, did you think
20   that SDW posed a threat to the students in the vicinity?
21        MR. TERRELL: Object to the form.
22        A. Yes. When the fight -- he took off running. The
23   fight was over. The principal had the -- the female
24   principal had the other kid in her possession. He was
25   running toward that principal to get to that kid, which if

## Page 55

1    the PSO and officer wouldn't have intervened, there is a good
2    chance that principal could have got badly hurt and the kid
3    could have got hurt again.
4         MR. TERRELL: Object to the responsiveness.
5         Q. So, in your opinion, then, based on what you've told
6    me, was there a -- did SDW pose a risk to the administrator?
7         MR. TERRELL: Object to the form.
8         A. Yes.
9         Q. Did SDW pose a risk to the other student?
10        MR. TERRELL: Object to the form.
11        A. Yes.
12        Q. Did SDW pose a risk to himself?
13        MR. TERRELL: Object to the form.
14        A. He did, yes.
15        Q. Did SDW pose a risk to Officer Moore?
16        MR. TERRELL: Object to the form.
17        A. Yes.
18        Q. Did SDW pose a risk to Officer Rivers?
19        MR. TERRELL: Object to the form.
20        A. Yes.
21        Q. From what you saw, did SDW resist Officer Moore's
22   efforts to subdue him up until the injury?
23        MR. TERRELL: Object to the form.
24        A. Yes.
25        Q. From what you saw, did SDW resist Officer Rivers'

## Page 56

1    efforts to subdue him up until the injury?
2         MR. TERRELL: Object to the form.
3         A. Yes.
4         Q. How did he resist their efforts, based on your
5    observation?
6         A. He wasn't -- he was kicking, number one. He would
7    not do what Officer Rivers told him, you know, to stop. So,
8    when he grabbed his arm. He was actually keeping his arm
9    from being put behind his back where Officer Rivers had to
10   take both his arms. So, he was not compliant, doing what he
11   was told.
12        Q. Did you hear Officer Moore say anything to SDW
13   telling him to stop or stop resisting?
14        A. I heard -- I thought actually Officer Rivers was
15   telling him to stop resisting. So, I heard that.
16        Q. Okay.
17        A. I just thought that came from Officer Rivers. I
18   didn't know if Moore said it or not.
19        Q. All right. So --
20        A. But I did hear --
21        Q. Can you explain what you heard Officer Rivers say,
22   then, to SDW?
23        A. To stop, you know, put your arm behind your back,
24   you know. He was asking him. You shouldn't have to keep
25   asking, you know. And if they restrain -- I mean, you have

Page 57

1  to take control. You have to be in control of that, because
2  if you are not in control and he gets away from you, somebody
3  is going to get hurt. Somebody else is going to get hurt.
4  So, you have to do whatever it takes to subdue that person,
5  you know. But when they are not compliant, you try to use
6  the least force, but if they are resisting, then you have to
7  use more force than what they are using.
8         MR. TERRELL: Object to the responsiveness.
9         Q. I want to make sure I understand. So -- so, the
10  first thing an officer -- can you explain what use of
11  force -- I know there is a continuum. Can you explain what
12  that is?
13        A. You use verbal first, you know. You try to get the
14  person to do what you ask them to do. If they don't do that
15  or they resist, then you get hands-on.
16        Q. Okay.
17        A. And, you know, I mean, it goes further than that, if
18  necessary.
19        Q. Okay. Just a moment to look this over. You talked
20  some about, or you got some questions about after the
21  incident, what kind of follow-up was done at BISD PD. And if
22  I'm correct in saying it, you know that there was a report
23  done but you didn't have any -- you weren't involved with
24  that report?
25        A. That's correct.

Page 58

1         Q. And would that have been because you weren't the
2  chief at that time?
3         A. That's correct.
4         Q. So, as sergeant, you wouldn't have been required to
5  be in on that report?
6         A. No, I would not.
7         Q. I guess -- let me go back. I know that we've
8  mentioned that Officer Rivers was put on administrative leave
9  after the incident, correct?
10        A. That's correct.
11        Q. You weren't police chief during the time that he was
12  on -- placed on administrative leave, correct?
13        A. That's correct.
14      · Q. So, you weren't a decision-maker on that decision,
15  correct?
16        A. That's correct.
17        Q. Who, if you know, made the decision to place him on
18  administrative leave?
19        A. I don't believe it was just the chief's decision to
20  put him on administrative leave.
21        Q. Whose decision was it?
22        A. I think it came from the head of personnel at that
23  time, wanted something done to him.
24        Q. Okay.
25        A. And I think that's the reason the chief did that.

Page 59

1         Q. When someone is placed, if you know, on
2  administrative leave, is that sometimes done just while
3  investigation is pending?
4         A. Yes.
5         Q. And what is the reason to place someone on
6  administrative leave while you are investigating, if you
7  know?
8         A. Most officers are put on administrative leave when
9  they're involved in any major incident. And that's so that
10  it can be investigated, not only by their department, but an
11  outside agency will come in and do an investigation if it's a
12  major.
13        Q. Do you know if the Beaumont ISD Police Department
14  did an investigation afterward into the incident?
15        A. Yes, they did.
16        Q. Do you know the outcome of that investigation? Do
17  you know the outcome of that investigation?
18        A. My understanding was that the -- the investigator at
19  that time, or that the investigator -- another investigator
20  was used to investigate it because our investigator's wife
21  was MeLisa Moore. Danny Moore was our investigator. Chief
22  did not want him investigating because of his wife's
23  involvement. So, he used Sergeant Payne, Eric Payne, to do
24  the investigation. And Payne did the investigation and found
25  that, in his opinion, that Officer Rivers didn't do anything

Page 60

1  wrong.
2         Q. I know that you've mentioned the administrative
3  leave being a disciplinary consequence. Is that just your
4  opinion, that it's a disciplinary consequence?
5         A. To be put on administrative leave?
6         Q. Uh-huh.
7         A. I'm not sure.
8         Q. Let me ask it a different way. I know that you've
9  mentioned that people are placed on administrative leave
10  following incidents --
11        A. Right.
12        Q. -- of a certain degree?
13        A. Right.
14        Q. And the -- it seems like the practice is, then, to
15  investigate into the incident; is that correct?
16        A. Right.
17        Q. And determine if there is any disciplinary action
18  needed afterward.
19        A. That's correct.
20        Q. So, the actual placement of someone on
21  administrative leave is not, in and of itself, a disciplinary
22  action, correct?
23        A. It's not a punishment, no.
24        Q. It is just a -- placing -- to remove someone from
25  the situation so that an investigation can be thoroughly

**Page 61**

1   done?
2       A. That's correct.
3       Q. So, when you said earlier that it was a disciplinary
4   consequence, did you misspeak?
5           MR. TERRELL: Objection to the form.
6       A. Yes.
7       Q. After the investigation, I know that we've talked
8   about that there was a grand jury hearing and there were
9   charges and it was looked into -- the incident was looked
10  into further. You were aware of that, correct?
11      A. Correct.
12      Q. Do you know what the outcome of that -- of that
13  investigation was?
14      A. I know the grand jury no-billed him, Officer
15  Rivers.
16      Q. And do you know at what point Officer Rivers was
17  removed from administrative leave?
18      A. No, I don't.
19      Q. Who made the decision to bring Officer Rivers back
20  from administrative leave?
21      A. I'm not sure. I don't remember.
22      Q. Would it have been the police chief's --
23          MR. TERRELL: Object to the form.
24      Q. -- decision?
25      A. Yes, it would have been.

**Page 62**

1           MR. TERRELL: Object to form.
2       Q. So, whose decision would it have been?
3           MR. TERRELL: Object to the form.
4       A. Should have been the police chief.
5       Q. But you weren't in on any of those decisions?
6       A. I was not.
7       Q. That's just your understanding of what the chain of
8   command would have been.
9       A. That should have been what happened.
10      Q. Chief Hall, after -- I know that -- after you have a
11  chance to kind of review incidents or see what happened, that
12  it's difficult to know -- well, it's easy to know in
13  hindsight how you might have done something different, but
14  it's sometimes difficult in the heat of the moment to know
15  what to do. Is that an accurate way of describing your
16  decision-making as a police officer, kind of like on the
17  streets? And I use that term to mean --
18          MR. TERRELL: Objection to the form.
19      Q. -- reality?
20      A. You have a split second, you know. It's not like
21  you get a second chance to go back and think, you know, would
22  I have done something different? Like I said, with all the
23  commotion going on, you have a split second to make a
24  decision. You hope that you make the right decision.
25          When you normally do make that decision, you,

**Page 63**

1   yourself, feel that that's the correct thing to do at that
2   time. You go back to look at it, you may think, man, could I
3   have done something different? You know. You start second
4   guessing yourself. You can't do that when you are in that
5   heated fight or situation. So, you have a split second. You
6   can't go back and change anything.
7           MR. TERRELL: Object to the responsiveness.
8       Q. Since Officer Rivers has been back on the force,
9   that's been quite some time, correct?
10      A. Correct.
11      Q. Have other officers -- have they told you their
12  opinions about Officer Rivers? Do people still request him
13  to come out and do work? Have there been any issues with him
14  being able to perform the work?
15      A. No. No issues whatsoever that I'm aware of.
16          MS. KALCHTHALER: I think that's all the questions I
17  have for you now.
18              (2:42)
19          MR. TERRELL: I have just a couple. I'm going to
20  try to do something here real quick.
21              EXAMINATION
22  BY MR. TERRELL:
23      Q. Now, you believed that SDW posed an imminent threat
24  to all these people. You said that, right?
25      A. Correct.

**Page 64**

1       Q. And at all times, he posed that threat up until the
2   time of the broken arm, the arm snapped?
3           MS. KALCHTHALER: Objection, form.
4       Q. You heard -- you've seen the video where he snapped
5   his arm, right?
6       A. No, I have not seen the video.
7       Q. Okay. I'll show it to you in a second, but go
8   ahead. We are going to need another tape now. I thought you
9   had seen it, okay.
10      A. No.
11      Q. I'll ask a question, and then we'll pull up the
12  video. There is -- most times at police forces when somebody
13  gets on administrative leave, it's not disciplinary, it's
14  with pay, correct?
15          MS. KALCHTHALER: Objection, form.
16      A. Yeah, I think -- I mean, every situation is probably
17  different, but normally it's with pay.
18      Q. And his was without pay, right?
19      A. His was.
20      Q. That's why you said it was -- you thought it was
21  disciplinary, right?
22          MS. KALCHTHALER: Objection, form.
23      Q. Or one of the reasons you said that.
24          MS. KALCHTHALER: Objection, form.
25      A. I never really understood why it was without pay. I

Page 65

```
1    think, my opinion, I think the chief was told to put him on
2    administrative leave without pay.
3        Q.  Well, and then the chief also had an opinion that he
4    did this thing improperly?
5        MS. KALCHTHALER:  Objection, form.
6        A.  He did.
7        Q.  And, so, if you combine the fact that the police
8    actually had an opinion and told people that he did the
9    maneuver improperly, along with putting him on administrative
10   leave without pay, that would lead you to believe it was
11   disciplinary, right?  And is that why you answered that way
12   before?
13       MS. KALCHTHALER:  Objection, form.
14       A.  No, what I thought was that due to the fact the
15   chief felt, apparently, it was improper procedure, that
16   that's -- that might have been another reason he put him on
17   without pay, because in his opinion, he thought he did
18   something wrong.
19       Q.  That's my point.  Now, you've never seen the tape,
20   right?
21       A.  No, I haven't.
22       Q.  I'm going to pull it up here.  Let's make sure.  I
23   tell you what, can we come over of here?
24           (OFF-THE-RECORD DISCUSSION)
25           (PLAYING VIDEO)
```

Page 66

```
1        Q.  (BY MR. TERRELL)  Now, Chief, this would be who?
2        A.  Officer Rivers.
3        Q.  And this would be who?
4        A.  MeLisa Moore.
5        Q.  Okay.  At this point, does he have the suspect
6    behind him?
7        MS. KALCHTHALER:  Objection, form.
8        Q.  Or --
9        A.  I think he's under him.
10       MS. KALCHTHALER:  Objection, form.
11       Q.  Here we go, watch.  Watch right here.  Okay.
12   Suspect is under him.
13       A.  Right.
14       Q.  The -- Ms. Moore is on top of him.
15       MS. KALCHTHALER:  Objection, form.
16       A.  Partially.
17       Q.  And at that point, he is under the two officers,
18   correct?
19       A.  Correct.
20       Q.  At that point, if he's on the ground face first, is
21   he posing a threat to all the people around him, at this
22   point right here, which is 13 seconds into the thing?
23       MS. KALCHTHALER:  Objection, form.
24       A.  At that point?
25       Q.  Yeah, at that point alone.
```

Page 67

```
1        A.  No, not while they are on top of him.
2        Q.  I didn't think so.  At that point -- okay.  We moved
3    a couple of seconds, 15 seconds.
4        A.  Right.  At that point?
5        Q.  At that point.
6        A.  It looks like he's trying to get out.  Then he would
7    have posed as a threat, if he gets loose.
8        Q.  At 14 seconds he does -- at 13 he doesn't, but at 15
9    he may.  Okay.  Right there.  He certainly doesn't pose a
10   threat when the officer has both hands on his shoulder and
11   he's down and Officer Moore is on top of him, does he?
12   According to --
13       MS. KALCHTHALER:  Objection, form.
14       A.  From what you see, no.
15       Q.  From what you see, that's 17, he does not pose a
16   threat to anybody, getting away, or -- because they are
17   subduing him right here, he's subdued?
18       MS. KALCHTHALER:  Objection, form.
19       A.  Okay.
20       Q.  Is that right?
21       MS. KALCHTHALER:  Objection, form.
22       A.  They have him.
23       Q.  They have him.  Okay.  Okay.  That was unnecessary,
24   you agree with me?
25       MS. KALCHTHALER:  Objection, form.
```

Page 68

```
1        A.  What?
2        Q.  When he pulled his arm up, like that.  Let's go
3    back.
4        A.  I didn't see it.
5        Q.  Okay.  I understand.  You've never seen this before.
6        A.  Right.
7        Q.  At 18, we agree he's subdued.  He's got him.
8        MS. KALCHTHALER:  Objection, form.
9        Q.  According to you?
10       MS. KALCHTHALER:  Objection, form.
11       A.  Yeah.  I mean, it looks like he has him.
12       Q.  Yeah, he has him, okay.
13       MS. KALCHTHALER:  Objection, form.
14       Q.  Right here, watch.  See it?
15       A.  Oh, right there.
16       Q.  That's unnecessary.
17       MS. KALCHTHALER:  Objection, form.
18       Q.  I mean, looking at this --
19       MS. KALCHTHALER:  Objection, form.
20       Q.  Let me ask the question.  Looking at this as the
21   police chief, are you going to say that it was necessary when
22   you said he had him subdued at 15, to jerk his arm all the
23   way up there and snap it?
24       MS. KALCHTHALER:  Objection, form.
25       A.  Okay.  What I'm saying is --
```

Page 69

1  Q. I'm saying in hindsight. I'm not saying at the
2  time.
3     MS. KALCHTHALER: Objection, form.
4  A. If I look at this right now, what I see is that the
5  young man is resisting, okay? He's not complying, compliance
6  by putting his arm behind his back like he's asked to do.
7  Now, but what you don't see in here, that I did see, his feet
8  kicking wildly.
9  Q. So, you are saying this was -- perfectly
10 necessary?
11 A. All I'm saying is that --
12    MS. KALCHTHALER: Objection, form.
13 A. -- you hope that this situation doesn't happen, but
14 you are trying to get his arm behind him. You are not
15 actually trying to bring that arm forward, okay? But when
16 you are struggling this way and the other person is putting
17 pressure this way, then, you know, your arm gets jerked.
18 Q. So, this wasn't something he did?
19    MS. KALCHTHALER: Objection, form.
20 Q. This was something that --
21 A. I'm saying --
22 Q. Let's watch it again. Let's watch it again. Snap.
23 Wow. You are saying that was necessary?
24    MS. BROUSSARD: Objection, form.
25    MS. KALCHTHALER: Objection, form.

Page 70

1  Q. Are you going to actually say that was necessary?
2     MS. BROUSSARD: Objection, form.
3     MS. KALCHTHALER: Objection, form.
4  A. What I'm saying is --
5  Q. Look, right there. Are you saying that was
6  necessary?
7     MS. BROUSSARD: Objection, form.
8     MS. KALCHTHALER: Objection, form.
9  A. What I'm saying is I don't think that was meant to
10 be, though.
11 Q. You are saying that's excessive?
12    MS. KALCHTHALER: Objection, form.
13    MS. KALCHTHALER: Objection, form.
14 A. I don't call that excessive. I mean, I don't -- I
15 don't call --
16 Q. That's fine. Pulling on -- pulling the young man's
17 arm over his head. I'm asking you the questions. I'm asking
18 the question --
19    MS. KALCHTHALER: Objection, form.
20 Q. -- you are entitled to give me an answer --
21    MS. KALCHTHALER: Let him finish.
22    MR. TERRELL: I'm asking a question.
23    MS. KALCHTHALER: He's allowed to finish.
24 Q. You are saying that pulling the young man's arm all
25 the way over his head after he's had him subdued about 10

Page 71

1  seconds earlier was not excessive, in your opinion? That's a
2  yes or no question.
3     MS. KALCHTHALER: Objection, form. Same
4  objection.
5  A. I'm saying that I don't think that was -- he meant
6  to bring his arm --
7  Q. My question was, when he has him subdued 10 seconds
8  earlier --
9     MS. KALCHTHALER: Objection, form.
10 Q. -- okay, and you said he was subdued, correct?
11    MS. KALCHTHALER: Objection, form.
12 A. He had -- he was on top of him.
13 Q. He had him subdued.
14    MS. KALCHTHALER: Objection, form.
15 Q. Ten seconds later, you think it's necessary for him
16 to pull his arm all the way over his head in the position
17 it's at on Number 24?
18    MS. KALCHTHALER: Objection, form.
19 A. I don't -- I'm not an expert. So, I just tell you,
20 I'm not an expert on that. So, I'm not telling you it's
21 necessary or not necessary.
22    THE VIDEOGRAPHER: I'm sorry. We've got to change
23 tapes.
24       (2:52)
25    (WHEREUPON, THERE WAS A BREAK IN THE PROCEEDINGS,

Page 72

1  AFTER WHICH THE TESTIMONY RESUMED AS FOLLOWS:)
2        (2:56)
3        (PLAYING VIDEO)
4  Q. (BY MR. TERRELL) Okay. Do you recall that?
5  A. I don't remember.
6  Q. You don't remember any of this, do you?
7  A. I mean, I don't remember that.
8     MS. KALCHTHALER: Objection, form.
9  A. I mean, I didn't see that arm like that.
10    MS. KALCHTHALER: Can we reflect -- just for the
11 record, did you slow that video down at the end?
12    MR. TERRELL: No, that's the way it is. There are
13 about three or four, cop breaks kids arm in school. I want
14 to see if this is the same one. That's an automatic. Let's
15 see if this is one that's not slowed down. No, that's a
16 different one.
17 A. You seen that one?
18 Q. No, huh-uh.
19 A. Yeah, look at that one. I saw that one.
20 Q. Here, I think this is the one. Okay. Do you
21 remember this part of the incident?
22 A. I was coming around. I do remember seeing her with
23 that young man there.
24 Q. Where are you right at this point?
25 A. Probably running.

Page 73

```
1     Q.  Okay.  Running?
2     A.  Yeah.
3     Q.  With Officer Rivers?
4     A.  No. no.
5     Q.  He's already there?
6     A.  I think Rivers was ahead of me.
7     Q.  Okay.
8     A.  Me and one of the principals.  And we are somewhere,
9   we are right over here when we saw.
10    Q.  Wish I could get this.  Now, at that point, they are
11  both on top of him.
12        MS. KALCHTHALER: Objection, form.
13    Q.  Did you see that?
14    A.  That's on the go-down, yeah.
15    Q.  And at that point, we said earlier, that -- that's
16  14, we saw that earlier.  And you said it looked like they
17  had him down at this point, right?
18        MS. KALCHTHALER: Objection, form.
19    A.  Yeah, they -- they have him, yeah.
20    Q.  Now, they've got him right there.
21        MS. KALCHTHALER: Objection, form.
22    Q.  Do you agree with that?
23        MS. KALCHTHALER: Objection, form.
24    A.  Yeah, he has him by the arm.  She's kind of laying
25  on half his body.
```

Page 74

```
1     Q.  He's subdued.
2         MS. KALCHTHALER: Objection, form.
3     Q.  At that point?
4     A.  They have him.  He's still resisting because I'm
5   standing right here.
6     Q.  But he's subdued.  Nothing else needs to be done at
7   this point to protect the health and welfare of anybody
8   around there at this point.  You agree with me?
9         MS. KALCHTHALER: Objection, form.
10    A.  He needed to be handcuffed.
11    Q.  Okay.  Handcuffed.
12    A.  Yeah.
13    Q.  Do you know if they ever handcuffed him?
14        MS. KALCHTHALER: Objection, form.
15    A.  No, I don't know.
16    Q.  Okay.  And you are saying that last effort was
17  required in order to properly subdue this young man?
18        MS. KALCHTHALER: Objection, form.
19    A.  Again, I'm not saying yes or no, okay.  I'm not an
20  expert at --
21    Q.  If you'll tell me you don't have an opinion as to
22  whether or not that was excessive or not excessive, then
23  we'll go on to something else.
24    A.  I don't have an opinion.
25        MS. KALCHTHALER: Objection, form.
```

Page 75

```
1     Q.  Okay.  So, you have no opinion after reviewing the
2   videotape if it was necessary for Officer Rivers to snap that
3   young man's arm up above his head and break his arm, right?
4         MS. BROUSSARD: Objection, form.
5         MS. KALCHTHALER: Objection, form.
6     A.  Again --
7     Q.  If you don't have an opinion, it's fine.  I just
8   need to know.
9     A.  No, I don't.
10    Q.  Huh?
11    A.  No. I don't.
12    Q.  Do you recall that, him screaming?
13    A.  Yeah, I can hear him screaming.
14    Q.  No.  Do you recall that?
15    A.  Him screaming?
16    Q.  Yeah, like that when you were there.
17    A.  Yes, I do remember him hollering.
18    Q.  Did you run to him?
19    A.  Actually, I'm standing right there.
20    Q.  Okay.  What did you do about him screaming?
21    A.  There was nothing I could do about the screaming.
22    Q.  Well, I mean, did you call the ambulance?  Did you
23  go get some ice?  You know, that's what I'm getting at.
24    A.  No, we did call an ambulance.
25    Q.  Okay.  Were there students there hollering, get off
```

Page 76

```
1   him, get off him?
2     A.  Students were hollering a lot.  I'm not sure --
3     Q.  It was a -- it was a combative situation?
4         MS. KALCHTHALER: Objection, form.
5     Q.  Would you say that?
6         MS. KALCHTHALER: Objection, form.
7     A.  As far as what, what are you --
8     Q.  Your definition of combative, or maybe a riot?
9     A.  It wasn't a riot.
10        MS. KALCHTHALER: Objection, form.
11    A.  It was a fight with a group of kids, which that's
12  what happens normally with a fight, they circle around.
13    Q.  You can agree from a regular, common sense
14  standpoint, that looks pretty bad when he snaps that arm?
15        MS. BROUSSARD: Objection, form.
16        MS. KALCHTHALER: Objection, form.
17    Q.  From looking at that video --
18    A.  Yeah, from looking at the video --
19    Q.  -- it looks like a horrible thing.
20        MS. KALCHTHALER: Objection, form.
21    A.  It looks bad.
22    Q.  It looks like he didn't need to pull his arm up over
23  his head, from the video?
24        MS. BROUSSARD: Objection, form.
25        MS. KALCHTHALER: Objection, form.
```

Page 77

1    A.  Again --
2    Q.  Look, and I'm asking. I'm --
3    A.  No, no.
4    Q.  I'm asking from just looking at the video, as a
5  parent, as a human being --
6    A.  Looking -- looking at that video, yes, somebody
7  would say that was maybe too forceful.
8    Q.  Over the top?
9    A.  Yeah.
10      MS. KALCHTHALER: Objection, form. He gets to
11  finish. He's still talking.
12    Q.  No, you can.
13    A.  Can I finish?
14    Q.  Yeah. Yeah, feel free.
15    A.  Okay. But, you know, what people don't see is that
16  he is resisting, okay? And when you are putting force -- it
17  would be like me grabbing your arm, trying to get it behind
18  you, and you are holding it. And then -- then you want to
19  give up and your arm is already moving in that direction, you
20  know, and it's going to go further --
21    Q.  Okay. So, that's what you think. You think it
22  was -- just a second. Let's get off this one. So, your
23  opinion is, then -- oh, crud. I got on the wrong one.
24      I'll just go -- your opinion is that from looking at
25  the video, you don't see the entire story?

Page 78

1      MS. KALCHTHALER: Objection, form.
2    A.  No, I do not see the entire story.
3    Q.  From looking at the video, it looks like it's way
4  excessive, right?
5      MS. KALCHTHALER: Objection, form.
6    A.  Looking at the video.
7    Q.  Looks like it's way excessive, correct?
8    A.  It does.
9    Q.  But you were there.
10    A.  Yes.
11    Q.  And you are saying that there were some things that
12  were going on that weren't captured in the video that would
13  mitigate the video?
14      MS. KALCHTHALER: Objection, form.
15    A.  Yes.
16    Q.  But from purely looking at the evidence we have on
17  the video, you, as a police chief, would say that's
18  excessive?
19      MS. KALCHTHALER: Objection, form.
20    Q.  From just looking at the video.
21      MS. KALCHTHALER: Objection, form.
22    A.  Looking at the video, yeah, if you were just looking
23  at the video.
24    Q.  Let me ask the question again so I got a clear
25  record because she is giving me the evil eye and she is bad

Page 79

1  about that. From looking at the video -- and I know you
2  haven't seen it before today, right?
3    A.  No, I have not.
4    Q.  From looking at the video, clearly it was excessive
5  force?
6      MS. KALCHTHALER: Objection, form.
7    Q.  From the video.
8      MS. KALCHTHALER: Objection, form.
9    A.  I'm not going to say it was excessive, but I'm going
10  to say that it looked bad.
11    Q.  It looked bad?
12    A.  In the video.
13    Q.  But you are saying that you were there and there
14  were other things going on that might have made this video
15  not show the whole story?
16    A.  That's correct.
17      MS. KALCHTHALER: Objection, form.
18    Q.  Okay. That's what I need to know.
19      MR. TERRELL: Thank you, sir. Appreciate it.
20      MS. KALCHTHALER: No further questions.
21      (3:06)
22      (CONCLUSION OF DEPOSITION)
23
24      * * * * *
25

Page 80

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TEXAS
2        BEAUMONT DIVISION
3  DARON JEROME WILLIS AND          *
   SUBRINNA LYNN COLEMAN,           *
4  Individually and as Next Friend of *
   SDW, a Minor,                    *
5        Plaintiffs                 *
                                    *
6  VS.                      * CA NO. 1:14-CV-00314
                                    *
7  BEAUMONT INDEPENDENT             *
   SCHOOL DISTRICT, ET AL,          *
8        Defendants                 *
9  _____
10
11      REPORTER'S CERTIFICATION
12      DEPOSITION OF DAVID HALL
13        JANUARY 30, 2015
14
15    I, STACY AMY BAKLIK, Certified Shorthand Reporter
16  in and for the State of Texas, hereby certify to the
17  following:
18    That the witness, DAVID HALL, was duly sworn by the
19  officer and that the transcript of the oral deposition is a
20  true record of the testimony given by the witness;
21    That the deposition transcript was submitted on
22  2/1/2015 to the witness or the attorney for the witness for
23  examination, signature and return to me within 20 days;
24    That the amount of time used by each party at the
25  deposition is as follows:

## Page 81

```
1        Mr. Terrell - 1 hour, 20 minutes
2        Ms. Kalchthaler - 20 minutes
3        That pursuant to information given to the
4   deposition officer at the time said testimony was taken, the
5   following includes counsel for all parties of record:
6        MR. B. TERRELL, Attorney for Plaintiff;
7        MS. KELLEY L. KALCHTHALER, Attorney for Defendant;
8        MS. FRANCES BROUSSARD, Attorney for Defendant.
9        That $741.00 is the deposition officer's charges to
10  the Plaintiff for preparing the original deposition
11  transcript and any copies of exhibits;
12       I further certify that I am neither counsel for,
13  related to, nor employed by any of the parties or attorneys
14  in the action in which this proceeding was taken, and further
15  that I am not financially or otherwise interested in the
16  outcome of the action.
17       Certified to by me this 1st day of February, 2015.
18
19
20
         STACY AMY BARLIK, CSR
21       Texas CSR No. 2680
         Firm Registration No. 30
22       Expiration Date: 12/31/2016
         P. O. Box 566
23       Nederland, Texas 77627
         (409)729-3838
24
25
```

## Page 82

```
1   WITNESS NAME: DAVID HALL
2   DATE OF DEPOSITION: JANUARY 30, 2015
3
4   PAGE LINE      CHANGE        REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24
25       I, DAVID HALL, have read the foregoing deposition
```

## Page 83

```
1   and hereby affix my signature that same is true and correct,
2   except as noted above.
3
4
5            DAVID HALL
6
7   THE STATE OF TEXAS:
8   COUNTY OF JEFFERSON:
9        Before me, _____, on this day
10  personally appeared DAVID HALL, known to me or proved to me
11  under oath or through_____ (description of
12  identity card or other document) to be the person whose name
13  is subscribed to the foregoing instrument and acknowledged to
14  me that they executed the same for the purposes and
15  consideration therein expressed.
16       Given under my hand and seal of office this
17  _____ day of _____, _____.
18
19
20            NOTARY PUBLIC IN AND FOR
21            THE STATE OF _____
22
23
24
25
```