IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DARON JEROME WILLIS *et al* | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:14-cv-00314 |
| | § | |
| BEAUMONT INDEPENDENT | § | |
| SCHOOL DISTRICT, *et al* | § | |
| Defendants | § | |

## DEFENDANT BEAUMONT INDEPENDENT SCHOOL DISTRICT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant Beaumont Independent School District ("BISD" or "District") files its Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, as follows:

1. **EVIDENTIARY OBJECTIONS**: The District objects to the YouTube.com video attached as Exhibit B, on the grounds that it has not been properly authenticated and Plaintiff has otherwise not laid the proper foundation for its admission. A YouTube video is self-authenticating as a certified domestic record of a regular conducted activity, but only if the party offering the video satisfies the requirements of the business-records hearsay exception. *Randazza v. Cox*, 2014 WL 1407378, at *4 (D. Nev. 2014) (attached as Exhibit G.) To meet this exception:

> [T]he evidence must be accompanied by "a certification of their custodian or other qualified person that satisfies three requirements: (A) that the records were 'made at or near the time by—or from information transmitted by—someone with knowledge'; (B) that they were 'kept in the course of a regularly conducted activity of a business'; and (C) that 'making the record was a regular practice of that activity.'

*Id*. at *4. The *Randazza* court refused to consider a YouTube video on summary judgment, because "Plaintiffs have not proffered the certificate of YouTube's custodian or other qualified

person verifying that the page had been maintained as a business record in the course of regularly conducted business activities." *Id*. Without that, said the court, the video had not been properly authenticated and could not be considered.[1]

2. The District objects to the newspaper articles contained in Exhibit G, on the grounds that they are hearsay.[2] Newspaper articles are hearsay and inadmissible to prove the truth of a matter. *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 556 (5th Cir. 1980); *McAllister v. New York City Police Dept*., 49 F.Supp.2d 688, 705 n.12 (S.D. N.Y. 1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom….")

3. **Excessive Force Analysis**: Plaintiffs' discussion of their excessive force claim does not really challenge Officer Rivers' conclusion that SDW needed to be restrained – which makes sense, since their own expert agreed that the fight "required the application of non-deadly force to separate the subjects and restrain [SDW] from harming himself or others." (BISD Ex. D, p. 7.) They don't really challenge the maneuver used by Officer Rivers, which their own expert conceded was a "standard pain compliance/control technique taught at law enforcement academies." (*Id*. at p. 8.) Instead, their main focus is on a second-by-second analysis of a YouTube video of the incident, and their conclusion that Officer Rivers should have known that "he had SDW" and just stopped trying to restrain him the instant they hit the ground – or at least split seconds afterwards:

---

[1] Any subsequent arguments referencing the video are made subject to this objection.

[2] Even if the Court were to consider the articles, they are not evidence of anything relevant to this lawsuit. One article (G-4) is about the excessive use of long-term substitute teachers in the District, which has nothing to do with this lawsuit. Another article (G-2) accuses a BISD officer of aggravated sexual assault, but does not say that the underlying incident has anything to do with the school district. Contrary to what Plaintiff says, a third article (G-3) does not accuse Chief Duncan "of altering another officer's report," but rather that the Chief asked one of his officers to change his report to, according to the Chief, more accurately reflect the incident. The fourth article (G-1) is about another lawsuit involving a BISD police officer drawing her gun, but simply summarizes the Plaintiff's allegations in the lawsuit, and fails to address the District's side of the dispute.

> Thirteen seconds into the youvideo, Chief Hall testified at the point when minor Plaintiff was face first on the ground with both officers are on top of him, he was no longer a threat to anyone around him. "They had him," he was subdued. Ten seconds later is when Officer Rivers snapped his arm.

(Response, pp. 6-7.)  This line of analysis completely ignores the Supreme Court's admonishment that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

    4.       Plaintiffs' conclusion that Chief Hall said "they had him" and then a full ten (10) seconds elapsed before SDW's arm was broken, which is based on viewing the video, completely misrepresents what Chief Hall was trying to say.  If you review the video and read what Chief Hall actually said, it is clear that the length of time was much, much less:

> Q. At that point, if he's on the ground face first, is he posing a threat to all the people around him at this point here, which is **13 seconds** into the thing?
> A. At that point?
> Q. Yeah, at that point alone.
> A. No, not while they are on top of him.
> Q. I didn't think so. At that point – okay. We moved a couple of seconds, **15 seconds**.
> A. Right. At that point?
> Q. At that point.
> A. It looks like he's trying to get out. Then he would have posed as a threat, if he gets loose.
> Q. At 14 seconds he does – **at 13 he doesn't, but at 15 he may**. Okay. Right there. He certainly doesn't pose a threat when the officer has both hands on his shoulder and he's down and Officer Moore is on top of him, does he? According to –
> A. From what you see, no.
> Q. From what you see, **that's 17**, he does not pose a threat to anybody, getting away, or – because they are subduing him right here, he's subdued?
> A. Okay.
> Q. Is that right?
> A. They have him.

(Pl. Ex. D, p. 66, l. 20 to p. 67, l. 22 (objections omitted, emphasis added).)  So Chief Hall did not testify that SDW was completely subdued at 13 seconds; even if he was "subdued" at that exact point in time, Chief Hall testified that he was trying to break loose at the 15 second mark and still posed a threat.  The "they have him" comment is referencing the 17 second mark -- and

a review of the video submitted by the Plaintiff as Exhibit B shows that SDW's arm was broken at the 19 second mark.  So Chief Hall did not admit that there was a 10 second period between when SDW was completely subdued and when his arm was broken; instead, his testimony establishes at most a 2 second gap between when "they had him," and when the arm was broken.

5. This whole line of analysis shows the dangers in trying to analyze what should have or could have happened while watching a video from the comfort of a conference room; as the Supreme Court has noted, whether a given amount of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Even the Plaintiff's attorney admitted that the questions he was asking about the video were based on hindsight:

> Q. Let me ask the question.  Looking at this as the police chief, are you going to say that it was necessary when you said he had him subdued at 15, to jerk his arm all the way up there and snap it?
> A. Okay.  What I'm saying is –
> Q. ***I'm saying in hindsight.  I'm not saying at the time***.

(Pl. Ex. D, p. 68, l. 20 to p. 69, l. 2 (objection omitted, emphasis added).)  Chief Hall also explained that the video itself didn't show the whole story:

> If I look at this right now, what I see is that the young man is resisting, okay?  He's not complying, compliance by putting his arm behind his back, like he's asked to do.  Now, but what you don't see in here, that I did see, his feet kicking wildly.

(*Id*. at p. 69, ll. 4-8.)  The video clearly shows only part of the story – and even then, it shows that Rivers' attempt to subdue SDW was a single incident occurring over a very short period of time.  Trying to second guess what he should have done based on a frame-by-frame analysis of a YouTube video is exactly what the Supreme Court has warned against doing.

6. **<u>Entity Liability Under Section 1983:</u>**  Plaintiffs' attempt to establish entity liability against the District under *Monell v. City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978) is curious.  They claim that prior to January 2013, Officer Rivers "had not been employed

as a peace officer, but had worked as a salesman for an electric company for the past 27 years" (Response, p. 6), but largely ignore the fact that from 1992 to 2003, he also served as a reserve deputy for the Jefferson County Sheriff Department on the Gang Task Force, conducting investigations and arrests. (BISD Ex. B, ¶ 2.) They state briefly that Rivers "never received training in a school-based law enforcement" (Response, p. 6), but ignore the fact that he had his Intermediate, Advanced, and Master Peace Officer certifications, over 5,000 hours of training and/or education, and had completed 16 hours of Crisis Intervention Training and at least 12 hours of Use of Force training. (BISD Ex. C-1.) In *Andrews v. Fowler*, 98 F.3d 1069 (8th Cir. 1996), the court found that requiring officers to complete the regular police academy training and then undergo 2 weeks of on-the-job training was constitutionally sufficient to defeat a failure-to-train claim. *Id.* at 1076-77. Additionally, Plaintiffs still bear the burden of showing that it was Officer Rivers' alleged lack of training that actually caused the injury to SDW. *Pineda v. City of Houston*, 291 F.3d 325, 334 (5th Cir. 2002). As the Supreme Court has noted:

> Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989); *see also Pineda*, 291 F.3d at 332 ("The inadequacy of training must be closely related to the injury.") Since Plaintiffs cannot show that any lack of "training in a school-based law enforcement" actually caused the injury to SDW, it is not surprising that they spend little time on this argument.

7.   Instead, Plaintiffs' main argument appears to be that the District failed to "ensur[e] an ample and effective police presence for each campus." (Response, p. 1.) In other words, they should have had more police at West Brook High School. Plaintiff's main support for this argument is a document issued in August 2013 by the Texas Legislative Budget Board

called the "Management and Performance Review" ("Review"), which was a 30,000-foot review of problems going on in the District. (Pl. Ex. E.)

8. Before turning to some of the specific issues raised by the Plaintiffs, it is important to recognize what the Review does **not** say. The Review does **not** say that the District failed to train its police officers – it does not address the training of officers at all. (*Id.*) Contrary to the Plaintiffs' insinuations, the Review also does **not** state that West Brook or any other school was understaffed with regards to security personnel. The Review does **not** make any specific finding that more security personnel were needed in general or at any specific schools.

9. Despite the fact that Plaintiffs entitled one of their argument sections "Failing to implement state recommended formal police staffing guidelines" (Response, p. 13), and later conclude "the summary judgment evidence shows that the district failed to implement the state recommended police staffing guidelines" (*id.*), the truth is that nowhere in the Review does it identify any "state recommended formal police staffing guidelines." To the extent the Plaintiffs are suggesting that there are some formal guidelines out there that state that "a public school with X number of students and Y number of discipline incidents should have a minimum of Z number of police officers," the Review does not identify any such guidelines. Plaintiffs have certainly not identified any actual "state recommended formal police staffing guidelines" that the District failed to adopt. They offer no testimony – expert or even anecdotal – about how many police officers a school the size of West Brook should have.

10. The Review does state on page 5 of the summary that "the district has not established staffing guidelines in several of the district's operations. This practice has resulted in an inefficient use of resources in safety and security, transportation, maintenance, and technology." (Pl. Ex. E, p. 5.) However, the Review never really explains why the police department needs "formal staffing guidelines," what problems exactly those guidelines are intended to rectify, or what the guidelines would address. In several places in the Review, it

appears that the main purpose for the "formal staffing guidelines" would not be to increase safety, but rather to cut down on overtime by changing the ratio of police officers to part-time security officers:

> The district determines security staffing using an informal system based on incidents for each school, enrollment, and student and community demographics. For example, the Police Department uses a combination of police officers and public safety officers (PSOs) to meet the security demands of the district and community. This staffing pattern and practices in the Police Department has contributed to overtime and supplement pay expenses.

(*Id*. at pp. 5-6; *see also* p. 263 (Finding and Recommendation No. 5; p. 275, 278.) Given that the Review was written by the "Budget Board," it is not surprising that its real focus was on fiscal issues, and not primarily on safety.

11. Plaintiffs claim that the reason why staffing issues were significant is because "in the 2011-12 school year, BISD incurred over 6,000 more student disciplinary incidents than its closest peer,"[3] (Response, p. 13), citing to page 276 of the Review. But if the Court looks at Figure 12-9 on page 277 of the Review, which is where the "6,000" figure was derived from, it will see that Plaintiff's suggestion that that figure alone mandates additional police officers at BISD is grossly unfounded. While it is true that BISD had over 6,000 more student disciplinary incidents than Tyler ISD, almost all of that discrepancy (over 5,250) is due to a single category: "Violated Local Code of Conduct" that led to "In School Suspension." (Pl. Ex. E, p. 277.) If you look at the list of "General Conduct Violations" that can lead to an in-school suspension on pages 6 to 9 of the 2011-2012 Beaumont ISD Student Code of Conduct (a true and correct copy of which is attached as Exhibit H), and you eliminate those that have their own categories in Figure 12-9 under "In School Suspension," you will see that most of them are the sort of low-level, non-violent violation of school rules that assistant principals, and not police officers,

---

[3] It should be noted that the Budget Board does not explain why it felt that DeSoto ISD, Galena Park ISD, Judson ISD, and Tyler ISD were the "closest peers" to BISD, especially given that DeSoto, at least, is less than half the size of BISD. (*Id*. at p. 275, Figure 12-7.) It is also somewhat statistically dubious to try to draw conclusions from a comparison of BISD to only 4 out of the more than 1,000 other school districts in Texas.

should be addressing.

12.     However, if you compare the respective number of violent student incidents, such as "Assault" and "Fighting/Mutual Combat," that are at issue in this case, you will see that BISD's figures were much more in line with the other district's figures:

| Discipline Action Reason | BISD | DeSoto ISD | Galena Park ISD | Judson ISD | Tyler ISD |
|---|---|---|---|---|---|
| In School Suspension 27-Assault-District Employee | N/A | | N/A | 7 | |
| In School Suspension 28-Assault-Nondistrict Employee | 11 | | | 14 | N/A |
| In School Suspension 41-Fighting/Mutual Combat | 296 | 41 | 256 | 311 | 305 |
| Out of School Suspension 27-Assault-District Employee | 9 | | N/A | 23 | 7 |
| Out of School Suspension 28-Assault-Nondistrict Employee | 25 | N/A | N/A | 33 | |
| Out of School Suspension 41-Fighting/Mutual Combat | 750 | 428 | 322 | 516 | 782 |
| DAEP 27-Assault-District Employee | 8 | | N/A | 22 | 6 |
| DAEP 28-Assault-Nondistrict Employee | 24 | | 7 | 38 | 5 |
| DAEP 41-Fighting/Mutual Combat | 56 | 29 | 9 | 44 | 8 |

The actual data for violent student misbehavior shows that BISD's figures were not only comparable to its "closest peers," in only 1 out of the 9 categories (DAEP--Fighting/Mutual Combat) did BISD rank highest – and if you adjust for the fact that DeSoto ISD is less than half the size of BISD, DeSoto would have ranked higher in that category as well.[4]

13.     So if the Board was looking at Figure 12-9 to determine whether it should hire more security officers than its "closest peers" to deal with the sort of violent student misbehavior at issue here, it would not be clear <u>at all</u> that it should do so.  But what Plaintiffs have failed to tell the Court is that BISD already was employing more security officers:

> Figure 12-7 compares Beaumont ISD with peer districts similar to Beaumont ISD that are used for comparison purposes for this review.  Figure 12-7 shows that Beaumont ISD employs ***almost twice as much*** security staff than any of its peers.  The district does cover a larger geographical area with more total facilities than its peers.

---

[4] BISD also compares favorably in many of the other more serious discipline categories, such as "Controlled Substance/Drugs," where it ranked significantly lower than **all** of the other school districts.

(*Id.* at p. 275 (emphasis added).) While BISD is a larger district (geographically) than the other school districts, Figure 12-7 shows that BISD had a lower "square miles per security officer" than DeSoto ISD and Tyler ISD, a lower "facilities per security officer" than all of the other districts, and a *significantly* lower "students per security officer" than all of the comparators. So the bottom line is that a school board looking at the Review would not be expected to draw the conclusion that it needed to hire more security officers.

14.   The Review, of course, does not address the issue of whether more security officers were needed at West Brook, and Plaintiffs grossly misrepresent the number of security officers at West Brook in March 2014, and how they responded to the rumor of a pending fight on March 7, 2014. Plaintiffs claim that "there was an insufficient number of police employees on the premises" of West Brook (Response, p. 14) and suggest throughout their Response that there were only two officers on duty there. (*Id.*, *see also* p. 2.) At one point, they go so far as to claim that Office Moore "was trying to keep up the whole campus by [herself]," and that Chief Hall wasn't doing anything to help her. (*Id.* at p. 14 (paraphrasing in original)). However, Moore actually testified that while at first she was the only officer at West Brook, the District added a second, and in her third year they added two more security officers as they slowly expanded the BISD Police Department. (Pl. Ex. A, p. 31, ll. 12-21.) She specifically testified that it was Chief Hall who was trying to get her more help. (*Id.* at p. 31, l. 22 to p. 32, l. 6.) At the time of the incident, there were actually five (5) security personnel assigned to West Brook: "it was actually two security officers outside, one inside walking the building. And then two police officers on campus." (*Id.* at p. 22, l. 10-12.) Given that BISD had 33 total officers (Pl. Ex. E, p. 275, Fig. 12-7), they had over 15% of their entire force assigned to West Brook. BISD was not ignoring the potential for problems at that campus.

15.   Plaintiffs then claim that on March 7, 2014, "when two lone officers were presented with an overwhelming riot-type situation," they knew in advance that a "big" fight

might occur after school, and yet the District did nothing to help the two officers. (Response, p. 14.) This is also categorically incorrect. Moore testified that after hearing there might be a fight that day, they actually had six (6) security officers ("me, Rivers, Officer Jackson, San Miguel, and then two other public safety officers") – 18% of the BISD force -- spread out across the front of the school, because that was where all the students flowed through to get to their cars and the buses. (Pl. Ex. A, p. 41, ll. 5-17.) There was also at least one assistant principal there who actually responded to the fight first, and while Moore agreed with the attorney that she was not the proper person to be dealing with "some sort of criminal situation," she quickly added, "But the principals, you know, they always break up fights." (Id. at p. 42, ll. 4-13.) The bottom line is that the District had a significant number of officers at West Brook on the day in question ready to address the rumored fight. To suggest that the District violated the Constitution because only two of those officers happened to be standing close enough to where the fight actually broke out to respond quickly is ludicrous.

16.     Although Plaintiffs also complain that the District did not have a "Safety and Security Committee" and that they did not have a "Multihazard Emergency Operations Plan" ("EOP") in compliance with state law (Response, pp. 16-19), they fail to explain how not having either "actually caused" the injuries to SDW. *City of Canton*, 489 U.S. at 391. The components of an EOP are pretty broad and generalized, *see* TEX. EDUC. CODE § 37.108, and Plaintiffs offer no evidence that a "proper EOP" would have included a section on "what to do when you hear a fight may break out on your campus." If it did, it would probably recommend that the school increase security presence and spread them out across the area where they think the fight is going to occur – which is what happened at West Brook on March 7, 2014.[5]

---

[5] The Review, which was issued in August 2013, actually noted that since the onsite visit, the District had been working with the Region V Education Service Center to update its EOP and address any missing sections. (Pl. Ex. E, p. 272.) Plaintiffs offer no evidence that at the time of the incident that forms the basis of this lawsuit, which was over 6 months after the Review was issued, there were still any problems with the District's EOP.

## II.

For the foregoing reasons, as well as the reasons more fully developed in the District's Motion for Summary Judgment, Defendant Beaumont Independent School District respectfully requests that the court grant it summary judgment, dismiss all claims against it, and grant it such relief, both at law and in equity, to which as it has shown itself entitled.

Respectfully submitted,

**THOMPSON & HORTON LLP**

By: /s/ Christopher B. Gilbert
　　　Christopher B. Gilbert
　　　Attorney-in-Charge
　　　State Bar No. 00787535
　　　Frances R. Broussard
　　　State Bar No. 24055218

3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Telephone: (713) 554-6744
Facsimile: (713) 583-7698

**ATTORNEYS FOR DEFENDANT BEAUMONT INDEPENDENT SCHOOL DISTRICT**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing has been served on all counsel of record through the Court's electronic filing system, on February 17, 2015.

B. Adam Terrell
Weller, Green, Toups & Terrell, LLP
Post Office Box 350
Beaumont, Texas  77704-0350

Kevin Laine
Attorney at Law
1104 Orleans Street
Beaumont, Texas 77701-3611
*Attorneys for Plaintiff*

James E. Byrom
Kelley L. Kalchthaler
Walsh, Anderson, Gallegos, Green & Trevino, P.C.
10375 Richmond Avenue, Suite 750
Houston, Texas  77042
*Attorneys for Defendant, Stephen Rivers*

  /s/ Christopher B. Gilbert
Christopher B. Gilbert